# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JANE DOE; JOHN DOE 1; and JOHN DOE 2, individually and on behalf of all other students similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 24-cv-4831 |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF REMOVAL

Defendant Northwestern University ("Northwestern"), by its attorneys Saul Ewing LLP, hereby gives notice of the removal of this action from the Circuit Court of Cook County, Illinois, to the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453. This Notice is based upon the original jurisdiction of this Court over the parties under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). In support thereof, Northwestern states as follows:

### Background

1.     On May 1, 2024, Plaintiffs Jane Doe, John Doe 1, and John Doe 2 ("Plaintiffs") filed a putative class action complaint in the Circuit Court of Cook County, Illinois – Chancery Division, Case Number 2024 CH 4027. A copy of Plaintiffs' Complaint is attached as <u>Exhibit A</u>.

2.     Northwestern was served with the Complaint on May 16, 2024. A copy of the Affidavit of Service is attached as <u>Exhibit B</u>. No substantive matters have been addressed in the Circuit Court of Cook County as of the date of this filing.

3.     Plaintiffs' Complaint alleges that Jane Doe is a current graduate student at Northwestern, John Doe 1 is a current first-year undergraduate student at Northwestern, and John Doe 2 is a current graduate student at Northwestern's Kellogg School of Business. (Compl. ¶¶ 13-15.) Each Plaintiff identifies as Jewish. (*Id.* ¶¶ 37, 42, 45.) Plaintiffs allege that in exchange for paying tuition to Northwestern, they expected Northwestern to provide a campus where they could be "free to safely move about." (*Id.* ¶ 1.)

4.     According to Plaintiffs, an "encampment" was created on April 25, 2024 at the center of Northwestern's Evanston campus. (*Id.* ¶ 3.) Plaintiffs contend that the encampment, which they call the "Liberated Zone," featured anti-Semitic signs, participants "openly glorifying Hamas," and protestors chanting anti-Semitic slogans. (*Id.* ¶¶ 3-8.) Plaintiffs allege that Northwestern's policies regarding student demonstrations required prior approval for use of public campus space (*id.* ¶ 20), did not allow installation of tents (*id.* ¶ 26), prohibited use of sound amplifiers (*id.* ¶ 27), and did not allow the posting of flyers or posters except in designated areas (*id.* ¶ 28). Plaintiffs claim that Northwestern breached an express or implied contract with them – and the putative class members – when it did not enforce these policies with regard to the encampment and thereby failed to provide them with a safe campus experience. (*Id.* ¶¶ 64-66.)

5.     Plaintiffs' single-count complaint for breach of contract seeks declaratory, injunctive, and monetary relief arising out of their allegations that Northwestern failed to "enforce its policies in an objectively neutral manner" and failed "to provide a safe campus environment" for Plaintiffs and other Jewish students. (*Id.* ¶¶ 64, 70.)

6.     Plaintiffs purport to represent a class of similarly situated Jewish students enrolled in Northwestern's Evanston campus for the 2023-24 academic school year who did not participate in the encampment. (*Id.* ¶ 49.) Plaintiffs assert that they, like all class members, paid tuition to

Northwestern based in part on Northwestern's promise that it would provide them a safe and secure campus. (*Id.* ¶ 54.) According to Plaintiffs, they were harmed in that they did not feel secure on campus, they were forced to miss classes as a result, and they fear future protests of a similar magnitude. Plaintiffs have asked for injunctive relief requiring that Northwestern "take immediate steps" to enforce its policies, hold violators of those policies accountable, and ensure that all students "feel safe on campus." (*Id.* ¶ 69.) Plaintiffs have also requested monetary relief in the form of attorneys' fees, costs, and other litigation expenses and a reimbursement of some (or all) tuition. (*See id.* ¶ 66 ("Had Plaintiffs known Northwestern would utterly fail to enforce any of its policies, Plaintiffs would not have chosen to enroll at Northwestern or pay it tens of thousands of dollars in tuition.")).

### Timeliness of Removal and Venue

7.      This Notice of Removal has been timely filed within thirty days of Plaintiffs' service of summons on Northwestern. *See* 28 U.S.C. § 1446(b).

8.      The Circuit Court of Cook County, Illinois is located within the United States District Court for the Northern District of Illinois, Eastern Division. *See* 28 U.S.C. § 93(a)(1). Thus, venue is proper in this Court under 28 U.S.C. § 1441(a) because the Northern District of Illinois "embraces" the state court in which the removed action is pending.

### Removal is Proper Pursuant to CAFA

9.      "A defendant has the right to remove a case from state to federal court when the federal court could exercise jurisdiction in the first instance." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510 (7th Cir. 2006) (*citing* 28 U.S.C. § 1441(a)). This Court's jurisdiction is measured at the time of removal. *Id.*

10.     CAFA vests federal district courts with original jurisdiction over any case which is: (a) a putative class action; (b) with a proposed class of at least 100 members; (c) that satisfies minimal diversity requirements; and (d) presents an amount in controversy of at least five million dollars in the aggregate, exclusive of interest and costs. 28 U.S.C. § 1332(d); *see also Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017); *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 676-77 (7th Cir. 2006). "CAFA was enacted to 'grant broad federal jurisdiction over class actions." *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 618 (7th Cir. 2012). Accordingly, CAFA should be read "broadly, with a strong preference that interstate class actions… be heard in federal court." *Hart*, 457 F.3d at 681.

11.     This action satisfies all four requirements of CAFA, and removal is therefore warranted. First, Plaintiffs' lawsuit is a putative class action and the proposed class contains at least 100 members. Plaintiffs themselves allege that Northwestern's Jewish population that did not participate in the encampment exceeds 100 students. (Compl. ¶ 51.) Additionally, while Northwestern does not require students to reveal their religious affiliations, Hillel International, a campus organization that serves more than 140,000 students at 850 colleges and universities, states that it serves 1,200 undergraduate and 1,000 graduate Jewish students at Northwestern. *See* Hillel - Northwestern University.[1] Even assuming some of these students participated in the encampment, there are well in excess of 100 individuals in the proposed class. Therefore, the first requirement for removal pursuant to CAFA is met.

