**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| JANE DOE, JOHN DOE 1, JOHN DOE 2, and JOHN DOE 3, individually and on behalf of all other students similarly situated, | |
| | Case. No. 1:24-cv-04125-JRB-JC |
| Plaintiffs, | |
| | Honorable John Robert Blakey |
| v. | |
| NORTHWESTERN UNIVERSITY, | |
| Defendant. | |

**NORTHWESTERN'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED**
**CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) AND 12(B)(1)**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 4

I.     The Encampment ................................................................................................ 4

II.    Plaintiffs' Complaint ........................................................................................... 5

ARGUMENT ............................................................................................................... 7

I.     Because Northwestern Quickly And Peacefully Ended The Encampment, The Complaint Fails To Allege A Plausible Claim For Relief Under Rule 12(b)(6). .............. 7

II.    The Complaint Fails To Adequately Allege A Title VI Claim For Additional Reasons. ....................................................................................................... 10

     A.    The Complaint Fails to Adequately Allege the Elements of a Title VI Claim ........................................................................................................ 10

          1.    The Complaint Fails to Allege Direct Discrimination .............................. 10

          2.    The Complaint Fails to Allege Deliberate Indifference ........................... 12

     B.    The Allegations Unrelated To The Plaintiffs And To The Encampment Are Irrelevant To Plaintiffs' Title VI Claim. .............................................. 15

III.   Plaintiffs Fail To State A Breach Of Contract Claim For Additional Reasons. ............... 15

     A.    Northwestern Has Disclaimed Any Contractual Relationship In Its Student Handbook. .......................................................................................... 16

     B.    Plaintiffs Have Not Identified Specific And Enforceable Promises. ................... 18

     C.    Plaintiffs Cannot Assert A Breach Of Contract Claim Relating To Northwestern's Title IX Policy. ............................................................... 19

IV.   The Court Should Dismiss Plaintiffs' Requests For Injunctive Relief And Punitive Damages. ...................................................................................................... 20

     A.    The Court Should Dismiss Plaintiffs' Request For Injunctive Relief. ................. 20

          1.    The Court Should Dismiss Plaintiffs' Claim for Injunctive Relief Under Rule 12(b)(1) for Lack of Standing. .............................................. 20

          2.    The Court Should Dismiss the Mandatory Injunction Components of Plaintiffs' Requested Injunction. ....................................................... 22

     B.    The Court Should Dismiss Plaintiffs' Claim For Punitive Damages. .................. 23

CONCLUSION ............................................................................................................ 24

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Adusumilli v. Ill. Inst. of Tech.*, No. 97 C 8507, 1998 WL 601822 (N.D. Ill. Sept. 9, 1998) ........14

*ASARCO Inc. v. Kadish et al.*, 490 U.S. 605 (1989).......................................................................21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...........................................................................................7

*Bailey v. Worthington Cylinder Corp. & Worthington Indus., Inc.*, 90 F.4th 1193
    (7th Cir. 2024)..........................................................................................................................20

*Barnes v. Gorman*, 536 U.S. 181 (2002) .......................................................................................23

*Bennett v. Schmidt*, 153 F.3d 516 (7th Cir. 1998).........................................................................15

*Bimler v. Loyola Univ. of Chi.*, No. 84 C 5623, 1985 WL 609 (N.D. Ill. Apr. 12, 1985).............22

*Brown v. Rector & Visitors of the Univ. of Va.*, No. 3:07–CV–00030, 2008 WL 1943956
    (W.D. Va. May 2, 2008) ...........................................................................................................17

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) ..................................5

*Buschauer v. Columbia Coll. Chi.*, No. 20 C 3394, 2021 WL 1293829
    (N.D. Ill. Apr. 6, 2021) .............................................................................................................16

*C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536 (7th Cir. 2022)..............................................7, 15

*Carr v. Bd. of Regents of Univ. Sys. Of Ga.*, 249 Fed. Appx. 146 (11th Cir. 2007).....................17

*Clapper et al. v. Amnesty Int'l USA et al.*, 568 U.S. 398 (2013) ...................................................22

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)...............................................7, 10, 12

*Dep't of Com. v. New York*, 588 U.S. 752 (2019).........................................................................22

*Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) ..........................................................7, 10, 12, 13

*Doe v. McHenry Cnty. Coll.*, 2020 WL 5209834 (N.D. Ill. Sept. 1, 2020) ...................................19

*Gabrielle M. v. Park Forest–Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817
    (7th Cir. 2003)..........................................................................................................................12

*Gibson v. Walden Univ., LLC*, 66 F. Supp. 3d 1322 (D. Or. 2014)...............................................17

*Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873 (7th Cir. 2022) ....................................................18

*Hendrichsen v. Ball State Univ.*, 107 Fed. Appx. 680 (7th Cir. 2004) ..........................................13

*Kestenbaum v. President & Fellows of Harvard Coll.*, No. CV 24-10092-RGS,
2024 WL 3658793 (D. Mass. Aug. 6, 2024) ....................................................8, 9, 11

*Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718 (N.D. Ill. 2015)...........................................10, 11

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...........................................................21, 22

*Mathews v. Clark Atlanta Univ., Inc.*, No. 1:17-CV-2963-MLB, 2023 WL 2229670
(N.D. Ga. Jan. 13, 2023) ......................................................................................17

*Sojda on behalf of Sojda v. Chi. Bd. of Educ.*, No. 23 CV 4231, 2024 WL 1579065
(N.D. Ill. Apr. 11, 2024) ......................................................................................12

*Omokwale v. Baylor Univ. – Louise Herrington Sch. Of Nursing*, No. 3:23-CV-0354-X,
2024 WL 116428 (N.D. Tex. Jan. 10, 2024) ......................................................17

*Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058 (N.D. Ill. 2021)...........................................18, 19

*Polley v. Nw. Univ.*, 560 F. Supp. 3d 1197 (N.D. Ill. 2021).................................................18

*Raines v. Byrd*, 521 U.S. 811 (1997) ......................................................................................20

*Resendez v. Prance*, No. 3:16-CV-862-JVB-MGG, 2018 WL 3275615
(N.D. Ind. Jan. 26, 2018) ......................................................................................11

*Sierakowski v. Ryan*, 223 F.3d 440 (7th Cir. 2000) ......................................................21

