# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JANE DOE, et al, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>NORTHWESTERN UNIVERSITY,<br><br>    Defendant. | Case No. 1:24-cv-04125-JRB-JC<br><br>Honorable John Robert Blakey |

## DECLARATION OF ELIZABETH A. FEGAN

1.  I, Elizabeth A. Fegan, am over the age of eighteen and declare that the following information is true, correct, and based on my personal knowledge:

2.  I am a Managing Member of Fegan Scott LLC and represent Plaintiff John Doe 3 ("Plaintiff") in this matter. I submit this declaration in support of Plaintiff's motion to proceed pseudonymously. This declaration is based upon my personal knowledge. If called upon as a witness, I could and would competently testify as to the facts set forth therein.

3.  On August 27, 2024, Plaintiff's counsel disclosed Plaintiff's identity to Northwestern's counsel on an Attorney's Eye's Only basis.

4.  Attached are true and correct copies of the following documents:

| Exhibit | Title |
|---|---|
| A | Alums for Campus Fairness, "Tracking the Surge: The Alarming Rise of Antisemitism on American College Campuses" (Aug. 26, 2024), available at https://www.campusfairness.org/new-acf-report-exposes-worsening-antisemitism-and-compromised-safety-on-campuses/ (last visited Aug. 28, 2024) |
| B | D'Onofrio, "Northwestern president testifies at Congressional hearing on alleged antisemitism at colleges," ABC (May 23, 2024), available at https://abc7chicago.com/post/northwestern-university-president-michael-schill-testify-congress-hearing/14860875/ (last visited Aug. 28, 2024) |

| Exhibit | Title |
|:---:|:---|
| C | Israel, "Noisy Pro-Hamas Mob Ruins Shabbat for Jewish Dem's Family and his Chicago Neighbors," The Jewish Press (June 30, 2024), available at https://www.jewishpress.com/news/eye-on-palestine/hamas/noisy-pro-hamas-mob-ruins-shabbat-for-jewish-dems-family-and-his-chicago-neighbors/2024/06/30/ (last visited Aug. 28, 2024) |
| D | Pierre, "Pro-Hamas Protesters Show Up at Jewish Illinois Officials' Homes, Declare 'No Sleep for War Criminals,'" the algemeiner (July 1, 2024), available at https://www.algemeiner.com/2024/07/01/pro-hamas-protesters-show-up-jewish-illinois-officials-homes/ (last visited Aug. 28, 2024) |
| E | Press Release, ADL Reports Unprecedented Rise in Antisemitic Incidents Post-Oct. 7 (Dec. 11, 2023), available at https://www.adl.org/resources/press-release/adl-reports-unprecedented-rise-antisemitic-incidents-post-oct-7 (last visited Aug. 28, 2024) |
| F | Blog, "Chicago Sees Rise in Antisemitic Incidents and Activism Amid Action by Anti-Israel Groups" (March 2024), available at https://chicago.adl.org/antisemitisminchicago/ (last visited Aug. 28, 2024) |
| G | Chicago Commission on Human Relations 2024 Hate Crimes and Hate Incidents Report (June 27, 2024) |
| H | Northwestern's Policy on Discrimination, Harassment, and Sexual Misconduct (eff. Aug. 12, 2024) |

5.      Northwestern University President Michael Schill testified before the House Education and the Workforce Committee on May 23, 2024. A video of his testimony is available at https://www.youtube.com/watch?v=4bu4eGIDNss (last accessed Aug. 28, 2024).  At timestamp 1:10:30 – 1:10:40 in the video, President Schill confirms that there "have been zero suspensions, zero expulsions" as a result of antisemitism on campus during the 2023-2024 academic year.

6.      On May 1, 2024, a staff attorney for Judge Sophia Hall, Circuit Court of Cook County, Chancery Division, informed Steven Blonder, Esq. by email that the State Court granted Plaintiffs' Petition to Appear and Proceed Under Fictitious Names Pursuant to 735 ILCS 5/2-401(E). *See Jane Doe et al. vs. Northwestern Univ.*, No. 2024-CH-04027, ORDER (Cir. Ct. Cook Cnty. May 1, 2024).

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: August 30, 2024                    _____*Elizabeth A. Fegan*_____
                                          Elizabeth A. Fegan

# EXHIBIT A



Survey on Experiences and Attitudes

TOWARDS ANTISEMITISM

# ACF'S EXECUTIVE DIRECTOR

It doesn't take a survey to tell us that Jewish and pro-Israel students faced significant challenges during the 2023-2024 academic year. We are all too familiar with the high-profile antisemitic attacks and palpable climate of fear that tragically engulfed so many of our nation's colleges and universities. ACF's 2024 survey of 1,171 Jewish American college students and recent grads allows us to quantify this challenging year with hard data to back up the lived experiences of students and recent alumni.

The results, compared with our 2021 survey, expose dangerous trend lines for Jewish and pro-Israel students on college campuses. **Antisemitism is getting worse**. Students are **hiding their Jewish identity**. We are increasingly seeing a **lack of safety** in both digital and physical spaces.

While our survey paints a grim picture overall, there are some positive takeaways. Students and recent graduates who attended organized Jewish community events were *significantly less likely* to report feeling unsafe on campus. This reaffirms that there is safety in community. It should inspire us to redouble our efforts to support Jewish life on campus.

Avi D. Gordon
Executive Director, Alums for Campus Fairness



# KEY FINDINGS



# KEY FINDINGS

**ANTISEMITISM GETTING WORSE:** Antisemitism is a growing and worsening problem on US college campuses.

- ○ In comparison to 2021 answers, antisemitism is becoming more intense across every parameter tested.
- ○ Over 80% of Jewish students and recent graduates consider antisemitism a 'very serious problem.'

80%



# KEY FINDINGS

**HIDING IDENTITY:** Students feel unsafe identifying as Jewish. Today, nearly **8 in 10** Jewish students and recent grads say they have avoided places at school out of concern for their safety as a Jew.

- ○ Jewish students and recent graduates who attended a Jewish community event on campus are more likely to report feeling safe identifying as Jewish on campus.



ALUMS
for Campus Fairness

# KEY FINDINGS

**COMPROMISED SAFETY:** 58% of Jewish students reported that they or someone they know was physically threatened on campus for being Jewish.





# KEY FINDINGS

**COMPROMISED SAFETY:** There was a 45% increase in reported physical threats at private universities.









# ANTISEMITISM GETTING WORSE



**93%** of Jewish college students and recent grads continue to recognize antisemitism as a problem.

93%



# ANTISEMITISM GETTING WORSE



There was a **9-point jump from 74% to 83%** in responses indicating that antisemitism is a 'very serious problem.'





# ANTISEMITISM GETTING WORSE

There was a **26-percentage** point increase in respondents reporting antisemitism as a 'major problem' on campus in the **Midwest.**





# ANTISEMITISM GETTING WORSE

"UW-Madison is a hotbed of antisemitism. Faculty openly cancel class to encourage students to attend pro Palestinian protests."

**- UW-MADISON GRADUATE**



# ANTISEMITISM GETTING WORSE

When alumni compare their college experience to the current climate, they believe things are worse now.

Alumni believe that antisemitism is four times worse on college campuses today than when they were students.

4X



# ANTISEMITISM GETTING WORSE

" I went to a college with a fairly large Jewish population and graduated some years ago. But now there have been incidents at my school and I can see how the climate has changed a lot and has become really unsafe for Jewish students. "

**- GRADUATE OF A PRIVATE UNIVERSITY IN THE NORTHWEST**



# ANTISEMITISM GETTING WORSE

Students know antisemitism is a problem. Now, 76% of them believe it is getting worse, a nearly **30-point jump**.







# ANTISEMITISM GETTING WORSE

" I volunteer for my campus LGBTQIA+ Pride event, and after recognizing me from photos of me at a Hillel event, a few students spammed the Pride committee's Instagram saying Zionists shouldn't be allowed and I should be removed from the committee and that they would boycott the event because it was supporting genocide. "

**- CURRENT STUDENT AT A STATE UNIVERSITY IN THE WEST**





# HIDING IDENTITY



# HIDING IDENTITY

Many respondents don't feel safe identifying as Jewish on campus.

**37%** now say they 'never' or 'rarely' feel safe, up from **20%**.





# HIDING IDENTITY

Among current students, 44% 'never' or 'rarely' feel safe identifying as Jewish on campus.



# HIDING IDENTITY

Students and recent grads who attended organized Jewish community events on campus in 2024 are **more likely** to feel safe identifying as Jewish at school.

2/3 respondents who attended at least one event usually or always felt safe.

Half of those who never attended agreed.



ALUMS
for Campus Fairness

# HIDING IDENTITY



**Almost 80%** of respondents reported avoiding places, events, or situations because of their Jewish identity.



# HIDING IDENTITY

"I lost most of my friends on October 7th. I specifically asked for comfort and they said that it "made them uncomfortable to support Israel" in response. Word for word."

**- CURRENT STUDENT AT A STATE UNIVERSITY IN SOUTHWEST**





COMPROMISED SAFETY



# COMPROMISED SAFETY



**81%** of respondents said they or their friends received threatening or antisemitic messages, up 10 points.





# COMPROMISED SAFETY

"

Mostly experienced antisemitic ideology on "friends" social media stories, had people swipe up on my stories accusing me of believing certain things, got called a derogatory name while chalking positive messages for Israel on campus (by a professor), got flipped off with some friends while holding an Israeli flag at an anti-Israel protest as well as was called complicit in genocide.

**- CURRENT STUDENT AT A PRIVATE UNIVERSITY IN THE MIDWEST**



# COMPROMISED SAFETY

**60%** of respondents said a faculty member made an offensive antisemitic remark to them or someone they know.



# COMPROMISED SAFETY

"My professor went on a rant about how there's too many Jews in medicine. He also said that terrorism is just what the big army calls the little army, and said Hamas is a group of 'freedom fighters'..."

**- CURRENT STUDENT AT A STATE UNIVERSITY IN THE SOUTHWEST**



# COMPROMISED SAFETY

"We had an Israeli student get called a terrorist by a faculty member at our school after October 7."

**- GRADUATE OF A STATE UNIVERSITY IN THE SOUTHWEST**



# COMPROMISED SAFETY

**Over 50%** of respondents said they or someone they knew were physically threatened for being Jewish.

>50%



# COMPROMISED SAFETY

"I'm from UCLA where Jewish students, including many people I know, were assaulted and harassed for weeks and weren't protected by school response. I've heard of people running around with knives for Jewish students or posting pig related artwork to represent Jews. It is insane and rampant."

**- CURRENT UCLA STUDENT**



# COMPROMISED SAFETY



**More than half** of respondents from private schools said they were **physically threatened** for being Jewish, a **43% jump.**



# UNDERSTANDING THE SAMPLE



# POLLSTER

This research included the largest quantitative *and* qualitative survey ever conducted of Jewish-American college students and alumni. The respondents were 18-29 year-old self-identifying Jewish individuals who were either current students or recent graduates of a four-year undergraduate program in the US. A total of 1,171 quantitative surveys were completed, with 334 respondents opting to share their personal experiences with antisemitism. The data-set was extremely rich, including 725 currently enrolled students and 446 alumni from a broad range of private and public schools across the entire US. It encompassed a diverse mix of self-identified religiosity and varying levels of engagement with the on-campus Jewish community. This survey included the same questions as a similar online survey we conducted with Alums for Campus Fairness in the spring of 2021.

Stephan Miller
CreoStrat



# METHODOLOGY

○ Data collected online between May 17-28, 2024
○ Respondents were recruited via social media posts and advertising
○ 3,940 respondents began the survey and were filtered to meet the following criteria:
   ○ 18-29 year-old Americans that self-identify as Jewish
○ Respondents were current students or recent graduates of a 4-year undergraduate degree program in the US
   ○ 725 were enrolled students, 446 were alumni
○ There was a total of 1,171 completed surveys, with a small weight applied based on gender
○ One half of a percent (.5%) and higher is rounded up in this report
○ The 2021 survey of 506 respondents included the same filter of respondents and the same questions as 2024. The 2021 report can be viewed here.



# YEARS RESPONDENTS WERE BORN



# RESPONDENTS ATTEND/ED SCHOOLS ACROSS THE U.S.



# ATTENDED BOTH PUBLIC AND PRIVATE SCHOOLS



# EXHIBIT B

# Northwestern president testifies at Congressional hearing on alleged antisemitism at colleges

By Jessica D'Onofrio and Mark Rivera 
Thursday, May 23, 2024



Northwestern University President Michael Schill defended his actions before Congress at a hearing on antisemitism Thursday.

EVANSTON, Ill. (WLS) -- Northwestern University President Michael Schill was in the hot seat on Capitol Hill at a hearing Thursday morning on antisemitism on college campuses.

In a fiery exchange, a Republican lawmaker questioned Schill about allegations of antisemitic hate on campus.

Northwestern was one of the many college campuses nationwide where pro-Palestinian encampments were set up for days.

They wanted a cease-fire in Gaza and universities to cut ties with Israeli institutions.



The president of Northwestern University, defended the private school on Capitol Hill

Schill defended his decision to negotiate an agreement with pro-Palestinian demonstrators who had set up an encampment last month on the school's Evanston campus.

"We did not give in to any of the protesters' demands and the commitments we made are consistent with our values," Schill said. "Importantly, I rejected the main student demand for divestment, and will not ever recommend that NU use its resources for political purposes."

Schill, who noted that he descends from Holocaust victims and survivors, told the House Committee on Education and the Workforce that engaging students with dialogue instead of force was the best and safest path forward, as he saw dangers escalating at the encampment.

"These are all of our students. My No. 1 obligation is public safety and their safety because, if you do not think it's safe, you cannot learn," he said.

But the Republican chairwoman of the committee from North Carolina, Virginia Foxx, had some sharp words for Schill and other college leaders who were called to testify.

"Each of you should be ashamed of your decisions that allowed antisemitic encampments to endanger Jewish students," Foxx said. "Mr. Schill and Dr. Holloway, you should be doubly ashamed for capitulating to the antisemitic rule breaking."

**RELATED: Lawsuit accuses Northwestern of failing to protect Jewish students from antisemitic harassment**

Thursday's was one of a series of hearings being held on the way colleges have handled antisemitism on their campuses. Many on the House committee grilled college leaders and called for accountability.

"Those who are in charge of universities, who negotiate with pro-terror protesters, are not doing their jobs," Foxx said. "Taxpayer dollars have no business funding universities without principals that align with the principles of this country."

She pointed to seven members of Schill's antisemitism advisory committee resigning, as well.

Sparks flew from New York Republican Elise Stefanik, as she discussed Northwestern's new "F" rating from the Anti-Defamation League.

Northwestern's agreement required supporting two visiting Palestinian faculty for two years and the full cost of education for five Palestinian undergrads, among other inclusivity and investment disclosure agreements.

Schill said those staff and student supports were part of already existing programs.

But the questioning continued.

"Isn't it true that a Jewish student was told to 'go back to Germany and get gassed?'" Stefanik said.

"I've heard that alleged. Again, it is being investigated. We will investigate any claim of discrimination," Schill said.

"But, it is a fact that you've said there have been zero suspensions, zero expulsions," The Republican congresswoman said.

"Thus far with lots of investigations on their way," Schill said.

Thursday morning, pro-Palestinian protesters gathered at Northwestern University, as they listened to Schill's testimony.

"We call on President Schill not to misrepresent the nature of our encampment and feed into the culture war against peaceful student protest," a pro-Palestinian student said.

Schill said in the wake of the encampment, students have been held accountable and disciplined along with staff. He also, said at his direction, he will be working over the summer to update Northwestern's student conduct code, and new policies will be in place before students return to campus.

The ADL is reiterating its call for Schill to resign after seeing his testimony.

Schill said he is restarting an antisemitism task force on campus and acknowledged existing rules and policies are falling short.

# EXHIBIT C

Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 49 of 196 PageID #:405

# Noisy Pro-Hamas Mob Ruins Shabbat for Jewish Dem's Family and his Chicago Neighbors

By **David Israel** -  24 Sivan 5784 – June 30, 2024



Photo Credit: April Brady/Project on Middle East Democracy

*Rep. Brad Schneider (R-Il) at a House Foreign Affairs Committee's Subcommittee on the Middle East and North Africa.*

City officials issued a community advisory alert stating that at approximately 2:43 Saturday morning, the Highland Park Police Department's dispatch received roughly 30 noise complaint calls. The complaints reported people who were shouting near Woodland Road. According to CBS 2, Representative Rob Schneider was not present at his residence during the incident, though other family members were home at the time of the protest.

In the early hours of Saturday morning, Hamas supporters staged an overnight protest outside the Highland Park residence of Representative Brad Schneider (D-Il). The demonstration led to noise complaints and caused concern among local residents. The event left many neighbors unsettled, especially given the protesters' pledge to return. Residents also questioned the limited response to the late-night disturbance, expressing concerns about how authorities handled the situation.

A social media post documented a nighttime demonstration outside Congressman Brad Schneider's residence. The caption stated, "Activists in Chicago rouse Brad Schneider at 2:30 AM, calling for UNRWA refunding and an end to US support of what they term a genocide."

The post appeared on an account called "Direct Actions for Palestine," which mentioned two pro-Hamas organizations: American Muslims for Palestine (AMP) Chicago and Students for Justice in Palestine (SJP) Chicago.

According to the post, demonstrators criticized Schneider regarding Congress' decision to defund UNRWA, as well as his approval of military assistance to Israel.

The account added, "We need to hold him responsible for the loss of over 45,000 Palestinian lives in Gaza. If justice is denied to Gaza, then sleep will be denied to you. This marks only the beginning."

According to city officials, law enforcement responded promptly, arriving within minutes to find approximately 40 demonstrators on the sidewalk. The protesters used banners, loudspeakers, and drums to voice pro-Hamas slogans and what were described as antisemitic chants. Video footage shared on social media also captured the sound of siren-like noisemakers.

A statement from Rep. Schneider's office reported that a red substance, suspected to ██████ blood, was spilled on the sidewalk during the protest.

On June 14, Rep. Schneider said on the House floor: "The most extraordinary points in history … are when there are crossroads, and we are at a crossroads. We are at a moment where the possibility of changing the future of the Middle East for the better is in front of us: Saudi Arabia, willing to and wanting to normalize relations with Israel; the Abraham Accords laying the foundation for those possibilities; the ability to defeat Hamas … to give the people of Gaza a hope for a positive future, a better future. All that's in front of us. And I pray to God that we don't lose that moment. Because the alternative … if we don't grasp this moment, could be very dark. So, I hope that we do everything we can to make sure we take the right path here."

*Share this article on WhatsApp:*

**David Israel**

David writes news at JewishPress.com.

Printed from: https://www.jewishpress.com/news/eye-on-palestine/hamas/noisy-pro-hamas-mob-ruins-shabbat-for-jewish-dems-family-and-his-chicago-neighbors/2024/06/30/

Scan this QR code to visit this page online:





EXHIBIT D

Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 53 of 196 PageID #:409

# the algemeiner

JULY 1, 2024 2:44 PM

# Pro-Hamas Protesters Show Up at Jewish Illinois Officials' Homes, Declare 'No Sleep for War Criminals'

 *by Dion J. Pierre* 



*Illustrative:* Pro-Hamas protesters outside the Garfield Park Conservatory in Chicago, Illinois on Tuesday, May 21, 2024. Photo: Ron Sachs via Reuters Connect

Pro-Hamas agitators roamed the streets of the greater Chicago area over the weekend, harassing Jewish residents and fostering unrest in their campaign to pressure elected officials into boycotting and divesting from Israel.

Marching through the heavily Jewish suburb of Highland Park early on Saturday morning, a mob consisting of some 40 protesters — who concealed their faces with masks and

Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 54 of 196 PageID #:410

keffiyehs — amassed outside the home of US Rep. Brad Schneider (D), who is Jewish, reportedly dousing "red liquid" on the sidewalk.

About 24 hours later, the protesters undertook a similar action, showing up at the Chicago home of Illinois Gov. Jay Robert Pritzker (D), who is also Jewish.

The group responsible for the disturbance, which calls itself "Direct Action for Palestine," said on social media that Pritzker and Schneider are "war criminals" while denouncing Schneider's voting for a bill which, if passed, would defund the United Nations Relief and Works Agency (UNRWA), several of whose employees allegedly aided Hamas' Oct. 7 massacre across southern Israel.

"No sleep for war criminals. Palestinian, Arab, and allied youth refuse to let war criminals rest, including Representative Brad Schneider who was awoken at 2:30 am," Direct Actions for Palestine said in a social media post following its demonstration. "We demand a complete reinstatement of UNWRA funding, Illinois' divestment from Israel, and an end to the US backed genocide on Gaza."

Reports on the protesters' actions circulated on social media, with some saying that they approached residents asking if they are a "Jew." Others said that local law enforcement declined to make any arrests.

"It's unfortunate that instead of seeking a constructive dialogue with Congressman Schneider, a group of people hiding their faces chose to taunt and intimidate a predominantly Jewish neighborhood on the Jewish Sabbath in the middle of the night," a spokesperson for Schneider said in a statement following the incidents. "It's even more disturbing the chose to harass a community that is preparing to commemorate the second anniversary of the Highland

Park mass shooting, a shared tragedy that was spurred by hate."

The statement added, "The congressman is always happy to meet and sit down with anyone. I encourage those who disagree with his views to seek a conversation in the daylight rather than disturbing and traumatizing families in the darkness of night."

The Anti-Defamation League's (ADL) Midwest office denounced the demonstrations on Sunday, describing them as blatantly antisemitic and undermining the group's claim that it wants peace.

"The chants were antisemitic. The false charge of genocide is antisemitic," ADL Midwest tweeted. "The targeting of Jewish elected officials is antisemitic. This clearly isn't about peace."

Incidents of antisemitic hatred in Chicago have increased, according to a new report by the Chicago Commission on Human Relations issued last week.

"Antisemitic acts including assault, harassment, and vandalism rose to their highest level in recent history in 2022, jumping 128 percent from the previous year, from 53 to 121," the report said, before noting that anti-Jewish hate crimes have further spiked due to the ongoing Israel-Hamas war in Gaza. "Tensions around the conflict have impacted communities across the country, leading to protests in our streets and college campuses."

*Follow Dion J. Pierre* [@DionJPierre](https://twitter.com/DionJPierre).

# EXHIBIT E

PRESS RELEASE

# ADL Reports Unprecedented Rise in Antisemitic Incidents Post-Oct. 7

Published: 12.11.2023

## More than 2,000 incidents reported in U.S. since Hamas massacre, a 337-percent increase

New York, NY, December 11, 2023 … Since the Hamas massacre in Israel on Oct. 7, U.S. antisemitic incidents reached the highest number of incidents during any two-month period since ADL (the Anti-Defamation League) began tracking in 1979, according to preliminary data released today.

Between Oct. 7 and Dec. 7, ADL recorded a total of **2,031 antisemitic incidents**, up from 465 incidents during the same period in 2022, representing a 337-percent increase year-over-year. This includes **40 incidents of physical assault**, 337 incidents of vandalism, 749 incidents of verbal or written harassment and 905 rallies including antisemitic rhetoric, expressions of support for terrorism against the state of Israel and/or anti-Zionism. On average, over the last 61 days, Jews in America experienced **nearly 34 antisemitic incidents per day.**

"This terrifying pattern of antisemitic attacks has been relentless since the Israel-Hamas war began on Oct. 7, with no signs of diminishing," said Jonathan Greenblatt, ADL CEO. "The lid to the sewers is off, and Jewish communities all across the country are being inundated with hate. Public officials and college leaders must turn down the

temperature and take clear action to show this behavior is unacceptable to prevent more violence."

The data includes one fatality that occurred at an anti-Israel protest in Los Angeles, where a Jewish man was killed after being hit in the head by a pro-Palestinian protester. There were about **250 antisemitic incidents** that specifically targeted Jewish institutions such as synagogues and campus Hillels. On college and university campuses, ADL has recorded a total of **400 antisemitic incidents**, compared to only 33 incidents during the same period in 2022. At least **1,411 of the total incidents could be clearly linked to the Israel-Hamas war.**

An interactive map plotting where incidents occurred since Oct. 7 can be found here.

In addition to attacks against Jewish institutions, ADL tracked an increase in vandalism and harassment on businesses are Jewish or Israeli, such as a Dec. 3 rally in Philadelphia where a large group of protesters gathered outside a falafel shop and accused the owners of committing a "genocide."

"Vandalism of a Jewish business isn't political protest – it's antisemitism and it's criminal," said Greenblatt. "Boycotts have historically targeted the Jewish community at times of crisis, and it's alarming that it's happening again now."

*ADL is the leading anti-hate organization in the world. Founded in 1913, its timeless mission is "to stop the defamation of the Jewish people and to secure justice and fair treatment to all." Today, ADL continues to fight all forms of antisemitism and bias, using innovation and partnerships to drive impact. A global leader in combating antisemitism, countering extremism and battling bigotry wherever and whenever it happens, ADL works to protect democracy and ensure a just and inclusive society for all.*



## Fight Antisemitism

Explore resources and ADL's impact on the National Strategy to Counter Antisemitism.

Learn More

# EXHIBIT F





Serving Northern Illinois, Wisconsin, Indiana, Minnesota, North Dakota & South Dakota

**ABOUT**

ADL MIDWEST

2021 IMPACT REPORT

KEY STATS

**VIDEOS**

2021 FIRST AMENDMENT FREEDOMS AND

NO PLACE FOR HATE® CELEBRATION

THE FIGHT FOR VOTER RIGHTS

THE STOP HATE FOR PROFIT CAMPAIGN

AND COMPANIES THAT CARE

FIRST AMENDMENT ART AND ESSAY

CONTEST

ADL IMAGINES A WORLD WITHOUT HATE

THROUGH EDUCATION

THE AMERICAN DREAM

CONFRONTING ANTI SEMITISM

ADL'S RELATIONSHIP WITH LAW

ENFORCEMENT

**NEWS**

BLOG

IN THE NEWS

PRESS RELEASES

IMPACT STORIES

**PROGRAMS**

A WORLD OF DIFFERENCE®

ECHOES & REFLECTIONS

MANAGING IMPLICIT BIAS

NO PLACE FOR HATE®

8/29/24, 12:19 PM
Anti-Defamation League | Chicago Sees Rise in Antisemitic Incidents and Anti-Israel Agitation by Anti-Israel Groups | Midwest

Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 62 of 196 PageID #:418

WORDS TO ACTION

1ST AMENDMENT CONTEST

**MEDIA INQUIRIES**

**DONATE**

**GET INVOLVED**

MY CAMPAIGN AGAINST HATE

SIGNATURE SYNAGOGUES

GLASS LEADERSHIP INSTITUTE

ADL MIDWEST ASSOCIATE BOARD

PLANNED GIVING

LIVINGSTON LEGACY SOCIETY

CORPORATE SPONSORS

FOLLOW US ON SOCIAL MEDIA

SHARE OUR RESOURCES

STEPS TO COMBAT HATE

JOIN OUR MAILING LIST

**CAREERS**

**NEWSLETTER SUBSCRIPTION**

**CONTACT**

**VIDEO**

**PRIVACY POLICY**

DONATE

Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 63 of 196 PageID #:419





🏷 Posted in **Blog**, **Uncategorized**.

# Chicago Sees Rise in Antisemitic Incidents and Activism Amid Action by Anti-Israel Groups

March 20, 2024



Since the Hamas terror attacks on Israel on October 7, 2023, the city of Chicago and the surrounding area has seen a troubling rise in antisemitic incidents which has coincided with an increase in anti-Zionist activism organized by several local groups.

While this activism was initially limited to criticism of and calls for action against the state of Israel, it has evolved into action against those whom activists refer to as Zionists, which in practice has often meant "Jews." Most recently, this action included a campaign leading to the cancellation of a concert by Jewish musician Matisyahu in Chicago and the assault of a Jewish man who was holding a small Israeli flag as he arrived at a screening of #Nova on March 11, 2024, a documentary on Hamas' unprovoked attack on an Israeli music festival on October 7.

