# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, JOHN DOE 1, JOHN DOE 2, | ) | |
| and JOHN DOE 3, individually and | ) | |
| on behalf of all other | ) | |
| students similarly situated, | ) | |
| | ) | Case. No. 1:24-cv-04125-JRB-JC |
| | ) | |
| Plaintiffs, | ) | Honorable John Robert Blakey |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## NORTHWESTERN'S MOTION TO DISMISS

Plaintiffs respond as follows in opposition to Northwestern University's Rule 12(b)(6) and 12(b)(1) Motion to Dismiss (the "Motion"):

## ARGUMENT

Northwestern's Motion should be denied. The primary flaws that appear throughout its brief are: 1) it presents a narrow version of the alleged facts, which it skews in its favor, in order to downplay or erase the egregious harassment and discrimination against Jewish students (before, during, and after the encampment); 2) it tries to analogize its own conduct, which allegedly accommodated, encouraged, and rewarded harassment, to other schools' punitive responses to harassment, despite the two bearing no resemblance and being legally distinct; and 3) it relies upon evidentiary standards that simply do not apply at the pleading stage, which its own cited case law (some of which has been overturned) makes clear. Northwestern invites the Court to skim past the allegations and sidestep the standards on a motion to dismiss, so that it never has to defend itself on an evidentiary record.

Northwestern's Motion forgets that under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [its] favor." *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1038 (7th Cir. 2021). "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). "A complaint survives dismissal if it contains "enough facts to state a claim to relief that is plausible on its face." *Id.* "'Plausibility' is not a synonym for 'probability' in this context," and requires only "more than a sheer possibility that a defendant has acted unlawfully." *Walgreen Co. v. Peters*, No. 21 CV 2522, 2024 WL 50379, at *3 (N.D. Ill. Jan. 4, 2024) (internal quotations and citations omitted). "The question is not whether the [plaintiff] will prevail when it presents its evidence, but

whether its allegations, *taken as true*, state a claim…" *U.S. S.E.C. v. Benger*, 931 F. Supp. 2d 901, 903 (N.D. Ill. 2013).

I.      **Plaintiffs' Title VI claims are more-than-plausible, and Northwestern's presentation of the law, and its recitation of the allegations, are wrong at best and misleading at worst.**

Plaintiffs' Title VI claims survive dismissal because the allegations paint a plausible picture of Northwestern's deliberate indifference to a hostile campus environment and of its intentionally discriminatory lax (or non-existent) policy enforcement for the protection of Jewish students. Northwestern attacks Plaintiffs' hostile environment claim chiefly by arguing the allegations show Northwestern was not deliberately indifferent to the encampment[1], as a matter of law. Northwestern then challenges Plaintiffs' intentional discrimination claim by primarily arguing Plaintiffs have not sufficiently identified analogous comparators, which is an evidentiary standard not relevant at the dismissal stage. Northwestern offers two additional arguments for dismissing the hostile environment claim: that Plaintiffs have not plausibly alleged severe and pervasive harassment, and that Plaintiffs have not alleged Northwestern's knowledge of the harassment. Those arguments are without merit, which Plaintiffs address in turn.

---

[1] Northwestern attempts to narrow the Court's focus to the "encampment" only, when the Complaint identifies this event as perhaps the climax, but far from the sole expression of, the antisemitic campus environment. Indeed, the entire "Background" section of Northwestern's Motion is a cursory, tilted, and incomplete summary of the encampment alone, and Northwestern discusses only its efforts to disband the physical tents of the encampment (without mentioning any efforts to address pervasive campus antisemitism). (Mot., pp. 4-5.) It nakedly asserts that "Plaintiffs' legal claims must arise from their own experience at the encampment (and the Rock)." (Mot., pg. 5.) As detailed in § III.A, *infra*, this argument is wrong on the law and defies common sense for how hostility towards one member of a protected class affects all members similarly. *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007). In doing so, Northwestern fails to address the hostile environment on campus more broadly, as alleged in the Complaint.

**A. The allegations do not show Northwestern acted reasonably *as a matter of law*, but instead describe Northwestern encouraging and rewarding, rather than taking action against, students, student organizations, and faculty engaged in discriminatory harassment of Jews on campus.**

Northwestern's self-satisfaction with its disbanding of the encampment tents does not provide a basis for dismissing Plaintiffs' Title VI hostile environment claim. A school violates Title VI when its deliberate indifference "cause[s] students to undergo harassment or make[s] them vulnerable to it." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999). Schools "enjoy flexibility…in disciplinary decisions unless their response to harassment is clearly unreasonable." *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014).[2]

Northwestern cannot show that Plaintiffs have not *plausibly* alleged Northwestern's deliberate indifference to the hostile environment on campus. Put another way, the allegations taken as true do not reveal that Northwestern's conduct was not clearly unreasonable, as a matter of law. None of the cases Northwestern cites support its claim; instead, they largely undermine it.

Northwestern points to two recent federal decisions related to similar "encampments" – one at MIT and one at Harvard. (Mot., pp. 7-9). While Northwestern claims these decisions help them, they instead highlight the defects of Northwestern's requested dismissal.

In *StandwithUs v. Mass. Inst. Of Tech.* (the "MIT Case"), the district court granted MIT's motion to dismiss a hostile environment claim because the allegations showed MIT's response was not "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." No. CV 24-10577-RGS, 2024 WL 3596916, at *4 (D. Mass. July 30, 2024). The

---

[2] Northwestern ignores that Plaintiffs allege conduct beyond peer-harassment, which is subject to a lesser showing of severity or pervasiveness. *See Jane Doe I v. Bd. of Educ.*, 364 F. Supp. 3d 849, 860 (N.D. Ill. 2019) (distinction between teacher-on-student harassment or workplace harassment and student-on-student harassment "is significant.") (citing *Davis*, 526 U.S. at 651-53). "[C]ourts recognize that harassment by a teacher inherently harms students and affects their educational experience." *Id.* (citation omitted).

court so ruled because, unlike what is alleged here, the allegations showed "MIT's evolving and progressively punitive response" which it held "largely tracked its increasing awareness of the hostility that the demonstrators directed at Jewish and Israeli students." *Id.* at * 5. "MIT began by suspending student protestors," and also suspended "one of the most undisciplined of the pro-Palestine student groups." *Id.* When internal disciplinary action proved ineffective, and students returned to the mostly evacuated encampment, MIT "arrested trespassing students." *Id.*

