# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, JOHN DOE 1, JOHN DOE 2 and JOHN DOE 3, individually and on behalf of all other students similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-01425 |
| v. | ) ) ) | Honorable Judge John R. Blakey |
| NORTHWESTERN UNIVERSITY, | ) ) | |
| Defendant. | ) | |

**BRIEF OF THE NATIONAL JEWISH ADVOCACY CENTER (NJAC) AND THE**

**COALITION AGAINST ANTISEMITISM AT NORTHWESTERN (CAAN) AS**

***AMICI CURIAE* IN SUPPORT OF THE PLAINTIFFS' OPPOSITION TO**

**DEFENDANT'S MOTION TO DISMISS**

## INTEREST OF AMICI

The National Jewish Advocacy Center, Inc. (NJAC) is a nonprofit organization dedicated to combating antisemitism in all of its forms.

The Coalition Against Antisemitism at Northwestern (CAAN) is a community of thousands of Jewish and Israeli students, parents, professors, and other advocates focused on addressing antisemitism at Northwestern University.[1]

The proper resolution of this case is of critical importance to both NJAC and CAAN, as it directly involves Northwestern University's obligation to protect its Jewish and Israeli students by implementing effective measures to identify and combat unlawful antisemitism on campus.

## ARGUMENT

**Introduction**

The standard for problematic behavior that can cause University to lose federal funding under Title VI of the Civil Rights of 1964 is if the University allows conduct that is so "severe, pervasive or persistent so as to interfere with or limit the ability of the victim to participate in or benefit from an educational service, activity, opportunity or privilege."[2] As shown in the brief presented by *amici curiae*, the Court should deny Northwestern's motion to dismiss because Northwestern's actions were *clearly* unreasonable in light of all the known circumstances, as demonstrated by the ultra vires agreement that Northwestern's administrators signed.

**Part I**

---

[1] More about CAAN can be found here: Legal: https://www.yeswecaan.org/legal-action, Media: https://www.yeswecaan.org/in-the-news, and Broad partnership with other organizations: https://www.yeswecaan.org/partners.

[2] *Doe v. Galster*, 768 F.3d 611, 613–14 (7th Cir. 2014) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999))

Page | 1

In the United States, Title VI of the federal Civil Rights Act of 1964[3] requires recipients of federal funding to ensure their programs and activities are free from harassment, intimidation and discrimination on the basis of race, color and national origin. On December 11, 2019, the government announced an executive order codifying the requirement that when evaluating claims regarding unlawful antisemitic discrimination under Title VI, the Department of Education's (DOE) Office of Civil Rights (OCR) should consider the gold-standard International Holocaust Remembrance Alliance's (IHRA) definition of antisemitism that the U.S. government had already been using for many years.[4]

As a condition of receiving federal financial assistance, a school gives the DOE a written assurance that the program will be conducted in compliance with all requirements imposed by Title VI. This imposes an affirmative obligation to provide an equal opportunity for all students to study in a harassment free environment.[5]

**Part II: Antisemitism on Northwestern's Campus**

The facts in this case are largely undisputed. For months, Jewish students on Northwestern's Evanston and Chicago campuses were subjected to an ever-increasing amount of antisemitic harassment, culminating in the "encampment on Deering Meadow" which University President Schill publicly admitted was a "major antisemitic event on campus."[6] On Thursday, April 25, 2024, protestors erected an encampment on Deering Meadow at Northwestern's

---

[3] *Civil Rights Requirements: A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI")*, U.S. DEP'T OF HUMAN RESOURCES, https://www.hhs.gov/civil-rights/for-individuals/special-topics/needy-families/civil-rights-requirements/index.html#:~:text=Title%20VI%20of%20the%20Civil%20Rights%20Act%20of%201964%2C%2042,or%20other%20Federal%20financial%20assistance (last updated July 26, 2013).
[4] https://www.govinfo.gov/content/pkg/DCPD-201900859/pdf/DCPD-201900859.pdf
[5] *See* Ivan E. Bodensteiner, *Peer Harassment--Interference with an Equal Educational Opportunity in Elementary and Secondary Schools*, 79 Neb. L. Rev. 1, 24 (2000) (citing 34 C.F.R. § 100.4(a)(1999)).
[6] *See* Defendant's Motion to Dismiss, Introduction

Page | 2

Evanston campus Compl. ¶ 86 at which time they openly harassed and threatened Jewish and Israeli students, chanted genocidal slogans against Israel and the Jewish people, and inundated the campus with antisemitic and harassing posters.

