UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JANE DOE, JOHN DOE 1, JOHN DOE 2, and JOHN DOE 3, individually and on behalf of all other students similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>NORTHWESTERN UNIVERSITY,<br><br>       Defendant. | Case. No. 1:24-cv-04125-JRB-JC<br><br>Honorable John Robert Blakey |

**NORTHWESTERN'S REPLY BRIEF
IN SUPPORT OF ITS MOTION TO DISMISS**

**INTRODUCTION**

  The fundamental question at this stage of this case is whether Plaintiffs have alleged facts sufficient to support a conclusion that Northwestern University ("Northwestern") acted clearly unreasonably when it resolved the encampment on Deering Meadow through a negotiated non-violent resolution within four days of its inception and, further, its response caused Plaintiffs to be subjected to actionable harassment. The Supreme Court has made clear that a court can resolve this test of reasonableness on a motion to dismiss. Resolving this question on the pleadings is particularly appropriate here because there is no dispute as to the key operative facts: the Complaint accurately describes the duration of the encampment, Northwestern's consistent efforts to disband it, and the agreement Northwestern ultimately negotiated to bring the protest to a halt.

  Plaintiffs' response brief makes clear that they would have preferred a more confrontational and punitive response. But the Supreme Court and Seventh Circuit have held that

schools have discretion in deciding how to respond to peer harassment so long as their actions are not deliberately indifferent to known unlawful harassment. What is more, Plaintiffs' preferred approach did not work. The protestors did not respond to threats of discipline in the first days of the encampment, and Northwestern quickly shifted its focus to seeking a negotiated resolution in order to more swiftly resolve the disruption and avoid violence. This approach enabled Northwestern to resolve the encampment more quickly than other universities grappling with similar protests. This includes MIT, which took three weeks to disband its encampment through a mix of negotiated discussions and discipline. The District of Massachusetts nevertheless found that MIT's efforts over those three weeks were reasonable because the school acted with a "consistent sense of purpose in returning civil order and discourse to its campus."

Plaintiffs' response brief is also particularly fixated on the terms of the agreement between the protestors and Northwestern. Plaintiffs argue that this agreement "rewarded" the protestors and encouraged further discrimination. Plaintiffs, however, never explain how the terms of the agreement support the inference of a Title VI violation or breach of contract as to any of them individually. Nor do Plaintiffs identify any further discrimination incited by the agreement. In sum, the agreement performed its intended purpose: it peacefully resolved an intractable situation and quickly returned campus life to normal.

The Complaint should be dismissed for additional reasons. Plaintiffs have failed to adequately allege the elements of direct discrimination or deliberate indifference under Title VI. Plaintiffs likewise fail to state a claim for breach of contract, especially in light of the express and conspicuous contract disclaimer at the front of Northwestern's Student Handbook. In addition, although Plaintiffs' response brief narrows the number of provisions at issue, they still fail to identify any enforceable promise by Northwestern. And Plaintiffs cannot premise their breach of

2

contract claim on Northwestern's Title IX policy because it is already required to comply with Title IX.

Finally, the relief requested in the Complaint is overbroad. Plaintiffs cannot seek injunctive relief because they do not allege future harm that is "certainly impending." The Court should also strike the mandatory components of the proposed injunction, which seek to force Northwestern to take certain affirmative acts, such as investigating and disciplining students and professors. Forcing Northwestern to take those actions would violate Illinois law relating to personal service contracts and turn this Court into a school disciplinarian. The Court should also strike Plaintiffs' request for punitive damages because they are not recoverable in Title VI and breach of contract cases.

## ARGUMENT

**I. Because Northwestern Quickly And Peacefully Ended The Encampment, The Complaint Fails To Allege A Plausible Claim For Relief Under Rule 12(b)(6).**

The Supreme Court has made clear that a court can determine whether a school's response to discrimination was "clearly unreasonable" on the pleadings. Mot. at 9-10 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999)). As explained in Northwestern's opening brief, Northwestern's negotiated resolution of the encampment was not "clearly unreasonable," especially when compared to other protests which lingered for weeks. *Id.* at 7-10. Plaintiffs respond with two arguments, neither of which is persuasive.

