IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, JOHN DOE 1, JOHN DOE 2, and JOHN DOE 3, individually and on behalf of all other students similarly situated, | ) ) ) ) ) | Case No. 24-cv-4125 Case No. 24-cv-04831 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge John Robert Blakey |
| NORTHWESTERN UNIVERSITY, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

### I. Introduction

Plaintiffs sue Northwestern University, alleging violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. and breach of contract in connection with Northwestern's response to on-campus demonstrations and acts of antisemitism. Defendant Northwestern moved to dismiss. For the reasons explained below, the Court grants, in part, Defendant Northwestern's motion [28].

### II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint that fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all inferences in the plaintiff's favor. *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024). Courts are not, however,

"obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are not enough. *Id.* The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Esco*, 107 F.4th at 679 (citing *Twombly*, 550 U.S. at 555). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Twombly*, 550 U.S. at 556).

## III. Amended Complaint Allegations

Plaintiffs' Amended Consolidated Class Action Complaint [24] alleges the following facts.[1] The complaint stems from the horrific October 7, 2023 Hamas attack on Israel, codenamed Al Aqsa Flood, in which Hamas terrorists murdered, kidnapped, raped, and mutilated thousands of civilians. [24] ¶¶ 27, 59. In the days following that attack, several members of Northwestern's faculty in Evanston posted about the attack on social media, with one stating "resistance is justified when a people are

---

[1] The facts set forth in Plaintiffs' amended complaint, of course, are taken as true for purposes of resolving the motion to dismiss. *See Killingsworth v. HSBC Bank Nevada,* 507 F.3d 614, 618 (7th Cir. 2007).

occupied." *Id.* ¶ 60. Another professor, Steven Thrasher, said a New York Times story on sexual assault allegations relating to the October 7 attack was "widely discredited," and noted that a story by the Guardian was disturbingly "similar." *Id.* ¶ 56, n. 37. School programs like the Northwestern Women's Center and the Asian American Studies Program also made statements on social media. The Women's Center shared a brochure from the Palestinian Feminist Collective with short articles on protests and advocacy, protest chants, hashtags like #AlAqsaFlood, and website links to suggested readings about the Israeli-Palestinian conflict. *Id.* ¶¶ 57–59. The Asian American Studies Program made a statement on Islamophobia and disputed reports that Hamas had "beheaded babies." *Id.* ¶ 61. Student groups like Students for Justice in Palestine ("SJP") issued statements accusing "Zionists" of "whitewashing" and legitimizing the "genocide" of Palestinians, which several Northwestern faculty members signed onto. *Id.* ¶ 62.

Northwestern maintains a satellite campus in Qatar ("Northwestern Qatar"), through which students and faculty in Evanston and Qatar may visit the other campus in exchange programs. *Id.* ¶¶ 39–40. At Northwestern Qatar, faculty also posted on social media about the Hamas terror attack. Professor in Residence Khaled AL-Hroub called for a Third Intifada to "sweep away the occupier," while an assistant professor in residence tweeted the "chain must be broken," in reference to the Hamas incursion into Israel. *Id.* ¶¶ 49, 52. AL-Hroub also participated in a radio interview where he said he had not seen "any credible media reporting" that Hamas killed women and children on October 7th, prompting Northwestern to issue a statement

3

condemning the "attempt to minimize or misrepresent the horrific killing of Israeli civilians by Hamas." *Id.* ¶¶ 80, 81.

On April 25, 2024, student demonstrators at Northwestern's Evanston campus organized an encampment of tents, protest signs, and flags on Dearing Meadow, the campus' central lawn. *Id.* ¶ 86. Within the encampment, several individuals dressed up as members of Hamas, demanding to know whether others spoke Hebrew. *Id.* ¶ 87. Some of the signs featured blatant antisemitic imagery, like a slashed-out Star of David or a drawing of Northwestern's President Schilll—a Jewish man—with horns and blood dripping from his mouth. *Id.* ¶ 89. In and around the encampment, several demonstrators physically assaulted or shouted slurs at Jewish students. *Id.* ¶¶ 90–92, 99, 100, 102. During the encampment, participants also shouted slogans like "Intifada, Intifada, Long live the Intifada," "Globalize the Intifada," "Resistance is justified when people are occupied," and "From the river to the sea, Palestine will be free." *Id.* ¶ 94. When Jewish students attempted to document the encampment, they were physically assaulted, blocked from entering, or had phones and cameras knocked out of their possession. *Id.* ¶ 102. In a video statement to the Northwestern community, President Schill condemned such incidents of antisemitism, stating that the signs with a slashed-out Star of David or the drawing of him with horns left "no ambiguity" about their antisemitic nature. *Id.* ¶ 103.