12.     Second, minimal diversity is satisfied. Minimal diversity requires only that "at least one class member [be] diverse from at least one defendant." *Roppo*, 869 F.3d at 578. Northwestern is private research university with its principal place of business in Evanston, Illinois and,

---

[1] https://www.hillel.org/college/northwestern-university/

therefore, is a citizen of Illinois. Many members of the putative class are citizens of states other than Illinois; in fact, seventy one percent of Northwestern's students are citizens of states other than Illinois. *See, e.g.*, <u>Freshmen Home Region</u>.[2] As such, minimal diversity is met.

13.    Finally, the amount in controversy exceeds CAFA's requirement. To "determine whether the matter in controversy" exceeds five million dollars, "the claims of the individual class members shall be aggregated." 28 U.S.C. § 1332(d)(2); *see also Roppo*, 869 F.3d at 581. A "good faith estimate" of the amount of damages is enough, as this burden is a "pleading requirement, not a demand for proof." *Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 763 (7th Cir. 2011). The calculation considers the "amount required to satisfy plaintiff's demands in full on the day the suit begins" and a "good faith estimate of the stakes is acceptable if it is plausible and supported by a preponderance of the evidence." *Oshana*, 472 F.3d at 511. "Once the proponent of federal jurisdiction has explained plausibly how the stakes exceed $5 million, then the case belongs in federal court unless it is legally *impossible* for the plaintiff to recover that much." *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008) (citations omitted) (emphasis added).

14.    Plaintiffs' Complaint asks for injunctive relief requiring Northwestern to "take immediate steps" to enforce its policies, hold violators of those policies accountable, and ensure that all students "feel safe on campus." (Compl. ¶ 69.) Plaintiffs have also requested monetary relief in the form of attorneys' fees, costs, and other litigation expenses and a reimbursement of some (or all) tuition. (*See id.* ¶ 66.) If Plaintiffs were to recover fully, the amount recovered would easily exceed five million dollars.

15.    First, the costs of complying with prospective – injunctive – relief are taken into consideration in determining whether the jurisdictional threshold is met. *Keeling v. Esurance Ins.*

---

[2] https://www.northwestern.edu/provost/about/ir/data-book/v54/2.04-freshmen-home-region.pdf

*Co.*, 660 F.3d 273, 274 (7th Cir. 2011). In *Keeling*, the Seventh Circuit considered the costs to the defendant to comply with the requested injunctive relief, finding it to be at least $1.5 million. *Id.* It counted this amount in the calculation to determine whether the amount in controversy exceeded five million dollars. *Id.*

16.     In this case, Plaintiffs are asking for Northwestern to provide additional security in order to ensure that they feel safe on campus where, according to them, "these types of 'encampments' [will] continue until all 'demands' are met." (Compl. ¶ 65.) To provide the type of full time, all-encompassing security Plaintiffs seek, Northwestern would be required to pay overtime for its own police department and outsource staffing from additional vendor partners to cover any gaps. The costs for the overtime and outsourced staffing that Northwestern has already put in place since October 7, 2023 is approximately $531,200 and is currently anticipated to cost an additional $1,000,000-$2,000,000 on a going-forward basis. To fully provide the type of security and oversight Plaintiffs seek, Northwestern would also have to invest another $5,000,000-$7,000,000 in access control and camera technology capacity across campus. Accordingly, the cost of complying with the injunctive relief Plaintiffs seek, alone, exceeds CAFA's jurisdictional threshold.

17.     Second, the damages Plaintiffs seek in the cost of tuition reimbursement for the days of missed classes should also be included in the calculation. Plaintiff Jane Doe alleges that parts of her graduate program were "closed for several days because Northwestern could not guarantee the safety of those participating" and that she missed a seminar as a result of feeling unsafe. (Compl. ¶ 38.) Plaintiff John Doe 2 alleges that he would not have attended Northwestern *at all* had he known that Northwestern would allegedly not enforce its policies. (*Id.* ¶ 47.) Plaintiffs

further allege that all class members relied on Northwestern's alleged commitments regarding a safe campus in deciding to enroll and pay tuition. (*Id.* ¶ 62.)

18.     Northwestern estimates that the amount to reimburse putative class members for missed classes is over $400,000 per day for undergraduate students, approximately $30,000 per day for Kellogg graduate students, and approximately $337,616 per day for other graduate students. Even assuming the encampment lasted only five days, *see* Northwestern Students Israel Palestinians Protest,[3] that leaves damages in excess of $3,800,000 dollars.

19.     Specifically, for the spring quarter in 2024, Northwestern received approximately $179,600,000 in tuition from approximately 8,000 undergraduate students. *See* About Northwestern.[4] The average tuition amount for the spring 2024 quarter was thus approximately $22,450 per undergraduate student. The spring 2024 quarter ran from March 26, 2024 to June 1, 2024. *See* Academic Calendar.[5] Assuming five days of classes a week (and no class on Memorial Day), that is forty-eight academic days, with tuition being approximately $467 a day. Using a class size of 1,000 undergraduate students (or 12.5% of the student body) and assuming Plaintiffs would seek a full recovery, damages would be $467,000 a day. Graduate tuition for the Spring 2024 quarter was in excess of this amount. For example, quarterly tuition for a student earning a one-year MBA at Kellogg is $28,084 and $27,005 for a two-year MBA. *See* Kellogg Tuition.[6] 650 graduate students were enrolled in Kellogg for the Spring 2024 quarter. Assuming that a similar percentage of those students are Jewish, that leaves alleged damages of approximately $585 and $562 a day per student, or between $29,224 and $30,420 per day for class members enrolled in Kellogg.