*Simic v. City of Chi.*, 851 F.3d 734 (7th Cir. 2017) ......................................................20

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ......................................................................................20

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 2024 WL 3596916
(D. Mass. July 30, 2024)......................................................................................8

*T.E. et al. v. Pine Bush Cent. Sch. Dist. et al.*, 58 F. Supp. 3d 332 (S.D.N.Y. 2014)....................14

*Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517 (7th Cir. 2001) ..........................20

*Totten v. Benedictine Univ.*, No. 20 C 6107, 2021 WL 3290926 (N.D. Ill. Aug. 2, 2021) ...........11

*Trentadue v. Redmon*, 619 F.3d 648 (7th Cir. 2010) ......................................................14

*Truell v. Regent Univ. Sch. Of L.*, No. CIVA 2:04CV716, 2006 WL 2076769
(E.D. Va. July 21, 2006) ......................................................................................17

*U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003)...............................15

*UWM Student Ass'n v. Lovell*, 888 F.3d 854 (7th Cir. 2018) ......................................................21

*Williams v. Wendler*, 530 F.3d 584 (7th Cir. 2008) ........................................................................11

### STATE CASES

*Bilut v. Northwestern University*, 645 N.E.2d 536 (Ill. App. Ct. 1994) ....................................22, 23

*Bloch v. Hillel Torah N. Suburban Day Sch.*, 426 N.E.2d 976 (Ill. App. Ct. 1981).....................22

*Harris v. Adler Sch. of Pro. Psych.*, 723 N.E.2d 717 (Ill. App. Ct. 1999)....................................19

*Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 Ill. 2d 87 (1986) ..................................................23

### FEDERAL STATUTES

Rule 12(b)(1)..........................................................................................................................5, 20

Rule 12(b)(6)...........................................................................................................................7, 8

## **INTRODUCTION**

Plaintiffs are correct that the rise of antisemitism on college campuses is a serious problem that deserves the full attention of our country and its leaders. In late April of 2024, Northwestern University ("Northwestern" or the "University") found itself in the middle of this emotional firestorm as a result of the encampment erected at Deering Meadow on Northwestern's Evanston campus. The photographs, videos, and eyewitness accounts from the encampment leave no doubt that some protestors engaged in antisemitic rhetoric and harassment. This led Northwestern's President to declare with great concern that a "major antisemitic event" had occurred on Northwestern's campus.

But the occurrence of an antisemitic event does not create liability or justify civil litigation. Instead, the question for the Court is how Northwestern *responded* to that event. Unless it did so in a "clearly unreasonable" manner, Plaintiffs cannot satisfy the high bar set by Title VI. And the Complaint itself demonstrates clearly that the University acted swiftly and effectively in response to the encampment. The same holds with respect to Plaintiffs' breach of contract claim: when read together and as a whole, the only plausible inference from the allegations in the Complaint is that Northwestern adhered to its contracts when it negotiated a swift and peaceful end to the encampment.

As detailed in the Complaint, the encampment was erected on Thursday, April 25, 2024. Compl. ¶ 86. Northwestern issued multiple statements that same day warning students that the encampment was prohibited and that students would face discipline if they did not remove their tents. *Id.* ¶ 107. Northwestern also simultaneously began to engage in a dialogue with the protestors. *Id.* ¶¶ 107–08. Through these discussions, University officials were able to convince many demonstrators to remove their tents. *Id.* ¶ 107 n. 58. Northwestern also quickly issued interim rules designed to monitor and regulate the protest in real time. *Id.* ¶ 110. When protestors

refused to follow the interim rules or otherwise leave the encampment, Northwestern worked through the weekend to negotiate a peaceful end to the encampment, which was announced on Monday, April 29, 2024. *Id.* ¶ 114.

While Plaintiffs may not like the terms of the agreement Northwestern reached, there is no dispute that Northwestern acted quickly and decisively to end the encampment. The District of Massachusetts recently considered on a motion to dismiss the timing of MIT's response to a similar encampment erected around the same time (on April 21, 2024). Although it took three weeks to disband MIT's encampment, the court found that MIT responded reasonably through efforts that reflected a "consistent sense of purpose in returning civil order." MIT first attempted to negotiate a peaceful resolution of the encampment and then engaged in proportional discipline after those negotiation efforts proved unsuccessful. As a result of these combined efforts, MIT's encampment was eventually disbanded on May 10, 2024. The allegations in the Complaint demonstrate that, like MIT, Northwestern exhibited a "consistent sense of purpose in returning civil order." What is more, Northwestern was fortunate enough to resolve its encampment much more quickly and without using physical force. Given Northwestern's swift negotiated response, Plaintiffs fail to plausibly allege a claim to relief either under Title VI or for breach of contract.

Plaintiffs' Title VI claim also fails for multiple additional reasons. Plaintiffs have failed to state a claim for direct discrimination because the two "comparators" identified in the Complaint are too dissimilar to draw a meaningful comparison. Indeed, Plaintiffs' own allegations make clear that the encampment was an unprecedented event; it is not comparable to the handful of racist stickers and note that Northwestern found on its campus in 2019. Northwestern's statements regarding off-campus events like George Floyd's death are also not comparable.

Plaintiffs likewise fail to adequately allege the elements of a claim for deliberate indifference under Title VI. There are no allegations that Northwestern had actual knowledge of the specific instances of harassment directed at Plaintiffs. In addition, the harassment allegedly suffered by each individual Plaintiff was not "pervasive," a requirement to impose liability under Title VI. Plaintiffs generally allege that within a very short span of time, they (a) witnessed someone else get attacked, (b) had derogatory comments directed at them and/or (c) had their photo posted online in a derogatory fashion. While clearly inappropriate, these alleged actions do not rise to the level of severe and pervasive harassment under Title VI as a matter of law.

Plaintiffs' breach of contract claim also fails for additional reasons. As a threshold matter, Plaintiffs cannot premise their breach of contract claim on Northwestern's Student Handbook given that Northwestern expressly disclaimed any express or implied contractual relationship based on the terms of the Handbook. Further, statements of hope, intent, and desire in university policies are not actionable under Illinois law. Most (if not all) of the policies identified in the Complaint are aspirational statements that are too vague to be enforced. Plaintiffs have not identified any concrete, enforceable promises made by Northwestern to Plaintiffs that Northwestern failed to adhere to. Plaintiffs' breach of contract claim relating to Northwestern's Title IX policy is also not actionable as a breach of contract claim given that Northwestern is already obligated to follow Title IX.