Other activities include the targeting of the Jewish elected officials, including placing anti-Israel "Zionism is racism" propaganda outside the office of Illinois State Senator Sara Feigenholtz, a Jewish elected official, and the harassment of Chicago Alderman Debra Silverstein, the lone Jewish member of the Chicago City Council. Non-Jewish elected officials were also targeted with graffiti and harassing phone calls for opposing a ceasefire resolution in the Chicago City Council.

Anti-Zionism is a form of antisemitism. Zionism, broadly defined as the movement for Jewish self-determination and statehood in the Jewish people's historic homeland in the land of Israel, is frequently denigrated and impugned as a form of racism and bigotry by activists. Yet the overwhelming majority of American Jews feel attached to Israel as the Jewish homeland or view a relationship with Israel as part of their Jewish identities, regardless of their views about Israeli government policies. Demanding that Jewish people renounce Zionism as a condition for acceptance in public settings is antisemitic and has the effect of ostracizing and targeting much of the Jewish community.

Anti-Israel activists have also organized a series of disruptions of major thoroughfares relied on by commuters throughout the city. Fringe group Jewish Voice for Peace (JVP) organized many of these disruptions, including at Dearborn Avenue on March 8, 2024, Union Station on January 4, 2024, the Washington Street Bridge on December 14, 2023, and Ogilvie Transportation Center on November 13, 2023, where more than 100 protesters were arrested for misdemeanor trespassing. An additional large-scale disruption was held in which a nearly 100-car caravan temporarily shut down both sides of I-90 near O'Hare International Airport.  JVP is a radical anti-Israel and anti-Zionist group whose most inflammatory ideas can help give rise to antisemitism and are at odds with the views of the mainstream Jewish community.

This rise in antisemitic incidents has emerged alongside increased activity by several anti-Zionist groups in Chicago, namely organizations under the umbrella of the Chicago Coalition for Justice in Palestine, the most prominent of which are United States Palestinian Community Network (USPCN), Students for Justice in Palestine (SJP), and American Muslims for Palestine (AMP).

> USPCN – USPCN (U.S. Palestinian Community Network) is a radical anti-Israel activist group founded in 2006 that has expressed support for terror against Israel and regularly espouses antisemitic rhetoric.

> SJP – Students for Justice in Palestine (SJP) is the most prominent and active anti-Israel and anti-Zionist student group in the United States. SJP chapters regularly propagate antisemitic rhetoric; often applaud or justify terror attacks in Israel; attempt to expel "Zionists" from campus life; protest outside of Hillels (the main Jewish student group on U.S. campuses); and disrupt events on campus they deem pro-Israel.

> AMP – American Muslims for Palestine (AMP) is a Chicago-based anti-Israel and anti-Zionist activist organization whose leaders have promoted violence against Israel, the denigration of Zionism and Zionists, and at times, classic antisemitic tropes. After the Hamas massacre, AMP leaders have promoted troubling rhetoric, including by vilifying Zionism.

Below are examples of antisemitic incidents found at rallies, demonstrations and other events hosted by the Chicago Coalition for Justice in Palestine. Troubling developments at Chicago Public Schools are included as well. Despite Hamas, Hezbollah and PFLP being recognized by the U.S. government as foreign terrorist organizations, demonstrators have been spotted with Hamas paraphernalia such as Hamas flags and headbands, expressed support for the October 7 Hamas terror attack and held banners with messages espousing historic antisemitic tropes.

USPCN frequently displays a protest banner that features the hashtag #AlAqsaFlood, an explicit reference to Hamas's violence against Israel on October 7.



Since November 5, 2023, USPCN and SJP have hosted at least seven separate rallies where individual attendees either displayed Hamas or PFLP paraphernalia or wore Hamas headbands.



On March 13, 2024, a Jewish man was assaulted by anti-Israel demonstrators as he arrived at the screening of a documentary about the October 7 massacre at the Nova music festival in Israel.

(Below) An anti-Israel displays obscene gestures toward individuals attending the screening. *Photo courtesy of the Chicago JCRC.*



On March 8, 2024, USPCN planned a demonstration to protest the performance of Jewish musician Matisyahu. The Instagram flier for the event read, "Racist Zionist Matisyahu is not welcome in Chicago!" The performance was canceled before the protest could take place.  USPCN celebrated the cancellation.





On February 1, 2024, when the Chicago City Council convened to vote on a ceasefire resolution, several anti-Israel activists could be heard shouting, "Deb, are you cleaning war crimes out of your desk? Are you using all the Zionist money?" This trope-filled language was directed at Debra Silverstein, the City Council's only Jewish member, who led the legislative effort against the resolution. While an individual voiced opposition to the resolution and read passages from Hamas' charter, anti-Israel audience members could be heard shouting "liar" and "ceasefire now."

8/29/24, 12:19 PM
Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 71 of 196 PageID #:427
Anti-Defamation League | Chicago Sees Rise in Antisemitic Incidents and Activism Amid School and Anti-Israel Groups | Midwest

On January 29, 2024, organizers of a Chicago Public Schools (CPS) walkout shared a playbook and pre-approved chants that can be interpreted as calling for violence against Jews in Chicago and worldwide, including:

> *From Chicago to Gaza! Globalize the intifada!*

> *Intifada, intifada! Long live the intifada!*

> *There is only one solution! Intifada revolution!*

Protestors also chanted the antisemitic slogan "From the River to the Sea, Palestine will be free," a rally cry used by anti-Israel activists, including supporters of terrorist organizations such as Hamas, which seek Israel's destruction through violent means.

An antisemitic image was posted in a high school's Snapchat feed prior to the CPS student walkout.



On December 31, 2023, the Chicago Coalition for Justice in Palestine hosted a rally that featured an image of a swastika and Jewish star linked by the dollar sign, a reference to the antisemitic trope that Jews are greedy.





On November 24, 2023, the Chicago Coalition for Justice in Palestine hosted a protest featuring a sign with a depiction of the paragliders used by Hamas terrorists on October 7.

8/29/24, 12:19 PM   Anti-Defamation League | Chicago Sees Rise in Antisemitic Incidents amid Activism And Action against Israel-Groups | Midwest

Case: 1:24-cv-04125 Document #: 29-2 Filed: 08/30/24 Page 74 of 196 PageID #:430





On October 22, 2023, after protesting a rally promoting solidarity with Israel, USPCN released a statement, saying, in part, "We reject the notion that zionists [sic] should be able to gather." (circled below)





On October 18, 2023, the Chicago Coalition for Justice in Palestine hosted an emergency protest at which one attendee held a sign with an image of a paraglider, a reference to the method many Hamas terrorists used to infiltrate Israel October 7. Another participant held a sign playing into antisemitic tropes, depicting dollar bills in the shape of a snake, bloody handprints and the message "Zionism is racism" with the letter "s" stylized as "dollar" symbol.





🏷️ Posted in **Blog**, **Uncategorized**.

# EXHIBIT G



# CHICAGO COMMISSION ON HUMAN RELATIONS 2024 HATE CRIMES AND HATE INCIDENTS REPORT

**June 27, 2024**

**Nancy C. Andrade**
**Chair & Commissioner**

**Mayor Brandon Johnson**

## Contents

Executive Summary ............................................................................................................ 2

Introduction ...................................................................................................................... 6

Chicago: Birthplace of the Human Relations Movement ................................................ 7

Hate Crimes and Hate Incidents ..................................................................................... 9

What is a Hate Crime? ..................................................................................................... 9

What is a Hate Incident? ................................................................................................ 10

A Cautionary Note on Data ........................................................................................... 12

Hate Crimes and Hate Incidents Total Numbers .......................................................... 16

    Hate Crimes Data for All of 2023 and for January 1, 2024 to June 13, 2024 ................... 17

The Big Picture: Hate Crimes and Hate Incidents Overview ......................................... 25

Hate Crimes: A National, Regional, and Local Problem ................................................ 25

Chicago Takes Action: An Overview of CCHR Hate Crimes and Hate Incidents Activities .. 42

    Hate Crime Victim Advocate Work ................................................................................. 42

    Unity Brunch .................................................................................................................. 44

    Unity Summit ................................................................................................................. 46

THINK BEFORE YOU HATE: CCHR's Ongoing Initiatives ............................................... 50

    Think Before You Hate Ad Campaign ............................................................................ 50

    Hate Crime Reporting Community Pilot Program .......................................................... 50

Amended Hate Crimes Ordinance .................................................................................. 53

Hateful Flyers ................................................................................................................. 54

The Migrant Mission ...................................................................................................... 56

Findings and Recommendations .................................................................................... 59

Conclusion ...................................................................................................................... 65

Acknowledgement .......................................................................................................... 67

# Executive Summary

**PURPOSE**

The Chicago Commission on Human Relations (CCHR), the City's civil rights agency, is mandated to produce this annual report by the City's Hate Crimes and Hate Incidents Ordinance (Section 2-120-518 of the Municipal Code of Chicago). The report is intended as a summary of our work addressing hate crimes and hate incidents that occur within the City of Chicago. Its purpose is to inform the City Council and the public about the City's initiatives for addressing the problem of hate crimes and hate incidents.

The report is comprehensive. The ordinance requires CCHR to provide hate crimes and hate incidents data organized by community area, bias motivation, type of incident, and disposition (to the extent known). It also requires CCHR to provide an overview of hate crimes and hate incidents from local, regional, and national perspectives; an overview of CCHR's activities regarding hate crimes and hate incidents; plus, any findings and recommendations to reduce or eliminate hate crimes and hate incidents.

**MAIN POINTS**

Hate crimes and hate incidents are national and regional problems that also impact Chicago.

There is no universal definition of hate crimes or hate incidents, nor universal standards of measurement and reporting. Nevertheless, data from across the various national, regional and local jurisdictions indicates that recent years have seen record-high increases in reported hate crimes and hate incidents.

Global crises drive these increases. So do political partisanship and rhetoric, White nationalist propaganda, and online conspiracy theories.

Historically, African Americans, members of the Jewish community, and LGBTQ+ victims have been targeted most often. The COVID-19 pandemic also saw Asian American and Native Hawaiian/Pacific Islanders targeted like never before. Likewise, the increase in asylum-seekers and other migrants has accompanied record numbers of hate crimes and

hate incidents against Latine victims.[1] Now, the Israel-Hamas war is driving a sharp increase in antisemitic and Islamophobic hate crimes and hate incidents.[2]

Despite these increases, only a fraction of hate crimes get reported. The reasons for this are complex. People do not always recognize a hate crime when they experience one. Some fear retaliation. Others may not trust the police or the criminal justice system.

CCHR works with the Chicago Police Department (CPD) to handle the civilian side of hate crimes reported in Chicago. Our Hate Crime Victim Advocate helps victims cope with the aftermath. The advocate tracks their cases through the criminal justice system, accompanies victims to court and meetings with detectives, and provides referrals for other City or non-profit services.

Chicago Mayor Brandon Johnson's Administration is expanding the City's response to the epidemic of hate. In December, the City Council amended the City's Hate Crimes Ordinance for the first time in 30 years. Now, it includes non-criminal hate incidents. It also includes new data collection and reporting requirements, to increase transparency. This new data may lead to new approaches to address the problem of hate.

CCHR partnered with CPD to win a U.S. Department of Justice grant to create a community-based hate crimes reporting pilot program. This pilot program will operate in collaboration with several community-based organizations (CBOs). The CBOs will help with outreach to educate their communities about hate crimes. They will serve as culturally competent spaces for victims to report hate crimes to police. The program will supplement 911 and 311 reporting options, but not replace those. CCHR and CPD intend for the program to enhance police/community relations, build trust, and facilitate the reporting of hate crimes that otherwise would have gone unreported.

CCHR engages in various other initiatives and programing designed to bring people from different demographic groups together to discuss and work on solutions. Last December,

---

[1] CCHR recognizes that individuals use a wide variety of terms to refer to members of their own demographic group. (For example, Black/African American, Hispanic/Latino/Latinx/Latine, Asian/Asian American/Asian American-Pacific Islander/Asian American and Native Hawaiian/Pacific Islander, etc.) This report cites a wide range of sources which use various terms. Some sources use different terms interchangeably, within the same document. In this report, CCHR cautiously uses various terms, as well. Often this is done in direct quotes or in alignment with sources. CCHR recognizes that language evolves, and opinions differ as to appropriate terms. It is not CCHR's intent to endorse any term. We encourage the use of whatever terms are deemed appropriate by members of a given group.

[2] https://www.apstylebook.com/topical_most_recent This report cautiously refers to the present conflict as the 'Israel-Hamas war.' This is the term recommended by the Associated Press (AP), a not-for-profit news service. Their guidance is, "compiled from Associated Press coverage, AP experts and the AP Stylebook." The AP states that words to describe the present conflict, "should be chosen carefully to reflect respect for different perspectives on the conflict." The AP further states that they are, "calling the present conflict…a war, given the widespread and ongoing nature of military operations." CCHR acknowledges that opinions differ over the conflict and over the appropriate terms to use. It is not CCHR's intent to endorse any position or term. Our work depends on remaining neutral. We serve every demographic group within the City, and we partner with communities across the City to advance peace.

we launched the *Think Before You Hate* campaign on buses and trains. We are following up with posters, fliers, and social media to drive traffic to our website. We expect that this will help promote the amended ordinance and pilot program, plus our other initiatives.


**KEY EVENTS TIMELINE**

| | |
|---|---|
| CCHR Unity Brunch | January 2023 |
| CCHR Unity Summit | July 2023 |
| Award of DOJ Grant | October 2023 |
| *Think Before You Hate* Ad Campaign | December 2023 |
| Hate Crimes Ordinance Amended | December 2023 |
| Annual Hate Crimes and Hate Incidents Report | June 2024 |


**Hate Crimes and Hate Incidents Total Numbers** are discussed on Pages 16 – 20.


**FINDINGS AND RECOMMENDATIONS**

Chicago's Hate Crimes and Hate Incidents Ordinance mandates that this annual report should contain findings and recommendations to reduce or eliminate hate crimes and hate incidents. These may include an evaluation of City policies and procedures ensuring that hate crimes and hate incidents are comprehensively investigated, tracked, and reported; and that survivors receive assistance from City agencies, as appropriate.

To that end, the report makes the following recommendations:

1. Pass the proposed hate littering ordinance.
2. Review the staffing model in the CPD Civil Rights Unit for mission optimization.
3. Connect 311 hate incident reporters to the Mental Health System Expansion Initiative.
4. Implement Educational Programs for Youth to Address the Problem of Hate.

**Conclusion:** Regardless of how the data is measured, recorded, and reported across the various jurisdictions, there is consensus that the numbers of hate crimes and hate

incidents have gone up. Clearly, many of our family, friends, and neighbors feel threatened by hate, hate incidents, and hate crimes. The CCHR stands ready to oppose hate.

# Introduction

The Chicago Commission on Human Relations (CCHR) is the City's civil rights agency. Our enabling ordinance states that "...prejudice and the practice of discrimination... menace peace and public welfare."[3]  Accordingly, CCHR's role is to, "promote peace and good order...among various segments of society."[4]

To accomplish our mission, CCHR enforces the Chicago Human Rights Ordinance and Chicago Fair Housing Ordinance.[5] We engage in outreach to raise awareness about the City's anti-discrimination laws, so that Chicagoans know that they can file a claim with us at no cost and seek justice. We provide educational workshops that empower attendees to resolve conflicts on their own. We also provide free mediation services to resolve community tensions. Lastly, we address hate crimes and hate incidents,[6] and these are the focus of this report.  Our purpose with all of this is to improve human relations in Chicago.

CCHR issues this report in compliance with Section 2-120-518 of the Municipal Code of Chicago, which was amended in December of 2023.[7] This section was formerly the City's Hate Crimes Ordinance and is now the City's Hate Crimes and Hate Incidents Ordinance. The amended ordinance directs CCHR to compile this report and lists specific, comprehensive information about hate crimes and hate incidents. It also requires the report to be delivered annually by July 1, presented to the City Council Joint Committee on Public Safety and Health and Human Relations, and to be made public.[8]

---

[3] Section 2-120-480 of the Municipal Code of Chicago.
[4] *Id*.
[5] *Id*.
[6] Section 2-120-518 of the Municipal Code of Chicago.
[7] *Id*.
[8] *Id*.

# Chicago: Birthplace of the Human Relations Movement

Human relations commissions are "created to help manage intergroup relationships...and improve a community's prospects for harmony and prosperity."[9]  The human relations movement started in Chicago in 1919 when a mob of White people murdered an African American seventeen-year-old named Eugene Williams for floating across an invisible boundary at an unofficially segregated beach.[10] The mob stoned young Eugene until he drowned.[11] This was a "hate crime" long before the term was coined.[12]

Despite many witnesses, police refused to make an arrest. That injustice ignited racial tensions. Riots ensued and hundreds were injured. The violence spread for days.

When tempers finally quelled, 15 White people  and 23 African Americans lay dead. A thousand African American families had lost their homes to arson. Because of this event, the Chicago Commission on Race Relations, the first of its kind and a precursor to CCHR, was created to study intergroup relations. The hope was to prevent similar tragedies and breakdowns of the social order from reoccurring.[13]

Today, Chicago faces another inflection point. COVID-19's assault on public health and the economy worsened systemic inequities. A police officer's murder of George Floyd sparked unrest, protests, and calls for a reckoning of America's history of racial injustice. A fractured immigration system continues to deliver waves of new arrivals seeking and finding sanctuary, but also encountering tensions in many neighborhoods. As of this

---

[9] *Human Relations Commissions: Relieving Racial Tensions in the American City*, Brian Calfano and Valerie Martinez-Ebers, Columbia University Press (2022).
[10] *Id*.
[11] *Id*.
[12] https://counseling.illinoisstate.edu/downloads/self-help/vidette-hate-crimes.pdf
[13] *Supra* note 9.

writing, the Israel-Hamas war[14] continues, and this too has raised tensions here at home. Meanwhile, reported hate crimes in Chicago have reached historic levels.[15]

Chicago, "The City that Works," must meet these challenges. CCHR remains steadfast and integral to the City's efforts to advance peace. We will collaborate with the Office of the Mayor, the City Council, the Chicago Department of Police (CPD), other agencies, community-based partners, and all interested stakeholders to help build a better, safer, stronger Chicago...free from hate.  This report outlines those collaborative efforts.



---

[14] *Supra* note 2.
[15] https://chicago.suntimes.com/metro-state/2023/8/30/23853206/report-chicago-hate-crimes-2022-highest-since-1994

# Hate Crimes and Hate Incidents

CCHR works with CPD to address hate crimes and hate incidents reported to have occurred within the City of Chicago. CPD handles all law enforcement aspects, and CCHR tends to the civilian needs of victims, their families, and targeted communities.

When a hate crime is reported to CPD, the associated file is referred to CPD's Civil Rights Unit which oversees the investigation. Once the Civil Rights Unit produces an initial report, that report is forwarded to CCHR.

Our Hate Crime Victim Advocate then contacts the victim to see if they have any needs beyond those that are being handled by CPD. This may entail helping them to track the case through the criminal justice system, accompanying them to court dates or meetings with detectives working on their case, providing referrals for other City or non-profit services, or simply sharing a friendly face and sympathetic ear. The latter is the human touch victims of hate crimes appreciate more than words can express.

## What is a Hate Crime?

A hate crime is a criminal act that targets a person or group of people because of their actual or perceived identity.

In this context, "hate" does not mean rage, anger, or even dislike. It means bias against people or groups with characteristics that are set forth by law.

In Chicago, Illinois, state and local hate crime laws combine to protect people who are targeted for characteristics such as race, color, creed, religion, gender, sexual orientation,

gender identity, national origin, ancestry, immigration or citizenship status, or physical or mental disability.[16]

Hate crime laws provide for enhanced penalties over and above those for similar crimes which are not motivated by hate.[17] This is because the harmful impact of hate crimes extends further than other crimes.[18] They not only hurt the individual victims, but they also threaten others in the same protected class. According to Richard Cohen, Executive Director of the Southern Poverty Law Center, "hate crimes have the unique ability to send shock waves through communities...[a] hate crime is a terroristic act because it puts others who are similarly situated in fear."[19]

Regulating hate must be done with careful consideration of the First Amendment, but the U.S. Supreme Court has upheld enhanced penalties for hate crimes.[20]

## What is a Hate Incident?

In December 2023, the City Council amended the City's hate crimes ordinance.[21] The amendments added a new term to the ordinance: "hate incidents."[22]

The amended ordinance defines hate incidents as "any action that: (A) targets an individual or group based on their actual or perceived race, color, sex, gender identity, age, religion, disability, national origin, ancestry, or sexual orientation; (B) consists of clear and intentional acts of bias, prejudice or hostility, including but not limited to offensive

---

[16] Section 8-4-085 of the Municipal Code of Chicago and 720 ILCS 5/12-7.1.
[17] https://www.adl.org/resources/news/hate-crime-laws-punishment-fit-crime
[18] *Id*.
[19] https://www.themarshallproject.org/2015/06/19/when-is-a-crime-a-hate-crime
[20] *Wisconsin v. Mitchell* (92-515), 508 U.S. 47 (1993).
[21] https://chicago.suntimes.com/city-hall/2023/12/8/23994211/chicago-hate-crime-reporting-311-debra-silverstein
[22] *Supra* note 6.

language, symbols, or threats, that place the targeted individual or group in reasonable apprehension of a hate crime; and (C) is not classified as a criminal offense or as a violation of" the Municipal Code of Chicago.[23]

Hate incidents are any non-criminal act that targets a person or group from a protected class.

The amended ordinance added the ability to report hate incidents to 311. It also specified the inclusion of hateful graffiti and expanded reporting requirements for CPD and CCHR.[24]

According to the amendment's sponsor, Ald. Debra Silverstein (50th Ward) the reason for adding hate incidents to the City's Hate Crimes Ordinance is that hate incidents are often "a precursor" to hate crimes.[25] By tracking and monitoring hate incidents, the City can better understand "what's happening and try to get things under control before it turns into a crime."[26]



---

[23] *Id.*
[24] *Id.*
[25] https://chicago.suntimes.com/city-hall/2023/9/12/23870416/chicago-hate-crime-ordinance-rewrite-proposed-city-council-silverstein-antisemitism
[26] *Id.*

# A Cautionary Note on Data

While the amended ordinance requires the gathering and publication of hate crimes and hate incidents data, it is important to note that it is difficult to compile accurate hate crime statistics.[27] For example, under federal law, the Federal Bureau of Investigations (FBI) is required to tabulate both state and federal crimes that "manifest evidence of prejudice based on race, gender or gender identity, religion, disability, sexual orientation, or ethnicity."[28] For more than thirty years, the FBI has published an annual report providing a comprehensive national snapshot of hate violence in the U.S.[29] To achieve this, the FBI relies on its own records regarding federal hate crimes violations, in addition to data reported by local law enforcement agencies.[30]

According to the Southern Poverty Law Center, the annual FBI report is "based on flawed and inconsistent data."[31]

At the federal level, the Matthew Shepard And James Byrd, Jr. Hate Crimes Prevention Act, U.S. Code Title 18 Section 249, prohibits willfully causing bodily injury to anyone because of the actual or perceived race, color, religion, or national origin of any person.[32] A separate provision of the statute imposes penalties for the same conduct if it is committed under certain specified circumstances and motivated by the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person.[33]

---

[27] https://www.propublica.org/article/why-america-fails-at-gathering-hate-crime-statistics
[28] https://bjs.ojp.gov/topics/crime/hate-crime
[29] https://www.justice.gov/hatecrimes/hate-crime-statistics
[30] *Id.*
[31] https://www.splcenter.org/hopewatch/2024/04/24/new-legislation-opportunity-hate-crime-data
[32] https://www.justia.com/criminal/hate-crime-laws-50-state-survey/
[33] *Id.*

Most states have hate crime statutes that include crimes committed on the basis of race, color, and religion.[34] Many, but not all, also include crimes committed on the basis of sexual orientation, gender, gender identity, and disability.[35] The FBI relies on local law enforcement to collect and submit hate crimes data but cannot compel them to do so.[36]

While the U.S. Department of Justice (DOJ) provides a Hate Crime Data Collection Guidelines and Training Manual,[37] many localities define hate crimes and collect data in their own manner in practice.[38] Many do not bother to report such data or even to collect it.[39] Sometimes there is a breakdown when states and localities want to submit data to the FBI.[40]

For example, in 2022, the FBI released its annual compilation of hate crimes statistics, summarizing all hate crimes reported to the FBI in 2021. That year was the first year the FBI required all law enforcement agencies to report all crime, including hate crimes, through the National Incident-Based Reporting System (NIBRS), ostensibly a more accurate, detailed way of reporting crimes than the previous system, which was known as the Uniform Crime Reporting (UCR) program and dated back to the 1920s.[41]

Many jurisdictions were unable to complete the switch to the new system on time, which resulted in inaccurate reporting.[42] Only 11,834 of the over 18,000 law enforcement agencies nationwide took part in hate crime data collection, a 22% decrease from the

---

[34] *Id*.
[35] *Id*.
[36] *Supra* note 27.
[37] https://www.justice.gov/hatecrimes/resource/hate-crime-data-collection-guidelines-and-training-manual-version-30
[38] *Supra* note 27.
[39] *Id*.
[40] *Id*.
[41] https://ucr.fbi.gov/nibrs/2011/resources/a-guide-to-understanding-nibrs
[42] https://rac.org/blog/hate-crimes-2021-incomplete-picture

previous year, the lowest number of agencies in two decades.[43] This made statistical comparisons between 2021 and previous years almost pointless.

Chicago, like most large jurisdictions, including New York City and Los Angeles, lacked the technical capacity to adopt and scale up to the complex new system by the deadline of January 1, 2021.[44] Nevertheless, in 2022, Chicago became the largest municipality in the nation to transition to the new system and report all relevant data.[45]

Another problem that undermines accurate hate crime data collection is that victims and witnesses tend to underreport hate crimes.[46] According to the DOJ's National Crime Victimization Survey (NCVS), annually, on average, approximately 250,000 Americans are victims of a hate crime.[47] Yet, the numbers of hate crimes reported to the FBI in recent years have averaged between 10,000 to 12,000.[48]

The reasons for this disparity are complex. Sometimes people do not understand what a hate crime is, so they do not recognize it when they experience it.[49] Other times, they fear retaliation for reporting.[50] Sometimes, people do not trust the police or do not believe prosecutors and the criminal justice system will succeed in providing them justice.[51]

According to the Illinois Commission on Discrimination and Hate Crimes, data on hate crimes "do not draw an accurate picture of the problem of hate in Illinois or in the country.

---

[43] *Id.*
[44] https://news.wttw.com/2023/07/31/police-departments-are-gradually-adopting-more-detailed-program-report-nationwide-crime
[45] *Id.*
[46] https://www.newsnationnow.com/world/war-in-israel/underreporting-hate-crimes/
[47] https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/hcv0519_sum_3.pdf
[48] https://www.justice.gov/crs/highlights/2022-hate-crime-statistics
[49] *Supra* note 44.
[50] *Id.*
[51] *Id.*

Many victims do not report incidents. When victims do report, law enforcement officers may or may not record or investigate those incidents as hate crimes."[52]

At CCHR, we work in conjunction with CPD and consider ourselves partners in addressing hate crimes. We rely on CPD to notify us of the hate crimes and hate incidents reported to them. To that end, CCHR numbers reflect CPD numbers.

---

[52] https://cdhc.illinois.gov/content/dam/soi/en/web/cdhc/documents/cdhc-2023-annual-report.pdf

# Hate Crimes and Hate Incidents Total Numbers

The public has access to CPD's hate crimes statistics in real time, via the CPD Hate Crime Dashboard.[53]  Prior to the 2023 amendment, CPD tracked what it deemed non-violent hate incidents. The tally of these incidents was at times hard to calculate as there was no formal category or tracking mechanism. The 2023 amendment specifically addressed this issue by including the term "hate incident" together with its own reporting mechanism through 311.[54]

Hate crimes may be reported by calling 911 or visiting a CPD district. Hate incidents may be reported by calling 311, downloading the 311 app to your phone, or by visiting 311.chicago.gov on a computer. Due to the legal need for a complainant, hate crimes may not be reported anonymously.  Unlike hate crimes, hate incidents may be reported anonymously. However, if a victim requests specific follow-up services, they must include contact information; the report cannot be anonymous.