Unlike in the MIT Case, Plaintiffs here allege that Northwestern took *no action against* students or student organizations (such as discipline) to punish or discourage the open acts of antisemitism on campus. (*See e.g.*, ¶¶ 151-152).[3] Instead, Plaintiffs allege that Northwestern *rewarded* the discriminatory harassment, rather than dissuading it, and that in doing so, Northwestern incentivized it to continue. (¶¶ 12, 114-118, 226, 152). Indeed, Plaintiffs allege that is exactly what happened: the harassment did not stop even after Northwestern reached its so-called "agreement" with the encampment organizers[4], who felt emboldened by the administration's response. (¶¶ 117-120, FN 65) ("this agreement does not mark the cessation of our resistance but an essential and tactical pivot that enhances our leverage moving forward.")

Beyond *rewarding* the offenders rather than promptly disciplining them, Plaintiffs allege that Northwestern took official action that *encouraged* and *accommodated* the discriminatory and

---

[3] Any reference to paragraphs (¶¶) refers to allegations in the Complaint, ECF 24.

[4] At the same time it champions the "Agreement on Deering Meadow," Northwestern shrugs off the allegations pertaining to the agreement's specific terms, claiming they are "beside the point." (Mot., pg. 9). But this is false. When evaluating the plausibility of Plaintiffs' hostile environment claim, the Court can and should contrast Northwestern *rewarding* harassers via the agreement (which involved the school promising, among other things, to help the harassers avoid backlash from potential employers) with MIT (and other schools) *disciplining* them. The agreement and its cushy terms are squarely relevant.

harassing conduct before and during its occurrences. For example, Plaintiffs allege: that Northwestern's Women's Center – which Northwestern designates as a campus safety resource – publicly encouraged violence against Jews and celebrated Hamas' terror attack (¶¶ 57-59, 66-71, 209); that Northwestern's Library encouraged encampment participants – who were openly harassing Jewish students and otherwise violating university policy – to anonymously contribute "protest materials" to the school's official archive (¶¶ 122-125); that Northwestern accommodated this hateful eruption by turning off its scheduled lawn sprinklers, and by opening campus facilities to non-student agitators who are not typically permitted entry (¶¶ 112-113); that Northwestern tolerates calls for violence against Jews and antisemitic rhetoric among its faculty, including in the weeks and months leading up to the encampment (¶¶ 44-56); and that Northwestern's Outreach and Education Coordinator for its Office of Civil Rights and Title IX Compliance signed an SJP-authored letter containing conspiracy theories and blood libels about "Zionists" (¶ 62, FN 45). Given the lack of discipline, the affirmative perks bestowed on the harassers, and the myriad allegations of Northwestern's direct institutional involvement in supporting the toxic campus climate, it is clear this case and the MIT Case – which involved MIT's "evolving and progressively punitive response" – are apples and oranges.[5] Northwestern also tries to distinguish its conduct from that alleged in the recent case against Harvard, where the same Massachusetts district court denied the school's motion to dismiss a student's Title VI hostile environment claim. (Mot., pp. 8-9) (citing *Kestenbaum v. President & Fellows of Harvard College* No. CV 24-10092-RGS, 2024 WL 3658793, at *6 (D. Mass. Aug. 6, 2024)) (the "Harvard Case"). In the Harvard Case, the court focused on whether the complaint alleged meaningful discipline of harassers or whether the school

---

[5] Plaintiffs' Complaint explicitly notes MIT's suspension of the lead harassing student organization on campus (SJP) with Northwestern's inaction towards, and encouragement of, SJP's conduct. (¶ 152, FN 86).

was merely paying lip service. It noted that while Harvard suspended a student organization (the "Palestinian Solidarity Committee"), that "short-term suspension proved to be in name alone, as the PSC spearheaded the creation of the encampment in Harvard Yard just two days later." *Id*. The court noted that:

> To conclude that the [complaint] has not plausibly alleged deliberate indifference would reward Harvard for virtuous public declarations that for the most part, according to the allegations of the [complaint], proved hollow when it came to taking disciplinary measures against offending students and faculty.

*Id.* Such an outcome here would likewise reward Northwestern for similarly hollow public threats of discipline. As pled, on the first day of the encampment, Northwestern threatened to arrest students who refused to remove their tents, and that those violating University policies "will face discipline." Northwestern also stated it would "hold individuals accountable" when SJP violated university policy on other occasions. (¶¶ 107, 141). But Plaintiffs allege Northwestern took no disciplinary action – even worse than Harvard, who at least enacted a formal, albeit toothless, suspension. Northwestern did nothing when, even after its "agreement," protestors continued to violate school policy, making prominent campus spaces unsafe locations for Jewish students, featuring the same vitriol as seen during the encampment. (¶¶ 118-120). Like in the Harvard Case, this Court should refuse to laud Northwestern for empty declarations.

The Seventh Circuit hostile environment cases Northwestern cites similarly undermine Northwestern's requested dismissal. (Mot., pg. 7) (*Galster*, 768 F.3d 611, and *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022)). First, both are summary judgment cases, decided on an evidentiary record. These cases thus cannot support a dismissal, given their procedural posture. *See B.E., a minor, & Jenna Ewing, Plaintiffs, v. A.W., a minor, & Rockford Christian Sch., Defendants.*, No. 3:24-CV-50016, 2024 WL 3984282, at *3 (N.D. Ill. Aug. 28, 2024) (criticizing defendant-school for resting on *Galster* at the dismissal stage, stating: "RCS

relies on a summary judgment decision to establish this 'high bar.' *But that's the wrong standard to apply at this stage*. Indeed, this Court has a standing order reminding parties that they should rely on cases decided on the same procedural posture.") (emphasis added).