As Northwestern admits in its Motion to Dismiss, rather than enforce its rules, it entered into a dialogue with the students who were breaching the university's codes of conduct and safety policies and endangering the safety of Jewish students and faculty. The discussions resulted in the so-called Agreement on Deering Meadow [7], in which, Northwestern ceded its responsibility under Title VI of the Civil Rights Act of 1964 ("Title VI") to ensure the safety of all of its students and agreed to terms that included:

- to "permit peaceful demonstrations on Deering Meadow through the end of spring quarter classes", without regard for institutional time-and-place restrictions applicable to all members of the campus community;

- to "publicly condemn the doxing of any community member", irrespective of whether that community member engaged in criminally threatening conduct otherwise prosecutable; and

- to "advise employers not to rescind job offers for students engaging in speech protected by the First Amendment", without acknowledging that much of the activities at the encampment were, in fact, not protected by the First Amendment;

- to "provide a conduit to engagement with the Investment Committee of the Board of Trustees"; to "answer questions from any internal stakeholder about specific holdings . . .within 30 days" or else "provide a reason" and "timeline", notwithstanding that such student stakeholder has no fiduciary standing with respect to such decisions; and

---

[7] https://www.northwestern.edu/leadership-notes/2024/agreement-on-deering-meadow.pdf

Page | 3

- to "support visiting Palestinian faculty and students at risk (funding two faculty per year for two years; and providing full cost of attendance for five Palestinian undergraduates …. for the duration of their undergraduate careers)," and to "fundraise to sustain this program"; and to "provide immediate temporary space" and "provide and renovate a house" for "MENA/Muslim students," despite the fact that any and all danger on campus was generated from their own activities against fellow students and faculty.[8]

Northwestern's antisemitism problem is so egregious, and the Deering Meadow Agreement is so discriminatory, that the U.S. Congress' Committee on Education and the Workforce ("Committee on Education") launched an investigation on May 10, 2024, which included an extensive document discovery and required President Schill to attend a hearing about antisemitism on May 23, 2024.[9] On June 7, 2024, in a press release accompanying a public letter Congresswoman Virginia Foxx, Chairwoman of the Committee on Education and the Workforce, noted that:

"Unfortunately, rather than being cooperative and transparent, Northwestern has obstructed the Committee's investigation of this matter. Northwestern President Michael Schill impeded the Committee during his May 23, 2024, testimony by the fact that he pointedly refused to answer questions from Committee members, made statements at odds with the public record – including statements that contradicted the text of the Agreement on Deering Meadow (the Agreement) – and demonstrated an overall attitude of contempt for the Committee. President Schill's obstructive conduct comes on top of Northwestern's ongoing failure to comply with the Committee's May 10 document request…It is inappropriate to expect taxpayers to continue

---

[8] See *id.*
[9] The May 10, 2024 letter can be found here:
https://edworkforce.house.gov/uploadedfiles/northwestern_letter_final.pdf.

Page | 4

providing federal funding while Northwestern appears to be in violation of its obligations to its Jewish students, faculty, and staff under Title VI and defies the Committee's oversight."[10] Neither the campus Jewish community nor the University Board of Trustees were consulted before the Agreement on Deering Meadow deal was signed. This outrageous capitulation to accommodate the demands of the antisemitic agitators— who openly espoused vicious antisemitism, assaulted, spat on, and stalked Jewish students, and engaged in numerous violations of Northwestern's codes and policies—encourages future misconduct and sends an unmistakable message that Jewish students are second-class citizens, whose rights simply do not matter and can be bargained away at the University's whim. The entire notion of rule enforcement regarding student safety being contingent upon collateral negotiation rather than being an *a priori* obligation arising out of the existence of the rule itself, is an abandonment of reason- *i.e*. unreasonable.