**A. Northwestern Was Not Obligated to Respond to the Encampment with Force and Violence.**

Plaintiffs first argue that Northwestern's response to the encampment did not sufficiently punish or discipline the protestors. Resp. at 4. But Plaintiffs ignore that Northwestern *did* threaten discipline. Compl. ¶¶ 107-09. That approach *did not* work. *Id.* When the threats of discipline proved unsuccessful, Northwestern shifted to focusing on a negotiated resolution. *Id.* ¶¶ 114-16.

3

Those negotiations promptly and peacefully ended the encampment. *Id.*

Although Plaintiffs may have preferred a more confrontational approach, Northwestern was not required to use Plaintiffs' preferred method to resolve the encampment, especially since it was less effective. That is because "[s]chool officials are given broad latitude to resolve peer harassment." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) (citing *Davis*, 526 U.S. at 643). "[A] school []'s response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F. 4th 536, 543 (7th Cir. 2022). In fact, the "response does not have to be perfect or even successful." *Id.*

In pushing for a more confrontational response, Plaintiffs distort the recent *MIT* and *Harvard* decisions by suggesting the court only found in MIT's favor because it employed "punitive" disciplinary measures. Resp. at 4. That is wrong. MIT, like Northwestern, first attempted to negotiate a resolution and only turned to a more confrontational approach when those efforts proved "futile." *See StandWithUs Ctr. for Legal Just. v. Massachusetts Inst. of Tech.*, No. CV 24-10577-RGS, 2024 WL 3596916, at *5 (D. Mass. July 30, 2024).

The *MIT* court found that the school's varied efforts over three weeks reflected a "consistent sense of purpose in returning civil order and discourse to its campus." *Kestenbaum v. President & Fellows of Harvard Coll.*, No. CV 24-10092-RGS, 2024 WL 3658793, at *7 (D. Mass. Aug. 6, 2024). The touchstone of the *MIT* decision is that the complaint demonstrated that the university acted with purpose instead of "doing nothing." *MIT*, 2024 WL 3596916 at *4. The court contrasted this with Harvard which "did not respond at all." *Harvard*, 2024 WL 3658793 at *6.

The district court's approach is in line with Seventh Circuit law, which does not dictate the *manner* of response, so long as there *is* a response. The bottom line is that Northwestern had

discretion in how it chose to respond to the encampment. Northwestern chose the more peaceful and effective method. As a result, Northwestern's actions were not "clearly unreasonable," a conclusion that this Court can readily draw from the pleadings as a matter of law.

### B. The Terms of Northwestern's Agreement with Protestors Are Irrelevant.

Plaintiffs separately argue that Northwestern's negotiated resolution improperly "rewarded" the protestors. Resp. at 4-5. But they never explain how or why the agreement violates Title VI or any implied contract at issue in this case.

Plaintiffs also argue that the agreement "encouraged" additional discrimination. Resp. at 4-5. Plaintiffs attempt to tie the agreement to a wide range of disparate events, including incidents relating to the Women's Center, the Library archive, lawn sprinkler schedules, and social media posts. *Id.* at 5. But as Plaintiffs acknowledge, all of these events occurred "before and during" the encampment. *Id.* Plaintiffs' suggestion that the agreement caused these events is therefore not plausible. In any event, none of these incidents have anything to do with the specific Plaintiffs in this case. More importantly, Plaintiffs have also not come forward with any allegations that they have suffered discrimination subsequent to, let alone as a result of, the agreement.

### II. The Complaint Fails To Adequately Allege A Title VI Claim For Additional Reasons.

### A. The Complaint Fails To Allege Intentional Discrimination.

Plaintiffs have failed to allege intentional discrimination through either the "direct" or "indirect" method. Mot. at 10-15. Plaintiffs respond by arguing that they do not have to make this showing at the pleading stage. In support of their argument, however, Plaintiffs rely solely on Title VII cases. Resp. at 8-9.