On the first day of the encampment, Northwestern issued statements declaring the encampment was prohibited and that students who refused to remove their tents would be subject to arrest. *Id.* ¶ 107 nn.58, 59. Northwestern Police cited several

4

students who refused to remove their tents. *Id.* Despite these efforts, the encampment persisted, and demonstrators declined Northwestern's offer to "peacefully assemble" in compliance with Northwestern policies. *Id.* ¶ 108. Seeing this, Northwestern decided to "move forward with other options to protect the safety of the community." *Id.* While the encampment continued, Northwestern turned off the regularly scheduled lawn sprinklers on Dearing Meadow. *Id.* ¶ 112. Northwestern also allowed demonstrators, some not affiliated with the school, to access the Multicultural Center, normally accessible only to students. *Id.* ¶ 113.

On April 29, 2025, four days after the encampment began, Northwestern reached an "agreement" with the encampment organizers. *Id.* ¶ 114. Under the agreement, demonstrators removed their tents from Deering Meadow, while Northwestern promised to cover the undergraduate tuition of five Palestinians, and to renovate a house for Middle Eastern, North African, and Muslim students. *Id.* ¶ 115. Northwestern also condemned the doxing[2] of "any community member" and advised employers not to rescind job offers for students engaging in speech "protected by the First Amendment." *Id.* ¶ 116. Following the agreement, Northwestern SJP held an overnight sleepover on the lawn. *Id.* ¶ 118.

Two days later, on May 1, 2024, student demonstrators held a "Strike for Gaza" on Northwestern's Evanston campus. *Id.* ¶ 120. Some professors cancelled classes so students could participate, while others lectured at the demonstration. *Id.* Some

---

[2] "Doxing" involves releasing someone's personal details onto the Internet in an easily accessible form and it may be used to humiliate, intimidate, threaten, or punish the identified individual. *Elagha v. Northwestern University*, No. 24 C 12066, 2025 WL 1384291, at *2 n. 1 (N.D. Ill. May 13, 2025)

5

of the posters at the demonstration stated, "resistance is justified when people are occupied #AlAqsaFlood," and participants repeated similar messages. *Id*. During these on-campus demonstrations, Northwestern's school library asked demonstrators to "please consider saving your protest materials," inviting student demonstrators to submit materials for preservation in the University Archives. *Id*. ¶¶ 123–124.

Northwestern also maintains a Campus Violence Prevention Plan aimed at disciplining any "community member" who engages in "unacceptable behavior" like "intimidating, threatening, or violent behaviors that affect the ability to learn, work, or live in the University environment." *Id*. ¶¶ 66–69. Under the plan, community members who display material that degrades a person or group, or causes harm or fear for one's safety remains "subject to disciplinary action." *Id*. ¶¶ 69–70.

Plaintiffs sue Northwestern for discrimination under Title VI of the Civil Rights Act (Count 1), and breach of contract (Count 2). Northwestern moves to dismiss all claims for failure to state a claim under Rule 12(b)(6). *See* [28].

IV. **Analysis**

Under Title VI, no person in the United States "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI does not address religious-based discrimination, but courts recognize that "antisemitism can amount to racial discrimination, and thus form the basis for a Title VI Claim." *Canel v. Art Institute of Chicago*, No. 23 CV 17064, 2025 WL 564504, at *5 (N.D. Ill. Feb. 20, 2025)

6

(collecting cases). Here, Plaintiffs allege they experienced discrimination under Title VI because of their Jewish faith, which the Court construes as both a hostile educational environment claim and an intentional discrimination claim. Plaintiffs additionally assert a breach of contract claim, alleging Northwestern failed to follow its own policies and procedures concerning the discipline of community members engaged in discriminatory behavior (as spelled out in the school's Student Handbook, stated Title IX policy). Northwestern moves to dismiss both claims, and the Court considers each below.