---

[3] https://apnews.com/article/northwestern-students-israel-palestinians-protest-c3698198f13c986d6bc238ff96081f9d
[4] https://www.northwestern.edu/about/facts.html
[5] https://www.registrar.northwestern.edu/calendars/academic-calendars/
[6] https://www.kellogg.northwestern.edu/admissions/financial-aid/ft-fin-aid.aspx

20.     That does not account for non-Kellogg graduate students, which should also be included. For example, there are approximately 9,400 graduate students on the Evanston Campus, which would be approximately 752 such students in the proposed class. *See* Enrollment Statistics.[7] Using tuition from the largest of those schools – the Graduate School – damages would be $448 per day per student, or $337,616 a day for the class. *See* Tuition - the Graduate School.[8]

21.     In addition, attorneys' fees may be used in determining the amount in controversy. *See ABM Security Services, Inc. v. Davis*, 646 F.3d 475, 479 (7th Cir. 2011). Plaintiffs request that attorneys' fees be awarded. (Compl. *ad damnum*.) Accordingly, when considering the costs of complying with Plaintiffs' requested injunctive relief, the amount of potential tuition reimbursement, and attorneys' fees, the amount in controversy exceeds five million dollars and removal is appropriate.

---

[7] https://www.registrar.northwestern.edu/records/enrollment-graduation-statistics/enrollment-statistics-fall-2021.pdf
[8] https://www.northwestern.edu/sfs/tuition/graduate/the-graduate-school.html

## Conclusion

22.     As set forth above, this Court has original jurisdiction over this matter pursuant to CAFA. Northwestern submits this Notice of Removal without waiving any defenses to the claims asserted by Plaintiffs, without conceding liability, fault, damages or that Plaintiffs have pled a claim upon which relief could be granted, and expressly preserving all defenses to the Complaint, including that the matter is not appropriate for class resolution.

23.     A copy of this Notice of Removal is being served upon all known counsel of record as required by law, and a notice of removal is being filed with the Clerk of the Circuit Court of Cook County, Illinois simultaneously with this filing.

WHEREFORE, Northwestern University hereby gives notice of the removal of this action from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois, Eastern Division.

Dated: June 11, 2024                                    Respectfully submitted,

                                                        NORTHWESTERN UNIVERSITY

                                                        By: /s/ Elizabeth A. Thompson
                                                            One of its attorneys

James A. Morsch (james.morsch@saul.com)
Casey Grabenstein (casey.grabenstein@saul.com)
Elizabeth A. Thompson (elizabeth.thompson@saul.com)
Megan Warshawsky (megan.warshawsky@saul.com)
Saul Ewing LLP
161 North Clark Street, Suite 4200
Chicago, Illinois 60601
(312) 876-7100

Joshua W.B. Richards (joshua.richards@saul.com) – *pro hac vice* forthcoming
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
(215) 972-7777

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on June 11, 2024, she caused the foregoing **Notice of Removal** to be filed electronically with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which sent electronic notification to all parties who have appeared and are registered as CM/ECF participants in this matter, and sent notice via email to:

Steven P. Blonder (sblonder@muchlaw.com)
Joanne A. Sarasin (jsarasin@muchlaw.com)
Laura A. Elkayam (lelkayam@muchlaw.com)
Much Shelist, P.C.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606

/s/ Elizabeth A. Thompson

# EXHIBIT A

FILED
5/1/2024 3:00 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH04027
Calendar, 9
27509722

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JANE DOE, JOHN DOE I, and JOHN DOE 2, )
individually and on behalf of all other )
students similarly situated, )
                                   )     Case. No.       **2024CH04027**
                                   )
           Plaintiffs, )
                                   )
v. )
                                   )
NORTHWESTERN UNIVERSITY )
                                   )
           Defendant. )

## <u>COMPLAINT</u>

Plaintiffs, Jane Doe, John Doe 1 and John Doe 2 (collectively, "Plaintiffs") bring this class action breach of contract action against Northwestern University ("Northwestern"), and in support state as follows:

## INTRODUCTION

1.     In exchange for paying tuition, Plaintiffs expected Northwestern to fulfill a modest core promise it made to them and all other similarly situated, tuition-paying students: the conduct of your student peers and faculty will be governed by rules, and – once you enroll – you will be free to safely move about and avail yourself of our beautiful campus in accordance with those rules.

2.     Alas, the events of the past week laid bare Northwestern's gross breach of these promises. Rather than conduct the business of the campus in accordance with the clear rules of conduct that everyone signed up for, Northwestern ignored those rules, opting instead to facilitate, encourage, and coddle a dystopic cesspool of hate in the

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

school's lush green center, Deering Meadow.

3.     The "Liberated Zone" – an encampment created on April 25, 2024 by a registered student organization at Northwestern called Students for Justice in Palestine ("SJP") and their allies, and "inspired by actions at Columbia[1]," was erected in the center of Northwestern's Deering Meadow:



[**Figure 1**]

4.     Among the littering of tents, the encampment has featured participants

---

[1] A larger, similar encampment was set up at Columbia University in New York. That encampment has featured threats to Jews that "the 7th of October will be every day for you" and is or was led by a student who stated "Zionists do not deserve to live." *See* Complaint in *C.S. v. the Trustees of Columbia University in the City of New York*, Case No. 1:24-cv-03232 (S.D.N.Y, April 29, 2024); *see* https://www.instagram.com/p/C6O9TMXLVPC/?igsh=NTc4MTIwNjQ2YQ%3D%3D&img_index=1 (SJP Instagram post announcing the Liberated Zone).

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

openly glorifying Hamas[2] (the terror group that on October 7, 2023 committed the worst single day massacre of Jews since the Holocaust):



[**Figure 2**]

5.      The same Hamas-supporter shown above, who roamed freely through the encampment, also barked at passersby demanding they state whether they speak Hebrew. https://x.com/rich_goldberg/status/1783566767098384884?s=46 (last accessed May 1, 2024).