Finally, the Court should dismiss Plaintiffs' request for injunctive relief and punitive damages. As to their claim for injunctive relief, Plaintiffs do not (and cannot) allege an immediate threat of future harm. Even further, Plaintiffs' sweeping request for injunctive relief does not just prohibit discriminatory conduct (that the University already prohibits); it includes several mandatory components that would effectively turn over the role of day-to-day administering and

3

monitoring the University to the Court.  That remedy is neither practicable nor permissible under Illinois law.  The Court should also dismiss Plaintiffs' claim for punitive damages since punitive damages are not available for Title VI or breach of contract claims.[1]

## BACKGROUND

### I.  The Encampment

Protestors erected an encampment on Thursday, April 25, 2024 on Deering Meadow at Northwestern's Evanston campus.  Compl. ¶ 86.  Northwestern immediately issued a statement announcing that the encampment was prohibited.  *Id*. ¶ 107.  The University warned that "[s]tudents who refuse to remove their tents will be subject to arrest and their tents will be removed by the University" and "[c]ommunity members who do not adhere to University policies will face discipline." *Id.*

Later that day, Northwestern announced that some demonstrators declined the school's offer to "peacefully assembl[e] if they comply with Northwestern policies, including removing tents and ceasing the use of bullhorns and speakers." *Id.* ¶ 108.  Northwestern stated that it would "move forward with other options to protect the safety of the community and the continued operations of the Evanston campus." *Id.*  Northwestern also issued Interim Rules designed to manage and monitor the encampment. *Id.* ¶ 110.  After discussions with University officials, some

---

[1] Plaintiffs have used pseudonyms in the caption and throughout the Complaint.  While Northwestern has no objection to Plaintiffs proceeding anonymously, the University has requested on several occasions over the past three months that counsel for Plaintiffs provide the identities of Plaintiffs under seal pursuant a confidentiality agreement so that Northwestern can evaluate whether they have standing for the purposes of this motion.  Plaintiffs' counsel did not reveal the identifies of Plaintiffs until this morning, the day that Northwestern's motion to dismiss was due.  Northwestern therefore reserves the right to file a motion challenging the standing of the Plaintiffs and/or subject matter jurisdiction of the Court through a subsequent 12(b)(1) motion.

demonstrators removed the tents.  *Id*. ¶ 107 n. 58.[2]

When protestors refused to disband entirely, Northwestern officials worked through the weekend to peacefully negotiate with the protestors and announced an agreement on Monday, April 29, 2024.  *Id.* ¶ 114.  The agreement provided that the demonstrators would peacefully disassemble and remove their tents.  *Id.* ¶ 115.  Following the end of the encampment, Plaintiffs also allege that a separate demonstration was later briefly held at the "Rock" on Northwestern's campus on May 1, 2024.  *Id.* ¶ 120.[3]

## II.    **Plaintiffs' Complaint**

Although Plaintiffs' legal claims must arise from their own experience at the encampment (and the Rock), the bulk of Plaintiffs' 66-page Complaint has nothing to do with those demonstrations.   The Complaint instead addresses a wide range of topics, including Northwestern's Qatar satellite campus, the history of Hamas, Al-Jazeera, posts made by Northwestern professors on social media, campus speeches made by third parties, protests at football games, and other events.  *Id.* ¶¶ 23–84, 126–160.

Plaintiffs' alleged experiences of antisemitism on the Evanston campus emerge only at the end of the Complaint and span just a few paragraphs.  Plaintiffs are four anonymous students.  Jane Doe is a graduate student who alleges that the unnamed director of her unnamed graduate program cancelled "certain parts" of the program for days as a result of the encampment.  *Id.* ¶ 162.   She

---

[2] Compl. ¶ 107 (citing https://www.northwestern.edu/leadership-notes/2024/northwestern-enacts-interim-addendum-to-student-code-of-conduct.html (last accessed August 26, 2024)).  The Court can take judicial notice of websites cited in Plaintiffs' Complaint.  *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

[3] Plaintiffs allege that posters promoting the demonstration were circulated throughout the campus. *Id.*  Plaintiffs further allege that a "woman organizing the demonstration wore a mask and refused to state her name except to confirm that she was a Northwestern student."  *Id.* ¶ 178.  The woman allegedly repeated the phrase "resistance is justified when people are occupied."  *Id.*

alleges that she missed a seminar due to safety concerns. *Id.* Jane Doe also alleges that a protestor struck her friend with a sign and that another protestor screamed at her to "burn in hell." *Id.* ¶¶ 162–64. John Doe 1 alleges that he "heard hateful expressions when walking near the encampment with his mother." *Id.* ¶ 168. John Doe 1 also alleges that he was told that Jewish students "should go back to Europe" prior to the encampment. *Id.* John Doe 2 alleges that he walked past the encampment with a group of friends and that a protestor harassed one of his friends in the group. *Id.* ¶ 171. John Doe 2 also alleges that one of the demonstrators posted his photo in a derogatory online post. *Id.* ¶ 172. John Doe 3 does not allege that he encountered the encampment but alleges that he "has had violent antisemitic rhetoric shouted at him on multiple occasions" since October 7, 2023. *Id.* ¶ 176. John Doe 3 also alleges that he walked past the May 1, 2024 demonstration at the Rock. *Id.* ¶ 178.

Plaintiffs seek compensatory and punitive damages, as well as sweeping injunctive relief, including a prohibitory injunction enjoining "Northwestern from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students." *Id*. at pp. 64–65. Plaintiffs also seek an expansive mandatory injunction ordering Northwestern to take the following actions:

(i)  investigate and take disciplinary measures, including termination, against deans, administrators, professors, and other employees responsible for the antisemitic abuse permeating Northwestern leading to the intolerable hostile environment, whether because they engaged in or permitted it;

(ii)  investigate and take disciplinary measures, including suspension or expulsion, against students and student organizations who engaged in such conduct;

(iii)  implement required antisemitism training for Northwestern community members;

(iv)  investigate all instances of antisemitism that occurred during Northwestern's 2023–2024 academic year; and

(v)     appoint a neutral expert monitor to oversee compliance with this Court's order, Northwestern anti-discrimination and -harassment policies, and Title VI.