Below are the total number of hate crimes reported to the Chicago Police Department for all of 2023, plus, the total number of hate crimes reported for 2024, year-to-date, as of June 13, 2024.[55] The numbers and the terms used were extracted from the CPD Hate Crimes Dashboard on that date.  As required by the amended ordinance, the data is categorized according to community area, bias motivation, type of incident and disposition:

---

[53] https://home.chicagopolice.org/statistics-data/data-dashboards/hate-crime-dashboard/
[54] *Supra* note 4.
[55] *Supra* note 53.

## Hate Crimes Data for All of 2023 and for January 1, 2024 to June 13, 2024

### Total Hate Crimes by Year

| 2023 | 2024 (Year-to-Date)[56] |
|------|------|
| 303 | 124 |

### Hate Crimes by Bias Motivation

| Bias Motivation | 2023 | 2024 |
|------|------|------|
| Sexual Orientation | 61 | 28 |
| Religion | 81 | 55 |
| Race/Ethnicity/Ancestry | 170 | 40 |
| Disability | 3 | 1 |
| Gender Identity | 11 | 5 |
| Total | 326 | 129 |

### Hate Crimes by Bias Groups

| | 2023 | 2024 |
|------|------|------|
| Anti-Jewish | 50 | 50 |
| Anti-Black | 76 | 19 |
| Anti-Gay (M) | 36 | 18 |
| Anti-Homosexual | 19 | 9 |
| Anti-Hispanic/Latino | 28 | 7 |
| Anti-Transgender | 11 | 5 |
| Anti-Other Race | 17 | 2 |
| Anti-Islamic/Muslim | 16 | 3 |
| Anti-Arab | 5 | 2 |
| Anti-Asian | 11 | 4 |
| Anti-Hindu | 1 | 1 |
| Anti-White | 16 | 0 |
| Anti-Multiple Religions/Groups | 7 | 2 |
| Anti-Lesbian | 6 | 1 |
| Anti-American Indian Alaskan Native | 4 | 0 |
| Anti-Other Religion | 3 | 2 |
| Anti-Mental Disability | 2 | 1 |
| Anti-Catholic | 1 | 0 |
| Anti-Eastern Orthodox | 1 | 0 |

[56] The 2024 hate crimes data was extracted from the CPD Hate Crimes Dashboard as of June 13, 2024.

## Type of Hate Crimes

| | | | 2023 | 2024 |
|---|---|---|---|---|
| **Arson** | | | **1** | **1** |
| | By Fire | | 1 | 1 |
| **Assault** | | | **87** | **24** |
| | Simple | | 66 | 20 |
| | Aggravated | | | |
| | | By Handgun | 8 | 1 |
| | | Other Dangerous Weapon | 9 | 1 |
| | | By Knife | 3 | 0 |
| | | Police Officer | 1 | 0 |
| | Protected Employee | | | |
| | | Hands/Fists/Feet | 0 | 2 |
| **Battery** | | | **69** | **17** |
| | Simple | | 52 | 11 |
| | Aggravated | | | |
| | | By Knife | 3 | 2 |
| | | By Handgun | 1 | 1 |
| | | Hands/Fists/Feet | 2 | 1 |
| | | Other Dangerous Weapon | 9 | 2 |
| | | Of a Senior Citizen | 1 | 0 |
| | | Of a Child | 1 | 0 |
| **Criminal Damage** | | | **40** | **37** |
| | Criminal Defacement | | 17 | 20 |
| | To Property | | 12 | 10 |
| | To Vehicle | | 5 | 5 |
| | Institutional Vandalism | | 3 | 2 |
| | To State Supported Property | | 2 | 0 |
| | To City of Chicago Supported Property | | 1 | 0 |
| **Criminal Trespass** | | | **1** | **0** |
| | To Land | | 1 | 0 |
| **Intimidation** | | | **7** | **2** |
| | | | 7 | 2 |
| **Other Offense** | | | **54** | **18** |
| | Telephone threat | | 15 | 8 |
| | Harassment By Electronic Means | | 24 | 6 |
| | Harassment By Telephone | | 6 | 3 |

| | | | |
|---|---|---|---|
| | Other Crime Against Person | 9 | 1 |
| **Public Peace Violation** | | **6** | **1** |
| | Bomb threat | 3 | 1 |
| | Mob Action | 2 | 0 |
| | Reckless Conduct | 1 | 0 |
| **Robbery** | | **1** | **0** |
| | Attempted Strong Arm        No Weapon | 1 | 0 |
| **Sex Offense** | | **1** | **0** |
| | Attempted Criminal Sexual Abuse | 1 | 0 |
| **Theft** | | **5** | **0** |
| | $500 and Under | 5 | 0 |
| **Traffic Crash** | | **1** | **0** |
| | Minor Personal Injury Crash | 1 | 0 |
| **Weapons Violation** | | **1** | **0** |
| | Reckless Firearm Discharge | 1 | 0 |
| **Non-Criminal** | | **20** | **20** |
| | Non-Criminal Person | 15 | 12 |
| | Non-Criminal Property | 4 | 8 |
| | Found Property | 1 | |

## Hate Crimes by Community Area

| | 2023 | 2024 |
|---|---|---|
| West Ridge | 12 | 13 |
| North Park | 1 | 1 |
| Edgewater | 12 | 5 |
| Uptown | 9 | 7 |
| Lake View | 16 | 8 |
| Irving Park | 11 | 1 |
| Portage Park | 13 | 1 |
| Hermosa | 3 | 1 |
| Austin | 4 | 2 |
| Near North Side | 22 | 5 |
| Near South Side | 0 | 2 |
| New City | 1 | 1 |
| Hyde Park | 1 | 1 |
| Englewood | 1 | 1 |
| West Elsdon | 0 | 1 |

CCHR 2024 HATE CRIMES AND HATE INCIDENTS REPORT

| | | |
|---|---|---|
| Chatham | 4 | 3 |
| Mount Greenwood | 0 | 1 |
| Riverdale | 1 | 1 |
| Rogers Park | 19 | 11 |
| Forest Glen | 2 | 0 |
| Ohare | 4 | 2 |
| Albany Park | 4 | 1 |
| Dunning | 4 | 1 |
| West Town | 1 | 6 |
| Lincoln Park | 10 | 7 |
| Loop | 27 | 5 |
| West Garfield Park | 1 | 0 |
| North Lawndale | 3 | 2 |
| Armour Square | 4 | 1 |
| Bridgeport | 4 | 0 |
| Fuller Park | 2 | 0 |
| West Englewood | 3 | 0 |
| Chicago Lawn | 5 | 0 |
| Clearing | 2 | 1 |
| Greater Grand Crossing | 4 | 0 |
| South Shore | 6 | 2 |
| Roseland | 1 | 0 |
| Pulman | 1 | 0 |
| Washington Heights | 3 | 0 |

## Total Non-Criminal Hate Incidents by Year

| 2023 | 2024 |
|---|---|
| 24 | 20 |

## Dispositions of Hate Crimes

| | 2023 | 2024 |
|---|---|---|
| Bona Fide | 290 | 123 |
| Undetermined | 10 | 1 |
| Unfounded | 15 | 0 |

Below are the total number of hate incidents reported to 311 for 2024, year-to-date, as of June 13, 2024. The numbers and the terms used were extracted from 311 on that date. This is the first year that such data is being collected, pursuant to the amended ordinance.

20

As required by the amended ordinance, the data is categorized according to community area, bias motivation, type of incident and disposition.

**CCHR 2024 HATE CRIMES AND HATE INCIDENTS REPORT**

# Hate Incidents Data for January 1, 2024 to June 13, 2024

(This is the first year that hate incidents data is being recorded, pursuant to the Hate Crimes and Hate Incidents Ordinance).

| Total Hate Incidents by Year 2024 (Year-to-Date) |
|:---:|
| 17 |

### Hate Incidents by Bias Motivation[57]

| Bias Motivation | 2024 |
|---|---:|
| Sexual Orientation | 5 |
| Religion | 6 |
| Race/Ethnicity/Ancestry | 6 |
| Disability | 2 |
| Gender Identity | 4 |
| Undisclosed | 1 |
| Total | 24 |

### Hate Incidents by Bias Groups 2024

| | |
|---|---:|
| Anti-Jewish | 5 |
| Anti-Black | 1 |
| Anti-Gay (M) | 1 |
| Anti-Homosexual | 0 |
| Anti-Hispanic/Latino | 0 |
| Anti-Transgender | 1 |
| Anti-Other Race | 0 |
| Anti-Islamic/Muslim | 0 |
| Anti-Arab | 1 |
| Anti-Asian | 0 |
| Anti-Hindu | 0 |
| Anti-White | 0 |
| Anti-Multiple Religions/Groups | 0 |
| Anti-Lesbian | 0 |
| Anti-American Indian Alaskan Native | 0 |
| Anti-Other Religion | 0 |
| Anti-Mental Disability | 0 |
| Anti-Catholic | 0 |
| Anti-Eastern Orthodox | 0 |
| Undisclosed | 8 |

---

[57] The number of Hate Incidents by Bias Motivation is greater than the total number of Hate Incidents by Year because some of the hate incidents reports indicated more than one bias motivation within the same incident. For example, one report identified both race and religion as motivating factors for the hate incident, another report identified gender identity and sexual orientation as motivating factors for the hate incident, and a third report identified gender identity, sexual orientation, and disability as motivating factors for the hate incident.

## Type of Hate Incidents[58]

|  |  | 2024 |
|---|---|---|
| **Defamation** |  | **1** |
|  | Printed material | 1 |
| **Offensive Communication** |  | **12** |
|  | Electronic Means | 2 |
|  | Other | 1 |
|  | Printed material | 6 |
|  | Verbal | 3 |
| **Undetermined** |  | **4** |

## Hate Incidents by Community Area

|  | 2024 |
|---|---|
| Avondale | 0 |
| Douglas | 0 |
| East Side | 0 |
| Englewood | 0 |
| Garfield Ridge | 0 |
| Humboldt Park | 1 |
| Irving Park | 0 |
| Lake view | 2 |
| Lincoln Park | 1 |
| Logan square | 1 |
| Loop | 1 |
| Montclare | 1 |
| Near North Side | 2 |
| Near West Side | 0 |
| North Center | 0 |
| North Park | 1 |
| Portage Park | 0 |
| Rogers Park | 0 |

---

[58] The Type of Hate Incidents categories will be different from the Type of Hate Crimes categories. This is because 'crime' is a term of art in the law, so all crimes are named and defined either by state statute or city ordinance. The concept of 'incidents' is not a term of art, so there is no closed universe of types of incidents that may occur.

| | |
|---|---|
| South Chicago | 1 |
| South Shore | 1 |
| West Ridge | 4 |
| West Town | 1 |

## Dispositions of Hate Incidents[59]

| | 2024 |
|---|---|
| **Total Reported** | **114** |
| Bona Fide | 17 |
| Undetermined | 14 |
| Unfounded | 83 |

[59] For Dispositions of Hate Incidents this report utilizes the three categories of dispositions utilized by the CPD Hate Crimes Dashboard (Bona Fide, Undetermined, and Unfounded). CPD makes those determinations with regard to hate crimes and the numbers presented here reflect CPD's assessment of each reported hate crime. The hate incidents data referenced here comes from the 311 dashboard, which does not provide information regarding the dispositions. CCHR reviewed the facts alleged in each reported hate incident and categorized each accordingly.

## The Big Picture: Hate Crimes and Hate Incidents Overview

The amended ordinance requires CCHR to provide "an overview of hate crimes and hate incidents from local, regional, and national perspectives."[60] What follows is a comprehensive overview. However, the lack of uniform data collection and reporting methods across jurisdictions makes cross-referencing difficult, if not impractical. Nevertheless, what follows will create a picture that hate crimes and hate incidents, no matter how these are defined and measured, appear to have increased across the country.

## Hate Crimes: A National, Regional, and Local Problem

Hate crimes impact every community in America. They are a national, regional, and local problem that is trending in the wrong direction. A cursory glance at takeaways from the FBI's 2022 hate crimes report illustrates the severity of the problem. That year saw:

The **highest** number of reported race-based crimes ever (6,570).[61]

The **highest** number of crimes against African Americans since 2000 (3,424).[62]

The **highest** number of anti-Latine crimes ever (738).[63]

The **second-highest** number of anti- Asian American and Native Hawaiian/Pacific Islander crimes (525).[64]

The **highest** number of crimes motivated by the victim's sexual orientation (1,947).

---

[60] *Supra* note 6.
[61] *Supra* note 31.
[62] *Id*.
[63] *Id*.
[64] *Id*.

The **highest** number targeted because of their gender identity (469).

The **highest** number targeted because of their religion (2,014).[65]

The **highest** number of antisemitic crimes since 1993 (1,124).

A **growing** number of anti-Muslim crimes (158).[66]

That same year, 2022, CCHR Commissioner Nancy Andrade testified at a City Council budget hearing that, year-to-date in Chicago, there had been a 71% increase in hate crimes reported to CCHR compared to the same period the previous year.[67] At that point, CPD had forwarded CCHR reports for 77 hate crimes, compared to 45 for the same period during the previous year.[68]

At the time, in Chicago, Jewish people were the most frequent targets of hate crimes (18), followed by African Americans (16), members of the White community, (12), members of the LGBTQ+ community (8), Asian American and Native Hawaiian/Pacific Islanders (5), biracial people (5), members of the Arab community (3), and a Catholic (1).[69]

Since 2022, violent crime in Chicago has been on a downward trend.[70] Nevertheless, data shows that hate crimes have continued their trend upward.[71]

---

[65] *Id.*
[66] *Id.*
[67] https://chicago.suntimes.com/city-hall/2022/10/20/23415326/hate-crime-reports-chicago-commission-human-relations-immigrants
[68] *Id.*
[69] *Id.*
[70] https://news.wttw.com/2024/02/02/shootings-homicides-chicago-both-down-least-25-start-2024-according-police
[71] *Supra* note 15.

According to a 2023 report issued by the Center for the Study of Hate and Extremism at California State University, San Bernardino, in 2022, Chicago recorded its highest number of hate crimes in nearly three decades.[72] While the study's authors acknowledge that the study used different parameters than CPD uses when deciding what incidents to include in its hate crime statistics, they both show an upward trend.[73]

According to CPD's Hate Crimes Dashboard CPD received reports of 109 hate crimes in 2021.[74] In 2022, CPD received reports of 204 hate crimes, a nearly 100% increase over the previous year.[75] In 2023, they received reports of 304 hate crimes,[76] another significant increase.

During the 2022 budget hearing, some Alderpersons expressed concern that the rising tide of political partisanship and the 2024 presidential election would further fuel an increase in tension and hate crimes.[77] Commissioner Andrade pledged to partner with the City Council to build "something stronger with more visibility to address this."[78] To that end, the section below titled *Chicago Responds: An Overview of CCHR Hate Crimes and Hate Incidents Activities* will highlight some of the work that CCHR has done in collaboration with the Office of the Mayor, the City Council, and other partners to address hate crimes and hate incidents in Chicago.

---

[72] *Id.*
[73] Comparison of California State University study versus CPD Dashboard.
[74] *Supra* note 53.
[75] *Id.*
[76] *Id.*
[77] *Supra* note 66.
[78] *Id.*

A deep dive will better illustrate the problem on a national, regional, and local scale. For example, according to the FBI, anti-LGBTQ+ hate crimes jumped more than 19% nationally in 2022 compared to 2021.[79] The Human Rights Campaign declared a state of emergency for LGBTQ+ Americans and issued a report describing the community as "under attack."[80]

Many consider Illinois to be a safe haven for the LGBTQ+ community, and, generally speaking, it is.[81] Nevertheless, in Illinois, in 2022, hate crimes against members of the LGBTQ+ community saw the biggest year-to-year jump both in percentage and sheer numbers.[82] In 2022, in Illinois there were 66 hate crimes based on sexual orientation, eight based on gender identity and 64 based on religion.[83] The year before, there had been 29 for orientation, two for gender identity, and 22 for religion.[84]

Nationally, hate crimes against African American have gone up by much smaller percentages than other groups in recent years.[85] Still, African Americans remain by far the largest category of victims, making up nearly one-third of reported incidents nationwide.[86] In one poll, more than half of African American respondents reported fear of becoming the victim of a hate crime.[87] In 2022, hate crimes against African American Chicagoans went up by 50%.[88]

---

[79] https://thehill.com/homenews/lgbtq/4259292-fbi-crime-statistics-show-anti-lgbtq-hate-crimes-on-the-rise/
[80] https://hrc-prod-requests.s3-us-west-2.amazonaws.com/Anti-LGBTQ-Legislation-Impact-Report.pdf
[81] https://www.lgbtqnation.com/2024/04/rep-kelly-cassidy-helped-make-illinois-a-haven-for-lgbtq-rights-says-the-impact-is-beyond-words/
[82] https://illinoiseagle.com/2023/10/18/hate-crimes-rose-in-illinois-nationally-last-year/
[83] *Id.*
[84] *Id.*
[85] https://www.themarshallproject.org/2023/03/25/asian-hate-crime-fbi-black-lgbtq
[86] *Id.*
[87] https://www.usatoday.com/story/news/politics/2023/03/15/economy-gun-violence-black-voters/11417786002/
[88] https://news.wttw.com/2022/11/05/hate-crimes-against-black-chicagoans-50-year-city-agency-finds

Latines have also experienced a "significant increase" in hate crimes in recent years.[89] In 2021 alone, they saw a 41% increase nationally.[90] Brian Levin, the founding director of the Center for the Study of Hate and Extremism at California State University, which conducted a study cited earlier in this report, stated that one of the reasons for the increase is that, "different groups of people in the United States [are] getting involved in conspiracy theories, sometimes anti-Muslim, sometimes anti-African American, and sometimes anti-Latino."[91] These, "stigmatize minorities and promote hatred of ethnically diverse communities, such as Hispanics."[92]

Rachel Carroll Rivas, deputy director of research at the Southern Poverty Law Center concurred, adding, "We have seen a real increase in hate crimes directed against Jews, Black people, and people who identify as Hispanic or Latino. And this impact is being felt directly by people."[93]

One of the forces driving hate crimes against the Latine community is anti-immigrant rhetoric.[94] Politicians' use of bigoted language around immigration and border policy plays a role in driving hate crimes.[95] As Rivas noted, "anti-immigrant groups…have taken power in many political spheres, and they also repeat false and racist conspiracies that create a culture where hate crimes thrive."[96]

---

[89] https://www.nbcnews.com/news/latino/hate-crimes-latinos-see-significant-increase-rcna123211
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*

As with other groups, the numbers of hate crimes and incidents against the Latine community are almost certainly higher than what official records show.[97] In the case of Latines this may be because police departments do not uniformly track racial and ethnic information.[98] Another factor is that studies have shown that some Latines are less likely to report crimes due to distrust in law enforcement or concerns about immigration status.[99]

During the COVID-19 pandemic, members of the Asian American and Native Hawaiian/Pacific Islander (AANHPI) community also saw a sharp increase in hate crimes and hate incidents.[100] Between 2020 and 2021, hate crimes against this community nationally rose an astonishing 224%.[101] In a survey administered in late 2021, one in five members of the AANHPI community nationally reported experiencing a hate act in the past year.[102] This was due, in large part, to the misattribution of the coronavirus to their community.[103]

Again, the numbers of hate crimes against the AANHPI community are almost certainly underreported.[104] According to Chris Javier, a deacon at Chinese Christian Union Church in Chicago's Chinatown, "people in the Asian American and Pacific Islander community may feel hesitant to call 911 or report crimes in other ways [because of]

---

[97] *Id.*
[98] https://www.axios.com/2023/08/31/hate-crimes-latino-los-angeles-chicago
[99] *Id.*
[100] https://www.advancingjustice-aajc.org/anti-asian-hate
[101] https://www.csusb.edu/hate-and-extremism-center
[102] https://stopaapihate.org/2021/11/18/national-report-through-september-2021/
[103] https://www.wbez.org/race-class-communities/2020/03/31/asian-americans-in-chicago-feel-the-bite-of-prejudice-during-the-spread-of-the-coronavirus
[104] https://www.chicagotribune.com/2022/06/06/theres-pain-in-the-community-data-shows-increase-in-anti-asian-hate-crimes-nationwide-but-some-worry-chicagos-low-numbers-stem-from-lack-of-reporting/

thinking they won't be helped, feeling afraid of retribution or seeing language as a barrier."[105]

The DOJ suggests that police and local governments conduct outreach in different languages to raise awareness and inform communities about resources for victims of hate crimes.[106]

Native Americans do not report a high number of hate crimes.[107] That does not mean that they do not occur. As with other groups, it is believed that hate crimes against Native Americans go underreported.[108] According to Barbra Perry, a global hate crime expert and author of *Silent Victims: Hate Crimes Against Native Americans*, the true numbers are higher than reported.[109] The reasons Native Americans do not report hate crimes, she says, include, "a sense that they won't be taken seriously," and fear of retaliation.[110]

When hate crimes occur against Native Americans they do not often make headlines, which some argue is, "part of a pattern of discrimination and violence dating back generations."[111] According to Charles Abourezk, an indigenous rights activist and Chief Justice of the Rosebud Sioux Tribe Supreme Court, discrimination against Native Americans is widespread.[112] He says Native American communities have been,

---

[105] *Id.*
[106] https://www.justice.gov/hatecrimes/file/1223831
[107] https://www.voanews.com/a/rise-in-hate-crimes-alarms-native-american-communities/3887303.html
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*

"increasingly susceptible to the same kind of growing backlash or regression in terms of race politics [seen]...in the rest of the country."[113]

According to a 2023 report by the Anti-Defamation League (ADL), *Hate in the Prairie State*, racist propaganda campaigns and antisemitic acts more than doubled in Illinois in 2022, tracking a national trend.[114] The report details examples of extremism across the state and provides a comprehensive list of radical forces targeting Illinois, including White supremacist groups, anti-LGBTQ+ zealots, and QAnon conspiracy theorists.[115]

White supremacist propaganda campaigns rose by 111%.[116] Antisemitic acts including assault, harassment and vandalism rose to their highest level in recent history in 2022, jumping 128% from the previous year, from 53 to 121.[117] And attacks on abortion providers were carried out after the U.S. Supreme Court overturned the landmark *Roe v. Wade* decision.[118]

The ADL report was issued before the start of the Israel-Hamas war.[119] Antisemitic and Islamophobic hate crimes and hate incidents only increased stateside following the outbreak of those hostilities.[120] Tensions around the conflict have impacted communities

---

[113] *Id.*
[114] https://www.adl.org/resources/report/hate-prairie-state-extremism-antisemitism-illinois
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Supra* note 2.
[120] https://www.cnn.com/2023/10/29/us/hate-crimes-antisemitism-anti-muslim-dg/index.html and https://www.voanews.com/a/antisemitism-islamophobia-surge-in-2023-watchdogs-say/7407451.html

across the country, leading to protests in our streets,[121] and on college campuses.[122] They have even impacted City Council proceedings and the work of CCHR.[123]

According to a 2024 report by the Council on American-Islamic Relations (CAIR), *Fatal: The Resurgence of Anti-Muslim Hate*, the organization received 8,061 complaints of hate crimes or hate incidents nationwide in 2023, the highest number of complaints they have recorded in their 30-year history.[124] Nearly half of all complaints CAIR received were reported in the final three months of the year, after the start of the war.[125]

The ADL's annual report, released in 2024, is consistent with CAIR's findings.[126] Last year there was "an increase of dozens of percentage points in the number of antisemitic incidents in Western countries in comparison to 2022. A particularly steep increase was recorded following the October 7 attacks."[127]

Perhaps no incident better illustrates how these terrible global conflicts can result in hate crimes and lethal repercussions right here at home than the tragic murder of Wadea Al-Fayoume, a six-year-old Palestinian-American boy who was stabbed to death by his family's landlord.[128] According to his mother, who was also attacked, the landlord yelled "...you Muslims must die!" before attempting to choke and stab her.[129] After she attempted

---

[121] https://www.cbsnews.com/chicago/news/pro-palestinian-march-chicago-loop/
[122] https://www.axios.com/local/chicago/2024/05/08/chicago-universities-response-protests
[123] https://www.cbsnews.com/chicago/news/chaos-erupts-at-chicago-city-hall-as-aldermen-back-resolution-declaring-solidarity-with-israel/ and https://chicago.suntimes.com/city-hall/2024/1/31/24057161/mayor-brandon-johnson-gaza-ceasefire-resolution-raucous-debate-clears-chambers
[124] https://ca.cair.com/losangeles/wp-content/uploads/sites/6/2024/04/2024_Fatal_The_Resurgence_of_Anti-Muslim_Hate-11.pdf
[125] *Id*.
[126] https://www.adl.org/resources/press-release/tel-aviv-university-and-anti-defamation-league-publish-annual-report
[127] *Id*.
[128] https://www.cnn.com/2023/10/18/us/wadea-al-fayoume-death-wednesday/index.html
[129] *Supra* note 123.

to call for law enforcement, she found that the landlord had killed her son.[130] The landlord has been indicted by a grand jury on first-degree murder, attempted murder, battery, and hate crime charges.[131] The DOJ has also opened a hate crimes probe into the killing.[132]

---

[130] *Id.*

[131] *Id.*

[132] https://www.axios.com/2023/10/16/plainfield-illinois-murder-muslim-hate-crime

## Standing Up to Hate: National, Regional, and Local Responses

In recent years, federal, state, and local governments have stepped up their efforts to address the rising tide of hate crimes and hate incidents.

On the national level, the federal government runs the Matthew Shepard and James Byrd, Jr. Hate Crimes Program.[133] Via this program, the U.S. Bureau of Justice Assistance provides grants to support the hate crimes work conducted by state, local, and tribal law enforcement, and prosecution agencies and their partners.[134] The grants fund outreach, education, improved victim reporting tools, and investigations and prosecutions of hate crimes.[135] As noted later in this report, the State of Illinois, Cook County, plus CPD and CCHR have all received grants to assist with hate crimes and hate incidents work.

As stated above in the section on data, the FBI has published an annual report for over 30 years, providing the most important and comprehensive national snapshot of hate violence in the U.S.[136] Again, experts agree these reports have been based on flawed and inconsistent data.[137] Without accurate data, it is impossible to effectively address our nation's hate crime problem.[138]

A bipartisan bill introduced in Congress this year aims to improve the FBI's collection of this data.[139] The Improving Reporting to Prevent Hate Act (H.R.7648) would require state and local law enforcement to report accurate data to the FBI, and to engage in

---

[133] https://bja.ojp.gov/funding/opportunities/o-bja-2024-172097
[134] *Id*.
[135] *Id*.
[136] *Supra* note 29.
[137] *Supra* note 31.
[138] *Id*.
[139] *Supra* note 31.

meaningful hate crime prevention, outreach, and awareness initiatives.[140] As an incentive, it would condition federal funding to said agencies based on compliance with heightened reporting standards.[141] If this bill becomes law, it could improve hate crime reporting nationwide, providing better data to understand – and combat – the problem.[142]

In 2021, Illinois Governor JB Pritzker stated, "As the state most representative of our nation, Illinois is also home to the hate that plagues our nation - and in turn, [we have] an opportunity to lead the way in building a welcoming, inclusive state that all our residents can be proud to call home."[143]

In response to the onslaught of hate, Governor Pritzker re-established the **Illinois Commission on Discrimination and Hate Crimes** (ICDHC) after more than a decade of dormancy.[144] Housed within the Illinois Department of Human Rights (IDHR), the ICDHC's mission is "to identify and uproot sources of discrimination and bias at the source, while assisting with the development of resources, training, and information that allow for a swift and efficient response to hate-motivated crimes and incidents."[145]

In March 2024, ICDHC soft-launched **Illinois v Hate**, a non-emergency hate incident reporting helpline and online portal "to support individuals and communities affected by hate."[146] Illinois v Hate is not a crisis line and is not affiliated with or connected to law enforcement.[147] For emergencies, the public is urged to dial 911.[148]

---

[140] *Id*.
[141] *Id*.
[142] *Id*.
[143] https://gov.illinois.gov/newsroom/press-release.24721.html
[144] *Id*.
[145] https://cdhc.illinois.gov/
[146] https://cdhc.illinois.gov/report-hate.html
[147] *Id*.
[148] *Id*.