Nor do these two Seventh Circuit cases support dismissal substantively. *Galster* involved school officials promptly engaging in actual *discipline* of the harasser rather than rewarding, accommodating, or encouraging him. Once the defendants knew of the harassment, "they took action *against* the wrongdoers…" 768 F.3d at 614-619. "[S]chool officials promptly intervened," and "[a]s the incidents persisted and escalated, so did the school's responses." *Id.* at 619-620 (citing *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 824 (7th Cir. 2003) ("[t]he record reveals that the [school's response] was not clearly unreasonable. After each reported or observed instance…[student] was *disciplined* and steps were taken to prevent future inappropriate conduct.")) (emphasis added). Prompt discipline of the harasser – rather than a "half-hearted" threat of discipline, followed by rewards – was the touchstone in *Galster*.

The Seventh Circuit in *C.S. v. Madison Metro Sch. Dist.* granted the school's motion for summary judgment because "no reasonable jury could find that the…conduct of which [the Principal] had actual knowledge amounted to sexual harassment or discrimination within the meaning of Title IX." 34 F.4th 536, 546 (7th Cir. 2022). From this inapposite case, Northwestern plucks the rule that "a school district's response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an official decision to permit discrimination." *Id.* at 543. But here, the Complaint plausibly alleges that Northwestern *did* make an official (albeit unwritten) decision to permit discrimination against Jewish students and even encouraged it, before, during, and after the encampment.

The Court, with no evidentiary record before it, should reject Northwestern's self-serving

claim that it acted reasonably, especially where Northwestern's alleged response – one of accommodation and reward of harassers – bears none of the hallmarks of Title VI compliance.

**B. Northwestern seeks dismissal of Plaintiffs' intentional discrimination claim based upon evidentiary standards not applied at the pleading stage.**

Plaintiffs have stated a claim for intentional discrimination. To state a claim for discrimination under Title VI, a plaintiff must allege (1) that they have been intentionally discriminated against on the grounds of a protected characteristic; and (2) that defendants are recipients of federal assistance. *Irving v. Pui Tak Ctr.*, No. 12 CV 8092, 2013 WL 2251757, at *2 (N.D. Ill. May 22, 2013). Northwestern seeks dismissal of this claim by foisting improper *evidentiary* standards upon the pleading.

The Seventh Circuit is clear that discrimination claims under civil rights statutes "are not subject to a heightened pleading standard." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014).[6] Northwestern nonetheless argues the Seventh Circuit requires allegations of sufficiently similar comparators at the pleading stage. (Mot., pg. 11). *This is flatly wrong*. The Seventh Circuit is clear that allegations "such as the existence of a similarly situated comparator" are not required to state a claim. *Id*; *Cox v. Calumet Pub. Sch. Dist. 132*, 180 F. Supp. 3d 556, 561 (N.D. Ill. 2016) ("the evidentiary burden a Title VII plaintiff must *eventually* meet to prevail differs from the pleading standards for a motion to dismiss") (citing *Vega v. Chicago Park Dist.*, 958

---

[6] Though *Carlson* involved a Title VII claim, "Title VI case law has traditionally borrowed jurisprudence from other civil rights laws with a similar structure and purpose." *Anthony v. O'Fallon Twp. High Sch. Dist. 203 Bd. of Educ.*, No. 3:23-CV-00967-SPM, 2024 WL 245251, at *9 (S.D. Ill. Jan. 23, 2024) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("[Title VI] is parallel to Title IX .... The two statutes operate in the same manner ....")); *Deemar v. Bd. of Educ.*, No. 21-cv-3466, 2024 WL 3757169, at *10 (N.D. Ill. Aug. 9, 2024) ("Courts have analogized hostile educational environment claims under Title VI to hostile work environments under Title VII.")

F.Supp.2d 943, 953 (N.D.Ill.2013) (similarly situated argument is "an evidentiary standard applicable at the summary judgment stage; it is not a requirement in reviewing the sufficiency of the complaint.")) Indeed, the only Seventh Circuit case Northwestern cites is *Williams v. Wendler*, a summary judgment case. 530 F.3d 584 (7th Cir. 2008).

Northwestern goes on, claiming "Courts have therefore dismissed complaints alleging only a few dissimilar comparators." (Mot., pg. 11). This statement of the law is spurious, not only because the Seventh Circuit has expressly rejected this notion, but even more glaringly because the Magistrate report and recommendation on which Northwestern relies (and for which it gives a truncated citation) was overturned on this very issue. *Resendez v. Prance*, No. 3:16-CV-862-JVB-MGG, 2018 WL 3275615, at *6 (N.D. Ind. Jan. 26, 2018), *report and recommendation adopted in part*, No. 3:16-CV-862 JD, 2018 WL 1531788 (N.D. Ind. Mar. 29, 2018). The trial judge rejected the portion of the Magistrate's opinion relied on by Northwestern, citing *Carlson* and holding that "a plaintiff is not required to include allegations-such as the existence of a similarly situated comparator-that would establish a prima facie case of discrimination in order to survive a motion to dismiss." *Resendez v. Prance*, No. 3:16-CV-862 JD, 2018 WL 1531788, at *4 (N.D. Ind. Mar. 29, 2018) (internal citations and quotation marks omitted). Northwestern's entire argument regarding the sufficiency of Plaintiffs' comparators should be ignored, as Plaintiffs have no obligation at this stage to meet this evidentiary standard (and have also pled similarly situated student demographic groups received more favorable treatment). (*E.g.*, ¶¶ 2-6, 114-117).[7]

---

[7] Moreover, to the extent the Title VI analysis tracks Title VII, the Seventh Circuit may not even demand Plaintiffs establish 1:1 comparators at the evidentiary stage, either, to prevail on their intentional discrimination claim. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("Th[e] legal standard…is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused…the adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does

Because the Seventh Circuit has been clear on this point, neither of the other cases Northwestern cites move the needle. True, in the Harvard Case, the Massachusetts district court dismissed the plaintiff's direct discrimination claim because it felt the pleading "failed to adequately limn a comparator Title VI claim." 2024 WL 3658793, at *7. But the two First Circuit cases the court relied on there call its ruling on this point into doubt. *Id.* (citing *Doe v. Brown University*, 43 F.4th 195207 (1st Cir. 2022) and *Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). *Brown University* was decided on summary judgment. *Id.* And while *Dartmouth* was decided on a motion to dismiss, it was explicitly overruled. *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66–67 (1st Cir. 2004) ("there are no heightened pleading standards for civil rights cases…Let us be perfectly clear. The rule that we announce today is not contingent on the type of civil rights case.") (collecting cases) (internal citations omitted); *see also Davis v. Miami-Dade County*, No. 23-12480, 2024 WL 4051215, at *3 (11th Cir. Sept. 5, 2024) ("the *McDonnell Douglas* framework is an evidentiary tool not an independent standard of liability, and certainly not a pleading standard.").