In addition, because it was entered into without the required approval of the Board of Trustees, and in contravention of Northwestern's Bylaws and University Statutes[11], the agreement is unlawful and voidable, and is therefore *prima facie* evidence that the University's approach in bargaining away the rights of Jewish students to make their own lives easier rather than doing the hard work of making sure that violators were punished and the rules were enforced- is *clearly* unreasonable.[12]

---

[10] The June 7, 2024 letter can be found here: https://edworkforce.house.gov/uploadedfiles/6.7.24_letter_to_schill_and_barris.pdf, along with the press release, which can be found here:
https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=410668

[11] Charter: https://www.northwestern.edu/about/board-of-trustees/docs/university-charter.pdf, Statues: https://www.northwestern.edu/about/board-of-trustees/docs/university-statutes_2024-05-17.pdf, and Bylaws: https://www.northwestern.edu/about/board-of-trustees/docs/bylaws_approved_2024-05-17.pdf. *See* also attached Exhibits 1 and 2.

[12] Parts of the next section have been adapted from a legal opinion letter sent by Kasowitz Benson Torres, LLP to Northwestern leadership's arguing that its actions were unlawful and urging the Board of Trustees to invalidate the agreement. The letter is available here, and incorporated by reference.

**Part III: The Unlawful Unreasonable Ultra-Vires Agreement**

    **Required Approvals**

President Schill entered into the purported Agreement on Deering Meadow apparently without even *consulting* Northwestern's Advisory Committee on Preventing Antisemitism and Hate, which was formed to "assess the climate with respect to antisemitism and other forms of hate," to "provide guidance and advice to the President and Provost to help ensure that the entire University community stands for learning, civil discourse and informed dialogue on even the most intractable conflicts, . . . without fear of harassment or intimidation," and to advise on "issues related to safety and, when relevant, make recommendations to enhance protection."[13] In response, seven members of the Committee immediately resigned, and the Committee soon disbanded.[14]

The University Bylaws require that "[a] majority of the members of the Board of Trustees shall constitute a quorum for . . . the appointment of Professors, the establishment of chairs, enactment of bylaws for the government of the University (including . . . the University Statutes), and for the election of . . . members of the . . . Investment Committee of the Board of Trustees."[15]

---

https://www.standwithus.com/post/standwithus-urges-northwestern-university-trustees-to-nullify-unlawful-agreement-giving-in-to-encamp

13 *See* Northwestern Office of the President, *Overview of Committee Charge*, Northwestern University, https://www.northwestern.edu/president/about-the-office/special-projects/committee-preventing-antisemitismhate/advisory-committee-charter.html.

14 Jacob Wendler, *Seven members of Advisory Committee on Preventing Antisemitism and Hate step down*, THE DAILY NORTHWESTERN (May 1, 2024), https://dailynorthwestern.com/2024/05/01/campus/deering-encampment/breaking-seven-members-of-advisory-committee-on-preventing-antisemitism-and-hate-step-down/; *University statement on the status of the Committee*, Northwestern University (May 10, 2024), https://www.northwestern.edu/president/about-the-office/special-projects/committee-preventing-antisemitismhate/news/status-of-committee.html.

[15] Bylaws Art. II § 4.

Given that the Agreement purports to introduce governance changes involving the Investment Committee of the Board of Trustees by "re-establishing the Advisory Committee on Investment Responsibility" with "representation from student, faculty, and staff," and requiring disclosures "within 30 days" to "any internal stakeholder" in response to questions about specific holdings by the University,[16] Chair Peter Barris should have been required to assemble a meeting that included a quorum of the majority of the Board to vote on such changes. Otherwise, the stipulations agreed to by President Schill are beyond the scope of this authority. A quorum was also required because the Agreement purports to commit Northwestern to appoint professors or establish chairs for two visiting Palestinian faculty "per year for two years," and to "fundraise to sustain this program."[17]

**Endowment Investment Input**

Among Northwestern's most pernicious concessions to the agitators who threatened the physical safety of Jewish Northwestern students is its agreement to allow students to provide input with respect to university investments. The Agreement on Deering Meadow states that Northwestern commits:

- To provide a conduit to engagement with the Investment Committee of the Board of Trustees, the University is re-establishing the Advisory Committee on Investment Responsibility (ACIR) this fall. It will include representation from students, faculty, and staff.