Although the Seventh Circuit has not spoken on the issue in a Title VI case, district courts in this Circuit have required a plaintiff to allege comparable discrimination at the pleading stage in Title VI cases. *See, e.g.*, *Totten v. Benedictine Univ.*, No. 20 C 6107, 2021 WL 3290926, at *10

5

(N.D. Ill. Aug. 2, 2021). Other Circuits also require plaintiffs to plead adequate comparators in Title VI cases too. *Newman v. Howard Univ. Sch. of L.*, No. 1:23-CV-0436, 2024 WL 450245, at *10 (D. D.C. Feb. 6, 2024); *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 581 (8th Cir. 2021). For example, in *Harvard*, the court rejected the plaintiffs' attempt to show direct discrimination through comparators when the plaintiffs attempted to compare Harvard's handling of the encampment to its banning of other "controversial speakers." 2024 WL 3658793 at *7. The court found that "[t]he SAC fails to adequately limn a comparator Title VI claim." *Id.* Plaintiffs likewise fail to allege an adequate comparator.

      **B.**      **The Complaint Fails To Allege Deliberate Indifference.**

Plaintiffs have also failed to adequately allege the elements of a deliberate indifference claim under Title VI. Mot. at 12-15. First, there are no allegations that any specific school official had actual knowledge of Plaintiffs' alleged discrimination. *Id.* at 12. Plaintiffs argue that knowledge of Plaintiffs' experiences is "easily inferred" since the protests at Deering Meadow were public knowledge, but this says nothing of any *specific* school official's knowledge of Plaintiffs' *specific* experiences. The knowledge requirement is important because it gives the University an opportunity to consider a particular individual's concern and respond with reasonable measures to avoid further harassment. It is therefore not surprising that the Seventh Circuit has expressly held that "constructive notice" is not enough. *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) ("*Davis* established that actual—not constructive—notice is the appropriate standard in peer-harassment cases."). In addition to conflicting with Seventh Circuit law, Plaintiffs' inferential approach stands in stark contrast to the *Harvard* case where the plaintiffs allege that the plaintiffs themselves "complained repeatedly to various Harvard offices and administrators." *Harvard*, 2024 WL 3658793 at *2.

Plaintiffs' allegations of harassment also do not satisfy the "pervasive" element of a

6

deliberate indifference claim. Mot. at 13-14. In their response brief, Plaintiffs try to group the experiences of various non-parties cited in the Complaint in order to meet that high standard. Resp. at 12. For example, Plaintiffs point to Paragraph 92 of the Complaint which alleges that unidentified Jewish students were told to "burn in hell" and "go back to Germany." *Id.* Plaintiffs also point to Paragraph 91 which alleges that an unidentified Jewish student was spat upon. *Id*. These allegations, however, were *not directed to the Plaintiffs*.

When the allegations involving non-plaintiff students are removed, Plaintiffs' allegations boil down to the following claims: they (a) witnessed someone else get attacked, (b) had derogatory comments directed at them, and/or (c) had their photo posted online in a derogatory fashion. Compl. ¶¶ 161-80. While clearly inappropriate, these allegations are not "pervasive" and do not compare to other cases where that standard was met. Mot. at 13-14.[1]

### III. Plaintiffs Fail To State A Breach Of Contract Claim Because The Handbook Contains A Prominent Disclaimer And Plaintiffs Identify No Enforceable Promises.

#### A. The Student Handbook Expressly Disclaims Any Contract.

The beginning of Northwestern's 2023-24 Student Handbook contains the following disclaimer in large font:[2]

> The provisions of this Student Handbook do not constitute a contract, expressed or implied, between any students, prospective and/or matriculated, and Northwestern University. The University reserves the right to change any of the provisions, programs, rules, or regulations articulated in the Student Handbook at any time without prior notice. Specifically, the University reserves its right to change any information contained herein as part of its response to the novel coronavirus, COVID-19, or similar public health crisis at any time.

---

[1] Northwestern has also argued the Court should disregard the lengthy allegations in the Complaint that are unrelated to Plaintiffs and to the encampment in evaluating Plaintiffs' Title VI claim. Mot. at 15. Plaintiffs' allegations regarding Northwestern's Qatar satellite campus, the history of Hamas, Al-Jazeera, and other wide-ranging issues in the first half of the Complaint are simply not relevant to whether Northwestern reasonably responded to the April 2024 encampment. *Id.* Plaintiffs do not respond to this argument and therefore concede it.