### A. Title VI Hostile Environment

To plead a Title VI hostile educational environment claim, a plaintiff must allege that: (1) her or she participated in a federally funded program; (2) the alleged hostile environment was so severe, pervasive, and objectively offensive that it deprived them of access to educational benefits; (3) the school had actual knowledge of the conduct; and (4) the school was deliberately indifferent toward the conduct. *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014).

A school "can only be liable for harassment about which it has actual knowledge." *Gabrielle M. v. Park Forest-Chicago Heights, IL. School Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003). School officials have actual knowledge "only of the incidents that they witness, or those that have been reported to them." *Canel*, 2025 WL 564504, at *8 (citing *Galster*, 768 F.3d at 618). Courts, therefore, have "focused on reports or observations in the record of inappropriate behavior to determine when school officials had actual notice." *Id.* As a predicate matter, Plaintiffs must allege

7

that a school official was aware of the "severe, pervasive, and objectively offensive" harassment. *Id.* Yet in many instances here, Plaintiffs have not done so in the current complaint.

Plaintiffs allege liability and predicate their claims of loss of access to educational benefits on a variety of incidents, all relating to demonstrations in the wake of Hamas' October 7 terrorist attack. They allege a Title VI violation based upon "many other incidents on campus" which contributed to the hostility they endured. [24] ¶¶ 165, 169, 173, 179. But Plaintiffs do not plead any facts about what these "other incidents" involve; nor do they allege how these "other incidents" were reported to Northwestern officials, or that those officials otherwise had actual knowledge of such incidents. For example, John Doe 2 alleges that he was the subject of a "derogatory and harassing online post." [24] ¶ 172. Yet Plaintiffs do not allege anyone reported this post to Northwestern officials, or that Northwestern officials had actual knowledge of the post.

Likewise, John Doe 3 attributes his loss of access to educational benefits to a variety of events, including "antisemitic rhetoric" being "shouted at him," online harassment, false accusations, his observation of posters at a May 1, 2024 demonstration, and an interaction with a protestor at that demonstration where the protestor said to him, "resistance is justified when people are occupied." [24] ¶¶ 176–180. Again, however, Plaintiffs do not allege that Northwestern had actual knowledge of the antisemitic rhetoric, online harassment, or false accusations John Doe 3 faced, or knowledge of the substance of his alleged harassment. [24] ¶ 177.

8

Plaintiffs similarly do not allege that Northwestern officials had actual knowledge of the interaction between John Doe 3 and the protester at the May 1, 2024 demonstration. With no allegations that Northwestern had the requisite actual knowledge of these specific instances of harassment, Plaintiffs fail to properly allege a Title VI claim in connection with these incidents.

Across all the alleged instances of severe, pervasive, and objectively offensive conduct (that certainly deprived Plaintiffs of access to educational opportunities as alleged), there is just one—the encampment—where Plaintiffs allege facts to show school officials had actual knowledge. There, Plaintiffs' claims of deliberate indifference also lack sufficient factual detail, but for a different reason.

At the Deering Meadow encampment, numerous participants engaged in antisemitic harassment: dressing up as members of Hamas, displaying antisemitic signs, and assaulting or verbally harassing Jewish students. [24] ¶¶ 87–102. For Title VI liability to attach, however, Northwestern must have not only known about the conduct but been deliberately indifferent to it. Plaintiffs allege that Northwestern did nothing in the face of such offensive conduct and "allowed" the encampment to "clamor for five days uninterrupted." [24] ¶ 106. Plaintiffs add that Northwestern even encouraged, "accommodated," and "acquiesced to" the protesters: turning off its lawn sprinklers and awarding the protesters with "a bundle of goodies" in its negotiations to end the encampment. *Id.* ¶¶ 111–115. All of this, Plaintiffs argue, shows Northwestern was deliberately indifferent.