6.      The "Liberated Zone" also featured signs depicting Northwestern's Jewish president, Michael Schill, as a bloodthirsty devil:

---

[2] The participant's sweatshirt features an image of Abu Obaida, the spokesman of Hamas, a designated terrorist organization. https://www.state.gov/foreign-terrorist-organizations/ (last accessed May 1, 2024).

FILED DATE: 5/1/2024 3:00 PM   2024CH04027



[**Figure 3**]

7.      Demonstrators proudly chanted and depicted signs stating "From the River to the Sea," a genocidal slogan that calls for the elimination of the State of Israel (and, with it, the cleansing or subjugation of its millions of Jewish inhabitants):



[**Figure 4**]

4

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

8. And if there was any question, the encampment participants at Northwestern made clear that Jews were not welcome in the "Liberated Zone":



[**Figure 5**]

9. President Schill acknowledged these and other incidents of antisemitism at Northwestern in his April 30, 2024 video message to the community. https://www.youtube.com/watch?si=OtaStXBM33SIcFU1&v=HFFkYEEvW_s&feature =youtu.be ("Jewish students are feeling threatened and unsafe…when I see a Star of David with an 'X' on it, when I see a picture of me with horns, or when I hear that one of our students has been called a 'dirty jew' there is no ambiguity. This needs to be condemned…Jewish students must feel safe walking past Deering Meadow and everywhere on our campus.")

10. Yet the unapproved encampment, which, *ab initio*, violated multiple Northwestern policies, has been permitted to remain without consequence. As of April 30, 2024, the encampment remained standing.

11.     Rather than enforce its express and implied promises to Plaintiffs that Northwestern is a place of civility where free expression is governed by transparent, content-neutral codes of conduct, Northwestern twisted itself into a pretzel to accommodate the hostile and discriminatory encampment, legislate around it, and ultimately reward it.

12.     But Northwestern may not suspend its rules just because students and student organizations prefer to pitch tents and sleep on the central campus lawn, promoting discriminatory, terror-supporting ideologies until their "demands" are met. That's not the benefit of the bargain Plaintiffs struck. Northwestern's refusal to enforce its own policies is thus a breach of contract, in addition to being a total embarrassment to the broader Northwestern community.

## PARTIES

13.     Jane Doe is a graduate student at Northwestern.  She lives in Evanston, Illinois near the Northwestern campus.

14.     John Doe 1 is a first-year undergraduate student at Northwestern. He lives on campus in Evanston, Illinois.

15.     John Doe 2 is a graduate student at Northwestern's Kellogg School of Business ("Kellogg"). He lives in Evanston, Illinois near the Northwestern campus.

16.     Northwestern is one of the country's top private research and teaching universities, located in Evanston, Illinois. It has an undergraduate program, and multiple graduate programs, including the esteemed Kellogg School of Management.

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over Northwestern pursuant to sections 2-209(a)(1) and (7) of the Illinois Code of Civil Procedure because Northwestern

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

transacted business within Illinois and all parties made or performed a contract substantially connected with Illinois. 735 ILCS 5/2-209(a)(1), (7).

18.     Venue is proper in this Court under sections 2-101 of the Illinois Code of Civil Procedure. (735 ILCS 5/2-101).

## FACTS

### *The "Liberated Zone"*

19.     On April 25, 2024, Students for Justice in Palestine, a registered Northwestern student organization, along with its allies, erected an impromptu "encampment" at the center of Northwestern, on Deering Meadow. SJP self-describes the encampment as the "Liberated Zone."

20.     At the time the encampment began, Northwestern had policies governing student demonstrations and use of campus space, including a requirement that "[a]ll outdoor events and activities are subject to the requirements outlined in Northwestern's Outdoor Event Request Portal." https://policies.northwestern.edu/docs/demonstration-policy-final.pdf (Northwestern's Demonstration Policy). The Outdoor Event Request Portal contains content-neutral guidelines for the approval of student use of public campus space. The encampment did not obtain any approval for indefinitely setting up shop in the middle of campus. https://www.northwestern.edu/norris/events/event-management/outdoor-event-request-information.html (Northwestern's Outdoor Event Request Portal).

21.     Northwestern's Demonstration Policy also requires "participants in demonstrations or protests" to adhere to "other Northwestern policies…and state and federal law."

22.     Rather than endeavor to enforce its policies, Northwestern sat back and

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

allowed the protest to swell and become increasingly hostile to Jews including Plaintiffs.

23.     As described above, the encampment featured open support for Hamas. Upon information and belief, students were subject to chants of "Khabyar, Khaybar, Jews, Mohammed is coming." The encampment also involved grossly antisemitic signs and slogans that gradually popped up on the encampment's perimeter.

24.     Worse yet, select Northwestern faculty cancelled classes or attempted to hold them in the "Liberated Zone," either completely oblivious, indifferent, or callous, to how students like Plaintiffs experience the openly terror-supporting, hostile encampment. As an alternative, certain faculty members excused students from class (without penalty for classroom participation) if they wished to be present at the encampment.

### Northwestern issues ad hoc "interim" rules for the Liberated Zone

25.     Apparently under the belief that its current rules were inadequate to address the activities in the Liberated Zone (even as the encampment plainly violated Northwestern's policies already in place), Northwestern scrambled to adopt an "Interim Policy for Student Demonstrations and Other Expressive Activities on the Evanston Campus" which was described as an "addendum" to the Student Handbook. https://www.northwestern.edu/communitystandards/student-handbook/final-addendum-to-student-handbook-42524.pdf (Northwestern's "Interim Rules").

26.     The Interim Rules provided that "Any installation of tents or other temporary structures on University property is prohibited except for University-approved events."