*Id.*

## **ARGUMENT**

**I.     Because Northwestern Quickly And Peacefully Ended The Encampment, The Complaint Fails To Allege A Plausible Claim For Relief Under Rule 12(b)(6).**

A complaint must contain "sufficient factual matter" to state a facially plausible claim for relief, one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs' Title VI (Count I) and breach of contract (Count II) claims are not facially plausible because the Complaint makes clear that Northwestern acted reasonably and in compliance with the student policies cited in the Complaint when it quickly and peacefully ended the encampment at Deering Meadow.

As to Plaintiffs' Title VI claim, "[t]he Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999)).  "School officials are given broad latitude to resolve peer harassment and are liable only in 'certain limited circumstances.'" *Id.* (quoting *Davis*, 526 U.S. at 643).  "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*  In fact, the "response does not have to be perfect or even successful." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022).  As the Seventh Circuit recently explained, "a school district's response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *Id.*

With the recent rise in protests relating to the Israel-Hamas conflict, district courts have applied this deferential Title VI standard in class actions filed against other colleges dealing with

7

their own encampments. Those courts have explained that liability under Title VI requires "affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires." *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech*., 2024 WL 3596916, at *4 (D. Mass. July 30, 2024).

In *StandWithUs,* the court dismissed the plaintiffs' Title VI claim under Rule 12(b)(6) because the plaintiffs failed to adequately allege facts showing that MIT reacted to the encampment "in a clearly unreasonable manner" under Title VI. No. CV 24-10577-RGS, 2024 WL 3596916, at *5 (D. Mass. July 30, 2024). In that case, the protestors erected an encampment on campus on April 21, 2024. *Id.* at **1–2. MIT first attempted to end the encampment through peaceful negotiations. *Id.* When those peaceful efforts proved unsuccessful, MIT began to suspend and arrest trespassing students. *Id.*

MIT's disciplinary efforts eventually caused the encampment to disband, and by May 6, only five protestors remained. *Id.* That evening, however, there was another surge in the protests and the "encampment started anew." *Id.* This caused MIT to apply more police force, and the encampment was eventually ended on May 10, 2024. *Id.* Despite the fact that it took nearly three weeks to shut down the encampment, the court dismissed the plaintiffs' Title VI claim, finding "MIT's evolving and progressively punitive response largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students [and] shows that MIT did not react in a clearly unreasonable manner." *Id.* at *5.

That same court reached a different conclusion with respect to Harvard's response to its own encampment. *Kestenbaum v. President & Fellows of Harvard Coll*., No. CV 24-10092-RGS, 2024 WL 3658793, at *6 (D. Mass. Aug. 6, 2024). In *Kestenbaum*, the plaintiffs alleged that Harvard took little or no action to disband the encampment, which was erected on April 24, 2024

and "left undisturbed until May 14." *Id.* at *2. The court explained that the plaintiffs alleged that "Harvard did not respond at all" to some of the antisemitic threats and responded in an "indecisive, vacillating, and at times internally contradictory" manner. *Id.* at *6. The court contrasted this to MIT's response, which reflected a "consistent sense of purpose in returning civil order and discourse to its campus." *Id.* at *7.

Like MIT, Northwestern responded to the encampment with a "consistent sense of purpose in returning civil order." *Id.* In fact, as discussed above, Northwestern was able to resolve its encampment much more quickly than MIT and without resorting to physical force (as MIT tried to do). The Complaint demonstrates that Northwestern immediately denounced the encampment and threatened to discipline students who violated Northwestern's demonstration policies. Compl. ¶¶ 107–08. When the protestors refused to disband, Northwestern's leadership worked through the weekend to negotiate a peaceful end to the encampment within a few days. *Id.* ¶ 114. Northwestern's actions stand in contrast to those of Harvard, which allegedly allowed its encampment to continue undisturbed for weeks. As a result, in the absence of any alleged facts showing that Northwestern reacted to the encampment in a "clearly unreasonable" manner, the Court should reject Plaintiffs' efforts to "second-guess" Northwestern's peaceful resolution of the encampment.

Plaintiffs clearly take issue with the terms of the agreement reached, describing the terms as an "appalling" bundle of "goodies." *Id.* ¶ 115. But the terms of the agreement are beside the point: Plaintiffs may have strongly held views about what exactly Northwestern should have done in response to the encampment, but a Title VI plaintiff is not entitled to their desired or indeed *any* particular response to a hostile environment; the law requires only that the University provide a response that is not "deliberately indifferent." There is no plausible argument that ending the

encampment within days is "clearly unreasonable." Put another way, the touchstone is not by what means the University removes the hostile environment: rather, it is *that* the University removes the hostile environment. Plaintiffs' clear disagreement with how the hostile environment was removed is not material to the question of whether the University's response was "clearly unreasonable." And as the Supreme Court has made crystal clear, "in an appropriate case, there is no reason why courts, on a motion to dismiss . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis,* 526 U.S. at 648–49.

The Complaint fails to plausibly allege a breach of contract claim for the same reasons. The Complaint shows that Northwestern complied with both the letter and spirit of its written anti-discrimination policies when it immediately denounced any antisemitic rhetoric, threatened to discipline unruly protestors, and quickly shut down the encampment within days of its inception. Northwestern's decisive action ensured that Jewish and other students could enjoy full access to the Evanston campus, consistent with the policies identified in the Complaint.

## II.    The Complaint Fails To Adequately Allege A Title VI Claim For Additional Reasons.

### A.    The Complaint Fails to Adequately Allege the Elements of a Title VI Claim.

A plaintiff can allege a violation of Title VI in two different ways: (1) direct discrimination or (2) deliberate indifference. *Doe v. Galster*, 768 F.3d 611, 613–14 (7th Cir. 2014); *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015). Certain paragraphs of the Complaint appear to allege a claim for direct discrimination (Compl. ¶¶ 194–204), while others appear to allege a claim for deliberate indifference (*id*. ¶¶ 205–10). Plaintiffs' claims fail under both theories.