However, for non-emergencies, the public is encouraged to call (877) 458-4283, or 877 IL V HATE, Monday-Friday, 12 PM to 9 PM. They can also access the online portal, 24/7, at https://cdhc.illinois.gov/report-hate/report-form.html#ilvh.[149]

Funded by a DOJ Matthew Shepherd/James Byrd, Jr. grant, the helpline is a safe, confidential service. According to ICDHC, it will "provide essential tools, support, and referrals for victims of hate crimes."[150]

Illinois also responded to hate by adopting measures aimed at safeguarding the rights of LGBTQ+ people, even as other states moved to restrict the community.  Just before the pandemic, Illinois adopted the **Inclusive Curriculum Law (Public Act 101-0227)**, a measure which requires Illinois schools to include the positive contributions of lesbian, gay, bisexual and transgender individuals in their history curriculum.[151]

More recently, the state adopted additional laws to protect the LGBTQ+ community.[152] One new law will update language in existing acts to be more gender inclusive in order to affirm LGBTQ+ youth in foster care.[153]  Another will make it easier for LGBTQ+ couples to marry.[154]  A third allows multi-occupancy, gender-neutral restrooms to be installed in private and public Illinois businesses.[155] While the State previously allowed single-occupancy restrooms for any gender, the law now allows businesses to designate multi-occupancy gender-neutral restrooms.[156]

---

[149] *Id*.
[150] *Id*.
[151] https://will.illinois.edu/news/story/pritzker-signs-bill-requiring-illinois-schools-teach-lgbt-history
[152] https://apnews.com/article/illinois-lgbtq-laws-pronouns-gay-rights-79c885b9f57769412b3c993c8a5a90e6
[153] *Id*.
[154] *Id*.
[155] *Id*.
[156] *Id*.

Illinois responded to the rise in hate crimes against the Asian American and Native Hawaiian/Pacific Islander (AANHPI) community by adopting **the Teaching Equitable Asian American Community History (TEAACH) Act (Public Act 102-0044)**.[157] With this law, Illinois became the first state in the nation to require public schools to devote a unit of curriculum to the history of AANHPI community in the United States, including in Illinois and the Midwest.[158] The TEAACH Act requires schools' U.S. history courses to include the role that this community has played in advancing civil rights, which will highlight their contributions to the country's development.[159]

Last year, Gov. Pritzker also signed **Public Act 103-0422** into law, which mandates a new unit of study for Native American history in kindergarten through high school in each school district across the state.[160] The Illinois State Board of Education (ISBE) worked with stakeholder groups to develop a resource guide.[161] These included Native American educators and scholars, advocates from the Native American Chamber of Commerce and the Chicago American Indian Community Collaborative, as well as a member of the Prairie Band of Potawatomi Tribal Council.[162]

Professor Megan Bang, director of the Center for Native American and Indigenous Research at Northwestern University is a proponent of the enhanced curriculum requirements.[163] According to Professor Bang, when it comes to Native American history,

---

[157] https://www.injusticewatch.org/archive/2021/teaach-act-anti-asian-hate/
[158] *Id*.
[159] *Id*.
[160] https://truthout.org/articles/indigenous-led-effort-changes-illinois-school-curriculum-to-cover-native-history/
[161] *Id*.
[162] *Id*.
[163] *Id*.

most students as early as 2nd grade get, "a storyline of how the United States came to be. And it's either filled with stereotypes, or they start to know there was some violent stuff that happened."[164] She believes it is appropriate to teach students about, "the territories they're on, as well as sharing some of the value systems expressed in Indigenous stories."[165] Professor Bang adds that there is, "beautiful knowledge and ethics in many of our communities, and I think that classrooms could and should engage young children in those things."[166]

The Illinois Attorney General's Office responded to the problem of hate by working with Illinois legislators to enhance hate crime laws.[167] Recent amendments: expanded the list of crimes that can be prosecuted as hate crimes; addressed the increasing use of technology to attack victims; ensured that victims can file civil lawsuits; allowed judges to impose significant penalties; and permitted the Attorney General to bring civil hate crime claims.[168]

In 2022, Illinois Attorney General Kwame Raoul launched a first-of-its-kind civil lawsuit against two Illinoisans for allegedly engaging in hate crimes.[169] The lawsuit alleged that two residents of Carroll County, a mother and her adult son, both members of the White community, lynched an effigy of their African American neighbor, in chains, in a tree a few feet from his property.[170] They also hung a Confederate flag, displayed a racial slur in

---

[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] https://illinoisattorneygeneral.gov/rights-of-the-people/civil-rights/hate-crimes/
[168] *Id.*
[169] https://capitolnewsillinois.com/news/attorney-general-files-first-civil-hate-crime-lawsuit-under-authority-expanded-in-2018
[170] https://www.shawlocal.com/sauk-valley/2024/05/16/ex-savanna-woman-gets-3-years-in-prison-for-harassing-witness-in-race-based-case/

a window facing his home, and painted swastikas on their garage, which also faced his property.[171] They did this to intimidate him, as he was a witness against the pair in a criminal harassment case.[172] Last month the mother was sentenced to three years in prison for witness intimidation.[173]

In 2023, Cook County Board President Toni Preckwinkle partnered with Cook County Commissioner Scott Britton to launch **Cook County United Against Hate (CCUAH)**, an initiative meant to, "empower everyone, everywhere, to learn to actively stand against hate."[174] CCUAH is a coalition of individuals, nonprofits, faith groups, businesses, and governments united to publicly denounce racism, bigotry, and hatred of any kind through a resolution and proclamation, and by individuals signing an online pledge.[175]

CCUAH partners aim to build awareness through education about hate crimes and the root causes of prejudice and have already hosted a series of community-based events.[176] They will also highlight the work of exceptional organizations and cultivate an online library of resources.[177]

CCUAH also means to inspire conversation with a new community spirited United Against Hate symbol that highlights the need to actively reverse the impacts of discrimination and bigotry.[178] CCUAH means to challenge all communities to "champion

---

[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] https://www.cookcountyunitedagainsthate.com/
[175] https://www.cookcountyunitedagainsthate.com/take-the-pledge
[176] https://www.cookcountyunitedagainsthate.com/attend-an-event
[177] https://www.cookcountyunitedagainsthate.com/about
[178] *Id.*

social justice...take agency in ending discrimination and bullying, and...interrupt bullying, intolerance, and discrimination at every level, system, and institution where it exists."[179]

The Cook County State's Attorney's Office (CCSAO) has also responded to the rise in hate crimes. In 2023, it won a DOJ Matthew Shepherd/James Byrd, Jr. grant to implement the **CCSAO Against Hate: Education & Outreach Program** in Cook County, Illinois.[180]  The purpose of the Program is to increase public awareness, identification, and reporting of hate crimes, and to increase the CCSAO's ability to respond to hate crimes.[181]

---

[179] *Id.*
[180] https://bja.ojp.gov/funding/awards/15pbja-23-gg-05357-hate
[181] *Id.*

# Chicago Takes Action: An Overview of CCHR Hate Crimes and Hate Incidents Activities

## Hate Crime Victim Advocate Work

At the City of Chicago, the key player for CCHR's work in addressing hate crimes and hate incidents is the Hate Crime Victim Advocate. Once CCHR receives a hate crime or hate incident report from CPD, the Hate Crime Victim Advocate contacts the victims and notifies the local Alderperson.

While victim advocacy in this context does not involve legal representation, CCHR provides emotional support, victims' rights information, help in accessing resources, assistance in filling out crime victim related forms, and accompanies victims and their family members through the criminal justice proceedings. CCHR tracks the case to its conclusion and collaborates with other organizations, such as criminal justice or social service agencies, to get help or information for the victims.

A few scenarios based on case synopses illustrate the nature of this work. Names and other identifying details have been omitted.

In one case, an Asian American and Native Hawaiian/Pacific Islander man was assaulted on a CTA platform while waiting for the train. The man who allegedly attacked him shouted racial slurs during the beating. The victim was left injured and in need of medical attention. The perpetrator was arrested, but the victim felt traumatized, intimidated, and reluctant about pressing charges. CCHR's Hate Crime Victim Advocate accompanied the victim during meetings with CPD and the Cook County State's Attorney's

Office, and to court dates. The victim felt secure enough to proceed and a prosecution is
pending.

In another case, two women, an LGBTQ+ couple, were assaulted by alleged
members of a gang who harassed them with homophobic slurs. Both were injured and
traumatized. They filed a police report, and an arrest was made, but only one of the victims
wanted to proceed with a prosecution. The other victim feared the alleged gang members
would retaliate. CCHR's Hate Crime Victim Advocate connected them with Cook County
State's Attorney resources, accompanied them to court, and even arranged for a Cook
County Sherrif's Police officer to escort them into and out of the courthouse. They were
able to proceed with the prosecution. Incidentally, when the CCHR Hate Crime Victim
Advocate notified the local Alderperson about the case, the Alderperson flagged it for the
local CPD district, and special attention was paid to the alleged gang.

In another case, an undocumented, transgender Mexican woman was attacked by
alleged members of a local gang who shouted transphobic slurs. The victim sustained
injuries and was traumatized. She filed a police report and the gang's alleged ringleader
was arrested. Witnesses gave corroborating statements to police, but the gang allegedly
threatened them, and they refused to testify. The gang also allegedly threatened the victim
that if she did not drop the charges, they would kill her. The alleged gang members were
local to her neighborhood and knew where she lived. The CCHR Hate Crime Victim
Advocate contacted several housing non-profits in an entirely different neighborhood and
was able to secure a new apartment for the victim, so that she could feel safe. He also

informed her that, as an alleged crime victim and a witness she might qualify for a "U" visa to become documented, and she secured one. She is proceeding with the prosecution.

In another case, an undocumented Latine man was allegedly attacked outside of a bar by a group of men who shouted racial slurs and continued beating him, even as he fell to the ground, unconscious. He needed five staples to seal the huge gash in the top of his head, plus a neck brace. The victim was left unable to work for a significant period of time. The CCHR Hate Crime Victim Advocate connected him with the Illinois Attorney General's victim compensation fund. He accompanied the victim to meetings with CPD and the State's Attorney's Office. He advocated for the production of bodycam footage, which the victim and he viewed together. This revealed that the wrong person had been arrested. The victim identified the alleged correct perpetrator who was then arrested. CCHR's Hate Crime Victim Advocate also notified the victim that as an alleged crime victim and witness he might qualify for a "U" visa to become documented, which the man did secure.

These are only some of the many examples of how the CCHR Hate Crime Victim Advocate utilizes an empathetic, resourceful, creative, and interpersonal approach to assist hate crime victims. One of the main things that he hears from victims, when he contacts them and says that he is from the City, and he is here to help, is that they are grateful that, "someone from the City cares."

## Unity Brunch

In past years, CCHR held 'Unity' events that were designed to bring together Chicagoans from different demographic groups. These events were mounted in

collaboration with the Advisory Councils established under Section 2-120-500 of the Municipal Code of Chicago, when they were housed at CCHR and were fully staffed. Previously, CCHR had approximately 80 staff members, four times as many as it does today, which is approximately 20 staff.

Staff cuts began near the end of the Richard M. Daley Administration. The Rahm Emmanuel Administration further cut the CCHR staff. Over time, CCHR's staff and budget shrank and as a result, the Unity events were discontinued.

Commissioner Andrade took the helm of CCHR during the height of the COVID-19 pandemic, when everyone at the agency still worked remotely. Once the pandemic-era social distancing requirements began to relax, she decided to reinstate the Unity brand, with related events, to bring people back together, post-pandemic, to address prejudice, discrimination and hate, as they did in the past.

The first post-pandemic Unity event occurred in January 2023, when CCHR convened a Unity Brunch at the Chicago Cultural Center which consisted of a couple of panels and speakers. Attendees included non-profit leaders, City Council members, and other community-based stakeholders. Speakers included then-Mayor Lori Lightfoot, and then-CPD Superintendent David Brown.

One panel was about *Prejudice and Discrimination*. Panelists included Jake Agron of the Anti-Defamation League; Margaret Kujulian of the Circuit Court of Cook County (and a CCHR Board Member); Ald. Nicole Lee (11th Ward); Channyn Parker of Howard Brown Health; and Sufyan Sobel of the Council on American Islamic Relations. One of the main

takeaways was that when people take the time to get to know others who are different from themselves, it makes it harder to discriminate and be prejudiced. As Ms. Parker, a trans woman stated, "If you get to know me, it will be much harder for you to hate me."

The second panel was on the subject of ***Hate Crimes***. Panelists included Willette Benford, Director of Reentry for the Office of the Mayor; Karina Ayala Bermejo of the Instituto del Progreso Latino (and a CCHR Board Member); Cynthia Gourneau of the American Indian Health Services of Chicago; Vanessa Harris of Fun 4 the Disabled; and Terrell Odom of the University of Chicago (and Chair of the Advisory Council on Veterans). One of the main takeaways was support for a community-based hate crime reporting pilot program to expand outreach and collection of hate crimes reports and data.

Attendees were surveyed and most also expressed support for a follow-up Unity event, to continue the process of people from different demographic segments getting to know one another, and support for the implementation of a community-based hate crime reporting pilot program.

## Unity Summit

In July 2023, CCHR convened a Unity Summit at Malcolm X College. The all-day event coincided with the start of a new mayoral administration and a new City Council. Attendees included non-profit leaders, City Council members, and other community-based stakeholders. Audience participation was robust during the Q & A sessions that followed each panel.

Mayor Brandon Johnson gave welcoming remarks. He stated: "Our purpose today is to foster dialogue, to think about how we can work together. While we hail from different neighborhoods, and come from diverse segments of our City's population, we have one cause in common: Unity. That's why we're here...to talk about how to stand up to prejudice and discrimination. To boldly declare that *hate*...has no home in Chicago."

The first panel was titled ***Public Safety and Public Health Through an LGBTQ+ Lens.*** It was moderated by Ald. Rossana Rodriguez-Sanchez (33rd Ward), Chair of the City Council Committee on Health and Human Relations. Panelists included Ald. Lamont Robinson (4th Ward); Michael Millstein, Deputy Director of Community Policing, CPD; Antonio King, LGBTQ Health and Outreach Liaison, Chicago Department of Public Health (CDPH); and Jin-Soo Huh, Chair, Chicago LGBTQ+ Advisory Council. Topics included the work of CPD's LGBTQ+ Liaisons, and what was then known as the Treatment Not Trauma initiative, and since been renamed the Mental Health System Expansion (MHSE) initiative. These garnered support from attendees during the Q & A session that followed.

The second panel was titled ***Development without Displacement: Managing Community Change.*** It was moderated by Daniel Hertz, Director of Planning Research and Development, Chicago Department of Housing. Panelists included Ald. Lee, Ald. Maria Hadden (49th Ward), and Ald. Carlos Ramirez-Rosa (35th Ward). Topics included community-driven participatory zoning, inclusionary zoning, preservation of naturally occurring affordable housing such as two- and four-flats, and support for new affordable housing, all to counter displacement from gentrification. Attendees supported these during the Q & A session that followed.

The third panel was titled *The Many Faces of Islam*. It was moderated by Ahmad Jitan, Director of Organizing and Advocacy, Inner City Muslim Action Network (IMAN)(and a CCHR Board Member); Abdul Malik Ryan, Chaplain, DePaul University; Wesam Shahed, ASA, Cook County State's Attorney's Office; Ndidi Okakpu, Convener of the Chicagoland Shura Council; and Dr. Sabha Abour, Chief of Staff, Office of Ald. Lamont Robinson (4th Ward). Major themes that emerged included shared experiences of microaggressions and implicit bias, the racial and ethnic diversity of the Muslim community, dispelling harmful myths about women in Islam, and the fact that Islam is fundamentally a religion of peace.

The fourth panel was titled *Inspiring Young Chicagoans through Civic Engagement*. It was moderated by S. Mayumi "Umi" Grigsby, Esq., Chief of Policy for the Office of the Mayor. Panelists included Ald. Jessica Fuentes (26th Ward); Anthony Bryant, 3rd District, Chicago Police District Council; Camille Williams, Senior Programs Manager and Diversity Equity Inclusion and Accessibility Lead, Chicago Votes; and Julia Gould, University of Toronto undergrad (and CCHR Summer Intern). Topics included: fully funding local public schools to include civics education; extending voter registration drives to high schools, community colleges, and universities; extending voter registration drives to jails to "unlock civics"; and passage of the Peace Book Ordinance which is a proposal for a violence prevention program made up of three components: Peacekeepers, a City-Wide Peace Commission, and youth-led Neighborhood Peace Commissions in communities most impacted by gun violence. Attendees expressed support for all of these during the Q & A session that followed.

The closing panel was titled ***Standing Up to Racism, Antisemitism and Hate.*** It was moderated by Rabbi Michael Siegel, Senior Rabbi, Anshe Emet Synagogue. Panelists included Ambassador Reyna Torres Mendivil, Consul General of Mexico; Pastor Raymond Chang, President, Asian American Christian Collaborative; Karen Freeman-Wilson, CEO, Chicago Urban League; and Norman White, Hate Crime Victim Advocate, CCHR. The main theme that emerged is that communication between different demographics is vital to mutual understanding and acceptance. Attendees expressed a strong desire to continue to convene and foster dialogue. Plans are being discussed for another Unity Summit in the near future.

# THINK BEFORE YOU HATE: CCHR's Ongoing Initiatives

## Think Before You Hate Ad Campaign

In December 2023, CCHR launched the ***Think Before You Hate*** campaign which encompasses the Hate Crime Reporting Community Pilot Program, plus implementation of the amendments to the Hate Crimes Ordinance. The campaign roll-out included ads on CTA buses, trains and platforms, and on digital billboards throughout Chicago.

The purpose of the ad is self-evident; CCHR simply encourages the public to think before they engage in hate (and by implication, prejudice and discrimination). It is CCHR's position that hate, hate crimes, hate incidents, and all of their attendant harms thrive when people are not thinking rationally.

CCHR has already distributed posters and leaflets with the slogan and a QR code directing the public to our website. We will work to expand this message to the public.

CCHR is in the process of hiring a Public Relations Representative. When this person begins, one of their first tasks will be to develop creative ways to promote and disseminate our message.

## Hate Crime Reporting Community Pilot Program

As noted above, the underreporting of hate crimes results in skewed data. It also means that harmful behavior is not addressed. As also noted above, underreporting is due to multiple factors, including cultural differences, language issues, mistrust of law enforcement, fear of deportation, and lack of knowledge of the law.

CCHR seeks to address these issues by developing a Hate Crime Reporting Community Pilot Program which was a takeaway from the Unity Brunch program in January 2023. CCHR partnered with CPD to apply for a DOJ Matthew Shepard and James Byrd, Jr. Hate Crimes Program grant. In October 2023, we were awarded $400,000 to assist with the implementation of the program over the next four years. This program will entail working with a racially, ethnically, and culturally diverse group of community-based organizations (CBOs) that serve populations most often targeted for hate crimes: members of the African American community, White community, Asian American and Native Hawaiian/Pacific Islander community, Latine community, LGBTQ+ community, Jewish community, and Arab and Muslim communities, among others. The agencies will be strategically located to enable access to potential victims across Chicago.

The initial cohort of CBOs who have agreed to partner with us on this initiative include: the Chicago Urban League; the Anti-Defamation League; the Howard Brown Health Center; Metropolitan Community Services; the Chinese American Service League; the Instituto del Progreso Latino; and North Side Community Resources.

These partners will serve as alternate sites where the public can go to report hate crimes. The agencies identified to participate in this program are well established with strong relationships within the communities they serve. Residents will be able to go to these agencies to report hate incidents, hate crimes, and community tensions. They can do so in a culturally competent space, in their own language, with people they trust.

For hate incidents and hate crimes, the agency representative will not take a report but will instead call 911 to have a police officer come to the agency. The agency representative will be with the victim to provide support and assistance, including translation services if needed.

CCHR will provide training to the agencies about hate crimes and the victim assistance process. To ensure the development of a legally sound police report, which will be instrumental in the potential prosecution of these acts, agency representatives will be instructed not to initiate the taking of a report.

Similarly, when a resident comes to one of the partner agencies to report a community tension, the community representative will contact CCHR, which will then send a staff person to visit the site to speak with the resident. The CCHR staff person will work with parties to resolve disputes before tensions escalate and the possibility of violence increases.

CCHR will also develop educational outreach materials for this campaign including posters and one-page handouts which will be translated into multiple languages. Transit advertisements on the City's buses, trains, and rail stations, funded through a separate initiative, will be key to promoting the project. Social media posts will also be an important aspect of the outreach campaign.

For many years, CCHR has worked with community organizations to provide education about hate crimes. Despite the increased numbers of hate crimes reported annually to CPD, CCHR believes there may be underreporting. Besides providing safe

spaces to report hate incidents and hate crimes, another important goal for the pilot is to build trust in the community to reach out to CPD. To be clear, the pilot program is not designed to replace 911 or 311, but to supplement those avenues for reporting.

## Amended Hate Crimes Ordinance

As stated above, in December 2023, the City Council amended the City's Hate Crimes Ordinance. The amendment added "hate incidents" to the ordinance. This was done to address the growing rate of bias-motivated crimes and incidents, and because hate incidents may sometimes be precursors to hate crimes.

CCHR worked with Ald. Silverstein, CPD, the Department of Law, and the Office of the Mayor to craft an ordinance that is narrowly tailored to further the compelling governmental interest of addressing harmful hate incidents, while at the same time protecting our cherished First Amendment right of free speech.

Since adoption of the amended ordinance, CCHR led collaborations with Ald. Silverstein, CPD, the Office of Emergency Management and Communications (OEMC), which oversees the 311 system, plus, the Department of Streets and Sanitation (DSS), which oversees graffiti removal, to implement the different elements required by the ordinance. We provided training to all aldermanic offices regarding the amended ordinance and the new protocols for graffiti removal, since hateful graffiti must be documented and investigated as a hate crime.

## Hateful Flyers

Chicago has recently become the scene of a campaign of hateful propaganda and possible harassment.[182] Beginning in autumn of 2023, following the start of the Israel-Hamas war, someone or some people began to leave hateful flyers in several Chicago neighborhoods.[183]

The flyers, linked to a nationally active White supremacist group, were found mostly on cars, although occasionally at people's residences. The flyers are crude in nature and appear to be cut from pieces of cardboard.[184] They include discriminatory and hateful messages, handwritten in thick black marker. The messages target the Jewish community and spread antisemitic myths, tropes, slurs, and conspiracy theories. Many include swastikas and SS lightning bolts, which are common White supremacist and neo-Nazi symbols.[185] Sometimes the flyers or leaflets are left in plastic sandwich bags that also contain rice or woodchips that look like rat poison.[186]

Several wards have been impacted, including those represented by Ald. Brian Hopkins (2nd Ward), Ald. Scott Waguespack (32nd Ward), Ald. Timmy Knudsen (43rd Ward), Ald. James Gardiner (45th Ward), Ald. Leni Manaa-Hoppenworth (48th Ward), and Ald. Silverstein.

---

[182] https://hoodline.com/2024/02/chicago-rattled-by-antisemitic-flyers-community-leaders-and-authorities-respond-to-hate-surge/
[183] https://blockclubchicago.org/2023/11/16/more-antisemitic-signs-found-on-dozens-of-cars-in-jefferson-park/
[184] Id.
[185] Id.
[186] https://blockclubchicago.org/2024/04/08/antisemitic-flyers-with-rat-poison-like-substance-found-in-lincoln-park-alderman-says

According to some Alderpersons in impacted wards, the areas where flyers have been left have concentrations of Jewish constituents. This suggests it may be a strategic and tactical campaign to harass and cause fear.

The messages on the flyers and the perceived *modus operandi* of the perpetrator or perpetrators are consistent with a national campaign being spearheaded by a White supremacist group. CCHR is not naming the group as it is believed that they relish the attention and recognition that comes with media coverage, and we do not want to gratify or encourage them.

Many of the flyers have an address that led to the group's website, although this appears to no longer be active. Similar types of flyers, with similar messages, and the same website have been similarly distributed in cities and towns across the United States.[187]

Such conduct may reasonably be considered a hate incident. Now that Chicago amended the Hate Crimes Ordinance to include hate incidents, the public has an option to report such activity.

Since CCHR became aware of this campaign, we have responded by going to each area where such flyers have been distributed and counter-leafletting, door-to-door. We notify neighbors that the City is aware of the incident, that this qualifies as a hate incident, that they have the option to report it as a hate incident, and that reporting is as easy as dialing 311. Our flyers also contain a QR code that leads to the CCHR website so that residents may learn more.

---

[187] https://www.huffpost.com/entry/antisemitic-flyers-dozens-cities-states_n_621820dee4b06e1cc58ca726

CCHR becomes aware of these incidents when we hear about them from the CPD Civil Rights Unit, the local Alderperson, or we see it in the news. As soon as we learn about a new occurrence, we deploy to counter-leaflet. Whenever practicable we work in conjunction with the local Alderperson. To date we have leafletted with Ald. Waguespack, Ald. Knudsen, Ald. Manaa-Hoppenworth, and Ald. Silverstein.

## The Migrant Mission

Beginning in August 2022, Republican Texas Governor Greg Abbot began to transport asylum seekers to northern cities led by Democrats to make a partisan point about federal border policy.[188] Since we have long been a Welcoming City, Gov. Abbot targeted Chicago as one of those destinations.[189]

Thereafter, tens of thousands of asylum seekers and other migrants have streamed into the City in need of sanctuary and services to start their new life in this country.[190]

When the migrant mission began, the City put out an all-hands-on deck call to all agencies to help receive the volume of new arrivals.

CCHR is a small agency. At the time, our staff numbered in the mid-teens. Of those, the vast majority work in the Adjudication Unit, which is focused on enforcement of the Chicago Fair Housing Ordinance and the Chicago Human Rights Ordinance. This unit focuses on administrative law processes.

---

[188] https://www.axios.com/2023/10/10/texas-migrant-buses-major-cities-numbers
[189] https://cbsaustin.com/news/nation-world/battle-with-gov-abbott-chicago-becomes-latest-city-to-receive-migrants-from-texas-gov-greg-abbott-mayor-eric-adams-mayor-muriel-bowser-immigration-crisis-president-joe-bidens-border-policies
[190] https://www.usatoday.com/story/news/nation/2023/09/25/migrant-surge-us-cities/70921430007/

That makes the Inter-Group Relations Unit (IGR), our smallest unit, the nimbler arm of our department. Any new initiatives or challenges that CCHR faces depend on IGR's ability to pivot. The response to the arrival of thousands of people in need of services and support in a short amount of time became one of those new challenges.

At the time when buses began to arrive from Texas, IGR had four staff: three Human Relations Specialist IIs, and the Hate Crime Victim Advocate. Only two spoke Spanish, and the Hate Crime Victim Advocate is one of them. Thus, he became involved in receiving and serving recently arrived migrants. For many months, he spent one full day a week welcoming and helping to orient them.

Thereafter, CCHR hired a Director for IGR, a native-Spanish speaker, and he too became involved in the migrant mission. He has worked with the Office of the Deputy Mayor of Immigrant, Migrant and Refugee Rights, and contributed to the City's migrant shelters and community safety efforts. Another IGR staff member, the only Spanish-speaking Human Relations Specialist II provided **Know Your Rights** presentations and **Anti-Bullying** workshops to migrants housed in the City's shelters.

This brings us to the connection with hate crimes and hate incidents. The high number of people coming from the Southern border has strained the already limited City resources.[191] This has stirred conflict,[192] resentment,[193] and frustration.[194] Some long-term

---

[191] *Id.*
[192] https://www.nbcchicago.com/news/local/contentious-meeting-over-new-migrant-shelter-held-in-citys-smith-park-neighborhood
[193] https://thehill.com/latino/4279680-tensions-new-established-migrants/
[194] https://apnews.com/article/chicago-migrants-black-latino-biden-immigration-ab8d7f22eea423d86fb350665b9e66f6

Chicago residents have complained about conflicts that they experience with their new neighbors, the men, women, and children seeking refuge in the City. [195]

Since part of CCHR's mission is to address community tensions, and since we have been involved with the migrant mission from the beginning, the Mayor's Office of Community Engagement requested that CCHR work with migrants to address neighbors' concerns. CCHR is partnering with the Department of Family and Support Services and Department (DFSS) of Business Affairs and Consumer Protection (BACP) for an initiative to present workshops in the migrant shelters.