Northwestern similarly conflates these standards when claiming Plaintiffs cannot sustain an intentional discrimination claim through the "direct method." Indeed, its brief gives this away, when Northwestern writes that intentional discrimination through the direct method "is shown through *evidence* relating 'to the motivation of the decisionmaker responsible for the contested decision.'" (Mot., pg. 11) (emphasis added). Here, in claiming Plaintiffs have not established enough "evidence" of Northwestern's intent or who the school's ultimate decision-maker(s) may be, Northwestern relies upon *Totten v. Benedictine University* where the Court *denied* the

---

so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect.").

defendant's motion to dismiss and, in any event, cited to summary judgment cases (not dismissal cases) when setting forth the applicable standards. No. 20 C 6107, 2021 WL 3290926 (N.D. Ill. Aug. 2, 2021) (citing *Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999) (summary judgment case) and *Lubavitch-Chabad of Illinois, Inc. v. Northwestern University, et al.*, 6 F.Supp.3d 806 (N.D. Ill. Dec. 19, 2013) (same)). And, in any event, Plaintiffs have plausibly alleged discriminatory intent. (*e.g.*, ¶¶ 36-63) (alleging discriminatory conduct of official Northwestern departments, and the school's lucrative partnership with Qatar and Al-Jazeera, who spread antisemitism globally).[8] Accordingly, the Court should reject Northwestern's request to dismiss Plaintiffs' Title VI intentional discrimination claim.

**C. Plaintiffs plausibly allege a "severe, pervasive, and objectively offensive" hostile environment, and Northwestern brazenly narrows the allegations to argue otherwise.**

Plaintiffs have set forth allegations that plausibly reveal a "severe, pervasive, and objectively offensive" environment that deprived them "access to the educational opportunities or benefits provided by the school." *Galster*, 768 F.3d at 614 (citing *Davis*, 526 U.S. at 650). The Seventh Circuit has explained that "damages are not available for simple acts of teasing and name-calling among school children." *Id.* at 618 (internal quotations omitted). "Instead, to be actionable, the harassment must be serious enough to deny its victims the equal access to education that [Title VI] is designed to protect." *Id.*

Northwestern cites to *Galster* and *Hendrichsen v. Ball State University*, both summary judgment cases, in setting forth the general principles that harassment be severe and pervasive.

---

[8] Northwestern claims that Plaintiffs' allegations regarding Northwestern Qatar and Al-Jazeera are "irrelevant." (Mot., pg. 15). But these allegations, taken as true, show a motive for Northwestern to take a lax approach to Jew-hatred to placate its major overseas donor and institutional partners. These allegations increase the plausibility of Plaintiffs' claims of intentional discrimination. Further, the allegations showing Northwestern Qatar's promotion of antisemitism and pro-Hamas propaganda is relevant because staff and faculty from Qatar are deeply intertwined with Northwestern faculty, staff, and students in Illinois. (¶¶ 37-40).

The Seventh Circuit in both cases found that the *evidentiary record* did not support a finding of severe and pervasive harassment. In *Galster*, the conduct was "simple acts of teasing and name-calling among school children," and in *Hendrichsen*, the Court found the majority of the harasser's actions "never physically threatened nor humiliated the plaintiff," who herself admitted that her academic performance was unaffected by the harassment. 107 F. App'x 680, 685 (7th Cir. 2004).

Plaintiffs here have alleged much more than "simple acts of teasing" by school children. And they allege conduct that was both physically threatening and humiliating. Plaintiffs allege that in the open, public lawn at the center of their campus, Jewish students were told to: *Burn in hell! Go back to Germany! Get gassed! Zionist pigs are not welcomed in this space*. (¶ 92). Each of the Plaintiffs allege that they were specifically subject to some of these slurs (during and even before the encampment) and were aware that other Jewish students were, too. (¶¶ 164, 165, 166, 168, 169, 173, 176, 179, 180). Plaintiffs also allege: that a Jewish student wearing a *kippah* was spat on at the encampment, and Jewish students, including them, suffered other forms of physical assault and battery by encampment participants (¶¶ 90, 91, 102, 163, 164); that they were physically stalked and followed by encampment participants, and had their photos published online as a form of threatening harassment (¶¶ 164, 172); that Northwestern tolerates public, widespread support for Hamas and celebrations or justifications of violence against Jews among its faculty (including, unbelievably, by the outreach and education coordinator of its Office of Civil Rights) (¶¶ 36-56, 62); that Northwestern's official departments (like the Women's Center, formally tasked with student safety) have encouraged and celebrated violence against Jews (¶¶ 57-59); that individuals dressed in Hamas attire freely roam around campus, menacingly asking people if they speak Hebrew (¶¶ 87, 95); that Deering Meadow was, for weeks, littered with signs glorifying violence

against Jews (¶ 89, 93); that students openly chanted for "Intifada" and screamed that Hamas' "Resistance" was justified (*i.e.*, glorified violence against Jews) (¶ 94). And more.

Northwestern takes significant liberties in shrinking Plaintiffs' alleged experiences to "witness[ing] someone else get attacked," having "derogatory comments directed at them," "and/or ha[ving] their photo posted online in a derogatory fashion." (Mot., pg. 14). According to Northwestern, "[n]one of the Plaintiffs were assaulted physically," and none "were subjected to repeated harassment[9], given the short duration of the encampment." (Mot., pg. 14). Northwestern's false conjecture, and sheer mischaracterization of the facts, deserve no weight.