- Northwestern will answer questions from any internal stakeholder about specific holdings, held currently or within the last quarter, to the best of its knowledge and to the extent legally possible. Northwestern will do so within 30 days, or, if unable to respond within 30 days, will provide a reason and a realistic timeline.[18]

---

16 *See supra* n.1.
17 *See supra* n.1.
[18] https://www.northwestern.edu/leadership-notes/2024/agreement-on-deering-meadow.pdf § 2.

Page | 7

Northwestern's Bylaws and University Statutes are clear that preapproval by the Board of Trustees and/or consultation with relevant committees is required before University officials can bind the school to any significant financial undertaking or other obligation. The Bylaws and Statutes state as follows:

- "No contract, agreement, promise . . . or undertaking in the name of Northwestern University, shall be made by any of its officers . . . or by any student . . . unless the same shall have been first authorized by the Board of Trustees of the University, or . . . authority approved in accordance with the Bylaws." University Statutes, Art. VII § 2.

- "No agent or officer of the University shall have authority to expend any money or make any contract involving the payment of money unless the same be first approved in accordance with procedures authorized by the Board of Trustees." Bylaws, Art. V.

- Operating and capital budgets of Northwestern University must be approved by the Board of Trustees. Bylaws, Art. IV § 2(a)(6).

- Any changes to the approved annual operating budget or the approved annual capital budget are further subject to the approval of the Committee of Finance, and changes to the approved annual capital budget must also be made in consultation with the Committee on Educational Properties. *See id.*

Note that these requirements are *not* subject to waiver and that is it is not within the discretion of any administrator to bypass these rules when he or she feels overwhelmed by events. This clearly unreasonable response was made more egregious by the University's attempts to obfuscate its wrongdoing, including President Schill's blatantly false testimony that "we did not

Page | 8

give in to any of the protestors' demands"[19]—testimony that cannot be reconciled with the text of the Agreement, which includes no fewer than nine specific commitments made to the agitators who occupied the campus.[20]

The unlawful Deering Meadow Agreement fails to condition any of its substantial new financial expenditure commitments on the approval of the Committee of Finance, including the purported commitment to fund two visiting Palestinian faculty "per year for two years," to provide the "full cost of attendance for five Palestinian undergraduates to attend Northwestern for the duration of their undergraduate careers," and to "fundraise to sustain this program beyond this current commitment." The Agreement also commits Northwestern to "provide immediate temporary space" and to "provide and renovate a house for MENA/Muslim students . . . as soon as practicably possible." There is also no indication that the Committee on Educational Properties was consulted prior to this Agreement.

Without the Trustees' advance authorization or approval, these changes to the operating and capital budgets were not proper, and all of these concessions made in the name of the University to the leaders of the encampment were ultra vires acts.

**Fiduciary Duties**

Without the Trustees' advance authorization or approval pursuant to the provisions in the Bylaws, all of these concessions made in the name of the University to the leaders of the encampment were in breach of school governance policy, fiduciary obligations, Title VI, and commonly accepted notions of justice, fairness, and logic. President Schill's commitment to the inclusion of radical agenda-driven students and faculty in University investment decisions is not

---

[19] https://www.cbsnews.com/chicago/news/northwestern-universitys-president-to-testify-before-congress-about-antisemitism-on-college-campuses/
[20] *Id.*

Page | 9

only a material departure from standard endowment-management practice, but a subordination of the interests of University donors and the University's best interests by its President to the capricious emotions of several hundred rioters who represent no one but themselves and certainly not the thousands of students and faculty who did *not* authorize such input.