[2] Available at https://www.northwestern.edu/communitystandards/student-handbook/student-handbook-documents/final-23-24-student-handbook.pdf at p. 5 (last accessed Sept. 23, 2024).

7

Where a student handbook contains such a disclaimer, courts have found that a student has no right to enforce the terms therein as a contract. *Id*. at 16-17 (citing cases). Nonetheless, Plaintiffs contend that the disclaimer is "not enforceable" for three reasons: it is not conspicuous, it is unconscionable, and it cannot overcome specific promises contained elsewhere. Resp. at 16-17.

First, the disclaimer language *is* conspicuous, contained at the beginning of the Student Handbook in the Table of Contents, set in its own paragraph, in a clear and large font. To be conspicuous, a court need only to consider "if attention can reasonably b[e] expected to be called to the term or clause." *R.O.W. Window Co. v. Allmetal, Inc.*, 367 Ill. App. 3d 749, 753 (3d Dist. 2006). The only case upon which Plaintiffs rely—*Bell Fuels, Inc. v. Lockheed Electronics, Co.*, 130 Ill. App. 3d 940 (1st Dist. 1985)—does not support their argument. That case considered a warranty disclaimer under the UCC. *Id.* at 946. And that court found that the disclaimer, set apart in its own paragraph, was adequately conspicuous. *Id.* Even if the UCC was applicable, the disclaimer here was set apart in its own paragraph, is conspicuous, and is, therefore, enforceable.

Nor is the disclaimer unconscionable. Once again, Plaintiffs rely on a single inapposite case to support their argument to the contrary. That case, *Ahern v. Knecht*, 202 Ill. App. 3d 709 (2d Dist. 1990), found that it was unconscionable for defendant to charge plaintiff $762 to repair an air conditioner without actually repairing it. In other words, *Ahern* stands for the unremarkable position that requiring payment without providing a service is a "grossly disparate exchange of values." *Id.* at 717. Plaintiffs make no analogous allegations about the terms of the Handbook.

Finally, Plaintiffs assert that the "Handbook contained specific promises" that "overcome Northwestern's disclaimer." Resp. at 17. Yet again, the cases upon which Plaintiffs rely do not support their argument. In *Troia v. North Cent. Coll.*, No. 20-cv-05229, 2023 WL 6065346 (N.D. Ill. Sept. 18, 2023), the handbook did not expressly disclaim a contractual relationship. Instead, it

8

stated only that the college reserved "the right to alter any program . . . without notice." *Id.* at *5 n.5. And *Perman v. ArcVentures, Inc.*, 196 Ill. App. 3d 758 (1st Dist. 1990), found that an employer was required to (and did) follow the specific procedures set forth in the employee handbook before terminating an employee notwithstanding a disclaimer. *Id.* at 765-66.

### B. Plaintiffs Have Not Identified Any Specific And Enforceable Promises.

Even if the disclaimer did not preclude Plaintiffs' breach of contract claim, that claim still fails as Plaintiffs have alleged no specific promises Northwestern allegedly failed to uphold. Mot. at 18. As Plaintiffs acknowledge, only specific promises contained in a university's catalogues, bulletins, and student handbooks can even potentially "constitute the terms of the contract." *Ghayoori v. Killen*, No. 23-cv-2116, 2024 WL 3402529, *4 (C.D. Ill. July 12, 2024); *see also Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 537 (7th Cir. 2023). Importantly, "general statements of policy or broad pronouncements of a University's compliance with existing anti-discrimination laws, promising equitable treatment of all students cannot provide the basis for a breach of contract claim." *Rolph v. Hobart & William Smith Coll.*, 271 F. Supp. 3d 386, 406 (W.D.N.Y. 2017) (cleaned up) (citation omitted); *see also Harris v. Adler Sch. of Prof'l Psychology*, 309 Ill. App. 3d 856, 861 (1st Dist. 1999). That is, in part, because statements of "intention, hope, or desire" are not enforceable. *Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058, 1064 (N.D. Ill. 2021).