9

Deliberate indifference is a "stringent standard of fault." *Bd. Of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). The deliberate indifference standard "requires that the school's response not be clearly unreasonable, which is a higher standard than reasonableness." *Moore v. Freeport Cmty. Unit Sch. Dist. No. 145*, 570 F.Supp.3d 601, 607 (N.D. Ill. 2021). A school's response is sufficient "so long as it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022). A school's response does not need to be perfect or successful to clear this standard, and even a negligent response is not necessarily unreasonable under Title VI. *See Elagha*, 2025 WL 1384291, at *6 (citing *Moore*, 570 F.Supp.3d at 607). Depending upon the circumstances, a school's ultimate decision to impose no remedial measures could suffice and might not be "clearly unreasonable" or constitute deliberate indifference. *Id.*

*StandWithUs Ctr. For Legal. Just. v. Mass. Inst. Of Tech.*, 742 F.Supp.3d 133 (D. Mass. 2024), *aff'd* 2025 WL 2962665 (1st Cir. 2025), a case involving similar claims arising out of an encampment erected at the Massachusetts Institute of Technology ("MIT") just days before the encampment at Dearing Meadow, provides some guidance on the applicable standards. At MIT, Chancellor Melissa Nobles initially expressed "dismay over the encampment" and said MIT was "working to move in a constructive direction with those who are protesting." *Id.* at 139. One week later, MIT officials released a video statement saying the encampment violated MIT policy but, "in the interest of protecting free speech, MIT elected not to forcibly remove

10

the student protestors." *Id.* Two weeks after the encampment began, however, MIT's president then warned the demonstrators that if they did not take down the tents, they would face disciplinary proceedings. *Id.* Despite most students complying with the request, protests continued, leading to the suspension and arrest of several students. *Id.* On May 10, nearly three weeks after the encampment began, protesters disbanded the encampment. *Id.* In rejecting the plaintiffs' Title VI claims, the court in *StandWithUs* wrote that MIT "took steps to contain the escalating on-campus protests," with an "evolving and progressively punitive response," first by trying to "peacefully clear the encampment," then by using suspensions and arrests. *Id.* at 142. As a result, the court held, MIT's response was not "clearly unreasonable." *Id.* The court added that to fault MIT for "a failure of clairvoyance and a perhaps too measured response" would "send the unhelpful message that anything less than a faultless response" would "earn no positive recognition in the eyes of the law." *Id.* at 143.

A similar result was obtained in *Landau v. Corp. of Haverford Coll.*, 789 F.Supp.4d 401 (E.D. Pa. 2025), a case challenging Haverford College's response to a pro-Palestinian encampment. Though the sit-in at Haverford violated several campus policies, college administrators let the protest "run its course" out of fear that "worse behavior by the students would result" if they took immediate action to stop it. *Id.* at 420. Several months later, students set up an encampment, dubbed a "Liberated Zone," on the main college lawn with students erecting tents and banners and permitting entry only to those committed to the protest's objectives. *Id.* at 421.

11

Students who walked by the encampment and did not express support were shouted at and insulted. *Id.* This particular encampment and behavior lasted three days. *Id.* Once again, college administrators chose to "allow protestors to freely express themselves for three days." *Id.* Weighing Haverford's response, the court wrote that school officials "need not be perfect. They need not even be good." *Id.* Yet, the court found that, in both instances, Haverford "did not act with deliberate indifference." *Id.* Instead, Haverford officials came to the "defensible conclusion that intervention could have triggered an even larger and more disruptive backlash." *Id.* Thus, "Plaintiff's dissatisfaction" with Haverford's response did "not state a claim for violation of their civil rights." *Id.*

In contrast, at Harvard University, protestors erected an encampment which school officials "left undisturbed" for nearly three weeks before officials began negotiating a halt to the encampment. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F.Supp.3d 297, 304 (D. Mass. 2024). During the encampment, a Jewish student was approached and pushed in the presence of Harvard police officers, who failed to react. *Id.* at 309. On these facts, the court held that Harvard was deliberately indifferent in its "failure to address" what school officials "publicly recognized as an eruption of antisemitism on the Harvard campus." *Id.* at 310.

Similarly, protestors at the Cooper Union for the Advancement of Science and Art ("Cooper Union") occupied a school building, pushed past security, and intimidated Jewish students. *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F.Supp.3d 245, 276 (S.D.N.Y. 2025). Even when Cooper Union's

12

president fled the building with a security escort, the president ordered police officers to "stand down" and to not intervene when protestors "continued menacing the Jewish students." *Id.* These failures too were "clearly unreasonable" and amounted to deliberate indifference. *Id.*