27.     They also prohibited "any devices used to project or amplify sound on University property, including bullhorns" in the absence of advanced approval through

8

the Outdoor Event Request Form.

28.     The Interim Rules also prohibited "[a]ffixing flyers and postings to trees, benches, painted exteriors of campus buildings, campus sidewalks, and roadways," and provided that "flyers and postings may be affixed to lampposts and outdoor bulletin boards."

29.     The Interim Rules permitted non-permanent chalking on campus sidewalks not covered by overhangs, but prohibited chalking on "all other campus property, including buildings, walls, and stairs." The Interim Rules specifically prohibited using "paint, spray/adhesive chalks, markers, or inks…"

30.     Participants in the encampment violated every single one of these rules. The tents remained (and remain to date), students use amplified sound, and the adjacent campus spaces are covered in prohibited painting and flyering.

### *Rather than enforce rules, Northwestern negotiates with and capitulates to demonstrators*

31.     Instead of enforcing its rules, Northwestern elected to "negotiate" with the leaders of the Liberated Zone. Its "negotiations" culminated in an agreement publicized by Northwestern on April 29, 2024.

32.     The "Agreement" states that (for real, this time) the demonstrators would remove all tents at Deering Meadow (except for one "aid tent"), and that sound-amplifying     devices     must     be     approved     in     advance. https://www.northwestern.edu/leadership-notes/2024/agreement-on-deering-meadow.pdf (the "Agreement") (last accessed May 1, 2024).

33.     In exchange for the demonstrators following rules they are already required to comply with, Northwestern promised to "advise employers not to rescind job offers for

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

students engaging in speech protected by the First Amendment," and promised to fully pay the undergraduate tuition of five Palestinians. Northwestern also promised to "provide immediate temporary space for MENA/Muslim students," and to "provide and renovate a house for MENA/Muslim students…as soon as practicably possible."

34.     Northwestern also agreed to "provide a conduit to engagement with the Investment Committee of the Board of Trustees."

35.     In other words, Northwestern rewarded the protestors for breaking school policy left and right, rather than enforcing its code of conduct and policies governing student use of outdoor campus spaces.

36.     The "Agreement" is widely viewed by the protestors and their allies as just the "first step." As Northwestern's Students for Justice in Palestine stated in response to the Agreement: "there is always more to come." (Daily Northwestern, *BREAKING: Administrators, student demonstrators reach agreement to end encampment on Deering Meadow*, April 29, 2024); https://www.instagram.com/p/C6ZsZ5uPuEt/?igsh=NTc4MTIwNjQ2YQ== (Northwestern SJP Instagram, April 30, 2024) ("Once again, this agreement does not mark the cessation of our resistance but an essential and tactical pivot that enhances our leverage moving forward…") This promise of "more" was echoed by Representative Abdelnasser Rashid, who noted that "this will set a positive precedent for how universities should respond to student encampments…" (Rep. Rashid Updates, WhatsApp, April 29, 2024).

**Plaintiff Jane Doe's experience**

37.     Jane Doe is a Jewish student in a graduate program at Northwestern, who describes the campus atmosphere as lawless.

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

38.     On Thursday, April 25, 2024, the director of the program in which Jane Doe is enrolled announced that certain parts of the program would be closed for several days because Northwestern could not guarantee the safety of those participating.  As a result of being advised of safety concerns, Jane Doe also missed out on a seminar that she chose not to attend because her physical safety could not be guaranteed.

39.     Later that same day, Jane Doe was walking with a friend near the encampment when she was accosted by a demonstrator wearing a surgical mask and a keffiyeh.  The woman struck Jane Doe's friend with her protest sign and walked away.

40.     The following day, when Jane Doe was walking near the encampment, protesters screamed at her to "burn in hell." As Jane Doe left the area near the encampment, she was followed by the protesters.

41.     Simply put, the encampment and its surroundings instantly became a place of verbal and physical threats of violence for Jane Doe, and a site of antisemitic vitriol directed at her; as a result, she is on heightened alert when walking around campus and avoids certain campus areas and buildings where she does not feel safe.

### *Plaintiff John Doe 1's experience*

42.     John Doe 1 is a Jewish undergraduate student who has also been impacted by Northwestern's lack of enforcement of its own rules.

43.     John Doe 1 heard hateful expressions when walking near the encampment with his mother, who was visiting campus over the past weekend. This heightened John Doe 1's apprehension for his own safety on campus. John Doe 1 has previously been told on campus that Jewish students "should go back to Europe, to Poland!"

44.     Based on Northwestern's response to the encampment, and the antisemitism it features, John Doe 1 has concerns for his safety on campus. He is further

concerned that this will become a recurring pattern on campus every time the pro-Hamas demonstrators wish to ratchet up demands on the administration. His concern was exacerbated upon learning of Northwestern's Agreement with, and appeasement of, the demonstrators.

***Plaintiff John Doe 2's experience***

45. John Doe 2 is a Jewish graduate student attending the Kellogg School of Management. Over the past weekend, as he walked near the encampment with several friends, a protestor physically harassed one of the people in his friend group. Since then, John Doe 2 changes where he walks on campus, and does not feel safe to traverse the grounds; since his group of friends was physically threatened by the encampment, he has endeavored to avoid the location altogether.

46. Indeed, after his group was harassed by a demonstrator, John Doe 2 learned that one of the encampment demonstrators published a picture of John Doe 2 as he walked near the encampment, in a derogatory and harassing online post.

47. John Doe 2 made the decision to come to Kellogg because of its reputation as a great school. As a result of Northwestern's failure to enforce its policies as to the encampment, today he freely acknowledges that had he known of the antisemitism he would experience since arriving on campus, and of the fact that Northwestern faculty would openly embrace and encourage attendance at the encampment, he would not have enrolled in Kellogg; indeed, he intends to counsel prospective Jewish students to go elsewhere and he is contemplating transferring for next year to another school where the administration enforces its rules and antisemitism is less prevalent.