#### 1.    The Complaint Fails to Allege Direct Discrimination

To state a claim for direct discrimination under Title VI, plaintiffs must allege: (1) that they have been intentionally discriminated against on the grounds of race; and (2) that defendants are

recipients of federal financial assistance. *Khan v. Midwestern Univ.*, 147 F. Supp. 3d 718, 720 (N.D. Ill. 2015). A plaintiff can show intentional discrimination directly or indirectly. *Totten v. Benedictine Univ.*, No. 20 C 6107, 2021 WL 3290926, at *9 (N.D. Ill. Aug. 2, 2021). Plaintiffs do not allege intentional discrimination through the "direct method," which is shown through evidence relating "to the motivation of the decisionmaker responsible for the contested decision." *Id.* There are no allegations in the Complaint regarding the identity of any particular decisionmaker, much less their intent.

Plaintiffs instead attempt to establish intentional discrimination through the "indirect method" by reference to Northwestern's handling of allegedly comparable campus incidents. "To demonstrate discrimination under the indirect method, [a plaintiff] must show that she (1) is a member of a protected class; (2) met the school's legitimate expectations; (3) suffered an adverse action; and (4) was treated less favorably than similarly situated individuals outside of the protected class." *Id.* at *10. In *Kestenbaum*, the court rejected the plaintiffs' attempt to show direct discrimination through comparators when the plaintiffs attempted to compare Harvard's handling of the encampment to its banning of other "controversial speakers." 2024 WL 3658793 at *7 ("[P]laintiffs identify no comparably situated speakers or students who were treated more favorably when engaged in conduct analogous to that of the protestors.").

The law is the same in the Seventh Circuit: the identified comparators must be sufficiently similar. *Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008) (rejecting proposed comparison of punishment for hazing to accident at fraternity-sponsored camping trip). The number of comparators is also critical. "[T]hree cases is an inadequate sample on which to base an inference of discrimination when the cases are dissimilar." *Id.* at 588. Courts have therefore dismissed complaints alleging only a few dissimilar comparators. *Resendez v. Prance*, No. 3:16-CV-862-

11

JVB-MGG, 2018 WL 3275615, at *6 (N.D. Ind. Jan. 26, 2018) (dismissing complaint where the plaintiff presented "a small sample of dissimilar situations that cannot on their own support an inference of discrimination").

Plaintiffs identify only two comparators. Compl. ¶¶ 2–3. Plaintiffs first describe how Northwestern responded to students seeing "three stickers" and a "handwritten note" stating that "It's okay to be white" in 2019. *Id.* ¶ 2. Plaintiffs also discuss Northwestern's opposition to "anti-black racism" and "police brutality" in the wake of George Floyd's death. *Id.* ¶ 3. Neither of these incidents is an appropriate comparator for obvious reasons. Only the first one involved an actual on-campus incident. Plaintiffs identify no *actual* comparator students from either incident. And the stickers and handwritten note from 2019 are vastly different from the unprecedent protests at issue here. Even if these incidents were similar, Northwestern responded to all of them the same way: by immediately denouncing discrimination and harassment and taking swift action to ensure the safety of students. The Court therefore should dismiss Plaintiffs' direct discrimination claim.

### 2. The Complaint Fails to Allege Deliberate Indifference.

In order to state a claim for deliberate indifference, "[s]chool officials must have had 'actual knowledge' of harassment 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Galster*, 768 F.3d at 613–14 (quoting *Davis*, 526 U.S. at 650). To have actual knowledge of an incident, school officials must have witnessed it or received a report of it. *Gabrielle M. v. Park Forest–Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823–24 (7th Cir. 2003). "To impose liability, school officials' response to known harassment also must have been 'clearly unreasonable in light of the known circumstances.'" *Galster*, 768 F.3d at 614 (quoting *Davis*, 526 U.S. at 648); *see also Sojda on behalf of Sojda v. Chi. Bd. of Educ.*, No. 23 CV 4231, 2024 WL 1579065, at *2 (N.D. Ill. Apr. 11, 2024).

Plaintiffs cannot satisfy any of these elements. As discussed above, Northwestern's response to the encampment was not "clearly unreasonable" since it was able to peacefully resolve the disruption in just a few days. There are also no allegations that any of the Plaintiffs reported the discrimination they encountered to Northwestern such that the University had actual knowledge.

In addition, while Northwestern is sensitive to any harassment that Plaintiffs have encountered, the harassment described in the Complaint is not sufficiently "severe, pervasive, and objectively offensive" as a matter of law. *See Galster*, 768 F.3d at 613–14. In determining what constitutes severe and pervasive harassment, courts in the Seventh Circuit consider the "totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with . . . the student's educational opportunities." *Hendrichsen v. Ball State Univ.*, 107 Fed. Appx. 680, 684–85 (7th Cir. 2004) (holding that professor's actions towards student were not severe or pervasive enough because the inappropriate behavior lasted a few weeks, it did not physically threaten or humiliate the student, and the student admitted her academic performance was not affected by the professor's actions).

As a point of comparison, cases in which an environment was deemed sufficiently pervasive are markedly different from the allegations Plaintiffs make about their own experiences. For example, in *I.G. by & through Grunspan v. Jefferson County School District through Board of Education for Jefferson County School District*, the plaintiff alleged egregious conduct, including the repeated defacement of the plaintiff's father's car and school property with swastikas, derogatory jokes and remarks about the plaintiff's Jewish heritage, and that "[f]rom September through the remainder of 2016, students at the School 'were giving Nazi salutes and

13

verbally stating "Heil Hitler" as they walked through the halls during class breaks.'" 452 F. Supp. 3d 989, 995 (D. Colo. 2020) (citation omitted); *see also T.E. et al. v. Pine Bush Cent. Sch. Dist. et al.*, 58 F. Supp. 3d 332, 339–50 (S.D.N.Y. 2014) (describing alleged antisemitic conduct occurring over the course of years, including physical and verbal threats, school property vandalized with swastikas, and constant harassment such as the use of derogatory terms, derogatory name calling, and derogatory jokes about the plaintiff's Jewish heritage).