The IGR team has created a program titled **How to Be a Good Neighbor...And Set Yourself Up for Success.** We will be facilitating these workshops in Spanish in the migrant shelters. The purpose will be to orient migrants about the different cultural standards, rules, laws, and norms that we have here in Chicago, which are at the root of many of the conflicts and complaints neighbors have shared with the City.

All of this is relevant to hate crimes and hate incidents. Just as hate incidents can be precursors to hate crimes, community tensions can be precursors to hate incidents. By working with the shelter residents on being good neighbors, we are doing our small part to help them adjust to life in Chicago. In doing so, we may also prevent or mitigate community tensions that can lead to hate incidents and hate crimes.

---

[195] https://www.chicagotribune.com/2023/09/26/as-migrants-clash-near-high-volume-shelters-neighbors-and-businesses-grow-alarmed-we-dont-feel-safe

# Findings and Recommendations

The amended ordinance that requires CCHR to produce this report also specifies that the report should contain "any findings and recommendations to reduce or eliminate hate crimes and hate incidents, which may include an evaluation of City policies and procedures ensuring: (i) hate crimes and hate incidents are comprehensively investigated, tracked, and reported; and (ii) survivors receive assistance of City agencies, as appropriate."[196]

Pursuant to that directive, CCHR respectfully makes the following suggestions:

1. **Pass the proposed hate littering ordinance.**[197]

A proposal by Ald. Knudsen would further amend the Municipal Code of Chicago to prohibit leaving hateful or threatening material on people's personal, private, or real property.

CCHR believes this may help address the issue of individuals and groups threatening, harassing or otherwise targeting members of protected classes with hateful messaging that exceeds the bounds of protected speech. Ald. Knudsen introduced the proposed ordinance after constituents in his ward received over 80 hateful flyers.

Care must be taken to craft the language of the proposed ordinance narrowly, with great precision, in order to protect free speech rights guaranteed by the First Amendment.

---

[196] *Supra* note 6.
[197] https://blockclubchicago.org/2024/04/17/hate-littering-would-be-fineable-offense-under-proposed-ordinance/

CCHR is committed to working with Ald. Knudsen, the Department of Law, and the Office of the Mayor on this proposal.

2. **Review staffing model in CPD Civil Rights Unit for mission optimization.**

In October 2022, when Commissioner Andrade testified before the City Council Committee on the Budget and Government Operations, she shared that year-to-date, in Chicago, there had been a 71% increase in hate crimes reported to CCHR over the same period for the previous year.[198] At that point, CPD had forwarded CCHR reports for 77 hate crimes, compared to 45 for the same period during the previous year.[199]

It is important to note that those numbers reflected only the hate crimes that CPD had forwarded to CCHR at that date. As was noted in the news coverage at that time, CPD had received reports of 120 hate crimes during the same period.[200] Therefore, 43 of the reports made to CPD had not yet been forwarded to CCHR. The reason for this is that those reports were not ready.

Unfortunately, a backlog of reports accumulated because, at the time, the CPD Civil Rights Unit was under-resourced and CPD was suffering a shortage of officers.[201] To make matters worse, Chicago, like the rest of the country, had just experienced a pandemic-era

---

[198] *Supra* note 66.
[199] *Id*.
[200] *Id*.
[201] https://www.cbsnews.com/chicago/news/chicago-police-department-manpower-shortage-burnout-retirements-low-applications/

spike in crime that strained CPD resources and made the previous year, 2021, the City's, "deadliest year in a quarter century."[202]

Under that strain, the Civil Rights Unit lost members as officers were deployed to other units. By 2022, the Civil Rights Unit was down to one officer, from a previous average of 8 to 10. Under such trying conditions, backlogs are inevitable.

Delays in receiving CPD reports impact the work of serving hate crime victims. CCHR cannot contact a victim until a report is received. The value of providing support or assistance to a victim depends on reaching out as close to the incident as possible. Calling someone months after they have been victimized is sometimes helpful, but often it is not.

Over the past year, CPD has again been able to staff the Civil Rights Unit. Currently, they have seven people working there, including a Commander, a Sergeant, Officers, and a Detective. During this time, the teamwork between CCHR and the Civil Rights Unit has been more effective.

CCHR has collaborated with the Civil Rights Unit on implementation of the amendments to the Hate Crimes Ordinance. Victims are being supported in a timely and more effective manner. Plus, Alderpersons are timely kept abreast of hate crimes and hate incidents occurring in their wards.

---

[202] https://apnews.com/article/police-violence-chicago-united-states-homicide-53931ce4993937b570dd61dbbaa146ce

3. **Connect 311 hate incident reporters to the Mental Health System Expansion (MHSE) Initiative**

The 311 system has been taking hate incident reports since January of this year. During that time, CCHR, CPD, and OEMC staff have monitored the reports that are coming in. Many reports do not constitute bona fide hate incidents. While we are not mental health professionals, it is apparent that, of those reports that are not bona fide hate incidents, a percentage appear to show signs of mental health issues.

Given the fact that the City is now reimagining community safety, and that the Mental Health System Expansion Working Group (MHSE) recommendations will be central to those efforts, it may be that the 311 system, at least when it comes to hate incidents reporters, may provide an opportunity for referrals for mental health services. MHSE recommends the expansion of clinical services and non-police, behavioral health crisis response. This will provide more opportunities for referral to mental and behavioral health services and the means by which to receive those mental and behavioral health services.

CCHR has partnered with the CDPH, CPD, and OEMC, and begun an ad hoc practice of referring possible clients to CDPH. CCHR recommends that this be made a formal process in coordination with relevant Departments and Mayor's Office staff who are leading on MHSE implementation.

#### 4. Implement Educational Responses for Youth to Address the Problem of Hate

According to the FBI, in a report issued earlier this year, as many as 1 in 10 hate crimes in the U.S. takes place at schools, from kindergarten through college.[203] Schools are the third most frequent location for hate crimes, after residences and roadways/alleys.[204] African American students are the most frequent targets, followed by Jewish and LGBTQ+ students.[205] Nearly two-thirds of reported hate crimes that occur in schools take place in kindergarten-through-12th grade schools.[206]

New York City recently launched a curriculum in public schools to address hate crimes and bias incidents.[207]  The unit helps students learn, "what hate crimes are and the impacts they have on both individuals and communities, including schools."[208] The lessons are meant to help students, "understand current trends in hate crimes, types of perpetrator behavior, actions that can help prevent hate crimes, and community initiatives that foster belonging."[209]

CCHR recommends that the Chicago Public Schools implement such curriculum options for our students, perhaps as a supplement to their social and emotional learning initiatives. Education is key to the development of the individual and to the advancement of civil society. Today's youth are tomorrow's leaders.

---

[203] https://www.reuters.com/world/us/one-10-us-hate-crimes-occur-schools-fbi-says-2024-01-29/
[204] *Id.*
[205] *Id.*
[206] *Id.*
[207] https://www.silive.com/education/2024/04/nyc-unveils-curriculum-in-public-schools-to-address-hate-crimes-bias-incidents.html
[208] *Id.*
[209] https://www.facinghistory.org/resource-library/teaching-about-hate-crimes-their-impacts?utm_medium=email&utm_name=&utm_source=govdelivery

If we invest in teaching our children and young adults not only about the impact of hate, but also about the joys and benefits of tolerance, inclusion, equity, and understanding, then we will stand a chance of helping to rid Chicago of hate. This curriculum could be a model for statewide implementation to supplement the Inclusive Curriculum Law, the TEAACH Act, and Public Act 103-0422, which were referenced above.

# Conclusion

President Joseph R. Biden said, "Any hate crime is a stain on the soul of America."[210]

CCHR could not agree more. Hate crimes and hate incidents are a scourge to the nation, our state, our county and our beloved City of Chicago.

Regardless of how the data is measured, recorded, and reported across the various jurisdictions, there is a consensus that the numbers of hate crimes and hate incidents have gone up. Many of our family, friends, and neighbors feel threatened by hate, hate incidents, and hate crimes.

This is not a new problem.

Hatred is an ancient malady. It has plagued humanity from early on.

In one of his most famous sermons, *Loving Your Enemies*, the Rev. Dr. Martin Luther King, Jr. wrote, "Darkness cannot drive out darkness; only light can do that. Hate cannot drive out hate, only love can do that."[211]

Peace, equity, and prosperity depend on all good people, and all good governments, to remain vigilant, and to stand against the hate that festers in the world. As we imagine a more equitable, inclusive, and just Chicago, one where hate does not exist, we must think of the role that we play, each of us, as individuals, and as members of our respective communities, to make this City a better, safer, stronger place.

---

[210] https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/16/statement-from-president-joe-biden-on-hate-crime-statistics/ (On the release of the FBI's 2022 Annual Hate Crimes Report)
[211] Delivered at the Dexter Avenue Baptist Church in Montgomery, Alabama, on November 17, 1957.

We all have a responsibility to do our part.

That is why Mayor Johnson boldly stated: "Hate...has no home in Chicago."

This is not a passive statement. It is a call to action.

We at the Chicago Commission on Human Relations stand ready to oppose hate.

We hope that you will join us. Thank you.

# Acknowledgements

Special thanks to the following City departments for their collaboration on this report:

Office of the Mayor

Chicago Department of Police and the Civil Rights Unit

311 Office of Emergency Management Communications

Chicago Department of Law

Chicago Department of Public Health

Chicago Office of Equity and Racial Justice

Intergovernmental Affairs

# EXHIBIT H



**Approving University Officials:** Provost; Vice President and Chief Financial Officer; Vice President for Operations and Chief Operating Office
**Responsible Office:** Provost; Human Resources; Student Affairs; Office of Civil Rights and Title IX Compliance
**Effective Date: August 12, 2024**
**Next Review Date: September 1, 2025**

# POLICY ON DISCRIMINATION, HARASSMENT, AND SEXUAL MISCONDUCT

I.   **Policy** ................................................................................................................ 2
   A.   Policy Statement ............................................................................................ 2
   B.   Jurisdiction ..................................................................................................... 2
   C.   Purpose ........................................................................................................... 3
   D.   Accessibility ................................................................................................... 4
   E.   Definitions ...................................................................................................... 4
   F.   Prohibited Conduct under this Policy ............................................................ 5
   G.   Implementation .............................................................................................. 11
   H.   Consequences of Violating this Policy .......................................................... 18
   I.   Recordkeeping ................................................................................................ 20
   J.   Related Information ........................................................................................ 20
   K.   History ............................................................................................................ 21
II.  **Complaint Resolution Process** ....................................................................... 21
   A.   Introduction and General Procedures ............................................................ 21
   B.   Initial Inquiry ................................................................................................. 26
   C.   Educational Response ..................................................................................... 26
   D.   Administrative Review ................................................................................... 27
   E.   Alternative Resolution ................................................................................... 27
   F.   Formal Resolution .......................................................................................... 28
   G.   Appeals ........................................................................................................... 34
III. **Resources** ......................................................................................................... 37
   A.   Confidential Support, Advocacy, and Counseling Resources[5] ...................... 37
   B.   Seeking Confidential Medical Assistance in the United States ...................... 41
   C.   Preserving Physical Evidence ......................................................................... 43
   D.   Educational Training, Awareness, and Prevention Programs ......................... 44

Appendix A: Summary of Information on Reporting Sexual Misconduct and Receiving Support (including confidential support) and Resources at the NU-Q Campus ........................................................... 46

## I.    Policy

### A.    Policy Statement

Northwestern prohibits discrimination and harassment on the basis of race, color, religion, creed, national origin, ethnicity, caste, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, reproductive health decision making, height, weight, or any other classification protected by law (referred to as "protected statuses or protected characteristics") in the educational programs or activities Northwestern operates, including but not limited to matters of admissions, employment, housing, or services. Prohibited discrimination based on sex includes sexual misconduct, including but not limited to, sexual harassment, sexual assault, sexual exploitation, stalking, and dating or domestic violence. Such conduct violates Northwestern's values and disrupts the living, learning, and working environment for students, faculty, staff, and other community members.

Pursuant to the Department of Education's 2020 regulations implementing Title IX, the University has adopted an Interim Policy on Title IX Sexual Harassment, which governs certain instances of sexual misconduct. Allegations of sexual misconduct that do not fall within the jurisdiction of the Interim Policy on Title IX Sexual Harassment may fall within the jurisdiction of this Policy. Other forms of misconduct not covered by this policy or the Interim Policy on Title IX Sexual Harassment.

The University has adopted the following standards of conduct for all members of our community – students, faculty, and staff, as well as University vendors, contractors, visitors, guests, volunteers, interns, and third parties.

### B.    Jurisdiction

This policy applies to Students, defined under this policy as an individual who has gained admission to the University (Students); University employees, defined under this policy as all full-time and part-time faculty, University staff, student employees, wage employees (including temporary employees), professional research staff, and post-doctoral fellows (collectively Employees), and third parties, including University vendors, contractors, visitors, guests, volunteers, interns, and third parties.

The Office of Civil Rights and Title IX Compliance (NU-OCR) oversees the University's response to reports of discrimination and harassment, including sexual misconduct, as described below.

Northwestern may investigate or otherwise resolve any reported violations of this policy that occur in the context of a University program or activity or that otherwise affect the University's living, learning, or working environments, regardless of whether the reported conduct occurred on or off campus. Reports of violations of other University policies will be referred to the appropriate office.

For every report, NU-OCR will review the circumstances of the reported conduct to determine the following:

- Whether the University has jurisdiction over the parties involved;
- Which University policy is applicable to the parties and the conduct being reported; and
- The actions within the University's control necessary to eliminate, prevent, and address the reported conduct. (Note: In circumstances where NU-OCR finds a violation of policy, the NU-OCR refers the matter to the appropriate body/office for sanctioning as described in Section II(F))

Specific conduct covered by the Title IX Regulations on Sexual Harassment is governed by the University's Interim Policy on Title IX Sexual Harassment and will be addressed according to the processes stated therein. All other forms of sex-based discrimination are governed by this Policy, including sexual harassment, as defined in this Policy that does not rise to the level of Title IX Sexual Harassment as defined in the Interim Policy on Title IX Sexual Harassment.

Conduct that is initially raised through a formal complaint under the Interim Policy on Title IX Sexual Harassment may also be addressed under this Policy, in the University's discretion, when: (i) the conduct at issue, or some part of it, may constitute a violation of this Policy irrespective of whether it constitutes Title IX Sexual Harassment under the Interim Policy on Title IX Sexual Harassment; (ii) the formal complaint, or some part of it, has been dismissed under the Interim Policy on Title IX Sexual Harassment; or (iii) a final determination of a formal complaint has been made under the Interim Policy on Title IX Sexual Harassment and separate or additional action may be necessary to enforce this policy.

If the person alleged to have engaged in the conduct (e.g., Respondent) is not a member of the University community or is no longer affiliated with the University at the time of the report or at the time the Complaint Resolution Process is initiated (including when the Respondent has graduated or left the University), the University may be unable to take disciplinary action or initiate the Complaint Resolution Process, though it may still be able to provide supportive and other remedial measures to affected individuals. Individuals impacted by any form of discrimination, harassment or sexual misconduct, irrespective of whether it falls under this policy, may contact NU-OCR to receive support, resources, and information even if they do not wish to move forward with the Complaint Resolution Process described in Section II below.

Allegations of misconduct alleged to have occurred prior to August 14, 2020 will be assessed under the policy definitions in place at the time of the conduct and resolved in accordance with this policy.

## C.      Purpose

Northwestern is committed to fostering an environment in which all members of our community are safe, secure, and free from prohibited harassment, discrimination, and sexual misconduct in any form. When learning of conduct or behavior that may not meet these standards, community members and the University are expected to take an active role in upholding this policy and promoting the dignity of all individuals. The University has adopted this policy to meet its legal and regulatory requirements pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), Title VI of the Civil Rights Act of 1964 ("Title VI"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Illinois Human Rights Act ("IHRA"), and other relevant state and federal laws and local ordinances.

**D.      Accessibility**

NU-OCR is committed to making our services accessible to all members of the Northwestern community. The Office is cognizant of the physical accessibility of our space, the cultural competency of our staff, and the method and tone of the services we provide. Accessibility includes but is not limited to: providing reasonable accommodations to persons with disabilities, including mental health concerns, ensuring our online resources are accessible, providing translation services, and providing competent, respectful, and trauma informed service to people of all identities and expressions. To request an accommodation related to this policy or to discuss any questions or concerns about the accessibility of NU-OCR's services ore resources, please contact NU-OCR at OCR@northwestern.edu. For additional information regarding reasonable accommodations, see the University's Reasonable Accommodation Policy.

**E.      Definitions**

*Advisor* means the person the Complainant or Respondent has chosen to accompany the party to all meetings related to the Complaint Resolution Process. An advisor may be, but is not required to be, an attorney. An advisor may not be a party or witness.

*Associate Vice President* is the Associate Vice President for Civil Rights and Title IX Compliance/Title IX Coordinator or their designee.

*Complainant* means (1) a student or employee who is alleged to have been subjected to conduct that could constitute Prohibited Conduct under this policy or (2) a person other than a student or employee who is alleged to have been subjected to Prohibited Conduct and who was participating or attempting to participate in the University's education program or activity at the time of the Prohibited Conduct.

*Complaint* means an oral or written request to the University that objectively can be understood as a request for the University to investigate and make a determination about alleged Prohibited Conduct.

*Day* means any weekday Monday through Friday in which the University is in operation, including days when the University is in operation, but classes are not in session. For purposes of this Policy days constitute business days, and not calendar days.

*Party* means a Complainant or Respondent. *Parties* means two or more Complainants or Respondents collectively.

*Program or Activity* and *Program* means all of the operations of the University, including conduct that occurs in a building owned or controlled by a student organization that is officially recognized by the University and conduct that is subject to the University's disciplinary authority.

*Protected status or Protected Characteristic* means race, color, religion, creed, national origin (including shared ancestry), ethnicity, caste, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, reproductive health decision making, height and weight, or any other classification protected by law.

*Reporter or Reporting Party* means any person, including students, faculty, staff, and third parties, who discloses an incident of alleged prohibited conduct to the Office of Civil Rights and

Title IX Compliance, Title IX Coordinator, Deputy Title IX Coordinator, or a Responsible Employee. Reporters and Reporting Parties include any individuals who disclose such information, whether as Complainants, Respondents, or witnesses.

*Respondent* means a person who is alleged to have violated this policy.

*Witness* means a person who has knowledge related to specific aspects of a report or complaint.

**F.      Prohibited Conduct under this Policy**

The following conduct, collectively referred to as "Prohibited Conduct" is prohibited under this policy. The definitions are intended to give meaning to these terms in the context of this policy. The Interim Policy on Title IX Sexual Harassment, criminal and other applicable state laws may use different definitions of these terms.[1]

> **1.      Discrimination and Harassment**
>
> > a.   <u>**Discrimination:**</u> Discrimination is adverse treatment of an individual based on one or more actual or perceived protected bases or characteristics listed in this policy. Discrimination is a violation of this policy when it results in adverse action or negatively impacts the terms and conditions of an individual's employment or education or denies or limits participation in programs, services, or activities, except as permitted or required by law. Some examples of discrimination include:
> >
> > - Not allowing a student to join or participate in a student organization based upon their religious belief or because they wear symbols or styles of dress associated with their religion;
> >
> > - Refusing to allow a student or employee to participate in a program, class, or meeting based upon their national origin;
> >
> > - Not offering a job to a person based on their age;
> >
> > - Not recommending a person for promotion based on their gender identity.
> >
> > b.   <u>**Harassment:**</u> Prohibited harassment is unwelcome verbal, physical, written, or visual conduct or conduct using technology based on an actual or perceived protected characteristic that when based on the totality of circumstances is subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the education program or activity or has the purpose or effect of creating an academic or working environment that a reasonable person would consider to be intimidating, hostile, or offensive.
> >
> > In determining whether the conduct is sufficiently severe or pervasive so as to meet the above standards, NU-OCR examines the context, nature, scope, frequency, duration, and location of incidents, as well as the relationships of the persons involved. A person's subjective belief that

---

[1]Information on the applicable state law definitions in Illinois, Florida, California, New York, and Washington, D.C. can be found at https://www.northwestern.edu/sexual-misconduct/title-IX/relevant-laws.html

behavior is intimidating, hostile, or offensive does not make that behavior prohibited harassment under this Policy. The behavior must create a hostile environment and/or substantially interfere with access to a University program or activity from an objective perspective.

Examples of harassing conduct that may create a hostile environment include:

- Verbal abuse or use of racist, anti-Semitic, or anti-Arab slurs or hostile behavior, which could include insulting, teasing, mocking, degrading, or ridiculing another person or group regardless of whether the person is actually a member of the group;

- Defacing an individual's property with hateful symbols, such as a swastika or noose;

- Inappropriate physical contact, comments, questions, advances, jokes, epithets, or demands based on one or more actual or perceived protected characteristics;

- Physical assault, intimidation, or stalking on the basis of one or more actual or perceived protected characteristics; or

- Displays or electronic transmission of derogatory, demeaning, or hostile materials related to one or more actual or perceived protected characteristics

General bullying or uncivil behavior that is not based on a protected class does not fall within the purview of this policy or NU-OCR. However, such behavior may violate the University's expectations regarding Civility and Mutual Respect, Standards for Business Conduct, Northwestern's Student Handbook, or other University policy and should be reported to Human Resources and/or an individual's supervisor (for employees) or Community Standards (for students).

**2.** **Sexual Misconduct**

a. **Consent:** Consent represents the cornerstone of respectful and healthy intimate relationships. Northwestern expects its community members to communicate – openly, honestly, and clearly – about their actions, wishes, and intentions when it comes to sexual behavior, and to do so before engaging in intimate conduct. It is always the requirement of the individual initiating sexual contact or initiating a new type of sexual activity within an encounter to ensure that consent is present before acting and that consent is ongoing during sexual activity.

i. Capacity to consent

Consent is not present when an individual does not have the capacity to give consent, voluntarily or involuntarily, due to age (generally, the age of consent is 17 in Illinois), physical condition, or disability that impairs the individual's ability to give consent. Reasons why one could lack capacity to

give consent due to a physical condition include, but are not limited to, consumption of drugs or alcohol (voluntarily or involuntarily) or being in a state of unconsciousness, sleep, or other state in which the person is unaware that sexual activity is occurring.

"Incapacitated" refers to the state where a person does not understand the nature or fact of sexual activity due to the effect of drugs or alcohol consumption, medical condition or disability, or due to a state of unconsciousness or sleep. **When alcohol is involved, incapacitation is a state beyond drunkenness or intoxication. When drug use is involved, incapacitation is a state beyond being under the influence or impaired by use of the drug.** Alcohol and other drugs impact each individual differently, and determining whether an individual is incapacitated requires an individualized determination.

Some indicators of a lack of capacity to give consent due to consumption of drugs or alcohol may include, but are not limited to:

- Lack of full control over physical movements (for example, difficulty walking or standing without stumbling or assistance);
- Lack of awareness of circumstances or surroundings (for example, lack of awareness of where one is, how one got there, who one is with, or how or why one became engaged in sexual interaction);
- Inability to effectively communicate for any reason (for example, slurring speech, difficulty finding words).

A person may appear to be giving consent but may not have the capacity to do so. **When determining whether a person has the capacity to provide consent, the University will consider whether a sober, reasonable person in the same position knew or should have known whether the other party could or could not consent to the sexual activity.** It is especially important, therefore, that anyone initiating sexual activity is aware of their own level of intoxication as it may impact their ability to assess another person's capacity to give consent. Being intoxicated or impaired by drugs or alcohol does not excuse one from the responsibility to obtain consent. Being intoxicated or impaired by drugs or alcohol is never an excuse to commit sexual misconduct.

ii.    Aspects of Valid Consent

For purposes of this policy, *consent is present when clearly understandable words or actions manifest a knowing, active, voluntary, and present and ongoing agreement to engage in specific sexual or intimate contact.* Consent must be all of the following:

- ***Knowing:*** All individuals understand, are aware of, and agree as to the "who" (same partners), "what" (same acts), "where" (same location), "when" (same time), and "how" (the same way and under the same conditions) of the sexual activity.

- ***Active***: Consent must take the form of "clearly understandable words or

actions" that reveal one's expectations and agreement to engage in specific sexual activity. This means that silence, passivity, submission, or the lack of verbal or physical resistance (including the lack of a "no") should not – in and of themselves – be understood as consent. Consent cannot be inferred by an individual's manner of dress, the giving or acceptance of gifts, the extension or acceptance of an invitation to go to a private room or location, or going on a date.

- *Voluntary*: Consent must be freely given and cannot be the result of intimidation (extortion, menacing behavior, bullying), coercion (severe or persistent pressure causing fear of significant consequences from the other party if one does not engage in sexual activity), force (violence, physical restraint, or the presence of a weapon), threats (indications of intent to harm, whether direct or indirect), or fraud (misrepresentation or material omission about oneself or the present situation in order to gain permission for sexual or intimate activity).

- *Present and Ongoing:* Consent must exist at the time of the sexual activity. Consent to previous sexual activity does not imply consent to later sexual acts; similarly, consent to one type of sexual activity does not imply consent to other sexual acts. Consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another person.

Consent may also be withdrawn at any time, provided the person withdrawing consent makes that known in clearly understandable words or actions.

**b. Sexual Assault**

i. *Sexual penetration without consent:* Any penetration of the sex organs or anus of another person when consent is not present; any penetration of the mouth of another person with a sex organ when consent is not present; or performing oral sex on another person when consent is not present. This includes penetration or intrusion, however slight, of the sex organs or anus of another person by an object or any part of the body.

ii. *Sexual contact without consent:* Knowingly touching or fondling a person's genitals, breasts, buttocks, or anus, or knowingly touching a person with one's own genitals or breasts, when consent is not present. This includes contact done directly or indirectly through clothing, bodily fluids, or with an object. It also includes causing or inducing a person, when consent is not present, to similarly touch or fondle oneself or someone else.

iii. *Statutory rape:* Sexual intercourse with a person who is under the statutory age of consent under the laws of the state[2] in which the incident occurred. In Illinois, the age of consent is 17 years old. However, if the offender is in a position of authority or trust over the victim, the age of consent is 18.

---

[2] For incidents that occur outside of the U.S. (e.g., study abroad programs), Illinois law will apply in determining a violation of this policy.

    iv. *Incest:* Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

**c.** **Sexual Exploitation:** Taking sexual advantage of another person or violating the sexual privacy of another when consent is not present.

This includes, but is not limited to, the following actions (including when they are done via electronic means, methods or devices):

- Sexual voyeurism or permitting others to witness, listen to, or observe the sexual or intimate activity of another person without that person's consent;
- Indecent or lewd exposure or inducing others to expose themselves when consent is not present[3];
- Recording (through video or audio) any person engaged in sexual or intimate activity in a private space without that person's consent;
- Distributing sexual information, images, or recordings about another person without that person's consent;
- Recruiting, harboring, transporting, providing, or obtaining another person for the purpose of sexual exploitation;
- Inducing incapacitation in another person for the purpose of engaging in sexual conduct with someone who lacks capacity to consent, regardless of whether prohibited sexual conduct actually occurs.

**d.** **Dating/Domestic Violence:** Dating violence is any violence (including but not limited to emotional, physical, sexual, and financial abuse or threat of abuse) between two people who are or have been in a social relationship of a romantic or intimate nature. The existence of such a relationship will depend on the length and type of the relationship and the frequency of interactions between the persons involved.

Domestic violence is violence between two people who are or have been in an intimate or romantic relationship, who share a child in common, or who live or have lived together as spouses or intimate partners. Violence against any person by that person's caretaker or guardian (such as abuse against an elderly, young, or disabled person) may also be considered domestic violence. Examples of domestic violence include but are not limited to physical, emotional, sexual, technological and economic abuse or threat of abuse.