In the same vein, Northwestern claims Plaintiffs' allegations are "markedly different" from those of the plaintiff in *I.G. by & through Grunspan v. Jefferson Cnty. Sch. Dist. through Bd. of Educ. for Jefferson Cnty. Sch. Dist.*, 452 F. Supp. 3d 989, 994–95 (D. Colo. 2020). That case involved a Jewish student experiencing months of swastikas, Nazi salutes and chants, and comments like the only difference between Jews and cookies is that "a cookie comes out of the oven," and that the Zika virus should be "eradicated by gassing it, like the Jews."[10] *The school in that case did not even dispute that this constituted severe and pervasive harassment. Id.* Northwestern similarly tries to contrast this case with *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 357 (S.D.N.Y. 2014), where Jewish students suffered repeated slurs, witnessed

---

[9] For some reason, Northwestern cites the "general rule" that "unless the conduct is quite severe, a single incident or isolated incidents" cannot create a hostile environment. (Mot., pg. 14) (citing *Adusumilli v. Ill. Inst. Of Tech.*, No. 97 C 8507, 1998 WL 601822 (N.D. Ill. Sept. 9, 1998)). But Plaintiffs do not allege a single incident or isolated incidents, so this rule is of no relevance here. *See Savoy v. BMW of N. Am., LLC*, 313 F. Supp. 3d 907, 915-16 (N.D. Ill. 2018) (finding two specific racial slurs ("spic" and "f--king Puerto Rican") were severe even though "the slurs were used only sporadically over the two-year period detailed in the complaint").

[10] Northwestern oddly ignores that similar incidents are alleged by Plaintiffs. (*E.g.*, ¶ 92 ("go back to Germany!" "get gassed!")).

13

swastika graffiti, were called "crispy" and told they should have burned in the Holocaust, and suffered physical harassment including being slapped and having coins thrown at them.

Judging by Northwestern's discussion of these cases, in its view, Plaintiffs needed to endure months or years of "Heil Hitlers," swastikas, and Holocaust jokes for a Title VI claim based on antisemitic harassment to be actionable. This argument is unsupported as a matter of law, it ignores the allegations of the Nazi-like antisemitism found throughout the Complaint, but most starkly it reveals Northwestern's gross refusal to treat ecstatic support for Hamas, a designated terrorist organization, and its "Resistance" as no different than Heiling Hitler.[11]

Finally, Northwestern suggests, without any authority, that dismissal is appropriate because "none of the Plaintiffs allege that their grades suffered or that they were extensively absent from school." (Mot., pg. 14). But Title VI does not require this. Rather, it states that individuals may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance, on the basis of a protected characteristic. 42 U.S.C §§ 2000d. The Complaint more than ticks this box. (¶¶ 166, 168, 170, 171, 180, 182) (avoiding certain spaces, facilities, and programs on campus out of fear of harassment or physical harm); (¶180) (unable to study, focus, and perform course work).

### D. Plaintiffs have adequately alleged Northwestern's knowledge of the harassing environment.

Northwestern provides the Court with a one-sentence argument that dismissal is appropriate because there are no allegations that the school had actual knowledge of the harassing

---

[11] Northwestern's failure to grasp this is also made clear by its comment that Plaintiffs' allegations regarding "the history of Hamas" are "fat in [the] complaint that can be ignored." (Mot., pg. 15). But it is Hamas' history and present nature as an anti-Jewish hate group which threatens to kill Jews en masse – *just like the Nazis* – that makes Northwestern's tolerance of Hamas support on campus and amongst its faculty so egregious and dangerous to Jewish students (and not just a matter of "politics"…Hitler was a politician, too).

environment. (Mot., pg. 13). Northwestern's knowledge that Jewish students were being harassed on campus is easily inferred from the allegations. The antisemitic posters were openly and publicly posted within and around Northwestern's outdoor epicenter. The ruthless celebration of Hamas' violence against Jews was happening in front of the administration's eyes. Jewish students were told to "burn in hell," and "go back to Germany" in shouts from the central lawn. And Northwestern's faculty was well in attendance, while some of its institutional departments participated and cheered along. Even Northwestern claims in its Motion that it "quickly issued interim rules designed to monitor and regulate the protest in real time." (Mot., pg. 1). And Plaintiffs do allege the school's actual knowledge of the anti-Jewish climate on campus. (¶¶ 107, FN 58 (Schill's statement regarding "banners and chants that many have found hateful, intimidating, offensive and difficult to avoid"), 159).

Moreover, this is once again a question of evidentiary fact and not a pleading standard. As the Seventh Circuit commented in *C.S. v. Madison Metro. Sch. District*, these facts must be determined by a jury:

> There may be cases where the relevant school official insists he had no knowledge of the alleged discrimination, and thus no duty to respond to it. And that may be so even where the objective facts allow a different finding by a jury—in particular, that the school official buried his head in the sand to avoid acquiring knowledge of past or ongoing misconduct. In such cases a Title IX plaintiff may ask for a so-called "ostrich instruction"—a directive that the jury may infer actual knowledge based on the official's willful blindness to the objective reality in front of him…the instruction recognizes [] that an administrator presented with facts clearly showing existing misconduct may not shirk…obligations by declining to do the math.

34 F.4th 536, 545 (7th Cir. 2022). Northwestern has not presented the Court with any valid basis for dismissing Plaintiffs' Title VI claims. The Court should deny the Motion.

**II. Plaintiffs adequately allege a breach of contract.**

The terms of a university-student contract "are usually implied, with specific terms to be

15

found in the university bulletin and other publications; custom and usages can also become specific terms by implication." *Ross v. Creighton University*, 957 F.2d 410, 417 (7th Cir. 1992) (quotation marks and citation omitted). For the reasons explained below, Plaintiffs have alleged enforceable promises which Northwestern breached.

**A. Northwestern's promises concerning its enforcement of anti-harassment and anti-discrimination policies are specific.**

Specific promises made by a university may become contractual terms. (Mot., pg. 18 (quoting *Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058, 1064 (N.D. Ill. 2021)). Promises are analyzed objectively and in consideration of the parties' reasonable expectations. *Eckhardt v. Idea Factory, Ltd. Liab. Co.*, 193 N.E.3d 182, 191 (Ill. App. Ct. 2021). Plaintiffs do not rely on mere "aspirational statements." For example, the Student Handbook states that "[r]emaining a member of the Northwestern community *requires* a student to continuously comply with policies governing…social interactions, and personal behavior." (¶ 215). The Campus Violence Prevention Plan provides that a community member who violates it *is* subject to disciplinary action." (¶¶ 68, 70). Northwestern's policy on "Civility, Mutual Respect, and Unacceptability of Violence on Campus" likewise states that "a community member who has violated this policy *is* subject to disciplinary action." (¶ 220). The statements Plaintiffs rely upon in the Complaint are not mere "policy goals." They are specific statements by the school that it *will* discipline harassers.