Charitable trusts and endowment managers are trustees whose fiduciary duties are legally enforceable and endowments themselves are intended to keep tuition as affordable as possible and make capital improvements necessary for the university to fulfill its academic mission. "Thus, the goal of endowment management is to generate as much income as possible for the support of the school's mission…To preserve the atmosphere of neutrality, inclusiveness, and tolerance considered integral to educational environments, the duty of loyalty prohibits politically motivated investment decisions."[21]

Endowments are governed by independent boards of directors and subject to governing bylaws as well as to the norms and standards of fiduciary responsibilities. The input of parties acknowledged to be subject to a competing agenda is improper, and, in the case of Northwestern, not within the President's discretion to solicit. Unilateral actions taken by unauthorized entities whose authority may be apparent, but not in fact actual, are entirely ultra vires. When such actions are intended to secure adherence to already-incumbent standards of law and conduct, they are an abuse of position and a fraud on the donors who fund the endowments and the students and faculty who benefit from them.

In other contexts, such as climate change, private university student associations concerned about climate issues were found to have no special standing to bring action seeking injunction

---

[21] Laura E. Deeks, Discourse and Duty: University Endowments, Fiduciary Law, and the Cultural Politics of Fossil Fuel Divestment, 47 Envtl. L. 341 (2017).

Page | 10

requiring university to divest university's endowment of investments. The rationale is simple for two reasons.

Firstly, students have no as-of-right say in the management or administration of university's endowment that is individual to them or otherwise separable from the prescriptive fiduciary duties incumbent upon those independent directors tasked with ensuring the economic viability of the endowment. Secondly, universities strive to be places where students and faculty can openly exchange ideas without fear of institutional repression or intimidation. Once the endowment starts making decisions favoring one social or political group or idea over another, it risks creating an appearance of bias that jeopardizes the mission of the school.[22]

By law, a trustee must act in the "sole interests" of the beneficiaries, and other fiduciaries. The directors of a nonprofit corporation, for example, must act in the "best interests" of the beneficiaries. The duty of loyalty requires that the fiduciary not consider their personal interests in making decisions for the beneficiaries, but rather have "undivided loyalty" and consider only the interests of the beneficiaries.[23]

An agreement purportedly to ensure campus safety which so obviously further compromises such safety by rewarding dangerous behavior can never be reasonable, particularly where its design flouts campus safety rules and negotiates the impunity of breaking such rules, all while committing a non-profit to violate its own internal procedures and fiduciary duties. Accordingly, applying the reasonable standard adduced by Northwestern from the StandWithUs case, i.e. that liability under Title VI requires the conclusion that Northwestern reacted to the

---

[22] Susan N. Gary, Best Interests in the Long Term: Fiduciary Duties and ESG Integration, 90 U. COLO. L. REV. 785 (2019), citing Derek Bok, Statement of Derek Bok on Investment Policy, Harv. Gazette, Oct. 5, 1984, reprinted in Disinvestment: Is it Legal? Is it Moral? Is it Productive?: An Analysis of Politicizing Investment Decisions 99, 100-01 (1985).
[23] *Id*.

encampment in a "clearly unreasonable manner", the promised involvement of a select group of rule-breaking students with no authority to represent other students in the fiscal decisions of the school endowment is itself clearly unreasonable. This is particularly true where, as here, the capitulation to a mob implicates the unauthorized inclusion of non-fiduciaries in determining the university's investment decisions, upon the order of a President who had no authority to agree to such a servile accommodation. The fact that this concession was awarded in lieu of the school upholding its own Bylaws and University Statutes only serves to highlight the unreasonableness of Northwestern's response to the encampment when adjudged against the interests of the university, not to mention the faculty and the students as a whole, in maintaining a safe environment. Codes of conduct protect people when they are consistently enforced, not selectively invoked to the detriment of students who demonstrably require that protection.