Plaintiffs give short shrift to this requirement, citing a sum total of four paragraphs from their 230-paragraph Complaint, as the so-called "specific" promises Northwestern made:[3]

---

[3] Plaintiffs separately argue that they have alleged a breach of the duty of "good faith and fair dealing," which is sufficient to sustain their breach of contract claim. Resp. at 18 n.14. Plaintiffs contend that Northwestern waived any argument to the contrary. *Id.* Northwestern did no such thing: the duty of "good faith and fair dealing" is hardly a specific promise found in any alleged contractual documents and thus is squarely addressed by Northwestern's Motion to Dismiss. At any rate, Illinois law does not recognize a claim for breach of the duty of good faith and fair dealing. *Harris*, 309 Ill. App. 3d at 860 ("We agree that there is not a cause of action for breach of an implied provision of good faith in Illinois.").

9

- Paragraph 68: "The stated overarching policy of the plan is that 'Northwestern University does not tolerate acts or threats of violence committed by or against employees, faculty, students, visitors, or other third parties on University owned, controlled, or leased properties or in connection with University events or programs.'" Compl. ¶ 68.

- Paragraph 70: "Northwestern's Plan promises that 'a community member who has violated this policy is subject to disciplinary action…'" *Id.* ¶ 70.

- Paragraph 215: "Remaining a member of the Northwestern community requires a student to continuously comply with policies governing students' academic progress, social interactions, and personal behavior. As stated in one of the policies below, 'Student status at Northwestern is a privilege earned by meeting standards of academic performance and adherence to policies governing conduct." *Id.* ¶ 215.

- Paragraph 220: "In its policy on 'Civility, Mutual Respect, and Unacceptability of Violence on Campus,' Northwestern indicates that it prohibits 'demeaning, intimidating, threatening, or violent behaviors that affect the ability to learn, work, or live in the University environment.' 'These behaviors,' Northwestern [allegedly] promises, 'have no place in the academic community.' Northwestern [allegedly] promises that 'a community member who has violated this policy is subject to disciplinary action.'" *Id.* ¶ 220.

Notwithstanding Plaintiffs' attempts to narrow their allegations, the few remaining provisions are nothing more than vague, aspirational statements lacking specificity. *Harris* is dispositive. In that case, plaintiffs alleged that they were students in defendant's doctoral program and alleged a breach of contract based on the school's catalogue, which stated that the school did not discriminate on the basis of race and that all of its "educational programs, activities, and services offered to students" were administered on a non-discriminatory basis. 309 Ill. App. 3d at 858, 861. The Illinois Appellate Court upheld dismissal of the complaint, finding that the statement of general non-discriminatory policy was not actionable as a specific contractual promise. *Id.* at 861-63; *see also Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 420 (N.D.N.Y. 2019) (dismissing breach of contract claim premised on "general statements of policy").

Finally, to the extent that Plaintiffs are alleging Northwestern was contractually obligated to discipline *every* incident that arguably falls within prohibited student conduct, Plaintiffs have to

10

establish that the failure to take such actions was arbitrary, capricious, or in bad faith. *See Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 858 (7th Cir. 2019). On this issue, *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345 (S.D. N.Y. 2017), is instructive. There, plaintiff, a Columbia student, had been accused of rape by another student. *Id*. at 351. Plaintiff was found not responsible for the rape after an investigation by the university. *Id.*

Plaintiff contended that Columbia breached its contract with him by "failing to take disciplinary action" against the reporting student for publicizing the alleged rape and her other activism. *Id.* at 373. In dismissing his breach of contract claim, the court held:

> Columbia's 2013 and 2014 Gender-Based Misconduct Policies for Students state that Columbia is "committed to providing an environment free from gender-based discrimination and harassment." This is precisely the type of general policy statement that cannot form the basis for a breach of contract action…
>
> To the extent that [Plaintiff's] breach of contract claim may rely on Columbia's response to his complaint of gender-based misconduct against [the reporting student], it is foreclosed by the fact that Columbia's policy does not promise students who believe they have been the victim of gender-based misconduct any specific outcome. Instead, the University "provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress."

*Id.* at 373-75 (internal citations omitted); *see also Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 194 (D. R.I. 2016) (university's failure to enforce its alcohol policy against another student was not actionable).

Here, too, Plaintiffs cannot identify any promise by Northwestern that it must take disciplinary action against any student, let alone a promise of a specific outcome should it do so.[4] Absent such a specific promise, Plaintiffs' breach of contract claim fails.