As currently alleged, this case does not yet squarely fall on the Harvard University/Cooper Union side of the line: the allegations do not explain how Northwestern's conduct was clearly unreasonable or deliberately indifferent. Indeed, in the paragraphs immediately following Plaintiffs' allegations that Northwestern "allowed" the encampment to clamor "uninterrupted," Plaintiffs describe efforts by Northwestern officials to bring the encampment to an end. [24] ¶ 106. Like MIT officials, Northwestern officials also publicly denounced the encampment and told demonstrators that the encampment was prohibited. *Id.* ¶ 107. Thereafter, some protestors refused demands to remove their tents, and they received citations from Northwestern Police, *Id.* ¶ 107 n. 59; and then, after this initial approach failed to end the encampment, Northwestern explored "other options to protect the safety of the community and the continued operations of the Evanston campus." *Id.* ¶ 108. Working over the weekend, Northwestern officials negotiated the end of the encampment in four days, "a relatively short period compared to similar encampment activity on other college campuses." *Landau*, 2025 WL 1796473, at *10. Whereas MIT required three weeks to bring an end to the encampment, Northwestern ended its encampment in a few days. *StandWithUs*, 742 F.Supp.3d at 139. In contrast to officials at Harvard and Cooper Union, Northwestern officials did not leave the

13

encampment totally "undisturbed" or otherwise order law enforcement to stand down in the face of unlawful conduct. Instead, Northwestern unsuccessfully tried to discourage protesters with warnings and police citations, before negotiating for the encampment's conclusion, with a "purpose in returning civil order." *Kestenbaum*, 743 F.Supp.3d at 310.

Plaintiffs take issue with Northwestern's decision to explore "other options," and accuse Northwestern of accommodating or acquiescing to the encampment. [24] ¶¶ 109–112. But Title VI does not mandate a specific set of increasingly punitive measures to remove hostile environments, and courts "must hesitate to second guess" officials' judgments to find the appropriate response. *Landau*, 789 F.Supp.3d at 420. Just as Haverford officials came to the "defensible conclusion that intervention could have triggered an even larger and more disruptive backlash," so too did Northwestern, deciding that a negotiation would bring a quicker and more peaceful resolution. *Id.* at *10; [24] ¶ 103 n. 57 (Northwestern's President said that the school's approach "reduces the risk of escalation which we have seen at so many of our peer institutions."). In short, the legal question is not whether Northwestern "could have handled each situation better," *Landau*, 789 F.Supp.3d at 423, but rather was Northwestern "so indifferent to known acts of harassment that it caused students to undergo harassment or made them more vulnerable to it, and thereby undermined the students' education." *Id.* (citing *Davis Next Friend LaShonda D. v. Monroe Cnty.*

14

*Bd. Of Educ.*, 526 U.S. 629, 644–45 (1999)). The current complaint lacks the requisite allegation to show Northwestern's indifference.[3]

## B. Intentional Discrimination

Alternatively, Plaintiffs argue they have plausibly alleged a claim for intentional discrimination under Title VI. To state an intentional discrimination claim under Title VI, Plaintiffs must allege facts showing: "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on nationality or race." *Canel*, 2025

---

[3] In the current complaint, the Plaintiffs also lack detail regarding the concrete deprivations of access to Northwestern's educational benefits. To state a valid Title VI claim, Plaintiffs must "plead with specificity that the conduct at issue had some 'concrete, negative effect' on their education." *Landau*, 789 F.Supp.3d at 423 (citing *Davis*, 625 U.S. at 654). Courts have found concrete deprivations existed where plaintiffs alleged they "were forced to change their study habits or change schools, where they had a measurable drop in grades or increase in absenteeism, or where they developed anxiety sufficient to require intervention." *Id.* For example, in *Gartenberg*, plaintiffs alleged they suffered from "intense anxiety and panic attacks," "engaged therapists, missed and/or dropped assignments," and one student delayed completion of their degree. 765 F.Supp.3d at 278. There, the court concluded plaintiffs plausibly alleged a loss of educational benefits and opportunities. *Id.* Similarly, in *Canaan v. Carnegie Mellon University*, the plaintiff alleged that she missed numerous lectures and many hours of an 18-credit course, was denied meetings with a mentor, and avoided community events associated with her school program. 760 F.Supp.3d 306, 331 (W.D. Pa. 2024). This, too, was sufficient to show a loss of educational benefits and opportunities. *Id.* So too in *Frankel v. Regents of University of California*, where plaintiffs were blocked from entering classrooms and ultimately missed their final exams. 744 F.Supp.3d 1015, 1022 (C.D. Cal. 2024). In contrast, in *Canel*, the plaintiff alleged she was exposed to offensive banners, flyers, social media posts, and demonstrations, but never alleged how any of those acts "denied her access to" the school's "resources or opportunities." 2025 WL 564504, at *8. Given the absence of any allegation of a concrete, negative effect on plaintiff's education, "like a measurable drop in her grades or an increase in her absenteeism," the court dismissed plaintiff's Title VI claim. *Id.* citing *Gabrielle M.*, 315 F.3d at 823. In *Landau*, the court dismissed plaintiffs' Title VI claim because the plaintiffs alleged they changed their "routines" on campus and were "harassed" and "shunned" but did not allege a more concrete deprivation, like a "drop in grades, increase in absenteeism, or retention of a therapist for serious anxiety." 789 F.Supp.3d at 427. Here, among other things, Plaintiffs allege that they "heard hateful expressions when walking near the encampment," that they were subjected to verbal or online harassment, that they viewed a friend being struck by a protester, and that they generally observed unspecified "other incidents" but, again, lack details of the denials of access to Northwestern's resources or opportunities. [24] ¶¶ 163–165, 168–169, 172–173, 176–177.