***Class allegations***

48. Pursuant to the Illinois Code of Civil Procedure, 735 ILCS S 5/2-801,

12

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

Plaintiffs bring claims on their own behalf and as representatives of all other similarly situated students for Northwestern's breach of contract.

49.     Plaintiffs seek class certification for the following Class of similarly situated individuals:

> All Jewish students currently enrolled at Northwestern's Evanston campus for the 2023-2024 academic school year who did not participate in the encampment.

The following people are excluded from the Class: (1) any judge presiding over this action and members of their families; (2) persons who properly execute and file a timely request for exclusion from the Class; (3) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; and (4) the legal representatives, successors and assigns of any such excluded persons.

50.     This action is properly maintained as a class action because the class is so numerous that joinder of all members is impracticable; there are questions of law or fact that are common to the class; the claims of Plaintiffs are typical of the class claims; and the named Plaintiffs will fairly and adequately protect the interests of the class.

51.     More specifically, the total number of putative class members exceeds one-hundred students.

52.     There is a commonality of interest in the substantial questions of law and fact concerning the class – specifically, whether Northwestern made express and/or implied agreements with the class members regarding the enforcement of campus policies and student codes of conduct, whether Northwestern breached those promises when it refused to enforce its policies as to only one select type of student group and, in fact, encouraged the repeated breaking of its own policies by capitulating to the demonstrators, and whether the class has been damaged by Northwestern's alleged

breaches.

53.     Plaintiffs will fairly and adequately protect the class member interests, and there are no known conflicts of interest between Plaintiffs and the class members. The undersigned counsel has extensive experience litigating class actions and prosecuting cases of this nature.

54.     The claims asserted by Plaintiffs are also typical of the class members they seek to represent. Plaintiffs paid tuition to Northwestern based in part on the same broken promises as did the class members.

55.     The common questions of law and fact predominate over any individual issues and class action treatment will allow a large number of similarly situated students to prosecute their breach of contract claims against Northwestern in an efficient manner and without the need for duplicitous litigation, which will waste individual and judicial resources.

**COUNT I**
**Breach of Contract**

56.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in Paragraphs 1-55 above.

54.     Illinois law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

55.     When Plaintiffs applied to Northwestern, they reviewed the school's brochures, catalogues, and other online materials to evaluate whether they wanted to pay for and participate in Northwestern's programs. Through these documents and other published materials made available to Plaintiffs, Northwestern made express and implied

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

FILED DATE: 5/1/2024 3:00 PM  2024CH04027

contractual commitments concerning the campus environment, the opportunity for all students to learn and thrive, and protections against abuse, harassment, intimidation, and discrimination.

56.     Specifically, Northwestern promised that campus conduct, generally, was governed by rules and that students were required to comply with those rules:

> Remaining a member of the Northwestern community requires a student to continuously comply with policies governing students' academic progress, social interactions, and personal behavior. As stated in one of the policies below, 'Student status at Northwestern is a privilege earned by meeting standards of academic performance and adherence to policies governing conduct.'

Northwestern's          Student          Handbook,          pg.          7 (https://www.northwestern.edu/communitystandards/student-handbook/final-23-24-student-handbook.pdf) (last accessed May 1, 2024).

57.     The Student Handbook goes on to make clear that Northwestern would enforce its rules:

> The exercise of individual rights by students and other members of the Northwestern community may not abridge the following rights, subject, in appropriate circumstances, to the University's right to take actions to protect the health and safety of the University community and its members, guests, and visitors…The right of the University to take actions reasonably determined to secure the rights outlined above and to assure that students, faculty, and staff may pursue their legitimate goals on University premises or at University functions without interference.

Student Handbook, pp. 7-8.

58.     In the Student Handbook, Northwestern also shares its "policy statement" on "Student Rights and Responsibilities" by noting that:

> At Northwestern University, life outside the classroom is an integral part of the educational process…The student's awareness of the extent of their rights and responsibilities is necessary to the exercise of responsibility within the University community. To further these objectives and in

recognition of students as members of the Northwestern University community, the University has adopted the following statement of policy:

1. Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin...in the educational programs or activities Northwestern operates..." [...]

12. Students are free to use campus facilities for meetings of recognized student organizations, subject to policies as to time and manner governing the facility. [...]

15. Students are free to assemble, to demonstrate, to communicate, and to protest, recognizing that freedom requires order, discipline, and responsibility and further recognizing the right of all faculty and students to pursue their legitimate goals without interference. [...]

18. it is recognized that every member of the community has the responsibility to conduct themselves in a manner that does not violate the rights and freedoms of others and has the responsibility to recognize the principles within this statement of policy.

59.     The Student Handbook also reflects that student organizations are subject to codes of conduct, too:

Groups of students and recognized student organizations (here after referred to as "organizations") are expected to comply with all University policies, including the Student Code of Conduct and all additional policies pertaining to groups and organizations.

58.     Northwestern also claimed to prohibit disorderly conduct, which its Student Handbook defines as including "engaging in behavior that objectively prevents a student or group of students from benefiting from a class, program or activity," and "significantly interfering with the functioning of the University." (Student Handbook, pg. 29).

59.     In its policy on "Civility, Mutual Respect, and Unacceptability of Violence on Campus," Northwestern indicates that it prohibits "demeaning, intimidating, threatening, or violent behaviors that affect the ability to learn, work, or live in the University environment." "These behaviors," Northwestern promises, "have no place in

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

the academic community." Northwestern promises that "a community member who has violated this policy is subject to disciplinary action…" (Student Handbook, pp. 78-79)

60. Northwestern's Title IX policies also prohibit discrimination and harassment. Northwestern defines "Discrimination" as "treating someone differently because of their race, color, religion, creed, national origin, [and] ethnicity," and "Harassment" as "verbal or physical conduct…that has the purpose or effect of substantially interfering with, limiting, or depriving a member of the community from accessing or participating in the academic…environment [or] creating an academic…environment that a reasonable person would consider to be intimidating, hostile, or offensive." (https://www.northwestern.edu/civil-rights-office/policies-procedures/policies/policy-on-discrimination-harassment-and-sexual-misconduct.pdf) (Northwestern's Title IX policy).