Moreover, "[a]s a general rule, unless the conduct is quite severe, a single incident or isolated incidents" cannot create a hostile environment. *Adusumilli v. Ill. Inst. of Tech.*, No. 97 C 8507, 1998 WL 601822, at **1, 4 (N.D. Ill. Sept. 9, 1998) (holding that student's allegation of sexual harassment against classmate was not severe or pervasive because student alleged a single instance of physical harassment). Further, courts will examine the impact the alleged harassment had on the student's performance. *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010).

Plaintiffs' allegations of harassment here do not rise to the "pervasive" level. Plaintiffs allege that they (a) witnessed someone else get attacked, (b) had derogatory comments directed at them and/or (c) had their photo posted online in a derogatory fashion. Compl. ¶¶ 161–180. None of the Plaintiffs were assaulted physically. None of the Plaintiffs were subjected to repeated harassment, given the short duration of the encampment. And none of the Plaintiffs allege that their grades suffered or that they were extensively absent from school.[4] As a result, Plaintiffs cannot state a claim for deliberate indifference.

---

[4] The only Plaintiff that alleges the allegations in the Complaint affected his coursework is John Doe 3 who alleges that "[h]is ability to participate in his education at Northwestern has suffered, and he is frequently unable to focus, study, and perform his course work to the best of his ability." *Id.* ¶ 180. These allegations are too conclusory to be credited.

**B.** **The Allegations Unrelated To The Plaintiffs And To The Encampment Are Irrelevant To Plaintiffs' Title VI Claim.**

In determining whether Plaintiffs have adequately alleged a plausible Title VI claim, the Court should disregard the lengthy allegations in the Complaint that are unrelated to the Plaintiffs and to the encampment. Plaintiffs' allegations regarding Northwestern's Qatar satellite campus, the history of Hamas, Al-Jazeera, and other wide-ranging issues in the first half of the Complaint are simply not relevant to whether Northwestern reasonably responded to the April 2024 encampment, especially since Plaintiffs only seek to represent students who attended the Evanston campus. *See, e.g.*, *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("Prolixity is a bane of the legal profession" and "[f]at in a complaint can be ignored."); *see also U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Surplusage can and should be ignored.").

To the extent Plaintiffs are attempting to assert a claim related to the risk of future harassment, they have failed to do so. In *C.S. v. Madison Metropolitan School District*, the Seventh Circuit explained that past alleged harassment under Title VI or Title IX is not actionable if it merely raised concerns for future harassment. 34 F.4th 536, 542 (7th Cir. 2022). Along the same lines, Plaintiffs' allegations about incidents that allegedly happened to other students, in past years, under other circumstances, are not relevant to Plaintiffs' Title VI or other claims.

## III. Plaintiffs Fail To State A Breach Of Contract Claim For Additional Reasons.

Plaintiffs' breach of contract claim fails for several additional reasons. In support of their breach of contract claim, Plaintiffs point to the following statements in Northwestern's Student Handbook:

- "Remaining a member of the Northwestern community requires a student to continuously comply with policies governing students' academic progress, social interactions, and personal behavior. As stated in one of the policies below, 'Student

status at Northwestern is a privilege earned by meeting standards of academic performance and adherence to policies governing conduct.'" Compl. ¶ 215.

- "The exercise of individual rights by students and other members of the Northwestern community may not abridge the following rights, subject, in appropriate circumstances, to the University's right to take actions to protect the health and safety of the University community and its members, guests, and visitors . . . ." *Id.* ¶ 216.

- "Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin . . . in the educational programs or activities Northwestern operates . . . ." *Id.* ¶ 217.

- "Students are free to use campus facilities for meetings of recognized student organizations, subject to policies as to time and manner governing the facility." *Id.*

- "Students are free to assemble, to demonstrate, to communicate, and to protest, recognizing that freedom requires order, discipline, and responsibility and further recognizing the right of all faculty and students to pursue their legitimate goals without interference." *Id.*

- "[I]t is recognized that every member of the community has the responsibility to conduct themselves in a manner that does not violate the rights and freedoms of others and has the responsibility to recognize the principles within this statement of policy." *Id.*

- "Groups of students and recognized student organizations (here after referred to as "organizations") are expected to comply with all University policies, including the Student Code of Conduct and all additional policies pertaining to groups and organizations." *Id.* ¶ 218.

Plaintiffs also point to sections of Northwestern's Student Handbook that prohibit disorderly conduct. *Id.* ¶¶ 219–20. Finally, Plaintiffs cite Northwestern's Title IX policy, which prohibits discrimination and harassment on the basis of "race, color, religion, creed, national origin, [and] ethnicity." *Id.* ¶ 221. None of these statements are actionable.

A.    **Northwestern Has Disclaimed Any Contractual Relationship In Its Student Handbook.**

A student cannot assert a breach of contract claim based on a student policy that expressly disclaims any contractual relationship. *See Buschauer v. Columbia Coll. Chi.*, No. 20 C 3394, 2021 WL 1293829, at *2, 5 (N.D. Ill. Apr. 6, 2021) (finding no enforceable contract where course

16

catalog included a disclaimer that it "is not a contract") (citation omitted); *see also Carr v. Bd. Of Regents of Univ. Sys. Of Ga.*, 249 Fed. Appx. 146, 150–51 (11th Cir. 2007) (undergraduate catalog did not constitute a contract because of express disclaimer); *Omokwale v. Baylor Univ. – Louise Herrington Sch. Of Nursing*, No. 3:23-CV-0354-X, 2024 WL 116428, at **1–3 (N.D. Tex. Jan. 10, 2024) (dismissing contract claim where student handbook stated that "[t]he provisions of the Student Policies and Procedures do not constitute a contract, express or implied.") (citation omitted); *Mathews v. Clark Atlanta Univ., Inc*., No. 1:17-CV-2963-MLB, 2023 WL 2229670, at **14–15 (N.D. Ga. Jan. 13, 2023) (holding that no contract arose from the university's student handbooks where the "handbooks all expressly state they are not to be regarded as a contract between the students and [the university].""); *Gibson v. Walden Univ., LLC*, 66 F. Supp. 3d 1322, 1324–25 (D. Or. 2014) (holding that no contract existed where the university's student handbook expressly stated that "[n]either the provisions of this document, nor the acceptance of students through registration and enrollment in the university, constitutes a contract or an offer of a contract.") (citation omitted); *Brown v. Rector & Visitors of the Univ. of Va.*, No. 3:07–CV–00030, 2008 WL 1943956, at *6 (W.D. Va. May 2, 2008) (holding that student handbook did not constitute a binding contract because it "explicitly disclaims that it is not to be construed as a contract between the student and the University."); *Truell v. Regent Univ. Sch. Of L.,* No. CIVA 2:04CV716, 2006 WL 2076769, at **6–7 (E.D. Va. July 21, 2006) (dismissing breach of contract claim where the university's catalog stated "this catalog does not establish contractual relationships.") (citation omitted).