**e.** **Stalking:** Knowingly engaging in a course of conduct directed at a specific person that one knows or should know would cause a reasonable person to fear for their safety (or the safety of a third party) or suffer substantial emotional distress. "Substantial emotional distress" means significant mental suffering, anxiety or alarm.

Conduct that can amount to stalking may include two or more actions

---

[3] Breast-feeding a child is not indecent.

directed at another person[4], whether done directly, indirectly, through others, via devices, or via any other methods or means (specifically including electronic means e.g., cyberstalking), including but not limited to:

- Following a person;
- Being or remaining in close proximity to a person;
- Entering or remaining on or near a person's property, residence, or place of employment;
- Monitoring, observing, or conducting surveillance of a person;
- Threatening (directly or indirectly) a person;
- Communicating to a person;
- Giving gifts or objects to, or leaving items for, a person;
- Interfering with or damaging a person's property (including pets); or
- Engaging in other unwelcome contact.

**f.** **Sexual Harassment[5]:** Sexual harassment is any unwelcome conduct of a sexual nature where:

i. Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University program and/or activity, or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or

ii. The conduct has the purpose or effect of:

- Substantially interfering with, limiting or depriving a member of the community from accessing or participating in the academic or employment environment, and/or substantially interfering with an individual's academic performance or work performance; or
- Creating an academic or working environment that a reasonable person would consider to be intimidating, hostile, or offensive.

Examples of conduct that may constitute sexual harassment include:

- Pressure for a dating, romantic, or intimate relationship;
- Unwelcome sexual advances;
- Unwelcome touching, kissing, hugging, or massaging;
- Pressure for or forced sexual activity;

---

[4] Please note that actions need not be sexual in nature to constitute stalking.
[5] Sexual harassment is illegal in Chicago. Chicago law defines sexual harassment as: "any (i) unwelcome sexual advances or unwelcome conduct of a sexual nature; or (ii) requests for sexual favors or conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, or (2) submission to or rejection of such conduct by an individual is used as the basis for any employment decision affecting the individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment; or (iii) sexual misconduct, which means any behavior of a sexual nature which also involves coercion, abuse of authority, or misuse of an individual's employment position."

- Unnecessary references to parts of the body;
- Sexual innuendoes, gestures, or humor; or
- Sexual graffiti, pictures, or posters.

**3.     Retaliation[6]**

Northwestern strictly prohibits retaliation against any member of its community for reporting an incident of discrimination or harassment or for participating, in any manner, in an investigation or hearing related to a report of discrimination, harassment or sexual misconduct. The University considers such actions to be protected activities in which all members of the Northwestern community may freely engage.

Members of the community are prohibited from engaging in actions, directly or through others, which are aimed to deter a reasonable party or a witness from reporting discrimination, harassment or sexual misconduct or participating in an investigation or hearing or done in retribution for such activities. A detailed definition of retaliation and examples of retaliatory conduct are provided in the University's Policy on Non-Retaliation. Reports of retaliation related to this policy will be investigated and resolved pursuant to the processes set forth in this policy.

The Northwestern community is strongly encouraged to report any potential incident of retaliation under this policy to NU-OCR, who shall assess the matter and take appropriate actions to address such conduct.

**G.     Implementation**

**1. Reporting**

**a.   <u>Reporting Options</u>**

The University encourages reporting of discrimination, harassment and sexual misconduct. Members of the University community who believe they have experienced, witnessed or otherwise become aware of discrimination, harassment and sexual misconduct have the right to choose whether or not to report the incident to the University or law enforcement, and have the right to choose whether to engage with the University once the University receives a report.

i.   Reporting Incidents to the University

Any individual may report alleged or suspected discrimination, harassment or sexual misconduct to NU-OCR. Reports to NU-OCR may be made in person, by email, by regular mail, by phone, or electronically as explained below.

**Individuals impacted by discrimination, harassment or sexual misconduct may contact NU-OCR to receive support, resources, and information even if they do not wish to move forward with the**

---

[6] Retaliation for reporting sexual harassment is illegal in Chicago.

**Complaint Resolution Process described in Section III below.** Please see section II(A) ("Participation in Process") for more information. To speak to someone confidentially without making a report to the University, please see the Confidential Resources listed in Section III(A) below.

While anonymous reports will be reviewed by NU-OCR, the University's ability to address misconduct reported by anonymous sources may be significantly limited. NU-OCR will review every report of harassing conduct to evaluate whether such reported conduct creates or created a hostile environment.

There is no time limit for reporting an incident of discrimination, harassment or sexual misconduct. However, the University encourages reports be made as soon as possible after the incident. The passing of time makes reviewing the evidence more difficult and the memories of involved parties may become less reliable. NU-OCR reserves the right to investigate or otherwise address any report, regardless of when it is made, based on concern for the safety or well-being of the University community.

The staff identified below are specially trained to work with individuals who report or are accused of discrimination, harassment and sexual misconduct and have knowledge about on- and off-campus resources, services, and options—including the availability of supportive measures, as discussed below in Section I(F)(2).

**Emily Babb, Associate Vice President for Civil Rights and Title IX Compliance/Title IX Coordinator**

**Tiffany Little, Senior Director for Civil Rights and Title IX Compliance/Deputy Title IX Coordinator**

Location: Office of Civil Rights and Title IX Compliance, 1800 Sherman, Suite 4-500, Evanston
 Phone:    (847) 467-6165
Email:       OCR@northwestern.edu

**To File a Report Electronically**

Individuals may use the form at the following link to electronically file a report of sexual misconduct, including anonymous reports, with NU-OCR

https://www.northwestern.edu/NUReportSexualMisconduct

Individuals may use the form at the following link to electronically file a report of discrimination or harassment, including anonymous reports, with NU-OCR:

https://www.northwestern.edu/NUReportDiscrimination

An immediate auto-response email with information about resources and

12

options will be sent in response to reports filed electronically.

**Other University Reporting Options**

**EthicsPoint**
Third-party service for reporting complaints, including anonymous complaints, by phone or online
Phone:      (866) 294-3545
Website:   https://www.northwestern.edu/risk/compliance/report-a-concern/ethicspoint.html

Upon receipt of a report, an NU-OCR staff member will contact the person who may have experienced discrimination, harassment or sexual misconduct. The outreach from Office of Civil Rights and Title IX Compliance staff member will generally include information about rights and options, as well as resources available to parties. For incidents involving sexual misconduct the outreach will also include information regarding medical and confidential counseling and support resources; options for pursing a complaint and/or reporting the incident to law enforcement; how to request a protective order or no-contact directive; how to request interim measures from the University; how to preserve evidence; and where to access more information.

The outreach will also include an invitation to meet with or provide additional information to an NU-OCR staff member.

ii.   Reporting Incidents to Law Enforcement

An individual who has experienced sexual misconduct or discriminatory conduct constituting a crime has the right to choose whether to file a police report. Northwestern University encourages individuals to report such incidents to University Police or local law enforcement. Filing a police report can result in the investigation of whether sexual violence or other related crimes occurred and the prosecution of the perpetrator. Timely reporting to the police is an important factor in successful investigation and prosecution of crimes, including sexual violence.

**NU-OCR provides information on contacting local and campus law enforcement and will assist an individual in doing so. However, NU-OCR will not compel an individual to go to law enforcement.**

The Northwestern University Police has a written statement for sexual violence survivors (http://www.northwestern.edu/up/your-safety/sexual-violence/university-police- guarantee.html) that reflects its commitment to sensitivity and privacy. University Police can also assist in reviewing options with survivors and identifying and facilitating resources related to: Seeking medical attention;

- Seeking support, advocacy, and counseling services;
- Seeking protective orders from a court;
- Pursuing options under the University's sexual misconduct investigation process.

13

Employees of the University Police are University employees and therefore are obligated to promptly report incidents of sexual misconduct of which they become aware during the scope of their work as explained below. Employees of the University Police will make reports to NU-OCR regardless of whether the individual who experienced the sexual misconduct chooses to pursue criminal charges.

**Northwestern University Police Department**

Evanston Campus:
1201 Davis Street, Evanston
 Phone:    (847) 491-3456 (24 hours)

Chicago Campus:
211 East Superior Street, Chicago
Phone:    (312) 503-3456 (24 hours)
Website: https://www.northwestern.edu/up/

**Evanston Police Department**

Evanston Campus: 1454 Elmwood Avenue, Evanston
Phone:    911 or (847) 866-5000 (24 hours)
Website: https://www.cityofevanston.org/police

**Chicago Police Department – 18th District (covers Chicago campus)**

Chicago Campus: 1160 North Larrabee Ave., Chicago
Phone:    911 or (312) 744-4000 (24 hours)
Website: https://www.chicagopolice.org/about/police-districts/18th-district-near-north/

b.  **Reporting Obligations**

***All University employees (including student employees) and graduate students with teaching or supervisory authority, are required to promptly report discrimination, harassment, or sexual misconduct of which they become aware in the scope of their work for the University to NU-OCR unless they are a Confidential Employee. Note: This does not require a person experiencing harm to report the incident.*** Failure to fulfill this reporting obligation will be referred to the appropriate office for corrective action. The University encourages all individuals – including students not referenced above – to report discrimination, harassment, and sexual misconduct.

The reporting requirements for employees are explained in detail in the Policy on Reporting by University Employees of Disclosures Related to Discrimination and Harassment.

iii.  Incidents involving minors

14

As stated in the University's Policy on Minors at Northwestern all University employees, students, volunteers, and third-party contractors are obligated to report to the Illinois Department of Children & Family Services or applicable state agency (as well as University Police, in emergency situations) any suspected abuse and/or neglect of a child. This includes any and all incidents of sexual misconduct involving minors, which should be reported to NU-OCR as well.

Reporters should also contact their supervisor (if the reporter is an employee) or the Dean of Students (if the reporter is a student), as well as notifying the Office of Risk Management and the Office of Compliance, Audit, and Advisory Services in writing that a report has been made.

2. **Supportive Measures**

Supportive Measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or the Respondent before, during, or after the initiation of an investigation, or where no investigation has been initiated. Such measures are designed to restore or preserve equal access to the University's education programs or activities without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the University's educational environment, or deter discrimination, harassment and/or sexual misconduct.

Supportive Measures may include, but are not limited to the following:

- Arranging access to counseling services and assistance in setting up initial appointments
- Assistance in seeking extensions of deadlines or other course-related adjustments
- Assistance in arranging modifications of work or class schedules
- Assistance in arranging campus escort services
- Imposition of mutual restrictions on contact between the parties
- Assistance in arranging changes in work or housing locations
- Assistance in arranging leaves of absence
- Coordinating with University police for increased security and monitoring of certain areas of the campus
- Assistance in arranging other changes to academic, living, dining, transportation, and working situations
- Honoring an order of protection or no contact order entered by a State civil or criminal court, and other similar measures.

In providing Supportive Measures, NU-OCR will make every effort to avoid depriving any student of their education or access to the University's program or

15

activities. The Supportive Measures needed by each party may change over time, and NU-OCR will communicate with parties to ensure that any Supportive Measures in place are necessary and effective based on the parties' evolving needs.

NU-OCR will maintain the confidentiality of Supportive Measures provided to either a Complainant or Respondent, to the extent that maintaining such confidentiality does not impair the University's ability to provide the Supportive Measures in question. As noted above, an individual may request to receive support – including the Supportive Measures mentioned in this section – even if they do not choose to participate in the University's Complaint Resolution Process.

### 3.    Interim Removal

At any time after receiving a report of an alleged violation of this policy, the University may remove a student Respondent from the University's Education Programs and Activities on an emergency basis if an individualized safety and risk analysis determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations justifies removal.[7] . Any emergency removal of a student will involve consultation with the Behavioral Consultation Team and the Division of Student Affairs.

In the event the University imposes an interim removal, it will provide the Respondent with notice and an opportunity to challenge the removal decision. If Respondent wishes to challenge the interim action, the student Respondent must do so, in writing, within two calendar days of their receipt of the notice. In cases involving an interim removal, the Associate Vice President or designee will review the challenge and determine whether the interim suspension is with good cause and may continue. Any challenge or reevaluation an interim removal will be based on both the original and any new information collected related to the safety and security implications of the University community.

In the case of a Respondent who is a non-student employee, and in the University's discretion, the University may place the Respondent on administrative leave at any time after receiving a report, including during the pendency of the investigation and hearing process. The decision to place a non-student employee on administrative leave will be made by the employee's unit director and the Office of the Provost (for faculty Respondents) or Human Resources (for staff Respondents) upon recommendation of NU-OCR.

For all other Respondents, including third-party affiliates and guests, the University retains broad discretion to prohibit such persons from entering onto its campus and other properties at any time, and for any reason, whether after receiving a report or otherwise. Such individuals are generally not entitled to any process set forth in this policy, particularly upon removal from campus.

Please note that an interim removal is not directly related to a finding of

---

[7] The University will consider the factors set forth in Section II.A of this Policy when making this determination.

responsibility. Whether an interim removal is lifted, amended, or stayed will have no effect on findings as determined by an investigation.

4.     **Amnesty for Parties and Witnesses**

Northwestern encourages reporting of discrimination, harassment, and sexual misconduct and participating in resolution processes and seeks to remove any barriers to making a report or participating in a process. The University recognizes that an individual who has been consuming alcohol (including underage consumption) or using drugs at the time of the incident may be hesitant to make a report because of potential consequences for that conduct. To encourage reporting, an individual who makes a good faith report of discrimination, harassment, or sexual misconduct that was directed at them or another person or participates in an investigation as a witness or party will not be subject to disciplinary action by the University for a conduct or policy violation for personal consumption of alcohol or drugs that is related to and revealed in the report or investigation, unless the University determines that the violation was serious and/or placed the health or safety of others at risk. However, this does not extend to the distribution, sale, or otherwise providing another individual with alcohol or drugs for the purposes of inducing incapacitation. This Amnesty provision does not preclude or prevent action by police or other legal authorities. This Amnesty provision may also apply to student groups making a report of discrimination, harassment, or sexual misconduct.

5.     **Free Expression and Academic Freedom**

Northwestern is firmly committed to free expression and academic freedom. The University is equally committed to creating and maintaining a safe, healthy, and harassment-free environment for all members of its community, and firmly believes that these two legitimate interests can coexist.

Unlawful discrimination, harassment, sexual misconduct, and retaliation against members of the Northwestern community are not protected expression or the proper exercise of academic freedom. The University will consider academic freedom in the investigation of reports of discrimination, harassment, sexual misconduct or retaliation that involve an individual's statements or speech. NU-OCR will review every report of harassing conduct to evaluate whether such reported conduct creates or created a hostile environment. Even protected speech or expression may in some cases create a hostile environment in the University community. In such cases, the University may be constrained in its ability to impose disciplinary measures but will in appropriate cases respond in a manner calculated to restore access to the University's programs and activities to affected individuals.

6.     **Title IX and VAWA Statement**

It is the policy of Northwestern to comply with Title IX of the Education Amendments of 1972 (and all other applicable laws regarding unlawful discrimination and harassment including, but not limited to, Title VII of the

Civil Rights Act of 1964 and the Illinois Human Rights Act), which prohibits discrimination (including sexual harassment and sexual violence) based on sex in the University's educational programs and activities. The University's Interim Policy on Title IX Sexual Harassment may be found here: https://www.northwestern.edu/equity/documents/interim-policy-on-title-ix.pdf. It is also Northwestern's policy to comply with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crimes Statistics Act, as amended by the Violence Against Women Act. Title IX prohibits retaliation for asserting or otherwise participating in claims of sex discrimination.

VAWA imposes additional duties on universities and colleges to investigate and respond to reports of sexual assault, stalking, and dating or domestic violence, and to publish policies and procedures related to the way these reports are handled. Northwestern has designated the Title IX Coordinator, with assistance of the Deputy Title IX Coordinators, to coordinate Northwestern's compliance with Title IX and VAWA and to respond to reports of violations. The University has directed its Clery Program Manager to coordinate Northwestern's compliance with the Clery reporting related VAWA requirements. A person may also file a complaint with the Department of Education's Office for Civil Rights regarding an alleged violation of Title IX by visiting www2.ed.gov/about/offices/list/ocr/complaintintro.html or calling 1-800- 421-3481. Employees may also file a charge with the Equal Employment Opportunity Commission regarding an alleged violation of Title VII by calling 1-800-669-4000 or visiting https://www.eeoc.gov/employees/howtofile.cfm. Employees may also file a charge with the Illinois Department of Human Rights (IDHR) regarding an alleged violation of the Illinois Human Rights Act by calling 1-800-662-3942 or 1-866-740-3953 (TTY). In addition, after the IDHR has completed its investigation of the complaint, an appeal process is available through the Illinois Human Rights Commission, which can be contacted by calling 312-814-6269 or 312-814-4760 (TTY). Employees may also file a complaint with the Chicago Commission on Human Relations regarding an alleged violation of the Chicago Human Rights Ordinance by calling 312-744-4111 or via email at cchrfilings@cityofchicago.org.

## H.    Consequences of Violating this Policy

When a determination has been made that an individual has violated this policy, sanctions are determined based on several factors, including the severity of the conduct and any prior policy violations. In determining sanctions, the decision maker for sanctions has the following objectives:

- Promoting safety and protecting the University community;

- Sanctioning individuals for violating this policy and deterring them from similar future behavior;

- Ending conduct;

- Taking steps reasonably calculated to prevent the future reoccurrence of the conduct;

- Restoring the Complainant to their pre-deprivation status, to the extent practical and possible.

18

Sanctions and corrective actions can include, but are not limited to:

- Verbal warning
- Written warning
- Advisory letter
- Conduct review
- Disciplinary hold on academic and/or financial records
- Performance improvement/management process
- Required counseling or coaching
- Required training or education
- Campus access restrictions
- Referral to the Fitness for Duty process
- No trespass order issued by NUPD (with respect to campus locations)
- No-contact directive (with respect to an individual)
- Loss of privileges
- Loss of oversight, teaching or supervisory responsibility
- Probation
- Demotion
- Loss of pay increase
- Transfer (employment)
- Revocation of offer (employment or admissions)
- Disciplinary suspension
- Suspension with pay
- Suspension without pay
- Expulsion
- Termination of employment
- Revocation of tenure
- Degree hold
- Degree revocation
- Termination of contract (for contractors)

The University may assign other sanctions as appropriate to the particular situation. Sanctions and corrective actions will be imposed in accordance with relevant policies and/or procedures and other requirements set forth in the applicable Staff Handbook, Faculty Handbook, Student Handbook, other policies or handbooks that may be developed over time, or contracts. In addition to imposing sanctions, the University may take steps to remediate the effects of a violation on the impacted parties and others.

The University may offer additional measures, and/or take other action to eliminate any hostile environment caused by the discrimination, harassment or sexual misconduct, prevent the recurrence of any such conduct, and remedy the effects of any such conduct on the Complainant and the University community. Such measures may include, but are not limited to, the actions referenced above in Section I(F)(2), as well as training or other measures.

1.      **Violations of Directives Related to Supportive Measures and Interim Restrictions**

19

Violations of directives related to supportive measures or interim restrictions may lead to an investigation and disciplinary action, which may include, but is not limited to, any of the sanctions and corrective actions listed in the previous section, including expulsion or dismissal from the University; or termination of employment, including revocation of tenure.

### 2. Violations of the Policy on Non-Retaliation

Individuals who are found to have engaged in retaliation are subject to disciplinary action that may include, but is not limited to, any of the sanctions and corrective actions listed above, up to and including expulsion or dismissal from the University; or termination of employment, including revocation of tenure. Sanctions for retaliation may be applied regardless of whether there is a finding on the underlying discrimination, harassment, or sexual misconduct complaint.

## I. Recordkeeping

The University will maintain for a period of at least seven years: (1) for each complaint of discrimination, harassment, or retaliation, records documenting the Formal or Alternative Resolution Process and outcome and (2) for each notification the Associate Vice President receives of information about conduct that reasonably may constitute discrimination, harassment, or retaliation under this Policy, records documenting the actions the University took.

## J. Related Information

### 1. University policies and procedures

Interim Policy on Title IX Sexual Harassment

Reasonable Accommodation Policy

Reporting by University Employees of Disclosures Related to Discrimination and Harassment

Faculty Handbook

Non-Retaliation

Policy on Minors at Northwestern

Policy on Consensual Romantic or Sexual Relationships between Faculty, Staff and Students

Staff Handbook

Student Handbook

### 2. Other information

Department of Education Office for Civil Rights complaint forms

EthicsPoint

Resource Guide on the Policy on Discrimination, Harassment, and Sexual Misconduct

Sexual Misconduct Response & Prevention resource page

University Police Annual Security & Fire Safety Report

University Police Guarantee for Sexual Assault Victims

K.     **History**

This policy was enacted on August 14, 2020 and updated on September 1, 2021 and September 1, 2022, and September 1, 2023.  Midyear updates addressing changes to the City of Chicago's sexual harassment laws were made in July, 2022. Midyear updates adding three protected characteristics were made in April 2024

Policy URL: https://www.northwestern.edu/equity/documents/policy-on-institutional-equity.pdf

## II.     Complaint Resolution Process

A.     **Introduction and General Procedures**

*Introduction*

The procedures below outline the process the University follows when it receives a report alleging a violation of the *Policy on Discrimination, Harassment, and Sexual Misconduct* by a member of the Northwestern community[8]. For the purposes of this Policy, "by a member of the Northwestern community" means current students, current faculty (as defined by the Faculty Handbook), current staff members, and current student or employee groups.

NU-OCR retains discretion on whether to extend this process to current third-party affiliates who have a formal (including contractual) relationship with the University. Visitors to campus who are accused of discrimination, harassment or sexual misconduct are not entitled to the process set forth in this policy. NU-OCR is responsible for handling reports alleging discrimination, harassment and sexual misconduct. In addition, NU-OCR may consolidate complaints alleging discrimination, harassment, or sexual misconduct under this policy with complaints alleging potential violations of other University policies where the allegations arise out of the same facts or circumstances. The University may apply these complaint resolution procedures to such consolidated complaints in place of the community standards administrative hearing process (UHAS) or other University investigation process that otherwise would apply. NU-OCR will consult with the appropriate University office, such as the Office of Community Standards, Office of the Provost, or Office of Human Resources, in determining whether to consolidate complaints. Where the reported conduct also implicates the University's Interim Policy on Title IX Sexual Harassment, the procedures set forth in the Interim Policy on Title IX Sexual Harassment will apply. University groups, including student groups, and departments are expected to report concerns regarding alleged or suspected discrimination, harassment, or sexual misconduct to NU-OCR and not to take action to attempt to investigate or resolve such complaints independently. All reports of alleged violations of this policy will be handled in accordance with these complaint resolution

---

[8] When a current Northwestern employee or student is accused of violating this policy in the context of an affiliate organization (e.g. a Northwestern affiliated hospital), the Office of Civil Rights and Title IX Compliance will collaborate with the affiliate organization and the University retains the right to adopt the findings of the affiliate.

21

procedures, other University policies and processes, and applicable laws and regulations, including Title VII, Title IX,[9] the *Violence Against Women Act*, the *Illinois Preventing Sexual Violence in Higher Education Act*.

The process described below is Northwestern's internal University process to determine whether Northwestern policy was violated and is not a court system. As such, Northwestern's process does not use the same rules of procedure and evidence as those used by courts or law enforcement. **A person who has experienced a crime has the right to simultaneously file and pursue a criminal complaint with law enforcement and a complaint with the University if they choose, and to be assisted by the University in notifying law enforcement authorities if they choose, or to decline to notify such authorities**. Parties may also have options to file civil actions in court.

Because allegations of discrimination, harassment and sexual misconduct can sometimes raise challenging new issues, the University reserves discretion to take reasonable actions to address those issues in a manner consistent with the spirit of the applicable policies and procedures, while preserving fairness for both parties and maintaining the integrity of the complaint resolution process. Where this Policy is silent on a procedural issue, and no other applicable policy governs the issue, NU-OCR has discretion to adopt sound practices.

### *Participation in Process*

The University invites parties to participate fully in the complaint resolution process. In order for the University to investigate a complaint and/or enable a Respondent to fully respond to the allegations, most situations will require the Complainant's participation and that the Complainant's identity be disclosed to the Respondent.

When individuals report allegations of discrimination, harassment or sexual misconduct to the University and do not consent to the disclosure of their names and/or do not disclose the identity of the alleged offenders or identifiable information about the alleged offenders, the University's ability to respond to the reports may be limited. If a Complainant wants the University to conduct an investigation under these procedures but does not wish to participate in the investigation, the University will determine whether it is possible to move forward without the Complainant's participation. In some cases, it will not be possible to do so. If an individual reporting discrimination, harassment or sexual misconduct requests anonymity or does not wish to proceed with an investigation, the University will attempt to honor that request but NU-OCR will assess whether the reported conduct creates a hostile environment for the Complainant or others on campus and,, in some cases, NU-OCR may determine that the University needs to proceed with an investigation, including potentially disclosing the identity of the Complainant. In such cases, NU-OCR will not compel an individual to participate in the investigation. NU-OCR will consider the following factors in reaching a determination on whether to open a formal investigation when the Complainant requests anonymity or requests no formal investigation be conducted: (1) the totality of the known circumstances, (2) the presence of any risk factors as outlined below. (3) the potential impact of such action(s) on the Complainant, (4) any evidence showing Respondent made statements of admission or

---

[9] Title IX sex and pregnancy based discrimination matters are addressed under this policy, while Title IX Sexual Harassment matters are handled under the University's Interim Policy on Title IX Sexual Harassment.

otherwise accepted responsibility for the alleged conduct, (5) the existence of any independent information or evidence regarding the alleged conduct, and (6) any other available and relevant information. Risk factors include:

- The nature and scope of the alleged conduct, including whether the reported behavior involves the use of a weapon, physical violence,[10] or multiple Respondents;
- The respective ages and roles of the Complainant and Respondent;
- The risk posed to any individual or to the campus community by not proceeding, including the risk of additional violence;
- Whether there have been other reports of other prohibited conduct or other misconduct by the Respondent;
- Whether the report reveals a pattern of misconduct (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group;
- The University's obligation to provide a safe and non-discriminatory environment; and
- Whether any other aggravating circumstances or signs of predatory behavior are present.

For reports involving Discrimination or Harassment, when a Complainant does not wish to file a complaint on their own behalf, or when NU-OCR has received multiple reports or identifies a pattern of concerning conduct, the Associate Vice President may, in their discretion, proceed with an investigation in which the University is the Complainant. When making this decision, the Associate Vice President will balance the autonomy of the Complainant with the University's responsibility to investigate and consider the factors set forth in the paragraph above. When the University is the Complainant, a Reporting Party is treated as a complaining Witness and will only see their statement and be informed of the outcome of the investigation. The University will not coerce or retaliate against a Reporting Party to persuade them to participate in the investigation.

The University invites Respondents to participate fully in all aspects of the complaint resolution process. If a Respondent elects not to participate in any part of the process, the University may proceed without the Respondent's participation. Respondents will be held accountable for any outcomes issued, even if they decline to participate.

The University invites witnesses to participate in investigation processes. The University will not compel an individual to participate in the investigation.

NU-OCR will draw no adverse inference from a decision by any party or witness not to participate. However, if either Party declines to participate or limits the extent of their participation, such decision may limit the ability of NU-OCR to thoroughly investigate and resolve the complaint.

All participants have the responsibility to be completely truthful with the information they share at all stages of the process. Any individual who knowingly or intentionally provides false information as part of a report or investigation under this Policy will be subject to discipline in accordance with the procedures set forth in the Student Handbook,

---

[10] Physical violence means exerting control over another person through the use of physical force. Examples of physical violence include hitting, punching, slapping, kicking, restraining, strangling, and brandishing or using a weapon.

Faculty Handbook, or Staff Handbook. This provision does not apply to a good faith report that is not substantiated or proven by a preponderance of the evidence.