**B. The Student Handbook's general disclaimer is not enforceable.**

Relying on a page of out-of-circuit string cites, Northwestern claims that the Student Handbook cannot become an enforceable contractual term because it contained a disclaimer. Northwestern's argument fails for three independent reasons. First, the disclaimer is not conspicuous. *See Bell Fuels, Inc. v. Lockheed Elecs. Co.*, 130 Ill. App. 3d 940, 946, 474 N.E.2d 1312, 1317 (Ill. App. 1st Dist. 1985) (citing 810 ILCS. 5/1-201, which provides conspicuous terms

should be "set off from surrounding text of the same size by symbols or other marks that call attention to the language."). The Handbook general disclaimer does not list any specific terms, and is indistinguishably buried at the bottom of the table of contents, in the same font and style.[12]

Second, the disclaimer is unconscionable. Courts analyzing unconscionability consider, *inter alia*, the parties' commercial experience, whether the aggrieved party had a meaningful choice, and the inequality in the bargaining positions of the parties together with terms unreasonably favorable to the stronger party. *Ahern v. Knecht*, 202 Ill. App. 3d 709, 716, 563 N.E.2d 787, 792 (1990); 810 ILCS 5/2-302). Each of these factors weigh in favor of Plaintiffs. Indeed, the disclaimer is so lopsided that Northwestern believes that it can impose punitive measures against Plaintiffs under the Handbook, yet is under no obligation to enforce its terms, let alone on a non-discriminatory basis. (*See* Mot., pg. 19).

Third, the general disclaimer in the Student Handbook also does not overcome the specific promises found therein. *See Troia v. N. Cent. Coll.*, No. 20-CV-05229, 2023 WL 6065346, at *5 (N.D. Ill. Sept. 18, 2023) (finding disclaimer in course catalog was not enforceable where the allegations "taken as a whole" supported specific promise to provide in-person classes); *Perman v. ArcVentures, Inc.*, 196 Ill. App. 3d 758, 765, 554 N.E.2d 982, 987 (Ill. App. 1st Dist. 1990) (disclaimer unenforceable where manual included specific termination and grievance procedures). Here, the Student Handbook contained specific promises that, taken as a whole, overcome Northwestern's disclaimer. Student Handbook at 24-39 ("prohibited and restricted conduct"); *id.* at 40-49, 100-127 (sanctions for violations and related procedures); *id.* at 130 (incorporating Title

---

[12] *See Rothe v. Maloney Cadillac, Inc.,* 492 N.E.2d 497, 503 (Ill. App. Ct. 1st Dist. 1986) (disclaimer is conspicuous where it appeared in three separate places in the contract, twice set off in boxes, one of which employed large bold print and the other, italics), *rev'd on other grounds,* 518 N.E.2d 1028 (1988).

IX policy). The Student Handbook disclaimer does not negate Plaintiffs' contract claim.

### C. The Title IX policy is enforceable as a contractual term.

Northwestern's Title IX policy is an enforceable contractual term because it is not "limited precisely" to Title VI obligations. *Sweet v. BJC Health Sys.*, No. 3:20-CV-00947-NJR, 2021 WL 2661569, at *8 (S.D. Ill. June 29, 2021). For example, the policy states that prohibited harassment includes conduct that is subjectively objectionable (Title IX policy, § I.F.1.b), while Title VI is limited to objectively offensive conduct. *Galster*, 768 F.3d at 614.[13] Accordingly, because Northwestern's Title IX policy exceeds its Title VI obligations, it may be enforced as a contractual term. *Dinerstein v. Google, Ltd. Liab. Co.*, 484 F. Supp. 3d 561, 589 (N.D. Ill. 2020), *aff'd as modified*, 73 F.4th 502 (7th Cir. 2023).

Additionally, where a party has discretion in the performance of its preexisting legal obligations, promises related thereto may provide adequate consideration to enforce a related promise. *Libertyville Twp. v. Woodbury*, 121 Ill. App. 3d 587, 593, 460 N.E.2d 66, 71 (1984).[14] Title VI prohibits discrimination, but it does not prescribe specific policies or procedures. *See* 42 U.S.C. § 2000d. Northwestern's Title IX policy dictates a detailed procedure for how it claims to investigate and enforce Title VI matters on campus. *See* Title IX policy, § II. Northwestern has discretion in how and to what extent it punishes community members under the policy. *Id.* Such wide discretion suffices to establish consideration for Northwestern's promises contained in its

---

[13] The policy further states: "The process described below is Northwestern's internal University process to determine whether Northwestern policy was violated and is not a court system. As such, Northwestern's process does not use the same rules of procedure and evidence as those used by courts or law enforcement." *Id.* at 22, §II.A.

[14] Plaintiffs allege that "Northwestern also has breached the implied covenant of good faith and fair dealing." (¶ 227). Northwestern does not raise any argument with respect to this claim. *See generally* Mot., pp. 15-20. Accordingly, Northwestern waives any defense against this claim. *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008).

Title IX policy.[15] Finally, Northwestern's support is distinguishable because, unlike the Title IX policy's *specific* standards relating to discrimination and harassment, the alleged promises in those cases were nothing more than bare statements that the defendant would comply with applicable laws. *Harris v. Adler Sch. of Prof'l Psychology*, 723 N.E.2d 717, 720 (1999); *Doe v. McHenry Cty. Coll.*, No. 17 CV 4247, 2020 WL 5209834, at *1 (N.D. Ill. Sept. 1, 2020).

### III. Plaintiffs' claims seeking injunctive relief are well pled.

"To have standing for prospective injunctive relief, a plaintiff must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "A motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005) (citation omitted).

### A. Plaintiff adequately allege a personal stake in the dispute because they were the subject of, and were at all times within the target area of, the antisemitic harassment.

Northwestern's claim that Plaintiffs do not have a "'personal stake' in the dispute" because "most of Plaintiffs' allegations describe harassment and antisemitic conduct suffered by other students" fails as a matter of law and reveals Northwestern's ongoing inability to appreciate the nature of the harassment and discrimination Jewish students face on campus.