**Part IV: The Agreement on Deering Meadow Implicates a Commitment to Violate the Anti-BDS Laws of Several States**

Northwestern's legally invalid and morally bereft commitment to provide a means of input and participation to SJP, an infamously antisemitic organization advocating for the rights of foreign terrorist organizations to murder, kidnap and rape Israeli civilians,[24] is a new low for institutional governance. Not only does it endanger Northwestern students and faculty while breaching Northwestern's fiduciary duties to its donors and stakeholders, it places Northwestern in the crosshairs of state anti-BDS laws (*see, e.g.*, 40 ILCS 5/1-110.16) further harming Northwestern's ability to finance operations and transact with the state. Indeed, law professors at Harvard Law School and Boston University School of Law recently warned that divestment will

---

[24] https://dw-wp-production.imgix.net/2023/10/DAY-OF-RESISTANCE-TOOLKIT.pdf

Page | 12

"immediately trigger state anti-BDS laws, which could prohibit these states from buying debt issued by an Israel-boycotting university or buying services from it."[25]

Endangering students, rewarding criminality, compromising the independence of endowment trustees, allowing for the input of agenda-driven entities in school investment decisions, and materially committing to spending on behalf of entities that do not adhere to university safety rules, is not reasonable.

**Part V: Northwestern Is Wrong About Its Obligations Under the Law**

The University argues that Plaintiffs have failed to state a claim for direct discrimination because the two "comparators" identified in the Complaint are too dissimilar to draw a meaningful comparison. Despite the fact that there is no such clear standard, this claim is belied by the fact that President Schill essentially admitted (by refusing to answer the question) that if the same situation had happened to a different minority group he *would* indeed have handled it differently.[26]

The University also misstates and misapplies the standard in Title VI, claiming that the encampment did not last long enough for the antisemitic harassment involved to be considered pervasive.[27] The standard, however, is *not* as Defendants wish, conduct that is 'severe *and* pervasive' (although in reality the antisemitic conduct here was both) but rather 'severe *or* pervasive' enough to interfere with the victims' ability to benefit from relevant activities.[28] There

---

[25] Jesse M. Fried and David H. Webber, Colleges Divesting From Israel Face a Ben & Jerry's Meltdown, NEWSWEEK (May 13, 2024 1:37 PM) https://www.newsweek.com/kids-have-no-idea-what-theyre-talking-about-israel-opinion-1900025.
[26] https://owens.house.gov/posts/owens-grills-northwestern-president-over-financial-ties-to-terrorist-harboring-qatar
[27] Defendants, for example, ask the Court to ignore Plaintiffs' allegations regarding Northwestern's Qatar satellite campus, despite the fact that its existence contributes to a general pervasive feeling that Northwestern cares more about money than its Jewish students.
[28] https://www.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf

Page | 13

is no doubt that the antisemitic activity was severe, again, as Defendants' have themselves admitted.[29]

In citing to the recent decision in *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 2024 WL 3596916, at *4 (D. Mass. July 30, 2024), Defendants have hoisted themselves on their own petard. There can be no greater demonstration of a school "affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires" than their signing an ultra-vires agreement with wrongdoers to not only absolve them of any accountability but also reward their efforts!

Defendants are absolutely wrong that "the terms of the agreement are beside the point"[30], and they are wrong that "the touchstone is not by what means the University removes the hostile environment: rather, it is *that* the University removes the hostile environment." They must do so in a lawful way that does not cause *more* discrimination or reward those who discriminate.

Having admitted that there was a serious antisemitic incident on campus, it is also impossible to argue that the same officials did not have 'actual knowledge' of the antisemitic harassment that was happening.

## CONCLUSION

For the above reasons, the motion for dismiss should be denied.

Respectfully submitted,

---

[29] https://edworkforce.house.gov/uploadedfiles/schill_testimony.pdf
[30] *See* Defendant's Motion to Dismiss, Introduction

Page | 14

| | |
|---|---|
| Dated: September 24, 2024 | /s/ Stephanie Scharf |
| | |
| Mark Goldfeder | Stephanie Scharf |
| Bencion Schlager | Theodore Banks |
| NATIONAL JEWISH ADVOCACY CENTER | SCHARF BANKS MARMOR LLC |
| 666 Harless Place | 30 W. Hubbard Street, Suite 500 |
| West Hempstead, NY 11552 | Chicago, IL 60654 |
| Tel: (917) 301-8746 | Tel: (312) 897-1483 |
| mark@jewishadvocacycenter.org | sscharf@scharfbanks.com |
| ben@jewishadvocacycenter.org | tbanks@scharfbanks.com |
| | *Counsel for Amici Curiae* |