---

[4] Indeed, Plaintiffs concede that Northwestern has "wide discretion" as to "what extent it punishes community members" in disciplinary proceedings under Title VI and Title IX. Resp. at 18.

11

### C. Northwestern's Title IX Policy Is Not Actionable.

Plaintiffs' argument that they can enforce Northwestern's Title IX policy through a breach of contract action is wrong. *See* Resp. at 18. Plaintiffs attempt to distinguish *Harris* and *Doe* by claiming "the alleged promises in those cases were nothing more than bare statements that the defendant would comply with applicable laws." Resp. at 19. Even a cursory review of these cases demonstrates the incorrectness of this statement. *See Harris*, 309 Ill. App. 3d at 861 (quoting the school's non-discrimination policy); *Doe v. McHenry Cnty. Coll.*, No. 17-cv-4247, 2020 WL 5209834, *5 (N.D. Ill. Sept. 1, 2020) (same). The law already prohibits discrimination. Accordingly, Northwestern's agreement to "prohibit harassment and discrimination" does not provide an independent contractual obligation enforceable by Plaintiffs.[5]

## IV. The Court Should Strike Plaintiffs' Requests For Injunctive And Punitive Relief.

### A. The Court Should Dismiss Plaintiffs' Request For Injunctive Relief.

#### 1. The Court Should Dismiss Plaintiffs' Request for Injunctive Relief Under Rule 12(b)(1) for Lack of Standing.

The Court should dismiss Plaintiffs' sweeping request for injunctive relief for multiple reasons. First, Plaintiffs do not have a "personal stake" in the requested relief because their allegations are rooted in conduct suffered by others. Mot. at 20. In addition, Plaintiffs do not adequately allege that they face a "real and immediate" threat of future injury. *Id*. at 20-22.

Plaintiffs respond to the personal stake argument by pointing to "second-hand harassment" cases in the employment discrimination context. Resp. at 19-20. Even if this were an employment

---

[5] Plaintiffs cite *Sweet v. BJC Health Sys.*, No. 3:20-cv-00947-NJR, 2021 WL 2661569 (S.D. Ill. June 29, 2021). That case found only that plaintiffs could proceed on a breach of contract theory where their contract with defendant provided broader data security protections than federal law. *Id*. at *8. The same is true of *Dinerstein v. Google, LLC*, 484 F. Supp. 3d 561, 589-90 (N.D. Ill. 2020). Neither of these cases even addresses Title IX or Title VI, let alone stands for the proposition that a student can enforce a university's agreement to comply with Title IX as a contractual promise.

case, second-hand harassment alone is not enough. *Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 758 (7th Cir. 1998) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.") (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997)); *Ammons v. Dart*, No. 16-CV-7770, 2018 WL 2096372, at *4 (N.D. Ill. May 7, 2018) ("secondhand harassment" has "a lesser impact than direct harassment"); *Rosario v. Aunt Martha's Youth Serv. Ctr.*, No. 16-CV-05648, 2017 WL 4882365, at *4 (N.D. Ill. Oct. 30, 2017) (same). Accordingly, Plaintiffs' argument that they have standing to seek injunctive relief simply because "they were *aware* of the ubiquitous antisemitic incidents" is incorrect. Resp. at 20 (emphasis added).

As to Northwestern's argument that Plaintiffs do not face a "real and immediate threat" of future injury, Plaintiffs argue that they have made that showing in light of "Northwestern's yearslong track record of accommodating anti-Jewish discrimination and harassment." Resp. at 21. But the handful of pre-encampment allegations do not come close to showing that future discrimination is "certainly impending," least of all that it is "certainly impending" as to **them**. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Chavez v. Ill. State Police*, No. 94 C 5307, 1999 WL 592187, at *17 (N.D. Ill. Aug. 2, 1999).