15

WL 564504, at *14; *see also Doe v. Columbia College Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 657 (7th Cir. 2019)).[4] The parties agree that Northwestern receives federal financial assistance, and thus, this Court focuses its analysis on the second and third elements of Plaintiffs' claim.

A plaintiff can show discrimination, the third element of a Title VI intentional discrimination claim, directly or indirectly. *Totten v. Benedictine Univ.*, No. 20 C 6107, 2021 WL 3290926, at *9 (N.D. Ill. Aug. 2, 2021). To demonstrate discrimination under the direct method, a plaintiff must provide "direct evidence of—or sufficient circumstantial evidence to allow an inference of—intentional racial discrimination …." *Id.* (citing *Lubavitch-Chabad of Illinois, Inc. v. Nw. Univ.*, 6 F.Supp.3d 806, 816 (N.D. Ill. 2013), *aff'd*, 772 F.3d 443 (7th Cir. 2013)). Direct evidence "typically relates to the motivation of the decisionmaker responsible for the contested decision." *Id.* (quoting *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999)). To demonstrate discrimination under the indirect method, a plaintiff must allege that he or she: (1) is a member of a protected class; (2) met the school's legitimate expectations; (3) suffered an adverse action; and (4) was treated less favorably than similarly situated individuals outside of the protected class. *Id.* at *10 (citing *Lubavitch-Chabad of Illinois*, 6 F.Supp.3d at 817).

---

[4] Though *Columbia College* involved a claim brought under Title IX, the Seventh Circuit has noted that "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other." *Galster*, 768 F.3d at 617.

16

### a. Plaintiffs fail to plausibly allege discrimination through the direct method.

Plaintiffs argue they have plausibly alleged intentional discrimination under the direct method. In their response, Plaintiffs claim they have alleged discriminatory intent, through "discriminatory conduct of official Northwestern departments, and the school's lucrative partnership with Qatar and Al-Jazeera." [34] at 11; [24] ¶¶ 36–63. Plaintiffs add that Northwestern's "lucrative partnership with Qatar and Al-Jazeera" provides further "motive" for Northwestern to overlook antisemitism, and to "placate its major overseas donor and institutional partners." [34] at 11. Plaintiffs further claim, "faculty and staff at Northwestern Qatar call for violence against Jews and support Hamas, consistent with the Qatari government." [24] ¶ 43. Plaintiffs argue, then, that the "back-and-forth flow of Northwestern Qatar's faculty and students with Northwestern's Illinois campuses," combined with Northwestern's refusal to discipline "discriminatory conduct of its Northwestern Qatar faculty," "results in an unsafe campus for Jews at Northwestern." *Id.* ¶ 200. The unsafe campus ultimately leads to Plaintiffs' alleged deprivation of access to educational benefits: "a harassing campus climate that is a direct result of Northwestern's lopsided and discriminatory policy enforcement." *Id.* ¶ 204.