61. Northwestern's promises that the university is a place of civility that is governed in accordance with clearly communicated rules – including the rules that prohibited the "Liberated Zone" as a general matter, and certainly once it featured repeated hateful, terrorizing, and discriminatory slogans, chants, images, and signs – was an essential term of the contract between Plaintiff, the Class, and Northwestern.

62. Students like Plaintiffs and the Class took and continue to take Northwestern's commitments regarding the governance of the campus environment seriously when deciding whether to pay tuition, enroll in, and continue to attend Northwestern.

63. Northwestern specifically emphasizes its commitments in its publicly available materials and claims to pride itself on adhering to these values. By choosing Northwestern, Plaintiffs and the Class bargained for a campus environment that was

FILED DATE: 5/1/2024 3:00 PM 2024CH04027

governed by codes of conduct rather than mob rule. And they certainly did not bargain for the open, proud, and flowing efforts to intimidate Jewish community members in the center of campus under the guise of a "protest" which never complied with Northwestern's demonstration rules to begin with.

64. By allowing the above described uncontrolled, hateful "Liberated Zone" – an encampment which appears to be nothing more than students and faculty liberating themselves from Northwestern's rules without consequence, Northwestern failed to provide a safe campus environment governed by its own rules and therefore breached its contractual obligations.

65. Moreover, by negotiating with and capitulating to the demonstrators, Northwestern explicitly acknowledged its own breaches, and actively invited future lawless activities by rewarding them. In other words, Northwestern's entire course of action has all but guaranteed that these types of "encampments" continue until all "demands" are met.

66. Had Plaintiffs known that Northwestern would utterly fail to enforce any of its policies, Plaintiffs would not have chosen to enroll at Northwestern or pay it tens of thousands of dollars in tuition.

67. Plaintiffs complied with their obligations under their Agreement with Northwestern.

68. As a direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiffs have been injured and continue to sustain injury.

69. Accordingly, Plaintiffs demand that Northwestern take immediate steps to enforce its policies, hold violators accountable, and ensure that *all* students and faculty at Northwestern – not just the ones ostracizing Jews, celebrating Hamas, and calling for

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

Israel's destruction – feel safe on campus, as promised under the terms of Northwestern's agreement with Plaintiffs.

70.     An order of specific performance should issue requiring Northwestern to enforce its policies in an objectively neutral manner.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court enter an order:

A.   Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as class representatives of the Class, and appointing their counsel as Class Counsel;

B.   Declaring that Northwestern's actions, as described above, constitute breach of contract;

C.   Awarding injunctive and other equitable relief as described above and as necessary to protect the interests of the Class;

D.   Granting specific performance requiring Northwestern to comply with its policies;

E.   Awarding Plaintiff and the Class their reasonable attorneys' fees, costs, and other litigation expenses; and

F.   Awarding such other and further relief as equity and justice may require.

Respectfully submitted,

**JANE DOE, JOHN DOE 1 and JOHN DOE 2**,

By:     _/s/ *Steven P. Blonder*_

One of Their Attorneys

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

Date: May 1, 2024

Steven P. Blonder ([sblonder@muchlaw.com](mailto:sblonder@muchlaw.com))
Joanne A. Sarasin ([jsarasin@muchlaw.com](mailto:jsarasin@muchlaw.com))
Laura A. Elkayam ([lelkayam@muchlaw.com](mailto:lelkayam@muchlaw.com))
**MUCH SHELIST, P.C**.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 521-2000
Firm ID: 48345

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

FILED DATE: 5/1/2024 3:00 PM   2024CH04027

**Chancery Division Civil Cover Sheet**
**General Chancery Section**                                      (12/01/20) CCCH 0623

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JANE DOE, JOHN DOE 1, and JOHN DOE 2, individually
and on behalf of all other students similarly situated,

                                                        Plaintiff

          v.                                            Case No: _____

NORTHWESTERN UNIVERSITY,

                                                        Defendant

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

**Only one (1) case type may be checked with this cover sheet.**

| | | |
|---|---|---|
| 0005 ☐ Administrative Review | 0017 ☐ Mandamus | |
| 0001 ☒ Class Action | 0018 ☐ Ne Exeat | |
| 0002 ☐ Declaratory Judgment | 0019 ☐ Partition | |
| 0004 ☐ Injunction | 0020 ☐ Quiet Title | |
| | 0021 ☐ Quo Warranto | |
| 0007 ☐ General Chancery | 0022 ☐ Redemption Rights | |
| 0010 ☐ Accounting | 0023 ☐ Reformation of a Contract | |
| 0011 ☐ Arbitration | 0024 ☐ Rescission of a Contract | |
| 0012 ☐ Certiorari | 0025 ☐ Specific Performance | |
| 0013 ☐ Dissolution of Corporation | 0026 ☐ Trust Construction | |
| 0014 ☐ Dissolution of Partnership | 0050 ☐ Internet Take Down Action (Compromising Images) | |
| 0015 ☐ Equitable Lien | | |
| 0016 ☐ Interpleader | ☐ Other (specify) _____ | |

☒ Atty. No.: __48345__          ○ Pro Se 99500

          Steven P. Blonder, Laura A. Elkayam, Joanne A. Sarasin  Pro Se Only: ☐ I have read and agree to the terms of the Clerk's
Atty Name: __MUCH SHELIST, P.C.__                              Clerk's Office Electronic Notice Policy and
                                                              choose to opt in to electronic notice from the
Atty. for: __Plaintiffs__                                     Clerk's office for this case at this email address:

Address: __191 N. Wacker Drive, Suite 1800__

City: __Chicago__        State: __IL__       Email: _____

Zip: __60428__

Telephone: __(312) 521-2000__

Primary Email: __sblonder@muchlaw.com__

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 1

# EXHIBIT B



**SHERIFF'S OFFICE OF COOK COUNTY**
**AFFIDAVIT OF SERVICE**

| | | |
|---|---|---|
| **CASE NUMBER:** 2024CH04027 | **SHERIFF NUMBER:** 20107983 | **MULT. SER.:** 0 **DOC. TYPE:** CHAN |

**DIE DATE:** 05/25/2024 **RECEIVED DATE:** 05/02/2024 **FILED DATE:** 05/02/2024 **DIST:** 201

| | |
|---|---|
| **DEFENDANT:** NORTHWESTERN UNIVERSITY | **PLAINTIFF:** DOE, JANE AND JOHN 1 AND JOHN 2 |
| **ADDRESS:** 633 CLARK | **ATTORNEY:** MUCH SHELIST PC |
| **CITY:** EVANSTON | **ADDRESS:** 191 N WACKER DR |
| **STATE:** IL **ZIP CODE:** 60208 | **CITY:** CHICAGO |
| **ATTACHED FEE AMT:** | **STATE:** IL **ZIP CODE:** 60606 |
| **SERVICE INFORMATION:** C/O: OFFICE OF THE PRESIDENT, | |

**I CERTIFY THAT I SERVED THE DEFENDANT/RESPONDENT AS FOLLOWS:**

☐ **(1) PERSONAL SERVICE:** BY LEAVING A COPY OF THE WRIT/ORDER WITH THE DEFENDANT/RESPONDENT PERSONALLY, AND INFORMING DEFENDANT/RESPONDENT OF CONTENTS.

☐ **(2) SUBSTITUTE SERVICE:** BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT AT THE DEFENDANT'S USUAL PLACE OF ABODE WITH A FAMILY MEMBER OR PERSON RESIDING THERE, 13 YEARS OR OLDER, AND INFORMING THAT PERSON OF THE CONTENTS OF THE SUMMONS. ALSO, A COPY OF THE SUMMONS WAS MAILED TO THE DEFENDANT AT HIS OR HER USUAL PLACE OF ABODE ON THE DAY OF _ 20.

☐ **(3) UNKNOWN OCCUPANTS:** BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT NAMING "UNKNOWN OCCUPANTS" WITH A PERSON OF THE AGE OF 13 OR UPWARDS OCCUPYING SAID PREMISE.

☑ **(4) CORP/CO/BUS/PART:** BY LEAVING THE APPROPRIATE NUMBER OF COPIES OF THE SUMMONS, COMPLAINTS, INTERROGATORIES, JUDGMENTS, CERTIFICATIONS AND NOTICES WITH THE REGISTERED AGENT, AUTHORIZED PERSON OR PARTNER OF THE DEFENDANT CORPORATION ____COMPANY____BUSINESS _____ PARTNERSHIP ___

☐ **(5) PROPERTY RECOVERED:** NO ONE PRESENT TO RECEIVE ORDER OF COURT. ORDER POSTED IN PLAIN VIEW.

☐ **(6) S.O.S/D.O.I.:** BY LEAVING THE SUMMONS AND COMPLAINT WITH THE SECRETARY OF THE STATE/DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, AN AGENT OF SAID DEFENDANT LISTED ABOVE. ANY AGENT OF SAID CORPORATION NOT FOUND IN THE COUNTY OF COOK.

☐ **(7) CERTIFIED MAIL**

**\*\*\*\* COMPLETE THIS SECTION IF WRIT IS A THIRD PARTY CITATION/GARNISHMENT \*\*\*\***

☐ **(8)** AND BY MAILING ON THE ___ DAY OF _____ 20 _____ A COPY OF THE THIRD PARTY GARNISHMENT/CITATON SUMMONS AND NOTICE TO THE JUDGMENT DEBTOR'S LAST KNOWN ADDRESS AS INDICATED IN THE NOTICE WITHIN (2) BUSINESS DAYS OF SERVICE UPON GARNISHEE/THIRD PARTY DEFENDANT.

**THE NAMED DEFENDANT WAS NOT SERVED FOR THE GIVEN REASON BELOW:**

| | | |
|---|---|---|
| ☐ (01) NO CONTACT | ☐ (05) WRONG ADDRESS | ☐ (09) DECEASED |
| ☐ (02) MOVED | ☐ (06) NO SUCH ADDRESS | ☐ (10) NO REGISTED AGENT |
| ☐ (03) EMPTY LOT | ☐ (07) EMPLOYER REFUSAL | ☐ (11) OUT OF COOK COUNTY |
| ☐ (04) NOT LISTED | ☐ (08) CANCELLED BY PLAINTIFF ATTY | ☐ (12) OTHER REASON (EXPLAIN) |

**EXPLANATION:**

| | |
|---|---|
| WRIT SERVED ON: CAROLINE CAMIC | ATTEMPTED SERVICES |
| SEX: F RACE: WH AGE: 40 | Date Time Star # |
| THIS 16 DAY OF May 20 24 | |
| TIME: 11:27 AM | |

THOMAS J. DART,
SHERIFF, BY: /S/ PAPANICOLAOU, PETE #10959 , DEPUTY



**SHERIFF'S OFFICE OF COOK COUNTY**
**AFFIDAVIT OF SERVICE**

**CASE NUMBER:** 2024CH04027  **SHERIFF NUMBER:** 20107983  **MULT. SER.:** 0  **DOC. TYPE:** CHAN

**DIE DATE:** 05/25/2024  **RECEIVED DATE:** 05/02/2024  **FILED DATE:** 05/02/2024  **DIST:** 201

| Date | Time | Star # |
|------|------|--------|