As in the foregoing cases, Northwestern disclaimed any contractual relationship in its Student Handbook. The beginning of the Student Handbook states in bolded italics that "[t]he provisions of this Student Handbook do not constitute a contract, expressed or implied, between

any students, prospective and/or matriculated, and Northwestern University."[5] The Court should therefore dismiss any breach of contract claim based on the Student Handbook.

**B.      Plaintiffs Have Not Identified Specific And Enforceable Promises.**

In addition, Plaintiffs have not identified a specific and enforceable promise. To plausibly state a breach of contract claim under an express or implicit contract theory, a student must point to an identifiable contractual promise. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883-84 (7th Cir. 2022). For an implied contract, "the student's complaint must be specific about the source of the implied contract, the exact promises the university made to the student, and the promises the student made in return." *Id.* at 883 (quoting *Charleston v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 741 F.3d 769, 773 (7th Cir. 2013)).

Statements of intention, hope, and desire, however, are not enforceable. As one court explained, "[t]hough a student handbook may contain material that forms part of the contract between a university and its students, only the handbook's 'specific promises' become part of the contract, not its 'expression[s] of intention, hope or desire.'" *Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058, 1064 (N.D. Ill. 2021) (citing *Abrams v. Ill. Coll. of Podiatric Med.*, 395 N.E.2d 1061, 1065 (Ill. App. Ct. 1979); *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *7 (N.D. Ill. Feb. 4, 2019)). Accordingly, "'definite' and 'concrete promise[s]' must be distinguished from 'unenforceable expression[s].'" *Id.* (quoting *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *7 (N.D. Ill. Feb. 4, 2019)). *See also Polley v. Nw. Univ.*, 560 F. Supp. 3d 1197, 1207 (N.D. Ill. 2021) (granting motion to dismiss where students

---

[5] Northwestern's Student Handbook, pg. 5
(https://www.northwestern.edu/communitystandards/student-handbook/final-23-24-student-handbook.pdf) (last accessed August 22, 2024).

pointed to aspirational "promises" such as "an environment with limitless possibilities to learn, make a difference, and define your path for future success").

Most (if not all) of the provisions quoted in the Complaint are aspirational statements of "intention, hope or desire." *Oyoque*, 520 F. Supp. 3d at 1064. For example, many of the statements above stand for the simple proposition that Northwestern prohibits discrimination and encourages positive student interactions. These policy goals are simply too vague and aspirational to be contractually enforced. *Id.* To hold otherwise would expose colleges to limitless liability.

Besides being aspirational in nature, the provisions of Northwestern's policies cited above do not create enforceable contractual obligations on the part of Northwestern. For example, the policies obligating students to conduct themselves consistent with Northwestern's Code of Conduct run from the students to Northwestern, not vice versa. If students engage in expressive conduct that crosses the line, Northwestern has the "right" to discipline those students for violating the Code of Conduct or to take other action to protect the health and safety of the University community. Plaintiffs here improperly seek to convert that "right" into a contractual obligation owed to them by Northwestern. At bottom, Plaintiffs have not identified a specific and enforceable contractual obligation running from Northwestern to the Plaintiffs that the University breached.

### C. Plaintiffs Cannot Assert A Breach Of Contract Claim Relating To Northwestern's Title IX Policy.

Finally, Plaintiffs cannot premise a breach of contract claim on a promise in Northwestern's Title IX policy. Students cannot base a breach of contract claim on an obligation that a school is already legally obligated to perform. That is because "[t]he promise to do something one is already legally obligated to do is not consideration, and no new obligation is thereby created." *Harris* v. *Adler Sch. of Pro. Psych.*, 723 N.E.2d 717, 722 (Ill. App. Ct. 1999). *See also Doe v. McHenry Cnty. Coll.*, 2020 WL 5209834, at *5 (N.D. Ill. Sept. 1, 2020). Since

Northwestern is already obligated to comply with Title VI, Plaintiffs cannot assert a breach of contract claim against Northwestern for breach of Northwestern's Title VI policy.

**IV.** **The Court Should Dismiss Plaintiffs' Requests For Injunctive Relief And Punitive Damages.**

    **A.** **The Court Should Dismiss Plaintiffs' Request For Injunctive Relief.**

        **1.** **The Court Should Dismiss Plaintiffs' Claim for Injunctive Relief Under Rule 12(b)(1) for Lack of Standing.**

The Court should dismiss Plaintiffs' sweeping request for injunctive relief because Plaintiffs fail to allege any facts clearly demonstrating that they face an immediate threat of future injury. To establish a claim for injunctive relief, a plaintiff must allege the following three elements: "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017). For prospective relief, a plaintiff must demonstrate a "real and immediate threat of future injury." *Id.* The alleged injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). "[S]peculation that [plaintiff] may suffer the same injury at some time in the future" is insufficient to confer standing for prospective injunctive relief. *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001).

As an initial matter, most of Plaintiffs' allegations describe harassment and antisemitic conduct suffered by other students—not Plaintiffs. While Northwestern takes those allegations seriously, they are insufficient to confer standing because they fail to establish Plaintiffs' own "personal stake" in the dispute. *Raines v. Byrd*, 521 U.S. 811, 819 (1997); *see also Bailey v. Worthington Cylinder Corp. & Worthington Indus., Inc.*, 90 F.4th 1193, 1197 (7th Cir. 2024) (stating that a plaintiff must allege a "concrete, particularized" injury to establish standing). Allegations of injuries suffered by other students that did not result in harm to Plaintiffs fail to

establish particularized harm to Plaintiffs. *ASARCO Inc. v. Kadish et al.*, 490 U.S. 605, 615 (1989) (holding that plaintiff cannot surmount standing by "aggregating the allegations of different kinds of plaintiffs.").