### *Privacy and Sharing of Information*

The University considers reports and investigations to be private matters for the parties involved. For that reason, the University will protect the identity of persons involved in reports of alleged violations of this Policy to the best of its ability. The University will only share personally identifiable information with persons with a need to know such information in order for the University to investigate and respond to the report or to provide resources or support services. The identities of witnesses are typically shared with the parties, however, based on the specific facts, requests, and circumstances of a particular case, NU-OCR has discretion to anonymize witnesses when appropriate. The University does not publish the names nor post identifiable information about persons involved in a report of discrimination, harassment, or sexual misconduct in the University Police Daily Crime Log (Blotter) or elsewhere online.

All participants in an investigation will be informed that privacy enhances the integrity of the investigation, protects the privacy interests of the parties, and protects the participants from statements that might be interpreted to be retaliatory. The Complainant and Respondent will be asked at the beginning of the investigation to keep the information related to the investigation and resolution private, to the extent consistent with applicable law. Witnesses and advisors will be asked to keep any information learned in an investigation meeting private, to the extent consistent with applicable law. While the University will maintain confidentiality specified in this Section, the University will not limit the ability of the parties to discuss the allegations at issue in a particular case. Parties are advised, however, that the manner in which they communicate about, or discuss a particular case, may constitute Prohibited Conduct or Retaliation in certain circumstances and be subject to discipline pursuant to the processes specified in this policy.

Certain types of policy violations are considered crimes for which the University must disclose crime statistics in its Annual Security Report that is provided to the campus community and available to the public. These disclosures will be made without including personally identifying information.

### *Complaint Resolution Timeline*

The University strives to resolve all complaints in a prompt and timely manner. Although the length of each investigation will vary based on the circumstances of the case, the University strives to complete each investigation within ninety (90) calendar days of sending the written notice of investigation.

Additionally, the timeline for a case may be affected by breaks in the academic calendar, availability of the parties and witnesses (including due to a leave of absence), scope of the investigation, need for interim actions, and other unforeseen or exigent circumstances. The parties will be periodically updated on the status of their case. In cases where there is a simultaneous law enforcement investigation, the University may need to temporarily delay its investigation while law enforcement gathers evidence.

However, the University will generally proceed with its investigation and resolution of a complaint during any law enforcement investigation.

### Conflicts of Interest, Bias, and Procedural Complaints

No investigator, panelist, or appeal reviewer will make findings or determinations in a case in which they have a material conflict of interest or material bias. Any party who believes one or more of these University officials has a potential material conflict of interest or material bias must raise the concern to NU-OCR within two (2) calendar days of discovering the potential conflict so that NU-OCR may evaluate the concern and find a substitute, if appropriate. The Associate Vice President or their designee will determine whether a conflict of interest exists. The failure of a party to timely raise a concern of a conflict of interest or bias may result in a waiver of the issue for purposes of any appeal.

### Standard of Evidence

The University uses the preponderance of the evidence standard in investigations of complaints alleging discrimination, harassment or sexual misconduct and any related violations. This means that the investigation determines whether it is more likely than not that a violation of the policy occurred.

### Advisor/Legal Counsel

An advisor is a support person who may be present to provide support to a Complainant or Respondent throughout an investigation, alternative resolution, and/or sanctioning process. An advisor may not be a party or witness in the matter or a related matter. An advisor may be an attorney. A representative from the University's Office of General Counsel may attend any proceeding where an attorney is serving as an advisor for any party is present. A union representative may serve as an advisor, where applicable.

Complainants and Respondents may be accompanied by one advisor throughout the investigation and any sanctioning process or alternative resolution, provided that the involvement of the advisor does not result in an undue delay of the process. It is the responsibility of each party to coordinate scheduling with their advisor for any meetings. At the written request of the party, NU-OCR will copy an advisor on communication to the party. An advisor may not speak, write, or otherwise communicate with an investigator, panelist, or appeal reviewer on behalf of the Complainant or Respondent. NU-OCR will not allow an advisor to review any document or to attend any meeting in the absence of the Party they are assisting. NU-OCR will not consider or accept submissions and information from an advisor. If an advisor attempts to present information or submit documents on behalf of any Party, NU-OCR will notify the Party and provide the Party a reasonable amount of time to submit the information or documents directly, however the Office will not extend procedural deadlines for this reason. If the Party elects not to submit the information or documents, NU-OCR will not consider such information in the investigation or any resolution. Advisors may not engage in behavior or advocacy that harasses, abuses, or intimidates either party, a witness, or individuals involved in resolving the complaint. Advisors who do not abide by these guidelines may be excluded from the process.

Where a Party is a Student, prior to an Advisor participating in any meeting or receiving

any documents as part of any process under this Policy, the Party must execute a FERPA waiver permitting the advisor to have access to the Party's education records related to the process.

**B.    Initial Inquiry**

Upon receipt of a report of discrimination, harassment or sexual misconduct, or when a Complainant otherwise chooses to move forward with the complaint resolution process, the first step is an initial inquiry. An initial inquiry is an assessment by NU-OCR as to whether the allegations, if substantiated, would rise to the level of a violation of University Policy(ies); a determination of the specific policy(ies) implicated; and an assessment of appropriate University response. NU-OCR will conduct the initial inquiry within seven (7) business days after receipt of the report or meeting with the Complainant(s), whichever is later. This timeframe may be extended for good cause.

As a result of the initial inquiry, NU-OCR may determine that the conduct reported falls under the scope of the University's Interim Policy on Title IX Sexual Harassment and proceed to apply the procedures of that policy.

If NU-OCR determines that the conduct reported cannot fall under the scope of the Interim Policy on Title IX Sexual Harassment but could fall within the scope of this Policy, the possible next steps include:

- Close the Case: NU-OCR may close a case when insufficient information exists to move forward or when the alleged misconduct—even if substantiated— would not be a violation of policy. NU-OCR may, in its discretion, reopen a case in the future if additional information becomes available.
- Educational Response (See section C below)
- Administrative Review (See section D below)
- Alternative Resolution (See section E below)
- Formal Resolution (See section F below)

**C.    Educational Response**

Educational response involves measures taken by the University in response to a report of discrimination, harassment or sexual misconduct when formal resolution is not desired by the person who may have experienced the misconduct, when there is not enough information to proceed with a formal resolution process against a known Respondent, and/or where NU-OCR deems it an appropriate response. Educational response is not used where NU-OCR has determined that the University must proceed with an investigation. (See *Participation in Process*, above)

An educational response is nondisciplinary and does not result in findings related to responsibility or in sanctions. An educational response does not preclude further steps, including formal resolution or alternative resolution, if a complaint is later made or additional information is received by NU-OCR. Educational response may include, but is not limited to:

- An educational meeting with the subject of the report
- Referral to another University office for response

- Training for a group or unit
- An advisory letter

If NU-OCR refers an educational response to another University office, the responsive University office will provide a brief summary of the actions taken.

**D.** **Administrative Review**

NU-OCR has the discretion and authority to conduct an administrative review when formal resolution is not desired by the person who may have experienced the misconduct, when there is not enough information to proceed with a formal resolution process against a known Respondent, and/or where NU-OCR deems it an appropriate response.

In determining whether to conduct an administrative review of allegations, the Office will consider all known information, including (1) the nature and the severity of the allegations, (2) whether the allegations are amenable to resolution through other channels, such as human resources intervention; (3) the history of prior complaints regarding the same individuals, department, and/or area; (4) the expressed wishes, if known, of the affected individual; and (5) any other pertinent information. Upon initiation of an administrative review, NU-OCR will notify the head of the department/unit/area and other relevant University personnel (e.g., human resources professionals) of the commencement and scope of the review. Administrative reviews will include interviewing witnesses and reviewing pertinent documents and will normally be concluded within ninety (90) calendar days. The timeframe may be extended for good cause. NU-OCR will then produce a written report outlining the findings of the Administrative Review and any recommended action items to the executive responsible for the department/unit/area. The same level of confidentiality applicable in formal resolution processes will apply to administrative reviews.

**E.** **Alternative Resolution**

In matters where a complaint has been filed and has passed initial inquiry, the parties may elect to resolve the matter through Alternative Resolution. Both Complainant(s) and Respondent(s) may request Alternative Resolution. Alternative Resolution is voluntary, and the University will not require parties to engage in this process. Alternative Resolution utilizes informal resolution mechanisms to resolve complaints of sexual misconduct, discrimination, or harassment.

**All parties to a Complaint MUST agree to participate in Alternative Resolution. If any party does not agree, the matter must proceed to the investigation and formal resolution process.**

The University utilizes various forms of informal resolution options. Parties interested in alternative resolution will receive a written notice disclosing:

- The allegations,
- The requirements of the chosen alternative resolution process,
- The right to consult an advisor, and
- Notice that at any time prior to agreeing to a resolution, any party has the right to withdraw from the alternative resolution process and resume the Complaint Resolution Process with respect to the Formal Complaint.

In the event a party withdraws from the alternative resolution process, or the process is terminated by the facilitator, records from the alternative resolution process will not be shared with those investigating the matter but will be maintained by NU-OCR.

All parties will be asked to provide voluntary, written consent to the alternative resolution process before it begins. **This process will not be used to resolve allegations that an employee subjected a student to Title IX Sexual Harassment as defined in the Interim Title IX Sexual Harassment policy.** Alternative Resolution must be deemed as an appropriate option by the Associate Vice President or their designee in order to move forward. In assessing the appropriateness of alternative resolution, considerations may include, but are not limited to, the physical health and/or safety of the campus community, the severity of the conduct, and whether there have been any prior policy violations.

Alternative Resolution may include, but is not limited to, Facilitated Agreements. Facilitated Agreements are communications between the parties where a facilitator(s) serves as an intermediary to help the parties reach a mutually agreed upon resolution to the complaint. Parties may engage in Facilitated Agreements either directly (Facilitated Dialogue) or indirectly (Shuttle Negotiation). Examples of resolution terms obtained through this process, may include but are not limited to:

- Participation in educational offerings
- Restrictions from participation in campus events and/or registered student organizations
- Administrative and/or academic changes
- Relocation or removal from on-campus housing
- No Contact Directive

**Agreements reached as part of alternative resolution are final and cannot be appealed.** Alternative resolution can be terminated by either party prior to an agreement being signed. The Associate Vice President or their designee may also terminate the alternative resolution process if they believe it is no longer an appropriate option for the parties. The decision to terminate an alternative resolution process will be based on factors such as the nature and/or severity of the conduct described in the report, concerns related to safety/risk to campus community, or if the parties are unable to reach a mutual resolution agreement.

Anyone serving as an alternative resolution facilitator will be trained in accordance with current state and federal requirements. The Associate Vice President or their designee will be responsible for assigning a facilitator(s) to particular matters. The facilitator(s) for the alternative resolution process must not be the same person as the investigator or decision maker in a particular matter.

F.    **Formal Resolution**

*Notification to Parties*

Within seven (7) calendar days of completing an initial inquiry resulting in the decision to begin the Formal Resolution process, the Office of Civil Rights and Title IX

Compliance will provide written notice to the parties whose identities are known that includes:

- Notice of Northwestern's complaint resolution process.
- Sufficient details of the allegations known at the time so that the parties may prepare a response before an initial interview with the investigator(s), including:
  - the identifies of the parties involved in the incident, if known;
  - the conduct alleged to constitute a violation of policy; and
  - the date and location of the incident(s), if known.

The written notice will inform the parties of the University's prohibitions on retaliation and knowingly making false statements or knowingly submitting false information during the complaint resolution process.

If, in the course of an investigation, the University decides to investigate additional allegations about the Complainant or Respondent that arise that were not included in the initial notice, the Office of Civil Rights and Title IX Compliance will provide notice of the additional allegations to the parties whose identities are known pursuant to the requirements above.

### *Acceptance of Responsibility*

Prior to the conclusion of an investigation, the Respondent may elect to take responsibility for the prohibited conduct by contacting NU-OCR in writing. Following an acceptance of responsibility, NU-OCR may solicit additional information relating to the matter NU-OCR will issue a brief outcome determination to the parties summarizing the allegations and stating the Respondent has accepted responsibility, and will refer the matter to the appropriate office for sanctioning as delineated in the resolution sections below. Following the determination of sanctions, parties may appeal the sanctions imposed but not the finding(s) of responsibility as accepted by Respondent. In the event a Respondent decides to accept responsibility for some but not all of the allegations, NU-OCR will determine whether to sever the matter, sending the allegations for which the Respondent has accepted responsibility to the appropriate office for sanctioning and continuing with the formal resolution process for the remaining allegations. Alternatively, NU-OCR may determine it will proceed with the formal resolution process for all allegations.

### *Withdrawal of Complaint*

At any time prior to the conclusion of an investigation, the Complainant may request to withdraw the complaint, or any discrete allegations in the complaint, by contacting NU-OCR in writing. NU-OCR will determine whether to close the case or whether it is necessary to continue with the formal resolution process with regard to any or all allegations without the Complainant's continued participation.

### *Dismissal*

NU-OCR may dismiss a complaint or any allegations therein at any point during the investigation process if:

29

- The University is unable to identify the Respondent after taking reasonable steps to do so;

- The Respondent is no longer enrolled at, affiliated with, or employed by the University;

- The Complainant voluntarily withdraws any or all of the allegations in the complaint and NU-OCR determines that, without the complainant's withdrawn allegations, the conduct that remains in the complaint, if any, would not constitute discrimination under harassment even if proven true; or

- The conduct alleged in the complaint, even if proven, would not constitute discrimination, harassment, or sexual misconduct under this policy and NU-OCR has undertaken reasonable efforts to clarify the allegations with the complainant.

In the event NU-OCR determines that the complaint should be dismissed, NU-OCR will promptly inform the Complainant of dismissal and the basis for the dismissal and, if the dismissal occurs after the Respondent has been notified of the allegations, NU-OCR will also inform the Respondent of the dismissal and the basis for the dismissal. The parties may appeal the dismissal decision consistent with the procedures set forth in Section G.

### *Investigation*

NU-OCR investigates complaints proceeding through formal resolution. Depending upon the circumstances, one or more investigators will be assigned from NU-OCR. In some cases, another University office may conduct an investigation under the direction of the Office, or an external investigator may be retained. All investigators are trained on applicable law and the University's policies and procedures. Depending on the circumstances and in its discretion, the University may either consolidate or sever the investigation and/or sanctioning of multiple complaints involving the same Respondent and/or complaints where the parties have made discrimination, harassment or non-Title IX sexual misconduct allegations against each other. In the event a community member with multiple affiliations with the University (e.g., a staff member who is also a student) is found to have violated this policy, the University may initiate multiple sanctioning processes to address the violation in relation to each affiliation.

During the investigation, the investigator(s) will identify, elicit, and gather evidence related to the alleged misconduct, including inculpatory and exculpatory evidence. The burden of gathering evidence sufficient to reach a determination of whether or not a policy violation has occurred lies with the University and not with the parties.

During the investigation, the Complainant will have the opportunity to describe their allegations and present supporting evidence to the investigator(s). The Respondent will have the opportunity to hear the allegations, respond to them, and present supporting evidence to the investigator(s). No Party or Witness is required to participate in the investigation, and the Investigator will draw no adverse inference from a decision by any party or witness not to participate.

The Investigator will record, with permission of the Party or Witness, and transcribe (or arrange for transcription of) all interviews. For Parties or Witnesses who elect not to have their interview recorded, the Investigator will prepare a statement of the interview, and

the Party or Witness who declined to be recorded will be given the opportunity to review the interview statement of their own interview and correct spelling/grammar and factual errors and provide clarification if needed by the deadline set by the Investigator. If the Party or Witness does not provide any response to the interview summary within the allotted timeframe, the Investigator will consider the interview summary accurate. The Investigator may address any substantive comments or corrections submitted in the investigative report.

Meetings that do not constitute an interview are not audio or video recorded by the University, and may not be recorded by any participant. Parties and witnesses may take notes during investigation meetings. The Complainant and Respondent will have an equal opportunity to present names of potential witnesses and to propose questions the investigator(s) might ask the other party or witnesses. Complainants and Respondents may identify potential factual witnesses but may not present character witnesses. The investigator(s) will take the witness lists provided by the Complainant and Respondent into consideration when identifying the witnesses they will interview and what questions they might ask each witness, but these decisions are solely within the investigator's discretion. The investigator(s) retain discretion to limit the number of witness interviews the investigator(s) conduct if the investigator finds that testimony would be unreasonably cumulative, or if the witnesses do not have information relevant to the allegations at issue. The investigator(s) may also choose to interview other witnesses not identified by the parties.

The Investigator may have follow-up questions for a Complainant, Respondent, or Witnesses after their respective initial interviews. Each participant will have a reasonable time to complete any follow-up interview requested by an Investigator, but if a follow-up interview is not completed within a reasonable time frame, the investigation will move forward.

Generally, the investigator(s) will meet with each party and each witness separately and may hold multiple meetings with a party to obtain all necessary information. The parties may submit additional materials or information to the investigator(s) at any time before the conclusion of the investigation.

***Report review procedures***

1. **Preliminary Investigative Report:**

   After each party has been provided the opportunity to be interviewed by the investigator(s), identify witnesses, provide evidence, and suggest questions, and the investigator(s) have completed witness interviews and the gathering of evidence, the investigator(s) will prepare a preliminary investigative report. The preliminary investigative report will include a summary of the relevant information provided by Complainant, Respondent, and each witness, and a copy and/or written summary of all relevant evidence collected during the investigation. The preliminary investigative report will not contain any findings.

   The parties will be provided with an opportunity to review the preliminary investigative report and respond in writing. Typically, the report will be provided to each party electronically via the University's chosen cloud storage

platform. Parties are expected to maintain the privacy of this document and may view but not download or distribute this document. Unauthorized distribution of this document may result in referral to the appropriate office for disciplinary action.

The parties may each submit written comments, feedback, additional documentary evidence, requests or additional steps in the investigation, suggest written relevant questions for any party or witness, names of additional witnesses, or any other information they deem relevant to the investigator(s), up to twenty (20) pages, within ten (10) calendar days after the preliminary report is made available for review. Upon written request, NU-OCR may, in its discretion, waive or adjust the page limit or grant an extension for good cause to both Parties for the response provided that such extension generally will not exceed an additional ten (10) business days. Such an extension may cause University resolution to exceed the timeframes specified in these procedures.

The investigator(s) will review the written response provided by the parties and conduct any additional investigation necessitated by that feedback. If the Investigator receives information from a Party in response to the preliminary investigative report that warrants further substantive investigation or review, the Investigator, in consultation with the Associate Vice President, has the discretion to extend the investigation. If the Investigator extends the investigation, the Investigator will notify the Parties in writing, issue a second preliminary investigative report, and provide the Complainant and Respondent access to such report for review and comment for at least five (5) business days. The parties may each submit up to ten (10) pages of response regarding the new information.

The parties are permitted to review the preliminary investigative report and second preliminary investigative report solely for the purposes of this complaint process and may not photograph or disseminate the report to the public.

### Final Investigative Report and Outcome

After reviewing all responses submitted by the parties to the preliminary investigative report(s), the investigator(s) will incorporate relevant responses into a final investigative report. The final investigative report will contain all information from the preliminary report, any response to the preliminary report submitted by the Complainant and/or Respondent, and any additional information gathered. The Investigator(s) will make a determination based on a Preponderance of the Evidence whether there is sufficient evidence to support a finding of responsibility for a violation of the Policy (and, where applicable, any other relevant policies). The Investigator(s) will provide the full rationale for the findings, including an analysis of the available information, in the final investigative report. The Investigator(s)' determination will be based solely on the evidence contained within the final investigative report. The Associate Vice President or their designee will review and approve the final investigative report before the Investigator issues the report.

Complainant and Respondent will both be notified simultaneously in writing of the final investigative report and outcome of the investigation and provided access, via the

University's chosen cloud storage platform, to review the final investigative report and all attached materials, which are not otherwise privileged. The notifications will include findings related to alleged violations of policy and the rationale for all findings. If the complaint presents more than a single allegation of misconduct, a finding will be made separately as to each allegation.

### 1.    Resolution of cases where no violation has been found

Complainants and Respondents will be notified of their appeal rights and appeal procedures. As noted above, the University encourages the parties to maintain privacy of all communications related to findings.

### 2.    Resolution of cases where a violation has been found

If Respondent is found to be responsible for one or more policy violations, the notification of findings will include information regarding the sanctioning process. In determining sanctions, the decision maker for sanctions has the following objectives:

- Promoting safety and protecting the University community;

- Sanctioning individuals for violating this Policy and deterring them from similar future behavior;

- Ending conduct;

- Taking steps reasonably calculated to prevent the future reoccurrence of the conduct;

- Restoring the Complainant to their pre-deprivation status, to the extent practical and possible.

Within five (5) business days of transmission of the Final Investigation Report where there has been a determination of a policy violation, both parties may submit a statement (not to exceed 5 pages) to the Associate Vice President for consideration by the individual(s) responsible for determining an appropriate sanction. The Complainant may submit a written statement describing the impact of the discrimination or harassment on the Complainant, expressing a preference about the sanction(s) to be imposed, and describing any other information Complainant believes relevant to the issue of remedies and sanctions. The Respondent may submit a written statement explaining any factors that the Respondent believes should mitigate or otherwise be considered in determining the sanctions(s) imposed and any other information Respondent believes relevant to the issue of remedies and sanctions. The Associate Vice President will provide the parties' written impact and mitigation submissions to the individual(s) responsible for determining remedies and sanctions.

Sanctions will be recommended and/or determined as follows:

- **For student Respondents**, in the event a policy violation is found, NU-OCR will provide the final investigative report to the Office of Community Standards who will determine sanctions and corrective actions in

accordance with the procedures set forth in the Student Handbook. The Office of Community Standards will provide written notice of any sanction(s) imposed to the parties for violations of this policy simultaneously within seven (7) calendar days of the sanctioning decision. The notice will reference findings made by NU-OCR and will include the sanction(s), a summary of the rationale, and information about the appeal process.

- **For staff Respondents**, in the event a policy violation is found, NU-OCR will provide the final investigative report to the Office of Human Resources and the Respondent's manager(s), who are responsible for deciding what sanctions or corrective actions should be imposed on the Respondent, in accordance with the procedures set forth in the Staff Handbook. The Office of Human Resources and/or Respondent's manager will inform NU-OCR in writing of any sanction or corrective action imposed contemporaneous with the written notice to Respondent.

- **For faculty Respondents,** in the event a policy violation is found, NU-OCR will make a recommendation regarding whether the policy violation warrants considering termination or suspension. The final investigative report and the recommendation will be sent by NU-OCR to the faculty member's department chair, the dean, and the Associate Provost for Faculty. Next steps, including sanctions or corrective actions imposed, will be determined in accordance with the procedures set forth in the Faculty Handbook. The department chair, dean, and/or Associate Provost for Faculty will inform NU-OCR in writing of any sanction or corrective action imposed contemporaneous with the written notice to Respondent.

- For Respondents holding any other status, sanctions and/or corrective actions will be determined by the appropriate University office, depending on the status of the Respondent. The appropriate office will inform NU-OCR in writing of any sanction or corrective action imposed contemporaneous with the written notice to Respondent.

The Complainant will be notified of remedies offered or provided to the Complainant, sanctions imposed on the Respondent that directly relate to the Complainant, and any other steps the University has taken to prevent the recurrence and eliminate a discriminatory or hostile environment, if one was found to exist. In a case related to alleged sexual assault, stalking, or dating or domestic violence, the notification of sanction to the Complainant will also include all sanctions imposed on the Respondent, not just those directly related to the Complainant.

The Respondent will be informed of all sanctions imposed. The Respondent generally will not be notified of the individual remedies offered or provided to the Complainant.

Both Complainants and Respondents are informed of appeal procedures. As noted above, the University encourages the parties to maintain privacy of all communications related to findings and sanctions.

**G.     Appeals**

34

The Complainant or Respondent may appeal the dismissal, findings and/or, if sanctions are imposed, the determination of sanctions. An appeal will be handled in a manner consistent with any applicable terms or procedures in the Faculty Handbook, Staff Handbook, Student Handbook, or applicable contract. Otherwise, the terms and procedures outlined in these guidelines will control.

An appeal must be made within ten (10) calendar days of the date of the written notification of the findings or, if sanctions are imposed, the written notification of the sanctioning determination. An appeal must be in writing and specify the basis for the appeal. The written appeal must state with specificity: (1) the issues being appealed; (2). the bases for the appeal; and (3) if new evidence is offered, the appeal must describe with specificity the new evidence and how it could affect the outcome of the matter. An appeal is limited to fifteen (15) pages. The original finding is presumed to have been decided reasonably and appropriately by a preponderance of the evidence. The only grounds for appeal are as follows:

- New information discovered after the investigation that could not have reasonably been available at the time of the investigation and is of a nature that could materially change the outcome;
- Procedural errors within the investigation or resolution process that may have substantially affected the fairness of the process;
- The Associate Vice President or Investigator had a conflict of interest or bias for or against complainants or respondents generally or the individual Complainant or Respondent; or
- The Sanction is disproportionate with the violation.

Mere disagreement with the decision is not grounds for appeal under these procedures. The appellate process shall not re-hear a matter in part or in its entirety. In any request for an appeal, the burden of proof lies with the Party requesting the appeal.

If either party submits an appeal, the other party will be provided with a copy of the appeal and given ten (10) calendar days to submit a written response. A written response may not exceed fifteen (15) pages. The relevant appeal reviewer may, in their discretion, adjust the time limit for the appeal and/or response for good cause shown.

In the event sanctions were imposed, it shall be in the discretion of the Associate Vice President or their designee and the sanctioning office whether the sanctions shall be implemented or stayed pending resolution of an appeal.

Any appeal must be submitted electronically to NU-OCR at OCR@northwestern.edu or submitting an appeal form.

Appeals will be handled by the following reviewers, who may delegate the review of an appeal to a designee, and will delegate review in any case in which they cannot serve as an impartial reviewer.

- An appeal of a complaint involving a student Respondent will be addressed by the Senior Associate Dean of Students or their designee.
- An appeal of a complaint involving a faculty member Respondent will be

addressed by Associate Provost for Faculty or their designee.

- An appeal of a complaint involving a staff member[11] Respondent or Respondent of any status not named above will be addressed by Vice President for Human Resources or their designee,

The appeal is solely conducted via written statements. Neither Respondent nor Complainant will be allowed to request an in-person meeting with the appeal reviewer. In an extraordinary circumstance, the appeal reviewer may request an in-person meeting with the Complainant or Respondent. Should the appeal reviewer request a meeting with one party, a meeting will also be requested with the other party.

In the event the appeal includes the appeal of a sanction, the appeal reviewer will, prior to issuing a written decision, consult with the appropriate University personnel with disciplinary authority over Respondent and such officials will evaluate any sanctions to be imposed.

- For student Respondents, in the event of an appeal of a sanction, the appeal reviewer may consult with a UHAS Appeals Panel comprised of three faculty or staff members.

- For staff Respondents, in the event of an appeal of a sanction, the appeal reviewer may consult with the HR Business Partner and the Respondent's manager or unit leader.

- For faculty Respondents, in the event of an appeal of a sanction, the appeal reviewer may consult with the Executive Committee of the Faculty Appeals Panel who will review the basis of the appeal. The Executive Committee may review all documentation from the investigation and sanctioning process and any appeal statements received from the parties, and it may pose questions from NU-OCR and the Sanctioning Panel if needed. The Committee may, at its discretion, call individual meetings with the faculty member and Complainant or any other individual with firsthand information. The Executive Committee will make their recommendation to the Provost as to whether one or more of the grounds of the appeal has been met. The Provost will then make a decision whether to uphold the Sanctioning Panel's decision and what sanctions to impose. The Provost's decision is final.

The written decision on an appeal will be issued simultaneously to the parties as expeditiously as possible, usually within seven (7) business days of making a decision, though this may vary based on the scope of the appeal or unforeseen circumstances. The reviewer may review the full case, beyond the aspects of the case outlined in the request for appeal. If the reviewer does not find that any of the three grounds for appeal are present in the case, the outcome will be upheld. If the reviewer finds that any of the grounds for appeal are present in the case, they may amend the outcome, may issue a new outcome, or may refer the matter back to the decision maker for further consideration. No further review beyond the appeal is permitted. The appeal reviewer will notify the Office of Civil Rights and Title IX Compliance in writing of their written decision contemporaneously with providing the decision to

---

[11] The Staff Handbook provides an additional process for staff members appealing a sanction of termination.

the parties.