Aside from again spinning the allegations, Northwestern's argument runs squarely against the Seventh Circuit's admonitions against calling "second-hand harassment" "categorically less

---

[15] To be sure, Northwestern's discretion under its Title IX policy does not overcome its Title VI obligations or otherwise provide it the discretion to encourage, reward, or tolerate antisemitic harassment and discrimination on campus.

serious than harassment specifically aimed at the plaintiff." *Yuknis*, 481 F.3d at 554.[16] Offensive conduct may amount to harassment when a member of the group "being vilified" is "within the target area of the offending conduct" even if not himself "singled out." *Id.*[17]

Here, Plaintiffs allege that they were aware of the ubiquitous antisemitic incidents pervading campus throughout the school year which contributed to the hostile environment they encountered on campus and will continue to face this upcoming year. (¶¶ 165, 169, 173, 179); *see King v. Hillen*, 21 F.3d 1572, 1581 (Fed. Cir. 1994) ("[I]t is the cumulative effect of the offensive behavior that creates the working environment.") Plaintiffs need not be the next Jew to be spit on before they have a "personal stake." Plaintiffs not only allege they and others they were walking with were personally attacked, they also allege they were within the same target area as the other Jewish students who suffered similar abuse, and were aware it was occurring. *See EEOC v. WRS Infrastructure & Env't, Inc.*, No. 09 C 4272, 2011 WL 4460570, at *10 (N.D. Ill. Sep. 27, 2011) ("[T]he Court doubts any of the other black plaintiffs breathed a sigh of relief when they found out the noose was on Roberts' truck, not theirs.").

And because Plaintiffs are all Jewish students alleging they suffered the same kind of harassment, Northwestern's reliance on *ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989) is misplaced. There, the Supreme Court considered claims brought by "various individual taxpayers," and it held that "standing to sue is not a kind of gaming device that can be surmounted

---

[16] *Yuknis* is a Title VII case, but the same framework applies. *See* FN 6, *supra*.

[17] *Accord Pocono Mt. Charter Sch. v. Pocono Mt. Sch. Dist.*, 442 F. App'x 681, 689 n.11 (3d Cir. 2011) ("courts have upheld Title VI standing for plaintiffs who are not the direct targets of discrimination."); U.S. Department of Education, Office For Civil Rights, Dear Colleague Letter, May 7, 2024, ("Harassing conduct need not always be targeted at a particular person in order to create a hostile environment for a student or group of students, or for other protected individuals." (collecting cases)) (available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf).

merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves." *Id*. at 615. This case is not about speculative claims of "different kinds of plaintiffs," it is about the same kinds of plaintiffs who have pointed to specific threats made to themselves and other Jewish students like them on campus.

**B.  Plaintiffs adequately allege they face immediate threat of suffering similar harms this upcoming year.**

Northwestern next argues that even if Plaintiffs personally suffered injuries caused by its tolerance of antisemitism on campus, there is no immediate threat of future harm because Plaintiffs rely "on *past* alleged incidents of harassment." (Mot., pg. 21). But Northwestern ignores its own case law which recognizes that "past wrongs…may be evidence that future violations are likely to occur." *Sierakowski v. Ryan*, 223 F.3d 440, 445 (7th Cir. 2000); *see also Simic*, 851 F.3d at 738 (past wrongs "[]accompanied by any continuing, present adverse effects" can suffice).

In light of Northwestern's yearslong track record of accommodating anti-Jewish discrimination and harassment, which continues to this day, and the continuing harm Plaintiffs suffer as a result of such incidents, Plaintiffs adequately allege a real and immediate threat of future harm when they arrive on campus this year. Prior to October 7th and the 2023-2024 academic year, Northwestern demonstrated a consistent practice of accepting antisemitism at the university. (¶¶ 43-47, 55, 137-45). Predictably, Northwestern's history of turning a blind eye to antisemitism on campus fomented the grounds for the explosion of anti-Jewish harassment and discrimination following the October 7th terrorist attacks.  (¶¶ 48-54, 56-63, 79-82, 86-105-107, 118-20, 126-128, 145-179). More to the point, the lax approach to, if not outright encouragement of, pro-Hamas conduct against Jewish students prior to the encampment directly led to the "major antisemitic event on campus." Critically, unlike other universities, Northwestern took no meaningful action to punish students or individuals under its control who perpetuated such bigotry or to otherwise

protect Jewish students in the upcoming Fall quarter. In fact, the opposite is true; Northwestern has rewarded the "protestors." *See* Section I.A., *supra*; (¶¶ 115-16, 152). Even after Northwestern entered into the "agreement", pro-Hamas student organizations declared it a pivotal moment for entering the next phase of their resistance. The pleadings provide no basis to infer that the on-campus harassment will abate this upcoming year.

Moreover, Northwestern again misconstrues and selectively reads the Complaint. Northwestern states that the only future harm Plaintiffs allege is that they have "'fear and anxiety' for their safety on campus," which it calls "subjective" and "speculative." (Mot., pg. 21). First, Northwestern's argument dismisses the seriousness of such harms, which even President Schill recognized in his congressional testimony – "If you don't feel safe, you cannot learn." (¶ 182; *see also* ¶ 156). Second, it ignores other allegations that certain Plaintiffs purposefully avoid parts of campus due to the heightened risk of harassment, including physical violence, and that it has impacted John Doe 3's ability to perform at school. (¶¶ 171, 180). Third, Plaintiffs' allegations show that Northwestern's conduct to date has only strengthened the resolve of individuals who contributed to the hostile environment for Jewish students on campus and who have stated their intentions to continue their pro-Hamas activities. (*See, e.g.,* ¶ 117). Thus, as the court recognized in the Harvard Case and the MIT Case, "[t]he only genuinely disputed facts that weigh on [plaintiff's] ability to seek prospective injunctive relief are whether [Northwestern's] actions to date have been adequate and whether they will likely be effective going forward. This is the core merits dispute in this case[,]" which should not be ruled on "at this formative stage of the litigation." 2024 WL 3658793, at *4 (citation omitted) (addressing ripeness); *see also StandWithUs Ctr. for Legal Just.*, 2024 WL 3596916, at *4 (same).