None of the pre-encampment allegations approach the level of a Title VI violation or breach of contract, and, as usual, do not relate to Plaintiffs. Plaintiffs first cite to social media posts made by Northwestern employees and professors. Compl. ¶¶ 43-47, 55. Plaintiffs then describe certain activities by the Northwestern chapter of the Students for Justice in Palestine, including inviting alleged controversial speakers to speak at the university, protesting at football games, and posting signs on campus. *Id.* ¶¶ 137-45. But activities that are not themselves unlawful cannot serve as

13

proof that Northwestern will inevitably violate the law (or any contract) in the future.[6]

### 2. The Court Should Strike the Mandatory Injunction Components of Plaintiffs' Requested Injunction.

Northwestern has also argued that the Court cannot award a mandatory injunction because education contracts are considered agreements for personal services in Illinois, and courts are loathe to force the parties to take specific action, especially since courts are "ill equipped to run private colleges and universities." Mot. at 22 (quoting *Bilut v. Northwestern Univ.*, 269 Ill. App. 3d 125 (1st Dist. 1994)). Plaintiffs do not address this line of cases.

Plaintiffs instead cite three inapposite cases. One of them is a case under Michigan law. *Michigan Protection & Advocacy Servs. v. Flint Cmty. Sch.*, 146 F. Supp. 3d 897, 908 (E.D. Mich. 2015). Another does not address the Illinois personal service doctrine. *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 8 F. Supp. 2d 779, 791 (N.D. Ill. 1998). The only case Plaintiffs cite that did address the doctrine is *Gleicher, Friberg & Assocs., M.D., S.C. v. Univ. of Health Sci.*, 224 Ill. App. 3d 77 (1st Dist. 1991). In that case, the court found that the doctrine was not a concern because the University did not actually have to employ the plaintiff who just wanted to avoid a gap in his resume. *Id.* at 88.

In contrast to the hollow injunctive relief sought in *Gleicher*, Plaintiffs here seek far-ranging mandatory injunctive relief. Plaintiffs seek an order requiring Northwestern to investigate and discipline all instances of antisemitism from 2023–2024. Even further, Plaintiffs seek an order requiring Northwestern to conduct antisemitism training and ask the Court to appoint a neutral monitor to oversee compliance with the Court's order. The requested relief would require this Court to become embroiled in the day-to-day management of Northwestern. The Court is "ill

---

[6] In addition, this is not a case where Northwestern has an unlawful policy such that future harm is inevitable. *See, e.g., Santiago v. City of Chicago*, 446 F. Supp. 3d 348, 364-65 (N.D. Ill. 2020); *Martin v. Emmanuel*, No. 19 CV 1708, 2019 WL 4034506, at *3 (N.D. Ill. Aug. 27, 2019).

14

equipped" to monitor Northwestern in this way. *Bilut*, 269 Ill. App. 3d at 134.

### B. The Court Should Dismiss Plaintiffs' Request for Punitive Damages.

Punitive damages are not available under Title VI or for a breach of contract claim. Mot. at 23. Plaintiffs address this issue in a footnote, arguing that punitive damages are available in a breach of contract case alleging facts that fall within a recognized tort theory. Resp. at 24 n. 19. That may be true, but Plaintiffs do not identify what that tort would be in this case, and do not allege facts that would give rise to a traditional tort claim for a personal injury or even a business tort. Plaintiffs also argue that it is "premature" to address the availability of punitive damages now. *Id.* That is incorrect. Taking punitive damages off the table will conserve resources by narrowing the scope of discovery, damages, and trial testimony.

Dated: October 1, 2024

Respectfully submitted,

NORTHWESTERN UNIVERSITY

By: */s/ Joshua W. B. Richards*
One of its attorneys

James A. Morsch (james.morsch@saul.com)
Casey Grabenstein (casey.grabenstein.com)
Elizabeth A. Thompson (elizabeth.thompson@saul.com)
Megan Warshawsky (megan.warshawsky@saul.com)
Saul Ewing LLP
161 North Clark Street, Suite 4200
Chicago, Illinois 60601
(312) 876-7100

Joshua W.B. Richards (joshua.richards@saul.com) – *pro hac vice*
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
(215) 972-7777

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on October 1, 2024, she caused the foregoing to be filed electronically with the Clerk of the U.S. District Court, using the Court's CM/ECF system, which sent electronic notification to all parties who have appeared and are registered as CM/ECF participants in this matter.

/s/ *Elizabeth A. Thompson*