Plaintiffs' theory, however, does not explain how Northwestern's decision to establish a campus in Qatar demonstrates discriminatory intent on the part of Northwestern, and their arguments remain predicated upon conclusory allegations. Plaintiffs also plead no facts explaining how Northwestern is acting to "placate" Qatar, and they allege no non-conclusory facts plausibly showing a connection

17

between Northwestern's foreign partnerships and its actions toward antisemitism on its Evanston campus. At this stage, Plaintiffs must allege "adequate factual detail to lift" their claims "from mere speculative possibility to plausibility." *Schilling v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020) (citing *Iqbal*, 556 U.S. at 678). Plaintiffs have not.

The alleged connection between Qatari faculty and students and Northwestern's Evanston campus is also conclusory. Plaintiffs repeatedly complain that the relationship between Northwestern-Qatar and Northwestern-Evanston contributes to an unsafe environment for Plaintiffs in Evanston, but they plead no facts as to how. Though Plaintiffs complain that students from Qatar "participated in the major antisemitic event on campus"—the encampment—Plaintiffs' only factual support for this allegation is an image of a poster stating, "NU Qatar 4 a Free Palestine." [24] ¶ 126. By itself, this poster fails to plausibly show discriminatory harassment under Title VI. Plaintiffs complain that Qatari faculty sometimes speak at "lectures and presentations" on the Evanston campus through Northwestern's exchange program, but Plaintiffs plead no facts about any event in Evanston with a Qatari faculty member who engaged in discrimination. *Id.* ¶ 39. Plaintiffs also plead no facts showing that any of the Qatari faculty members named in the Complaint ever visited Northwestern's Evanston campus. In short, Plaintiffs' current allegations do not plausibly show how Qatari faculty and students created an unsafe environment for Plaintiffs in Evanston.

Finally, even where the complaint alleges individual Northwestern faculty and staff made offensive posts on social media, it fails to allege how those posts precluded

18

Plaintiffs from participating in, or denied them the benefits of, an educational program. Plaintiffs do not explain the details of how the social media posts "so eroded" their experience at Northwestern that they were "denied equal access to its resources or opportunities." *Canel*, 2025 WL 564504, at *8. Without any allegations that Plaintiffs even encountered the posts, or that the posts affected the programs Plaintiffs were enrolled in, the posts, without more, cannot form the basis of a Title VI claim.

> **b. Plaintiffs fail to sufficiently allege discrimination through the indirect method.**

Plaintiffs alternatively argue they have shown intentional discrimination through the indirect method: that by "enforcing its policies in one manner when it comes to Jewish students, while enforcing them in another when it comes to all other protected classes, Northwestern is engaged in discrimination prohibited by Title VI." [24] ¶ 203. This "lopsided and discriminatory policy enforcement" has caused Plaintiffs to "suffer a harassing campus climate." *Id.* ¶ 203.

Specifically, Plaintiffs alleged two comparator cases as evidence of this lopsided enforcement. First, when Northwestern responded to white supremacist stickers on campus by filing police reports, working with local authorities, and issuing a condemnation of the behavior. [24] ¶ 2. Second, when Northwestern announced its opposition to racism and police brutality in the wake of George Floyd's murder. *Id.* ¶ 3. Without more, however, these two comparators are insufficient to demonstrate discrimination under the indirect method, because Plaintiffs have not put forth "a single example of a similarly situated individual" outside their protected class that

19

"received the response" Plaintiffs sought from Northwestern upon complaining of harassment. *Elagha*, 2025 WL 3062790, at *6.

Here, Plaintiffs' reliance on the encampment also lacks the temporal connection to show that Northwestern's disciplinary decisions led to the "harassing campus climate." Plaintiffs' suggestion that Northwestern's past disciplinary decisions somehow led to the encampment is too conclusory to impose Title VI liability as alleged. Plaintiffs plead no facts establishing a plausible inference that past disciplinary decisions were a cause of the Deering Meadow encampment.

### C. Breach of Contract

Having determined that Plaintiffs' federal claim must be dismissed, the Court need not yet decide whether to exercise supplemental jurisdiction over Plaintiffs' state-law breach of contract claim. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("The usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

### V. Conclusion

Because Plaintiffs have failed to allege sufficient facts to support their claim that Northwestern violated Title VI, this Court grants, in part, Defendant's motion to dismiss [28]. If Plaintiffs can amend to cure the deficiencies, they may file an amended complaint with 45 days of the entry of this order.

Dated: March 3, 2026              Entered:

_____
John Robert Blakey
United States District Judge