Second, with respect to the alleged injuries *personally* suffered by Plaintiffs, such injuries fail to establish a claim for injunctive relief because they do not sufficiently allege an immediate threat of future harm. Rather, Plaintiffs merely allege they are entitled to prospective relief based on *past* alleged incidents of harassment, primarily during the four-day encampment in April 2024. These allegations of "past exposure to illegal conduct"—even if true—do not suffice to "show a present case or controversy regarding injunctive relief." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000) (citations omitted).

Plaintiffs instead must establish a "real and immediate threat of future injury." *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 860 (7th Cir. 2018). With respect to future harm, Plaintiffs state that the incidents alleged in the Complaint have caused "fear and anxiety" for their safety on campus. Compl. ¶ 182. While Northwestern takes Plaintiffs' concerns seriously, they are insufficient to establish any real or immediate threat of future injury that is of the same nature as that on which Plaintiffs predicate their request for relief. Plaintiffs allege subjective, speculative fears of injuries they *might* face. *See, e.g.*, *id.* ¶ 180. That is not enough.

Further, Plaintiffs fail to allege facts clearly demonstrating that any actionable injury Plaintiffs may suffer in the future is traceable to Northwestern. To allege traceability, Plaintiffs must demonstrate "a causal connection between the injury and the conduct complained of," meaning the injury must be "fairly . . . trace[able] to the challenged action of the defendant." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Where the causal relationship is dependent upon the decision of an independent third party, standing is "substantially more difficult to establish."

21

*Id.* at 562 (citation omitted); *see also Clapper et al. v. Amnesty Int'l USA et al.*, 568 U.S. 398, 414 (2013). To demonstrate a causal relationship, Plaintiffs must show "that third parties will likely react in predictable ways." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Plaintiffs fail to show that the independent third parties, which consist of unnamed students and protestors, "will likely react in predictable ways." *Id.* For these reasons, Plaintiffs' request for injunctive relief is improper.

### 2. The Court Should Dismiss the Mandatory Injunction Components of Plaintiffs' Requested Injunction.

Illinois courts generally refuse to award a mandatory injunction where the contract at issue is for personal services and the plaintiff has an adequate remedy at law. *Bloch v. Hillel Torah N. Suburban Day Sch.*, 426 N.E.2d 976, 977 (Ill. App. Ct. 1981). That is because "compelling the continuance of a personal relationship to which one of the parties is resistant is repugnant as a form of involuntary servitude." *Id.*

Illinois courts have found that the student-school relationship is one for personal services. *Id.* (explaining that the relationship between a "school and a student is one highly personal in nature."). In *Bilut v. Northwestern University*, 645 N.E.2d 536, 542 (Ill. App. Ct. 1994), the Illinois appellate court explained that this rule extends to private colleges and universities since "faculty must work closely with its [students]." Other courts have reached the same conclusion. *See, e.g.*, *Bimler v. Loyola Univ. of Chi.*, No. 84 C 5623, 1985 WL 609, at **1–2 (N.D. Ill. Apr. 12, 1985).

The reluctance of Illinois courts to issue a mandatory injunction in the educational setting is understandable given that courts are not in a good position to monitor and oversee the activities of colleges and universities. As the court explained in *Bilut*, courts are "ill equipped to run private colleges and universities." 645 N.E.2d at 542. In reversing the trial court's entry of a mandatory injunction, the court further explained that "we believe that private colleges and universities must

be accorded a generous measure of independence and autonomy with respect to the establishment, maintenance and enforcement of academic standards." *Id.*

Plaintiffs here seek far-ranging mandatory injunctive relief compelling Northwestern to take certain actions. As explained above, Plaintiffs seek an order requiring Northwestern to investigate all instances of antisemitism from 2023–2024. Compl. at pp. 64-65. Plaintiffs also ask this Court to order Northwestern to take disciplinary measures against any students, deans, professors, administrators or others who "engaged in or permitted" antisemitic behavior. *Id.* Even further, Plaintiffs seek an order requiring Northwestern to conduct antisemitism training and ask the Court to appoint a neutral monitor to oversee compliance with the Court's order, as well as with Northwestern's Title VI, anti-discrimination, and anti-harassment policies. *Id.*

The requested relief would require this Court to become embroiled in the day-to-day management of Northwestern. The Court is "ill equipped" to monitor Northwestern in this way. *Bilut*, 645 N.E.2d at 542. Because mandatory injunctions are prohibited in the university context in Illinois and Plaintiffs have an adequate remedy at law, the Court should dismiss and strike Plaintiffs' request for mandatory injunctive relief.

**B.     The Court Should Dismiss Plaintiffs' Claim For Punitive Damages.**

Punitive damages are not available under Title VI. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("[P]unitive damages may not be awarded in private suits brought under Title VI."). Nor are they available for breach of contract. *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 Ill. 2d 87, 94 (1986) ("[P]unitive damages are not recoverable for breach of contract."). Accordingly, the Court should dismiss Plaintiffs' claim for punitive damages.

## **CONCLUSION**

WHEREFORE, Defendant Northwestern University respectfully requests that this Court enter an order dismissing Plaintiffs' Consolidated Class Action Complaint with prejudice and granting such further relief as this Court deems equitable and just.

Dated: August 27, 2024                    Respectfully submitted,

                                          NORTHWESTERN UNIVERSITY

                                          By: */s/ Joshua W. B. Richards*
                                          One of its attorneys

James A. Morsch (james.morsch@saul.com)
Casey Grabenstein (casey.grabenstein.com)
Elizabeth A. Thompson (elizabeth.thompson@saul.com)
Megan Warshawsky (megan.warshawsky@saul.com)
Saul Ewing LLP
161 North Clark Street, Suite 4200
Chicago, Illinois 60601
(312) 876-7100

Joshua W.B. Richards (joshua.richards@saul.com) – *pro hac vice*
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
(215) 972-7777

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney certifies that on August 27, 2024, he caused the foregoing to be filed electronically with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which sent electronic notification to all parties who have appeared and are registered as CM/ECF participants in this matter.

/s/ *Casey T. Grabenstein*       