The written decision on an appeal will be issued as expeditiously as possible, though the timeframe may vary based on the scope of the appeal or unforeseen circumstances. A written decision regarding the appeal will be issued to the parties simultaneously within seven (7) calendar days of making a decision and the overall timeframe for an appeal generally shall not exceed 30 business days. If the appellate reviewer does not find that any of the three grounds for appeal are present in the case, the outcome will be upheld. If the reviewer finds that any of the grounds for appeal are present in the case, they may amend the outcome, may issue a new outcome, or may refer the matter back to the investigator(s) for further consideration. A final outcome on an appeal is not subject to further appeal. The appeal reviewer will notify NU-OCR in writing of their written decision contemporaneously with providing the decision to the parties.

## III.     Resources[12]

### A.     Confidential Support, Advocacy, and Counseling Resources[5]

The following Confidential Resources are available for individuals to discuss incidents and issues related to discrimination, harassment, and/or sexual misconduct on a confidential basis. Confidential Resources are not obligated to disclose reports of sexual misconduct to NU-OCR (under any circumstance) or law enforcement (except in very limited situations, such as when failure to disclose the information would result in imminent danger to the individual or to others or as otherwise required by law).

Confidential Resources can provide information about University and off-campus resources, support services and other options. As noted above, because of the confidential nature of these resources, disclosing information to or seeking advice from a Confidential Resource does not constitute a report or complaint to the University and will not result in a response or intervention by the University. A person consulting with a Confidential Resource may later decide to make a report to the University and/or law enforcement.

The Medical Resources in Section III(B) are also confidential resources and are not obligated to disclose reports of sexual misconduct to NU-OCR(under any circumstance) or law enforcement (except in very limited situations, such as when failure to disclose the information would result in imminent danger to the individual or to others or as otherwise required by law).

### On-Campus *Confidential* Resources

| Resource | Contact Information | Description |
|---|---|---|
| **CARE: Center for Awareness, Response &** | **Evanston Campus**: 633 Emerson Street, 3rd Floor (847) 491-2054 care@northwestern.edu | CARE is a confidential space for students impacted by sexual violence, relationship violence, or stalking, including friends or |

---

[12] For additional information, see Northwestern's Resource Guide on Non-Title IX Sexual Misconduct (http://www.northwestern.edu/sexual-misconduct/docs/NonTitleIXResourceGuide.pdf). Print copies are available by contacting the Office of Civil Rights and Title IX Compliance, at (847) 467-6165.

| Education[13,14]* | www.northwestern.edu/care | partners of survivors. CARE can be an advisor through the University complaint resolution process. Advocates can provide a space to process, ask questions, safety plan, and learn more about the impact of trauma. CARE also hosts a trauma support group and can connect with legal and medical advocacy, free counseling, and support groups on and off campus |
|---|---|---|
| **CAPS: Counseling and Psychological Services*** | **Evanston Campus**: 633 Emerson Street, 2nd Floor (847) 491-2151 (24-hours) **Chicago Campus:** Abbott Hall, 5th Floor 710 N. Lake Shore Drive (847) 491-2151 (24-hours) www.northwestern.edu/counseling/ | Provides counseling services to students, also provides a counselor on call 24 hours a day. |
| **Religious & Spiritual Life** | **Evanston Campus**: 1870 Sheridan Road (847) 491-7256 spiritual.life@northwestern.edu www.northwestern.edu/religious-life/ | Provides spiritual guidance for students and other members of the University community. |
| **Faculty Wellness Program*** | Director Gaurava Agarwal, MD gagarwal@nm.org https://hr.northwestern.edu/well-being/programs/faculty-wellness-program.html | Provides free consultations for faculty members to identify appropriate resources for personal and professional concerns. Resources may be offered over the phone, or faculty members can meet with the Faculty Wellness Program director for further discussion. |
| **Employee Assistance Program** | (888) 881-5462 (24 hours) https://www.northwestern.edu/hr/benefits/well-being/programs/employee-assistance-program/index.html | Provides confidential crisis intervention and short-term counseling for faculty and staff, as well as their household family members at no cost. |
| **Office of the** | **Evanston Campus:** | Provides confidential and informal |

---

[13] CARE is designated as the University's confidential advisor under the Illinois *Preventing Sexual Violence in Higher Education Act.*
[14] Note: Some staff and faculty may be confidential resources in some aspect of their work for the University (e.g. physicians), but are subject to the University's reporting obligation for information learned in connection with their work for the University outside of a confidential relationship. For example, physicians are confidential resources with respect to information shared with them by patients, but are obligated to report sexual misconduct of which they become aware through work not related to patient care, such as work in labs, classrooms, or student advising.

| Ombudsperson | ombuds@northwestern.edu<br>https://www.northwestern.edu/ombuds/ | assistance for resolving university-related concerns, is independent of the university's formal administrative structure, and considers all sides of an issue in a neutral manner. |

**Off-Campus *Confidential* Resources**

| Resource | Contact Information | Description |
|---|---|---|
| Hotlines | Chicago Metro Rape Crisis Hotline (YWCA): (888) 293-2080<br><br>Chicago Domestic Violence Line: (877) 863-6338<br><br>Evanston Domestic Violence Line (YWCA): (877) 718-1868<br><br>RAINN: Rape, Abuse & Incest National Network (800) 656-HOPE<br>https://hotline.rainn.org/ (online hotline) | All hotlines provide 24 hour (7 days/week) crisis counseling and information regarding sexual assault, dating violence, and stalking. Survivors and friends of survivors can call.<br><br>*Note: the hotlines can also provide information on local hospitals, such as what hospitals will have a victim advocate or SANE (Sexual Assault Nurse Examiner) available.* |
| Center on Halsted (LGBTQ Services) | 3656 N. Halsted St, Chicago (7 days a week, 8 a.m. to 9 p.m.)<br>LGTBQ Violence Resource Line: (773) 472-6469<br>http://www.centeronhalsted.org/avp | Services include: counseling services; connecting individuals with professional help, law enforcement, agencies, services, and other providers. |
| in*power (LGBTQ Survivor Support Services) | 4025 N. Sheridan Rd, Chicago (773) 388-1600 ext 3680<br>in.power@howardbrown.org<br>http://www.howardbrown.org/inpower/ | Services include: STI testing and treatment, short-term case management, linkage to community resources, holistic health referrals, support groups for young people and adults, legal advocacy |
| Resilience (Formerly known as Rape Victim Advocates) | Main Office:<br>180 N. Michigan Ave, Suite 600, Chicago (312) 443-9603<br>www.ourresilience.org | Services include: medical and legal advocacy, counseling services (individual and group). Services are free for survivors or friends/partners of survivors. |
| YWCA- Evanston | 1215 Church St, Evanston (847) 864-8445<br>https://www.ywca-ens.org | Services include: counseling and support for survivors of dating/domestic violence, legal advocacy, and residential services (emergency shelter) |
| Life Span Center for Legal Services and Advocacy | 70 E. Lake Street, Suite 600, Chicago (312) 408-1210<br>life-span@life-span.org | Services include (for survivors of DV, SV, and stalking): legal services, legal advocacy (i.e. |

| | | |
|---|---|---|
| | www.life-span.org | assistance with Orders of Protection, etc.), and counseling |
| Center for Contextual Change | 9239 Gross Point Road #300, Skokie (847) 676-4447 x304 (for appointments or a confidential assessment) www.centerforcontextualchange.org | Referrals for survivors of sexual and domestic/dating violence: individual and group counseling.<br><br>Referrals for perpetrators of sexual and domestic/dating violence: individual and group counseling |
| Apna Ghar | 4350 North Broadway, 2nd Floor Chicago, IL 60613 (773) 334-4663 www.apnaghar.org | Services include: 24/7 crisis line, legal advocacy, counseling, emergency shelter |
| Mujeres Latinas en accion | 2124 West 21st Place Chicago, IL 60608 (773) 890-7676 www.mujereslatinasenaccion.org | Services include: counseling, legal advocacy, medical advocacy |
| Greenlight Family Services (Formerly Porchlight Counseling Services) | (773) 750-7077 confidential helpline and intake http://greenlightfamilyservices.org/services/counseling | Services include: free counseling for survivors of sexual and/or domestic/dating violence |
| KAN-WIN | Offices in Chicago and Park Ridge (773) 583-1392 (Chicago) (847) 299-1392 (Park Ridge) 24-hour Hotline: (773) 583-0880 www.kanwin.org | Services include: (multi-lingual) free counseling, legal advocacy (assistance with protective orders/court accompaniment), and immigration protection for Asian-American or Asian immigrant survivors of sexual and/or domestic violence. |
| DC Rape Crisis Center | PO Box 42734 Washington, DC 20015 Business: 202-232-0789 TTY: 202-328-1371 Hotline: 202-333-7273 http://dcrcc.org/ | Services include: Individual & group counseling (English and Spanish); a 24-hour crisis hotline; community education & outreach |
| Network for Victim Recovery of DC | 6955 Willow St. NW #501 Washington, DC 20012 (202) 742-1727 info@nvrdc.org http://nvrdc.org | Services include: free case management and legal services to victims of crime |
| M.U.J.E.R. (Miami) | 27112 South Dixie Highway Naranja, FL 33032 Helpline/Hotline: (305) 763-2459 (305) 247-1388 http://www.mujerfla.org | Services include: 24-hour hotline, information and referral, crisis intervention, advocacy and accompaniment, crisis counseling, medical referrals, and case management. |
| Survivors' Pathway (Miami) | 1801 Coral Way, Suite 200 Miami, Florida 33145 (786) 275-4364 http://survivorspathway.org | Services include: counseling and social services |

| | | |
|---|---|---|
| **San Francisco Women Against Rape** | 3543 18th Street #7<br>San Francisco, CA 94110<br>(415) 861-2024<br>(415) 647-7273 (24-hour hotline)<br>http://sfwar.org | Services include: 24-hour crisis hotline, counseling and support groups, legal advocacy, medical accompaniment and advocacy, and case management |
| **Trauma Recovery Center (San Francisco)** | 2727 Mariposa Street, Suite 100<br>San Francisco, CA 94110<br>(415) 437-3000<br>http://traumarecoverycenter.org/ | Services include: medical services for acute sexual assault and support services to survivors of interpersonal violence. |

**B.      Seeking Confidential Medical Assistance in the United States**

Experiencing any form of violence or sexual misconduct is difficult and overwhelming. Survivors often experience a range of emotions, including fear, anxiety, and confusion, and may be unsure of what they want to, or should, do next. Regardless of whether the individual chooses to report the incident, the University strongly encourages survivors of any form of violence to seek medical attention as soon as possible, even if they feel no injury was sustained. Medical assistance providers can treat visible physical injuries and identify injuries that may not be visible, and, where appropriate, also address concerns regarding sexually transmitted infections and pregnancy, and provide emergency contraception (if requested). In addition, a hospital can test for the presence of alcohol or drugs (e.g., "date rape" drugs) and perform a rape evidence collection procedure (see Section III(D)(2)), which are also strongly recommended to preserve all legal remedies.

As noted above, the Medical Resources in Sections III(B) are also confidential resources and are not obligated to disclose reports of sexual misconduct to the Office of Civil Rights and Title IX Compliance (under any circumstance) or law enforcement (except in very limited situations, such as when failure to disclose the information would result in imminent danger to the individual or to others or as otherwise required by law).

**1.      Medical Services Available On or Near the Evanston and Chicago Campuses**

**Northwestern University Health Service**[15]
*Evidence collection kit cannot be provided; CARE staff can be contacted to provide support services, if desired. (See Section II(A) for more information on CARE.)*

Evanston Campus:      633 Emerson Street, Evanston
Phone:                          (847) 491-8100 (RN call service available 24 hours)
Website:                       http://www.northwestern.edu/healthservice-evanston/
                                       (for regular hours of operation and 24-hour emergency
                                       contact info)

Chicago Campus:        675 North St. Clair Suite 18-200, Chicago
Phone:                          (312) 695-8134
Website:                       http://www.northwestern.edu/healthservice-chicago
                                       (for regular hours of operation and 24-hour emergency

---

[15]All staff in University Health Services (including team athletic trainers and team physicians) and staff in the Office of Health Promotion and Wellness are considered confidential resources.

contact info)

**NorthShore University Health System/ Evanston Hospital, Emergency Dept. (24 hours)**
*Evidence collection kit available at no charge; Evanston Police Victim Services advocate can be present to provide support services, if desired.*

| | |
|---|---|
| Location: | 2650 Ridge Avenue, Evanston |
| Phone: | (847) 570-2111 (emergency room) |
| Website: | http://www.northshore.org/locations/our-hospitals/evanston-hospital/ |
| | (for more information or to request an appointment online) |

**Northwestern Memorial Hospital, Emergency Department (24 hours)**
*Evidence collection kit available at no charge; Advocate from Resilience will be present to provide support services, if desired.*

| | |
|---|---|
| Location: | 251 E Huron Street, Chicago |
| Phone: | (312) 926-2000 |
| Website: | https://www.nm.org/locations/northwestern-memorial-hospital |
| | (for more information) |

**Amita Health St. Francis Hospital, Emergency Services (24 hours)**
*Evidence collection kit available at no charge; Evanston Police victim services advocate can be present to provide support services, if desired.*

| | |
|---|---|
| Location: | 355 Ridge Avenue, Evanston |
| Phone: | (847) 316-4000 |
| Website: | https://www.amitahealth.org/location/amita-health-saint-francis-hospital-evanston-emergency-room |

Under Illinois law, medical personnel are required to alert police when it reasonably appears that the person requesting treatment has sustained an injury as a victim of a criminal offense, including sexual assault or violence, but individuals have the right to refuse to speak to police.

2. **Medical Services Available Near the Miami, Florida Campus**

**Jackson Memorial Hospital Roxcy Bolton Rape Treatment Center (5.8 miles from campus)**

*Evidence collection kit available at no charge.*

| | |
|---|---|
| Location: | 1611 NW 12th Avenue Institute Annex 1st Floor, |
| Miami Phone: | (305) 585-7273 |
| Website: | https://jacksonhealth.org/locations/roxcy-bolton-rape-treatment-center/ |

3. **Medical Services Available Near the Washington, D.C. Campus**

**MedStar Washington Hospital Center (2.9 miles from campus)**
*Evidence collection kit available at no charge via DC Forensic Nurse Examiners.*

|  |  |
|---|---|
| Location: | 110 Irving Street NW, Washington, D.C. |
| Phone: | (202) 877-7000 |
| Website: | https://www.medstarwashington.org |

4. **Medical Services Available Near the San Francisco Campus**

**Zuckerberg San Francisco General Hospital (7 miles from campus)**
*Evidence collection kit available at no charge; additional/follow-up services available via*
*theirRape Treatment Center.*

|  |  |
|---|---|
| Location: | 1001 Potrero Avenue, San Francisco |
| Phone: | (628) 206-8000 |
| Website: | http://zuckerbergsanfranciscogeneral.org/ |

**For information regarding seeking medical assistance at the Doha, Qatar (NU-Q) campus, please see Appendix A. Appendix A contains a complete summary of information regarding reporting sexual misconduct and receiving support (including confidential support) at the NU-Q campus.**

C. **Preserving Physical Evidence**

Sexual misconduct offenses may also be crimes in the state or locality in which the incident occurred. For that reason, survivors of sexual misconduct often have legal options that they can pursue. For example, a survivor may seek a protective order from a court against the perpetrator(s); pursue a civil action against the perpetrator(s); and/or participate in a law enforcement investigation and criminal prosecution of the perpetrator(s). Regardless of whether an incident of sexual misconduct is reported to the police or the University, Northwestern strongly encourages individuals who have experienced sexual misconduct to preserve evidence to the greatest extent possible, as this will best preserve all legal options for them in the future.

Additionally, such evidence may be helpful in pursuing a complaint with the University. While the University does not conduct forensic tests for parties involved in a complaint of sexual misconduct, results of such tests that have been conducted by law enforcement agencies and medical assistance providers may be submitted as evidence that may be considered in a University investigation or proceeding, provided they are available at the time of the investigation or proceeding.

Below are suggestions for preserving evidence related to an incident of sexual misconduct. It is important to keep in mind that each suggestion may not apply in every incident:

1. **General physical evidence preservation suggestions:**

- In order to best preserve their legal options in the future, individuals should

consider not altering, disposing of, or destroying any physical evidence of sexual misconduct.

- If there is suspicion that a drink may have been drugged, an individual should inform a medical assistance provider and/or law enforcement as soon as possible so they can attempt to collect possible evidence (e.g., from the drink, through urine or blood sample).

- Individuals can preserve evidence of electronic communications by saving them and/or by taking screen shots of text messages, instant messages, social networking pages, or other electronic communications, and by keeping pictures, logs, or copies of documents that relate to the incident and/or perpetrator.

- Even if survivors choose not to make a complaint with the University regarding sexual misconduct, they may consider speaking with University Police or other law enforcement to preserve evidence. Please note that, as University employees, University Police would have to report the concern to the Office of Civil Rights and Title IX Compliance.

**2.    Physical evidence preservation suggestions specific to sexual assault:**

- Because some evidence, particularly evidence that may be located on the body, dissipates quickly (within 48-96 hours), individuals who have been sexually assaulted and wish to preserve evidence should go to a hospital or medical facility immediately to seek a medical examination and/or evidence collection. Under Illinois law, any cost for an emergency medical or forensic examination for a victim of sexual violence that is not covered by private insurance or Illinois Public Aid will be covered by the Illinois Department of Healthcare and Family Services, and should not be billed to the patient.

- An individual who has been sexually assaulted and wishes to preserve evidence should, if possible, not shower, bathe, douche, smoke, brush teeth, eat, drink, use the bathroom, or change clothes or bedding before going to the hospital or seeking medical attention.

- If the individual who has been sexually assaulted decides to change clothes or bedding and wishes to preserve evidence, they should not wash the clothes worn or bedding used during the assault, and should bring them to a hospital, medical facility, or the police in a non- plastic (e.g., paper) bag.

- In Illinois, individuals who have been sexually assaulted may allow the collection of evidence even if they choose not to make a report to law enforcement. After the evidence is collected, Illinois law requires hospital staff to store it for two weeks. A sexual assault evidence collection kit may not be released by an Illinois hospital without written consent from the survivor.

**D.    Educational Training, Awareness, and Prevention Programs[16]**

When learning of conduct or behavior that may not meet the standards defined in the

---

[16] The City of Chicago requires training annually, including: a. A minimum of one hour of sexual harassment prevention training and bystander training for all employees; and b. A minimum of two hours of sexual harassment prevention training for anyone who supervises or manages employees.

Policy, community members and the University are expected to take an active role in upholding this policy and promoting the dignity of all individuals. The University offers a variety of training, awareness, and prevention programs to help prevent discrimination, harassment, and sexual misconduct within the Northwestern community. The University strives to ensure that such programming is developed to be culturally relevant; trauma informed; inclusive of diverse communities and identities; sustainable; responsive to community needs; informed by research or assessed for value, effectiveness, and outcome; and considerate of environmental risk and protective factors as they occur on the individual, relationship, institutional, community, and societal levels.

Additionally, the University provides annual training to investigators, and hearing panel members are trained on issues related to discrimination, harassment, and sexual misconduct, and the University's investigation and resolution procedures.

For information on educational training, awareness, and prevention programs offered each year, see: https://www.northwestern.edu/sexual-misconduct/education.

**Appendix A: Summary of Information on Reporting Sexual Misconduct and Receiving Support (including confidential support) and Resources at the NU-Q Campus**

**Options and Resources**

How can Northwestern help?

Knowing what options and resources are available will be helpful if you or someone you know experiences sexual misconduct.

Persons who may have experienced sexual misconduct have options:

1. Seek Medical Attention
2. Speak with On-Campus Confidential Resources
3. Access Off-Campus Resources
4. Contact the Police
5. Contact the University's Office of Civil Rights and Title IX Compliance
6. Request Interim Measures
7. Preserve Evidence

More detailed information about each of these options is provided below.

**1. Seek Medical Attention**

*In Qatar, if a survivor goes to the hospital, they may not retain sole discretion over whether to pursue criminal charges. Medical personnel at hospitals are required to alert the police when it appears that the person seeking treatment has sustained an injury as a result of a criminal offense, including sexual assault. The person seeking treatment then could be required to speak with the police. Survivors should visit a hospital or doctor with whom they feel comfortable. Survivors can talk to the NU-Q Chief Operations Officer for more information.*

If the survivor chooses not to go to the emergency room, s/he should still consider seeing a private doctor or a clinician. Survivors are encouraged to inquire about and understand the extent of confidentiality healthcare providers can provide to the survivor of sexual violence. The confidentiality laws and regulations may differ substantially from those in other countries.

Emergency contraception is not available in Qatar. Rape evidence collection may not be available in Qatar.

Individuals who have been sexually assaulted may choose to go to the emergency room. The nearest hospitals to the Northwestern University in Qatar campus are:

**Al-Ahli Hospital (6km from Education City)**
Ahmed Bin Ali Street
Emergency 24 hours a day, 7 days a week
+974 4489 8888

**Sidra Medicine (1km from Education City)**
*Women and children only*
Dukhan Road opposite Northwestern University in Qatar

46

Outpatient: Sunday-Thursday, 7:00 am – 4:00 pm
+974 4003 3333

There is also medical care available at the following location on campus:

**Qatar Foundation Primary Healthcare Center (QF PHCC)**
HBKU Student Center
+974 4454 1244 (call to inquire about hours of operation)

2. **Speak with On-Campus Confidential Resources**

These campus resources keep communications confidential except in very limited situations (e.g. minors, imminent danger).

*Employee Assistance Program (EAP)* (provides confidential short-term counseling services to employees via telephone)

Visit http://www.livewell.optum.com and click on 'My Services' for more information or call:

+974 4454 5293 or +44 1865 397 074 (UK direct number) Students have the following confidential resource available:

Free, short-term and confidential counseling services for students:

> NU-Q Counseling, Health and Wellness
> NU-Q 1-320
> +974 4454 5073 or patricia.collins@northwestern.edu

Counseling, Health and Wellness is available as a free confidential counseling option available to Northwestern University in Qatar students who have experienced sexual assault, dating or domestic violence, or any other type of sexual violence. Counseling, Health and Wellness will honor the privacy of your information. If the individual wants to notify the police, Counseling, Health and Wellness staff can be a resource. Regardless of whether the survivor wants to involve police, s/he may benefit from talking to a professional counselor.

Counselors listen and help survivors work through any anger, pain, sadness, relationship issues or coping mechanisms that may be related to sexual misconduct. Sometimes the effects are felt long after an incident occurred. It is never too late to seek counseling, even months or years later.

If you would like to learn more about counseling and other options available to survivors, you can talk to Counseling, Health and Wellness staff member confidentially.

3. **Access Off-Campus Resources**

Regardless of whether an individual wants to officially report sexual misconduct, s/he may explore independent counseling options.

**Private Hospitals with physical and mental health resources available**

| | |
|---|---|
| Al Ahli Hospital | +974 4489 8888 / +974 4489 8817 |
| Doha Clinic Hospital | +974 4438 4333 |

| American Hospital | +974 4442 1999 |
| Al Emadi Hospital | +974 4466 6009 |
| Social Protection and Rehabilitation | 974 4409 0999 Hotline:108 |

*(Counseling, psychological and shelter services for women and children)*

**Government Hospitals and Centers with physical and mental health resources available**
Hamad General Hospital          +974 4439 4444
Al Khor Hospital          +974 4474 5555
HMC Customer Service Center  16060 (Sun-Thurs 7am-10pm; Fri 2pm-10pm; Sat 10am-6pm)
Nesma'ak
Wifaq/Family Consulting Center +974 4406 9902 (mental health resources only)

Students may also wish to investigate private service providers of their choice, but are encouraged to inquire about and understand the extent of confidentiality they can provide to the survivor of sexual violence. The confidentiality laws and regulations may differ substantially from the protection laws in their home country.

**4.  Contact the Police**

Survivors are encouraged to talk to the Chief Operations Officer for more information on what may happen if they file a police report. Generally, once a sexual assault is reported to the police, physical evidence of a struggle is collected and then the case is referred to the prosecutor, who then determines if a crime took place. The amount of physical evidence which shows a struggle will usually decide the case. **If physical evidence is inconclusive, the case would be dismissed, and the survivor might either be asked to sign a statement or be jailed**.

**In an emergency dial +974 4454 0999 (on campus) or 999 (off campus) Police Reports and Respecting the Survivor's Decisions**

There is no right or wrong way for a survivor to proceed. The decision to report an assault to the police is a personal one.

You should help a student or colleague make a police report if they want your help, but if they do not want to, you should also respect that decision. Publicity, concerns over revictimization, historical poor treatment at the hands of the police, or fear of being jailed are examples of reasons a survivor might not want to involve the police.

**5.  Contact the Office of Civil Rights and Title IX Compliance**

Whether or not the individual makes a police report, they can contact and make a report to the University. An individual has the right to choose whether to report the incident to the Office of Civil Rights and Title IX Compliance for additional options and support and/or to request an investigation. The University will protect the identity of persons involved in reports of sexual misconduct to the best of its ability. The University will only share personally identifiable information with persons with a need-to-know in order for the University to investigate and respond or to deliver resources or support services.

**To report sexual misconduct to Northwestern, contact:**
Office of Civil Rights and Title IX Compliance

Reporting form: www.northwestern.edu/NUReportDiscrimination and
www.northwestern.edu/NUReportSexualMisconduct

Email:OCR@northwestern.edu

Qatar Campus Contact
Alex Schultes, Assistant Dean for the Student Experience
+974 4454 5088
+974 4454 5182

Hannah Balogun, Director of Human Resources
+974 4454 5121
+974 334 1038

Under Northwestern policy, all University employees (including student employees), as well as
graduate students with teaching or supervisory authority, are obligated to promptly report sexual
misconduct of which they become aware in the scope of their work for the University to the
Office of Civil Rights and Title IX Compliance. The Confidential Resources listed above are not
subject to this reporting requirement.

## 6. Support Services

Support services are individualized measures offered as appropriate to either or both the reporting
and responding parties involved in an incident of sexual misconduct, prior to an investigation or
while an investigation is pending. Support services include counseling, extensions of time or
other course-related adjustments, modifications of work or class schedules, campus escort
services, restrictions on contact between the parties, changes in work or housing locations, leaves
of absence, increased security and monitoring of certain areas of campus, and other similar
accommodations.

Support services will be individualized and appropriate based on the information gathered by the
Office of Civil Rights and Title IX Compliance, making every effort to avoid depriving any
student of their education. The measures needed by each party may change over time, and the
Office of Civil Rights and Title IX Compliance will communicate with parties throughout an
investigation to ensure that any interim measures are necessary and effective based on the parties'
evolving needs.

As noted above, an individual may request to receive support – including the measures mentioned
in this section – even if they do not choose to participate in the University's Complaint
Resolution Process.

## 7. Preserve Evidence

Northwestern encourages individuals who have experienced sexual misconduct to preserve
evidence to the greatest extent possible as this may preserve more options for them in the future.
Below are suggestions for preserving evidence related to an incident of sexual misconduct.

Outside of Qatar, a forensic rape exam is a consideration for many survivors of sexual violence.
Within the State of Qatar, it is a possible consideration for survivors of sexual violence.

**In the State of Qatar, forensic evidence for a conviction of rape may require that there was**

**resistance, i.e. skin of the perpetrator under the fingernails, bruises. If there is no evidence of a struggle, then an incident may not be classified as rape under Qatar law and the survivor may be accused of sex outside of marriage, which is illegal in the State of Qatar.**

It is important to keep in mind that each suggestion may not apply in every incident:

Preserve evidence of electronic communications like text messages, pictures, and/or social networking pages by saving them and/or taking screen shots.

If there is a suspicion that a drink may have been drugged, inform a medical assistance provider and/or police as soon as possible so they can collect evidence (e.g. from the drink, through urine or blood sample).

Because evidence that may be located on the body can dissipate quickly, consider going to a hospital or medical facility immediately to seek a medical exam. If possible, do not shower, brush teeth, or eat before going to the hospital or seeking medical attention, and do not wash clothes or bedding.