**C.  The harm Plaintiffs' face is fairly traceable to Northwestern's tolerance and, at times, promotion of anti-Jewish harassment and discrimination on campus.**

A "plaintiff does not lack standing merely because the defendant is one of several persons who caused the harm." *Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 422 F.3d at 500 (citations omitted). Plaintiffs need only allege that the harm they will suffer is "fairly traceable" to Northwestern's conduct. *Bryant v. Walgreen Co.*, No. 23 CV 1294, 2023 WL 5580415, at *3  (N.D. Ill. Aug. 29, 2023) (traceability is a "low burden") (citations omitted).

Plaintiffs allege Northwestern has been historically lax on antisemitic discrimination and harassment and has institutionally participated in it. Plaintiffs allege Northwestern fails to apply its own policies for the protection of its Jewish students, in the same manner it does for the benefit of other protected classes. And Plaintiffs allege Northwestern has intentionally adopted a de facto policy of looking the other way when Jewish students suffer harassment and discrimination at the hands of its students, student organizations, and its faculty. So, this is not even an issue of pure third-party conduct.

In light of Northwestern's historic tolerance of, and institutional involvement in, antisemitism on campus, Northwestern's argument that "Plaintiffs fail to show that the independent third parties, which consist of unnamed students and protestors, 'will likely react in predictable ways'" falls flat. (Mot., pg. 22) (citing *DOC v. New York*, 588 U.S. 752, 768 (2019)). Moreover, it ignores Plaintiffs' other allegations that pro-Hamas activists on campus have a multi-year history of discrimination and harassment at Northwestern and have issued statements regarding their intent to continue such activities. (¶¶ 44-47, 53-55, 117-118, 138-145.) Again, Northwestern's own support demonstrates that these allegations suffice (and also shows that this is an evidentiary concern not appropriately resolved at the pleading stage). *See DOC*, 588 U.S. at 752-53 (finding respondents *met their burden* of showing third parties will likely react in

predictable ways, based on *evidence* showing how such third parties "historically responded," even when such responses were illegal).

**D.  It is premature to dismiss or strike Plaintiffs' requested injunctive relief at this stage.**

Northwestern's attempt to dismiss or strike Plaintiffs' requested injunctive relief is not only substantively wrong, it is also premature.  (Mot., pg. 22-23.)[18] "Striking the prayer for injunctive relief where an adequate claim for discrimination has been alleged is not appropriate before [a plaintiff] has had an opportunity to attempt to support her allegations through discovery." *Glenn v. Bd. of Educ. of Barrington 220 Cmty. Unit Sch. Dist.*, No. 17-CV-02974, 2018 WL 5298529, at *5 (N.D. Ill. Oct. 25, 2018); *Kestenbaum*, 2024 WL 3658793, at *9 & n.17 (finding "the court need not (and cannot) tailor an injunction at this early stage" even though "many of [plaintiff's] requests are facially impractical or outside the jurisdictional authority of the court").[19]

Separately, Northwestern's request should also be denied because Plaintiffs are not seeking specific performance relating to academic standards based solely on contract. Northwestern relies on cases addressing school actions involving plaintiffs' *academic* qualifications or performance. *See Bloch v. Hillel Torah N. Suburban Day Sch.*, 426 N.E.2d 976 (1981) (seeking specific performance of readmission to private day school after child was expelled for excessive absences);

---

[18] *See Glenn v. Bd. of Educ. of Barrington 220 Cmty. Unit Sch. Dist.*, No. 17-CV-02974, 2018 WL 5298529, at *5 (N.D. Ill. Oct. 25, 2018) (noting that "Rule 12(f) does not authorize the striking of a prayer for relief," such a request for injunctive relief).

[19] It is similarly premature to strike Plaintiffs' prayer for punitive damages, which are available in a contract case where the alleged facts fall within a recognized tort theory. Though Plaintiffs do not seek punitive damages under Title VI, "a Title VI claim is analogous to a state claim for personal injuries to the extent that it seeks recompense for an injury to one's individual rights." *Monroe v. Columbia Coll. Chi.*, 990 F.3d 1098, 1100 (7th Cir. 2021). Accordingly, it is premature and inefficient to dismiss Plaintiffs' *prayer* for punitive damages now. *See Levin v. AT&T Mobility, LLC*, No. 21 C 2641, 2022 WL 159673, at *2 (N.D. Ill. Jan. 18, 2022) (a plaintiff "may seek punitive damages at trial even without demanding them in his complaint.") (citations omitted).

*Bilut v. Northwestern. Univ.*, 645 N.E.2d 536 (1994) (doctoral candidate not entitled to mandatory injunction concerning issuance of doctoral degree or already-rejected extension to complete dissertation) (and identifying three Illinois cases where injunctive relief *was* ordered against a university where such orders did not compel the continuance of a personal relationship). Northwestern's overly broad claim that "mandatory injunctions are prohibited in the university context" is simply incorrect. *See, e.g.*, *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 8 F. Supp. 2d 779, 791 (N.D. Ill. 1998); *Gleicher, Friberg & Assocs., M.D., S.C. v. Univ. of Health Scis.*, 586 N.E.2d 418, 425 (Ill. App. Ct. 1st Dist. 1991); *Mich. Prot. & Advocacy Serv. v. Flint Cmty. Sch.*, 146 F. Supp. 3d 897, 908 (E.D. Mich. 2015). The Court should reject Northwestern's invitation to prematurely rule on Plaintiffs' requested injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Northwestern's Motion.

Respectfully submitted,

Jane Doe, John Doe 1, John Doe 2, and John Doe 3

By: /s/ *Elizabeth A. Fegan*

Elizabeth A. Fegan
(beth@feganscott.com)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100

Jonathan D. Lindenfeld
(*Pro Hac Vice*)
(jonathan@feganscott.com)
FEGAN SCOTT LLC
305 Broadway, 7th Floor
New York, NY 10007
Ph: 332.216.2101

By:      /s/ *Steven P. Blonder*

Steven P. Blonder (sblonder@muchlaw.com)
Joanne A. Sarasin (jsarasin@muchlaw.com)
Laura A. Elkayam (lelkayam@muchlaw.com)
MUCH SHELIST, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2000

David Freydin
LAW OFFICES OF DAVID FREYDIN
8707 Skokie Blvd # 312
Skokie, IL 60077
Ph: 312.544.0365
Fax: 866.575.3765
david.freydin@freydinlaw.com

25